FILED
2026 SEP 23 PM 12:28
CLERK
U.S. DISTRICT COURT

Greg E. Lindberg, Plaintiff, pro se
Register No. 34828-058
FCI Atlanta, P.O. Box 150160, Atlanta, GA 30315
Correspondence address: P.O. Box 159, Thonotosassa, FL 33592
Telephone: 1-919-308-9686
Email: gelindberg@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GREG E. LINDBERG,<br><br>Plaintiff,<br><br>v.<br><br>AAPC HOLDINGS, LLC, and AMERICAN ACADEMY HOLDINGS, LLC,<br><br>Defendants. | **VERIFIED COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY JUDGMENT, AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**<br><br>Case No. Case: 2:26−cv−00881<br>Assigned To : Nielson, Howard C., Jr<br>Judge ___ Assign. Date : 9/23/2026<br>Description: Lindberg v. AAPC Holdings et al |

Plaintiff Greg E. Lindberg ("Mr. Lindberg" or "Plaintiff"), appearing pro se, for his Verified Complaint against Defendants AAPC Holdings, LLC ("AAPC Holdings") and American Academy Holdings, LLC ("American Academy Holdings," and together with AAPC Holdings, "AAPC" or "Defendants"), alleges as follows upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. This is an action for breach of contract, declaratory relief under 28 U.S.C. §§ 2201–2202, and preliminary and permanent injunctive relief under Federal Rule of Civil Procedure 65. It arises from AAPC's refusal to honor binding contractual obligations owed to Mr. Lindberg — including tax-distribution obligations under an Assignment Agreement to which AAPC Holdings is an express intended third-party beneficiary and whose terms AAPC Holdings accepted and consented to, and express indemnity obligations binding on AAPC — and from the imminent risk that AAPC's assets or ownership interests will be sold, transferred, encumbered, or refinanced on

terms that would irreparably destroy Mr. Lindberg's interests before the federal courts finally adjudicate his restitution obligations, including all pending appeals.

2. By letter dated September 1, 2026, delivered to AAPC's Chairman and Board of Directors at AAPC's headquarters in Salt Lake City, Utah, on September 8, 2026, by courier and by e-mail (the "September 1 Letter"), Mr. Lindberg made a written demand requesting (a) visibility into the anticipated refinancing of AAPC's credit facility with HPS Investment Partners, including advance review of term sheets; (b) the most recent board materials reflecting AAPC's 2026 EBITDA forecast; (c) performance of AAPC's tax-distribution obligations; (d) performance of AAPC's indemnity obligations; and (e) a pragmatic settlement of accrued obligations at $100,000 per month. The letter requested a written response within seven (7) days. A true and correct copy of the September 1 Letter is attached as Exhibit A; the filings enclosed with it are annexed as Exhibits F through I.

3. The seven-day period expired on September 15, 2026. Other than causing the Special Master's counsel to transmit to Mr. Lindberg's counsel, on September 17, 2026, the 2025 Schedule K-1 package issued by AAPC Holdings to Global Growth Holdings, LLC — which confirms the allocation of AAPC Holdings' 2025 income described below but was accompanied by no distribution and by no response to any of the demands — AAPC did not respond, did not perform, and has refused each demand. This action follows.

4. This action does not stand alone. It is pleaded against the background of two related proceedings, described in Parts E and F below and annexed as exhibits: (a) the civil action Mr. Lindberg has filed in the United States District Court for the Southern District of New York under the Racketeer Influenced and Corrupt Organizations Act, Lindberg v. Causey, et al., No. 1:26-cv-07938 (S.D.N.Y.) (the "RICO Action"), which alleges that the persons who have controlled Mr. Lindberg's former operating companies since 2018 — and who, since 2025, have controlled the sale process for the assets designated for restitution, including AAPC — have systematically destroyed their value while paying themselves unapproved fees (Exhibit D); and (b) the restitution record in the Federal Proceedings, including Mr. Lindberg's Motion for a Determination That No

Restitution Is Owed (Doc. 564 / Doc. 234) and his Response to the Government's Consolidated Position (Doc. 316), which document offsets and credits exceeding $3.7 billion against a $1.655 billion preliminary restitution figure (Exhibits F–J). Mr. Lindberg does not ask this Court to decide any question pending in those proceedings; he pleads them because they explain why AAPC's refusal to honor its contracts, and the prospect of an unsupervised refinancing or sale, threaten him with harm that no later judgment can repair.

## PARTIES

5. Plaintiff Greg E. Lindberg is a natural person domiciled in Hillsborough County, Florida, and is a citizen of the State of Florida. Mr. Lindberg founded and built the enterprise of which AAPC is a part, acquiring AAPC in 2006, and holds direct and substantial economic interests in AAPC, including the beneficial ownership of the Common Units of AAPC Holdings for federal, state, and local tax purposes and the corresponding right to receive allocations and tax distributions.

6. Defendant AAPC Holdings, LLC is a North Carolina limited liability company headquartered at, and with its principal place of business at, 2233 South Presidents Drive, Suite F, Salt Lake City, Utah 84120. For purposes of personal jurisdiction and venue, AAPC Holdings resides in Salt Lake City, Utah. AAPC Holdings is the parent holding company of the AAPC business and the entity through which income and gain of the business are allocated to its unit holders for tax purposes. Its 100 Common Units are held of record by the AAPC Voting Trust under the Amended and Restated Voting Trust Agreement dated as of March 1, 2022 (the "Voting Trust Agreement"), among Ankura Trust Company, LLC, as Voting Trust Trustee, AAPC Holdings, Global Growth Holdings, LLC, Mr. Lindberg, HPS Investment Partners, LLC, as administrative agent, and Freedom 3 Capital, LLC, as second lien collateral agent. AAPC Holdings is governed by the Seventh Amended and Restated Operating Agreement of AAPC Holdings, LLC dated March 1, 2022, as amended (the "Operating Agreement").

7. Defendant American Academy Holdings, LLC is a North Carolina limited liability company headquartered at, and with its principal place of business at, 2233 South Presidents Drive, Suite F, Salt Lake City, Utah 84120. For purposes of personal jurisdiction and venue, American Academy Holdings resides in Salt Lake City, Utah. American Academy Holdings owns and operates the business known as the American Academy of Professional Coders ("AAPC"), including the AAPC trademarks, and upon information and belief is a direct or indirect wholly owned subsidiary of AAPC Holdings whose operating earnings fund the allocations and distributions made at the AAPC Holdings level.

8. Upon information and belief, no member of either Defendant, and no person whose citizenship is attributable to either Defendant for purposes of 28 U.S.C. § 1332, is a citizen of the State of Florida. The Common Units of AAPC Holdings are held of record by the Voting Trust Trustee, Ankura Trust Company, LLC, and beneficially (as Non-Record Owner) by Joseph W. Grier, III, solely in his capacity as Special Master, a citizen of North Carolina; upon information and belief, the holders of the preferred equity of AAPC Holdings are citizens of states other than Florida. Upon information and belief, the sole member of American Academy Holdings is AAPC Holdings or an intermediate holding company whose citizenship is likewise determined by the foregoing members.

**JURISDICTION AND VENUE**

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different States and the matter in controversy exceeds $75,000, exclusive of interest and costs. Mr. Lindberg is a citizen of Florida; Defendants, as limited liability companies, take the citizenship of each of their members, none of whom is a citizen of Florida. The unpaid tax distributions and indemnifiable expenses at issue amount to tens of millions of dollars. AAPC reported pre-tax net income of approximately $84 million in its 2025 tax returns, allocated to Mr. Lindberg for tax purposes. That income alone translates to a required tax distribution to Mr. Lindberg of more than $30 million under the Tax Indemnification Agreement

and the Assignment Agreement. Mr. Lindberg has received zero funds from AAPC for tax distributions since the inception of the Tax Indemnification Agreement, and zero funds for the related expense of preparing the returns that report that income. The value of the injunctive and declaratory relief sought — protection of Mr. Lindberg's interests in an enterprise whose preferred equity alone carries a par value of approximately $357 million and which has been valued at approximately $3 billion — likewise far exceeds the jurisdictional minimum.

10. This Court has authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and Federal Rule of Civil Procedure 57, and to grant injunctive relief under Federal Rule of Civil Procedure 65.

11. This Court has personal jurisdiction over each Defendant. Each Defendant maintains its principal place of business in Salt Lake City, Utah, is at home in this State, and conducts continuous and systematic business here. The September 1 Letter was directed to, and the refusals and non-performance alleged herein occurred at, Defendants' headquarters in Salt Lake City.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because each Defendant resides in this District within the meaning of 28 U.S.C. § 1391(c)(2), and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Assignment to the Central Division is proper under 28 U.S.C. § 125(2) because Defendants reside, and the claims arose, in Salt Lake County.

13. The Assignment Agreement described below provides that its parties submit to the non-exclusive jurisdiction of the courts of Mecklenburg County, North Carolina, and the United States District Court for the Western District of North Carolina. That clause is permissive, not mandatory; it does not designate any exclusive forum and does not preclude suit in this District, where Defendants are at home.

## FACTUAL ALLEGATIONS

### A. The supervisory structure and Mr. Lindberg's interests in AAPC.

14. AAPC is among the assets held under the supervisory structure arising from Mr. Lindberg's federal proceedings in the United States District Court for the Western District of North Carolina, United States v. Lindberg, Nos. 5:19-cr-00022-MOC and 3:23-cr-00048-MOC (the "Federal Proceedings"). By Order dated January 23, 2025, that court appointed Joseph W. Grier, III as Special Master with custodial authority over certain assets, including the ownership interests of AAPC Holdings.

15. By Assignment Agreement made effective as of January 23, 2025, and executed February 13, 2025 (the "Assignment Agreement"), Global Growth Holdings, LLC and Mr. Lindberg (together, "Assignor") assigned to the Special Master, solely in his representative capacity, the Assigned Rights and Interests in the Common Units of AAPC Holdings and in the Voting Trust Agreement. Section 13 of the Assignment Agreement provides that AAPC Holdings is an intended third-party beneficiary of the Assignment Agreement. The transfer was made with the prior written consent of every member of the Board of Managers of AAPC Holdings, the Voting Trust Trustee, HPS, and F3, which consent is attached to the Assignment Agreement as its Exhibit A. A true and correct copy of the Assignment Agreement is attached as Exhibit B.

16. Section 4(e) of the Assignment Agreement provides that, solely for federal, state, and local tax purposes, Assignor "shall continue to be the beneficial owner of the Common Units as of and following the Effective Date, and shall continue to receive allocations and corresponding tax distributions if any with respect to the Common Units," with all parties' rights reserved concerning the appropriate amount of any tax distributions.

17. The Operating Agreement, to which the Special Master delivered a joinder under Section 4(c) of the Assignment Agreement, governs the allocation of AAPC Holdings' income and gain among its unit holders and the making of tax distributions in respect of those allocations. By consenting to the assignment on the terms of the Assignment Agreement, including Section 4(e), AAPC Holdings accepted and agreed that Mr. Lindberg would remain the beneficial owner of the

Common Units for tax purposes and would continue to receive the allocations and corresponding tax distributions attributable to those Units.

18. Notwithstanding Section 4(e) and the Operating Agreement, AAPC Holdings has allocated, and continues to allocate, income and gain of the business to Mr. Lindberg for tax purposes while the corresponding tax distributions have not been made to him. AAPC reported pre-tax net income of approximately $84 million in its 2025 tax returns, allocated to Assignor — Mr. Lindberg, through Global Growth Holdings, LLC, the co-Assignor and Non-Record Owner through which he held the Common Units — as reflected in the 2025 Schedule K-1 package that AAPC Holdings issued to Global Growth Holdings, LLC and transmitted on September 17, 2026. That income alone translates to a required tax distribution to Mr. Lindberg of more than $30 million under the Tax Indemnification Agreement and Section 4(e) of the Assignment Agreement. Mr. Lindberg has received zero funds from AAPC for any tax distribution since the inception of the Tax Indemnification Agreement on September 25, 2019 — not for 2025, and not for any prior year — and zero funds for the related tax-preparation costs, leaving him exposed to tax liabilities on tens of millions of dollars of income he has never received.

**B. The indemnity obligations.**

19. By Indemnification Policy adopted February 29, 2020, and Tax Indemnification Agreement dated September 25, 2019, and as confirmed in a liability assumption and novation confirmation dated July 16, 2024 (collectively, the "Indemnity Instruments"), Global Growth Holdings, LLC assumed and confirmed indemnity obligations running to Mr. Lindberg — including all costs of collection, litigation expenses, tax-preparation and tax-related legal costs, and potential judgments — binding jointly and severally on all Global Growth companies, including any company in which Mr. Lindberg or Global Growth maintain or maintained an economic interest. Each Defendant is such a company. The Tax Indemnification Agreement obligates the Global Growth companies to fund Mr. Lindberg's tax liabilities on income allocated to him from those companies and the related tax-preparation costs; the Indemnification Policy provides for advancement of covered expenses within ten days of demand and for judicial enforcement; the

Indemnity Confirmation confirms the obligations as binding on all Global Growth companies "including any companies that may now be in various trusts," and as covering, among other things, all costs of the Federal Proceedings. True and correct copies of the Indemnity Instruments are attached as Exhibit C.

20. Mr. Lindberg has personally advanced several million dollars for legal fees and support — including for Katten Muchin Rosenman LLP and internal legal support — within the scope of the Indemnity Instruments. The Special Master has taken the position that "there are no more funds for legal fees" and has declined reimbursement. Demand for performance of the indemnity was made on AAPC in the September 1 Letter. AAPC has not performed.

**C. The refinancing, the Clanwilliam precedent, and the threat to Mr. Lindberg's interests.**

21. AAPC's credit facility with HPS Investment Partners matures on July 1, 2027, and a refinancing process is expected to commence imminently if it has not already commenced. In the Federal Proceedings, Mr. Lindberg has demonstrated documented restitution offsets and credits of approximately $3.7 billion — including AAPC preferred equity already transferred to ULICO in December 2022 with dollar-for-dollar credit at its current $357 million par value — exceeding any restitution figure proposed in that case. Motions remain pending there, including Mr. Lindberg's Motion for a Determination That No Restitution Is Owed (Doc. 564 / Doc. 234, filed July 14, 2026) (Exhibit F), his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (Doc. 269, filed July 31, 2026) (Exhibit G), his Response and Objection to the Special Master's Second Supplement (filed July 30, 2026) (Exhibit H), his Response to the Government's Consolidated Position (Doc. 316, filed August 18, 2026) (Exhibit I), and his Motions to Compel Production of Ex Parte Communications and Restitution Data (Docs. 331, 332, filed August 31, 2026) (Exhibit J). In 2026 the Special Master, in a sealed appendix and with no motion, notice, or hearing, wrote AAPC down to a value near zero on "conjecture about generative artificial intelligence" — this for a business

valued by KPMG at $900 million in 2018, since valued by Houlihan Lokey at approximately $3 billion, and reporting approximately $84 million of net income on its 2025 federal return.

22. The danger of value destruction is not hypothetical. In September 2025, the Clanwilliam Group — a company under a signed purchase agreement at a materially higher valuation less than eighteen months earlier — was sold for approximately $450 million after management declined to complete a refinancing, forcing a fire sale to a favored buyer at a steep discount. A sale, transfer, or refinancing of AAPC or its assets conducted without visibility, before Mr. Lindberg's restitution obligations are finally adjudicated, threatens the same irreparable result here.

**D. The September 1 Letter and AAPC's refusal.**

23. The September 1 Letter, addressed to Chairman Greg Cappelli and the members of the Board of Directors at AAPC's Salt Lake City headquarters, sent by courier and by e-mail and received on September 8, 2026, made the specific, modest demands described above, was copied to the Special Master through his counsel, requested a written response within seven days, and designated Kathy Million as Mr. Lindberg's authorized representative to receive communications.

24. The response period expired on September 15, 2026. Apart from the transmission of the 2025 Schedule K-1 package described in paragraph 3, Defendants have not responded, have not provided the requested visibility or board materials, have not made tax distributions, have not honored the indemnity, and have refused the proposed settlement. All conditions precedent to the relief sought herein have been performed, have occurred, or have been waived or excused.

**E. Background: the RICO Action.**

25. On September 11, 2026, Mr. Lindberg, appearing pro se, filed a Verified Complaint in the United States District Court for the Southern District of New York, Lindberg v. Causey, et al., No. 1:26-cv-07938 (S.D.N.Y.), against Mike Causey, the North Carolina Commissioner of Insurance; Michael Dinius, the Special Deputy Rehabilitator of Mr. Lindberg's former North Carolina insurance companies; Mohsin Y. ("Mo") Meghji, Chief Executive Officer of M3 Partners, LP and acting Chief Executive Officer of NHC Holdings, LLC; and Williams Mullen,

P.C. The RICO Action pleads claims under 18 U.S.C. §§ 1962(c) and 1962(d), together with claims for conversion, breach of fiduciary duty, civil conspiracy, unjust enrichment, and injunctive relief. A motion for a preliminary injunction, filed with the complaint on September 11, 2026 (RICO Action Doc. 4), and an emergency ex parte application for a temporary restraining order and order to show cause, filed September 17, 2026, are pending in the RICO Action. A true and correct copy of the Verified Complaint in the RICO Action, without its exhibits, is attached as Exhibit D.

26. As alleged in the RICO Action, the defendants there, operating as an association-in-fact enterprise, extracted more than $165 million in fees from the insurance estates they administer without the court approval North Carolina law requires, while destroying billions of dollars of value in the businesses Mr. Lindberg built: they let a signed $450 million sale die in 2018; sold more than $1 billion of principal-protection bonds before maturity for approximately $394 million; blocked a signed $3.4 billion public-company merger agreement in 2024; sold the Clanwilliam Group in September 2025 for approximately $450 million against an $880 million valuation eighteen months earlier; and in December 2025 sold Beckett Collectibles — appraised at $1,003,924,000 — for approximately $134 million, off the docket of the supervising court. (Ex. D ¶¶ 1–9.)

27. The RICO Action further alleges that, since January 2025, the same group has operated through the federal restitution proceeding itself: on the Government's insistence a court-appointed Special Master was vested with "exclusive possession and control" of the assets designated for restitution — including NHC Holdings, LLC and AAPC Holdings — and with power to liquidate them; that within two weeks the Special Master removed the directors Mr. Lindberg's company had appointed to the NHC board and Mr. Meghji became NHC's acting Chief Executive Officer; that the $1.655 billion restitution figure rests on M3 "desktop" valuations the Special Master himself has described as a "best guess" and "inherently unreliable," developed through ex parte communications Mr. Lindberg has never been permitted to see; and that "[t]he liquidations continue: AAPC, Damovo, and the next sale." (Ex. D ¶¶ 6–7, 79–88, 104–108.)

28. The RICO Action specifically pleads the September 1 Letter and AAPC's position within the pattern: that AAPC, a Primary Restitution Asset, "was reduced to a value near zero on the Special Master's own reports, with no motion, notice, or hearing"; that its HPS credit facility matures July 1, 2027; and that Mr. Lindberg wrote to AAPC's Board on September 1, 2026 "so that AAPC does not become another Clanwilliam, sold to a favored buyer at a steep discount after management declines to complete a refinancing." (Ex. D ¶¶ 87, 104.) The RICO Action seeks, among other relief, a stay of any disposition or change-of-control refinancing of the Primary Restitution Assets, expressly including AAPC Holdings, pending final adjudication of Mr. Lindberg's restitution obligations, including all appeals. (Ex. D ¶ 157 & Prayer ¶ D.)

29. The RICO Action does not name either Defendant here, does not name the Special Master, and seeks no relief against any court. This action likewise seeks no relief against the Special Master and no determination of any question pending in the RICO Action or the Federal Proceedings. The two actions are complementary: the RICO Action addresses the conduct of the persons who control the sale process; this action enforces the contractual obligations that AAPC itself owes to Mr. Lindberg and protects his interests in AAPC pending the outcome of the Federal Proceedings.

**F. Background: the restitution record in the Federal Proceedings.**

30. By Order Appointing Special Master dated January 23, 2025 (Doc. 56) (Exhibit E), the Western District of North Carolina placed Mr. Lindberg's rights and interests in the Primary Restitution Assets, including AAPC, in the exclusive possession and control of the Special Master, required prior court approval before any sale (¶ 6(e)), required the Special Master to keep the parties regularly informed (¶¶ 5, 8), and provided that matters be brought before the court upon notice and hearing (¶ 15). No final order of restitution has been entered.

31. On July 14, 2026, Mr. Lindberg filed his Motion for a Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction (Doc. 564 in No. 5:19-cr-22; Doc. 234 in No. 3:23-cr-48) (Exhibit F). That motion demonstrates, on the record of the Federal Proceedings, that every one of

the approximately 43,000 policyholders of the North Carolina insurance companies has been paid in full, as the Special Master's own Notice of Distribution of December 23, 2025 confirms; that Mr. Lindberg committed approximately $1 billion of his own capital, personally guaranteed the affiliated loans, and purchased more than $1 billion of principal-protection bonds; and that the losses charged to him were caused by intervening acts of the rehabilitators and the Special Master after he ceded control in October 2018, including more than $165 million in fees paid without court approval. The Government did not respond to that motion on the merits within the time the local rules allow.

32. On August 18, 2026, Mr. Lindberg filed his Response to the United States' Consolidated Position (Doc. 316, responding to Doc. 308) (Exhibit I). Part VIII of that Response, together with Doc. 234, documents offsets, credits, and reductions against the $1,655,000,000 preliminary restitution figure of at least $2,899,418,383 before the Beckett sale and $3,765,418,383 with it — including the AAPC preferred equity transferred to ULICO, credited at par of $352,906,240 as of May 26, 2026 (approximately $357 million at current par); the value of the insurance companies when transferred in October 2018; the sale proceeds of the principal-protection bonds; and the below-market Clanwilliam, zero-coupon-bond, and Beckett dispositions. The Government's own chart disallows credit for several of those losses on the express ground that each resulted from decisions of the rehabilitators or the Special Master made after Mr. Lindberg ceded control — conceding, in other words, that those losses were caused by others. On Mr. Lindberg's showing, net restitution owed is $0 and restitution has been overpaid by more than $2 billion.

33. Also pending in the Federal Proceedings are Mr. Lindberg's Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders, with Proposed Order (Docs. 269, 269-5, July 31, 2026) (Exhibit G), which asks that court to stay all further sales and dispositions of the Primary Restitution Assets; his Preliminary Response and Objection to the Special Master's Second Supplement (July 30, 2026) (Exhibit H); and his Motions to Compel Production of Ex Parte

Communications and Restitution Data (Docs. 331, 332, August 31, 2026) (Exhibit J). The judgment entered May 29, 2026 is on appeal to the Fourth Circuit in consolidated Nos. 26-4309(L) and 26-4310. As of the date of this Complaint, no stay of asset dispositions has been entered in any forum.

34. These filings are annexed because they establish three facts that bear directly on the relief sought here: first, that Mr. Lindberg's interests in AAPC are substantial and protectable, and that once the restitution question is finally adjudicated AAPC stands to be restored to his full ownership and control; second, that the persons controlling the sale process for AAPC have a documented record of disposing of comparable assets at a fraction of their value, without notice or court approval, and of withholding the terms from Mr. Lindberg; and third, that AAPC's own conduct — allocating $84 million of 2025 pre-tax net income to Mr. Lindberg, owing him a tax distribution of more than $30 million on that income alone, paying him nothing since the Tax Indemnification Agreement was signed in 2019, and ignoring the September 1 Letter — fits that pattern.

**FIRST CLAIM FOR RELIEF**

**(Breach of Contract — Tax Distributions under Assignment Agreement § 4(e) and the Operating Agreement — Against AAPC Holdings)**

35. Plaintiff realleges and incorporates all preceding paragraphs.

36. The Assignment Agreement is a valid and enforceable contract governed by North Carolina law. Mr. Lindberg is a party to it. AAPC Holdings is an express intended third-party beneficiary of the Assignment Agreement under its Section 13, consented in writing to the assignment on the terms set forth therein, and accepted the benefits of the assignment, thereby binding itself to and accepting the terms of Section 4(e). The Operating Agreement is likewise a valid and enforceable contract under which AAPC Holdings is obligated to make tax distributions in respect of allocations of income and gain to its unit holders.

37. Under Section 4(e) and the Operating Agreement, Mr. Lindberg remains the beneficial owner of the Common Units for tax purposes and is entitled to receive allocations and the corresponding tax distributions.

38. AAPC Holdings has breached those obligations by allocating income and gain to Mr. Lindberg for tax purposes — including approximately $84 million of pre-tax net income for 2025, requiring a tax distribution of more than $30 million — while failing and refusing to make any corresponding tax distribution, despite demand.

39. As a direct and proximate result, Mr. Lindberg has been damaged in an amount to be proven at trial, exceeding $75,000, together with pre- and post-judgment interest.

**SECOND CLAIM FOR RELIEF**

**(Breach of Contract — Indemnity Obligations — Against All Defendants)**

40. Plaintiff realleges and incorporates all preceding paragraphs.

41. The Indemnity Instruments constitute valid and enforceable obligations binding jointly and severally on all Global Growth companies, including each Defendant, for Mr. Lindberg's benefit. The Indemnification Policy is governed by Delaware law and provides for advancement of covered expenses within ten days of demand and for judicial enforcement of that obligation.

42. Mr. Lindberg has incurred and personally advanced indemnifiable expenses, including attorneys' fees and legal-support costs amounting to several million dollars, and bears tax liabilities on income allocated to him — including the more than $30 million attributable to AAPC's 2025 income alone — that the Tax Indemnification Agreement obligates Defendants to fund, together with the related tax-preparation costs. He has made demand.

43. Defendants have failed and refused to indemnify, advance, or reimburse those expenses, in breach of their obligations.

44. As a direct and proximate result, Mr. Lindberg has been damaged in an amount to be proven at trial, exceeding $75,000, together with pre- and post-judgment interest, and is entitled to ongoing advancement of expenses as they are incurred.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Judgment — 28 U.S.C. §§ 2201–2202 — Against All Defendants)**

45. Plaintiff realleges and incorporates all preceding paragraphs.

46. An actual, justiciable controversy of sufficient immediacy exists between the parties concerning their respective rights and obligations under the Assignment Agreement, the Operating Agreement, and the Indemnity Instruments, and concerning whether AAPC or its assets may be sold, transferred, encumbered, or refinanced without notice to Mr. Lindberg before final adjudication of his restitution obligations in the Federal Proceedings.

47. Plaintiff is entitled to a declaration that (a) AAPC Holdings is obligated to make tax distributions to Mr. Lindberg corresponding to the allocations of income and gain made to him under Section 4(e) of the Assignment Agreement and the Operating Agreement; (b) each Defendant is bound by the Indemnity Instruments and obligated to indemnify and advance Mr. Lindberg's covered expenses; and (c) Mr. Lindberg holds protectable interests in AAPC entitling him to advance notice and review of any proposed sale, transfer, encumbrance, or refinancing of AAPC or its assets pending final adjudication of the Federal Proceedings, including all appeals.

**FOURTH CLAIM FOR RELIEF**

**(Preliminary and Permanent Injunctive Relief — Fed. R. Civ. P. 65 — Against All Defendants)**

48. Plaintiff realleges and incorporates all preceding paragraphs.

49. Unless enjoined, Defendants may sell, transfer, encumber, or refinance AAPC or its assets — or acquiesce in such a transaction — before Mr. Lindberg's restitution obligations in the Federal Proceedings are fully and finally adjudicated, including resolution of all pending motions and appeals.

50. Mr. Lindberg is likely to succeed on the merits of his contract and declaratory claims. He faces irreparable harm for which there is no adequate remedy at law: AAPC is a unique asset built over two decades; a fire-sale disposition, like the Clanwilliam and Beckett sales described in Exhibit D, would permanently destroy value and extinguish interests that money damages cannot restore, particularly where approximately $3.7 billion in documented offsets and credits stand to be adjudicated in Mr. Lindberg's favor and to restore AAPC to his full ownership and control.

51. The balance of equities favors relief: an injunction preserving the status quo imposes no cognizable hardship on Defendants, who retain the ability to operate the business in the ordinary course, while its denial exposes Mr. Lindberg to permanent loss. The public interest favors preserving assets pending adjudication and honoring contractual obligations.

52. Mr. Lindberg is therefore entitled to a preliminary and permanent injunction barring any sale, transfer, assignment, encumbrance, pledge, or other disposition of AAPC, its equity interests, or its assets outside the ordinary course of business — and barring the execution of any refinancing term sheet not first disclosed to Mr. Lindberg — until his restitution obligations in the Federal Proceedings are fully adjudicated, including final resolution of any pending appeals. Nothing in the relief sought herein is directed at the Special Master or seeks to alter, enjoin, or interfere with any order of the United States District Court for the Western District of North Carolina; any injunction entered shall be subject to the orders of that court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and:

A. Award compensatory damages on the First and Second Claims for Relief in an amount to be proven at trial, exceeding $75,000, together with pre- and post-judgment interest;

B. Declare the parties' rights and obligations as set forth in the Third Claim for Relief;

C. Enter a temporary restraining order, preliminary injunction, and permanent injunction barring any sale, transfer, assignment, encumbrance, pledge, refinancing, or other disposition of AAPC, its equity interests, or its assets outside the ordinary course of business until Plaintiff's restitution obligations in United States v. Lindberg, Nos. 5:19-cr-00022-MOC and 3:23-cr-00048-MOC (W.D.N.C.), are fully adjudicated, including final resolution of any pending appeals;

D. Order specific performance of the tax-distribution and indemnity obligations, including advancement of expenses as incurred;

E. Order Defendants to provide Plaintiff, through his designated representative, with the most recent board materials reflecting AAPC's 2026 EBITDA forecast and with advance notice and copies of any refinancing term sheet before execution;

F. Award Plaintiff his costs and expenses, including, to the extent counsel appears, reasonable attorneys' fees as permitted by contract or law; and

G. Grant such other and further relief as the Court deems just and proper.

DATED this 22nd day of September, 2026.

Respectfully submitted,

/s/ Greg E. Lindberg
GREG E. LINDBERG
Plaintiff, pro se
Register No. 34828-058
FCI Atlanta
P.O. Box 150160
Atlanta, GA 30315
Correspondence address: P.O. Box 159,
Thonotosassa, FL 33592
Tel: 1-919-308-9686
E-mail: gelindberg@gmail.com

## VERIFICATION

I, Greg E. Lindberg, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in this action; that I have read the foregoing Verified Complaint and know its contents; that the factual allegations concerning my own acts and knowledge are true and correct; and that, as to matters alleged on information and belief, or that are within the knowledge of the Defendants or drawn from the record of the proceedings cited, I believe them to be true.

Executed on September 22, 2026.

/s/ Greg E. Lindberg
GREG E. LINDBERG

**EXHIBITS**

Exhibit A — Letter of Greg E. Lindberg to the AAPC Board of Directors dated September 1, 2026, delivered September 8, 2026 (enclosures annexed separately as Exhibits C and F–I)
Exhibit B — Assignment Agreement effective January 23, 2025 (executed February 13, 2025), with Exhibit A consents
Exhibit C — Indemnity Confirmation dated July 16, 2024, enclosing the Indemnification Policy (Feb. 29, 2020) and Tax Indemnification Agreement (Sept. 25, 2019)
Exhibit D — Verified Complaint, Lindberg v. Causey, et al., No. 1:26-cv-07938 (S.D.N.Y. filed Sept. 11, 2026) (ECF Doc. 1, without exhibits)
Exhibit E — Order Appointing Special Master, Doc. 56, United States v. Lindberg, No. 3:23-cr-48-MOC (W.D.N.C. Jan. 23, 2025)
Exhibit F — Defendant's Motion for a Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction, Doc. 564 (No. 5:19-cr-22) / Doc. 234 (No. 3:23-cr-48) (July 14, 2026) (exhibits omitted)
Exhibit G — Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders, Doc. 269, with Proposed Order, Doc. 269-5 (July 31, 2026)
Exhibit H — Preliminary Response and Objection to the Special Master's Second Supplement, Doc. 267 / Doc. 583 (July 30, 2026)
Exhibit I — Defendant's Response to the United States' Consolidated Position (Doc. 308), Doc. 316 (Aug. 18, 2026)
Exhibit J — Motions to Compel Production of Ex Parte Communications and Restitution Data, Docs. 331, 332, with Doc. 331-2 (Aug. 31, 2026)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

Greg E. Lindberg v. AAPC Holdings, LLC and American Academy Holdings, LLC
Case No. 2:26-cv-__________

# EXHIBIT A

Letter of Greg E. Lindberg to the AAPC Board of Directors dated September 1, 2026 (delivered September 8, 2026)

**GREG E. LINDBERG**
P.O. Box 159 • Thonotosassa, Florida 33592

September 1, 2026

**VIA EMAIL AND CERTIFIED MAIL**

Mr. Greg Cappelli, Chairman
and the Members of the Board of Directors
American Academy of Professional Coders (AAPC)
2233 S Presidents Dr Suite F
Salt Lake City, UT 84120

**Re: (I) Upcoming AAPC Refinancing — Request for Inclusion and Visibility; (II) Outstanding Financial Matters and Settlement Proposal; Reservation of Rights**

Dear Chairman Cappelli and Members of the Board:

I write regarding the anticipated refinancing of AAPC's credit facility with HPS Investment Partners, which I understand matures July 1, 2027. Given the lead time such a process requires, I expect the refinancing effort will begin shortly, if it has not already. The purpose of this letter is to request, formally and in writing, that I be included in that process with clear visibility, and to place on the record the considerations that make that inclusion necessary. The Special Master, Joseph W. Grier, III, is copied on this letter.

As you are aware, AAPC is among the assets held under the supervisory structure arising from my federal proceedings in the Western District of North Carolina. In those proceedings, I have now filed, among other things, a Motion to Dismiss the restitution (July 14, 2026) and a Renewed Motion to Dismiss the Special Master (July 31, 2026). As set forth in those filings and in my Response and Objection to the Special Master's Report (July 30, 2026), the documented offsets and credits — including the AAPC preferred equity already transferred to ULICO in December 2022 with dollar-for-dollar credit at its current $357 million par value — exceed any restitution figure proposed in the case. We are confident that once these matters are fully adjudicated, including resolution of any pending appeals, that no further restitution will be owed and AAPC will be returned to my full ownership and control. Accordingly, no refinancing should be permitted to operate as an unlawful punishment and illegal sentence. As you may be aware, the $3.7 billion in restitution offsets and credits that I am due per the attached filings is more than twice any restitution claim.

The Board should also understand precisely the risk I am asking it to help avoid. In September 2025, the Clanwilliam Group — a company I had under a signed purchase agreement less than eighteen months earlier — was sold for approximately $450 million after management declined to complete a refinancing, forcing a fire sale to a favored buyer at a steep discount. That outcome is

now squarely before the federal court. A refinancing process for AAPC conducted without visibility, in which term sheets are executed before stakeholders see them, invites a repeat of the Clanwilliam situation. I do not believe anyone on this Board wants that, and neither do I.

My requests on the refinancing are simple and modest:

1. That I (through my designated representative, Kathy Million) be kept informed of the refinancing process as it develops, including its timeline and the institution(s) engaged to lead it — for example, whether Goldman Sachs will be engaged to handle this refinancing;

2. That any term sheets be shared with me before they are executed; and

3. That the Board provide the most recent AAPC board deck reflecting the 2026 EBITDA forecast.

These requests impose no burden on the company and compromise no confidence — the Special Master is copied here precisely so that this visibility occurs in the open, through proper channels. I recognize and respect that the Board and its Chairman owe fiduciary duties, and nothing in this letter asks anyone to act outside them. To the contrary: a refinancing completed at full value, on transparent terms, serves every constituency this Board answers to.

Separately, I want to place the following outstanding financial matters before the Board, as they bear directly on a fair resolution between AAPC and me:

(a) AAPC remains bound to make tax distributions to me under the terms of the Assignment of Interest Agreement, under which I retain all tax attributes of the business — a copy of which is enclosed;

(b) AAPC remains bound to the legal and tax indemnity executed in 2020 — the general indemnity policy enacted February 29, 2020, together with the tax indemnity policy enacted September 25, 2019, as confirmed in the Indemnity Confirmation dated July 16, 2024, binding jointly and severally on all Global Growth companies, including any company in which I or Global Growth maintain or maintained an economic interest — a copy of which is enclosed;

(c) the Special Master has recently taken the position that "there are no more funds for legal fees" and has declined to reimburse me for funds I have personally advanced for Katten Muchin Rosenman LLP and internal legal support, and other legal costs incurred in connection with these matters — amounting to several million dollars; and

(d) in settlement of the multi-million-dollar liability this represents, I propose that AAPC pay $100,000 per month, on a going-forward basis, to cover the items above. I believe the Board will recognize this as a reasonable and pragmatic resolution of obligations that would otherwise substantially exceed that sum.

Protecting the value of AAPC, and resolving these outstanding matters fairly, is of paramount importance to me, and we are fully prepared to pursue action in court — including to compel the Board's cooperation — to protect our interests here should that become necessary. It is my sincere

hope — and my expectation — that it will not be, and that the Board will instead choose the cooperative path this letter proposes.

I would appreciate a written response within seven (7) days. Kathy Million (kmillion@bccresearch.com, 919-368-5225) is authorized to receive all communications on my behalf.

Sincerely,

Greg E. Lindberg

**Enclosures:**

1. Motion to Dismiss the Restitution, filed July 14, 2026 (W.D.N.C.)
2. Renewed Motion to Dismiss the Special Master, filed July 31, 2026 (W.D.N.C.)
3. Response and Objection to the Special Master's Report, filed July 30, 2026 (W.D.N.C.)
4. Response to the Government's Consolidated Position (Doc. 308), filed August 18, 2026 (W.D.N.C.)
5. Legal and Tax Indemnity (Indemnity Confirmation, July 16, 2024, enclosing the General Indemnity Policy of Feb. 29, 2020 and the Tax Indemnity Policy of Sept. 25, 2019)
6. Assignment of Interest Agreement (AAPC Holdings, LLC Common Units), effective January 23, 2025 — Section 4(e) excerpt and signature pages

cc: Joseph W. Grier, III, Special Master -- (via counsel, Michael L. Martinez, Grier Wright Martinez, PA)
Kathy Million, President & COO, BCC Research
Vivek Ramachandran, Esq.
Robert Alban, Montshire Advisors

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

Greg E. Lindberg v. AAPC Holdings, LLC and American Academy Holdings, LLC
Case No. 2:26-cv-__________

# EXHIBIT B

Assignment Agreement effective January 23, 2025 (executed February 13, 2025), with Exhibit A consents

# ASSIGNMENT AGREEMENT

This ASSIGNMENT AGREEMENT ("Agreement") is made effective as of January 23, 2025 (the "**Effective Date**"), by and between Global Growth Holdings, LLC (fka Global Growth Holdings, Inc.), a Florida limited liability company ("**Global Growth**"), Greg E. Lindberg ("**Sponsor**," and together with Global Growth, "**Assignor'**) and Joseph W. Grier, solely in his capacity as special master appointed by the United States District Court for the Western District of North Carolina in United States of America v. Greg E. Lindberg, criminal case 3-23-cr-48-MOC ("**Assignee**" or "**Special Master**") and in accordance with the terms of the Order (defined below). Capitalized terms not defined herein have the meanings assigned them in the Seventh Amended and Restated Operating Agreement of AAPC Holdings, LLC dated March 1, 2022, as amended (the "**Operating Agreement**"). Assignor and Assignee are each sometimes referred to herein as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, the Special Master was appointed in accordance with that certain Order Appointing Special Master, United States of America v. Greg E. Lindberg, No. 3-23-cr-48-MOC (W.D.N.C. 2025) dated January 23, 2025 (the "**Order**");

WHEREAS, the Order directs the Defendant (as defined therein) "to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the special master, or one or more third parties selected by the special master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s and Global Growth Holdings, LLC's rights and interests" in certain specified assets, including "AAPC Holdings, LLC and any related entities or trusts";

WHEREAS, the Order outlines the responsibilities of the Special Master, which include recommending an appropriate method and timetable to liquidate and or/repatriate any available assets, including the ownership interests of AAPC Holdings, LLC, for the benefit of certain parties (the "**Purpose**");

WHEREAS, the Voting Trust Trustee is Trustee pursuant to that certain voting trust established pursuant to that certain Amended and Restated Voting Trust Agreement, dated as of March 1, 2022 (the "**AAPC Voting Trust**"), among Ankura Trust Company, LLC, not in its individual capacity but solely as Trustee for the AAPC Voting Trust (the "**Voting Trust Trustee**"), AAPC Holdings, LLC ("**AAPC Holdings**"), the Assignor, HPS Investment Partners, LLC, as administrative agent ("**HPS**"), and Freedom 3 Capital, LLC, as second lien collateral agent ("**F3**"), as amended, amended and restated, supplemented or otherwise modified from time to time (the "**Voting Trust Agreement**");

WHEREAS, the AAPC Voting Trust is the record owner of 100 Common Units of AAPC Holdings (the "**Common Units**") held for the benefit of Global Growth as Non-Record Owner (as defined in the Voting Trust Agreement);

WHEREAS, Global Growth is the Non-Record Owner of the Common Units.

WHEREAS, the parties agree that the interest in the Common Units to be assigned under this Agreement is intended to comply with the requirements under the Operating Agreement and the Voting Trust Agreement for an interest in the Common Units to be transferred as provided for in this Agreement;

WHEREAS, the parties agree that the Common Units once assigned under this Agreement will continue to be subject to the provisions of the Operating Agreement and the Voting Trust Agreement; and

WHEREAS, having previously obtained the written consent of all of the members of the Board of Managers of AAPC Holdings, the Voting Trust Trustee (as directed by the Independent Board of Directors), HPS and F3 that the proposed transfer under this Agreement is deemed to comply with the requirements under the Operating Agreement and the Voting Trust Agreement, with such consent attached hereto as Exhibit A, the Assignor desires to assign its interest in the Common Units to the Assignee, and the Assignee desires to accept such interest in the Common Units as set forth therein.

NOW, THEREFORE, Assignor and Assignee agree as follows:

1. <u>Assignment and Acceptance</u>. Effective as of the Effective Date, Assignor hereby, without recourse, representation or warranty of any kind, transfers and assigns to Assignee in his representative capacity all of Assignor's right, title, and interest, including without limitation except as provided herein all associated economic, legal, voting and beneficial rights and interests, and all claims and causes of action associated therewith, in and to (i) the Common Units and (ii) the Voting Trust Agreement (collectively, the "**Assigned Rights and Interests**"). Assignee hereby accepts the assignment of all of Assignor's right, title and interest, including without limitation except as provided herein all associated economic, legal, voting and beneficial rights and interests, and all claims and causes of action associated therewith, in and to (i) the Common Units and (ii) the Voting Trust Agreement, all in accordance with the Order, and the Assignee hereby assumes all of Assignor's obligations under the Common Units and the Voting Trust Agreement. Upon the consummation of the transfer of the Common Units to Assignee hereunder, the Voting Trust Trustee will remain the record owner of the Common Units in accordance with the Voting Trust Agreement and Assignee will be the Non-Record Owner of the Common Units. On and after the Effective Date, Assignor shall retain no rights or interests in or to the Assigned Rights and Interests except as provided herein. The Assignee hereby acknowledges and agrees that it has read and understood the provisions of the Voting Trust Agreement and the Operating Agreement and, from and after the Effective Date, the Assignee shall be a party to the Voting Trust Agreement and have the rights and obligations of Global Growth and the Sponsor and a "Subject Party" thereunder and shall be bound by the provisions of the Voting Trust Agreement, except as otherwise provided herein.

2. <u>Representations and Warranties.</u> The Assignee represents, warrants and covenants to the Assignor and AAPC Holdings, as follows:

a. The Assignee is duly appointed as Special Master pursuant to the Order and has full power and authority to execute, deliver and to perform its obligations under this Agreement.

b. The Assignee understands that the Common Units have not been registered under the Securities Act and are "restricted securities" within the meaning of Rule 144 under the Securities Act.

3. Representations and Warranties. Global Growth represents, warrants and covenants to the Assignee that Global Growth is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, it is in good standing under such laws, and it has full power and authority to execute, deliver and to perform its obligations under this Agreement. Global Growth represents that Global Growth converted from a corporation to a limited liability company prior to this Agreement. Sponsor represents, warrants and covenants to the Assignee that Sponsor has full power and authority to execute, deliver and to perform its obligations under this Agreement.

4. Covenants.

a. The Assignee agrees to administer the Assigned Rights and Interests in accordance with the Order.

b. On or promptly following the Effective Date, the Assignee shall deliver to the Voting Trust Trustee a joinder to the Voting Trust Agreement and "know your customer" information as the Voting Trust Trustee or AAPC Holdings may reasonably require to record Assignee as the Non-Record Owner of the Common Units on Exhibit B of the Voting Trust Agreement.

c. On or promptly following the Effective Date, the Assignee shall deliver to the Company a joinder to the Operating Agreement.

d. Each of the Parties will execute and deliver all further documents or instruments (i) required under the Operating Agreement or the AAPC Voting Trust and/or (ii) as may be reasonably requested by any other Party or AAPC Holdings and/or (iii) as required by the Court in accordance with or furtherance of the Order, in order to effect the intent and purposes of this Agreement in substance and form.

e. Each of the Parties acknowledges and agrees that solely for federal, state and local tax purposes, Assignor shall continue to be the beneficial owner of the Common Units as of and following the Effective Date, and shall continue to receive allocations and corresponding tax distributions if any with respect to the Common Units, with all Parties' rights reserved concerning the appropriate amount of any tax distributions, if any.

5. This Agreement is governed by the laws of the state of North Carolina, without regard to North Carolina conflict or choice of law provisions. Each of the Parties expressly irrevocably and unconditionally submits to and accepts the non-exclusive jurisdiction of the

courts of Mecklenburg County, North Carolina, the courts of the United States of America for the Western District of North Carolina and appellate courts from any thereof for any action, suit, or proceeding arising out of or based upon this Agreement or any matter relating to this Agreement, and waives any objection that it may have to the laying of venue in any such court or that such court is an inconvenient forum or does not have personal jurisdiction over it.

6. WAIVER OF JURY TRIAL. EACH OF THE PARTIES WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7. The invalidity or unenforceability of any term or provision of this Agreement will not affect the validity or enforceability of any other term or provision hereof. If any term or provision of this Agreement is for any reason determined to be invalid or unenforceable, there will be deemed to be made such changes (and only such changes) as are necessary to make it valid and enforceable.

8. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument. Transmission by facsimile or other form of electronic transmission of an executed counterpart of this Agreement will be deemed to constitute due and sufficient delivery of such counterpart. This Agreement may not be amended or modified except in writing by all of the Parties hereto and no condition herein (express or implied) may be waived except in writing by the Party whom the condition was meant to benefit.

9. All costs and expenses incurred in connection with this Agreement and the consummation of the transactions contemplated herein will be paid (a) in accordance with the procedure contained in the Order or (b) by the Party incurring such expense.

10. Except as strictly related to the Purpose, each of the Parties agrees not to, and agrees to cause its directors, officers, employees, agents, advisors, and controlling persons (together, "**Representatives**") not to, without the prior written consent of the other Party, directly or indirectly disclose the terms of any possible future transactions or any business information pertaining to AAPC Holdings learned thereby, inclusive of information regarding the ownership of AAPC Holdings (together, "**Confidential Information**"), to any entity, except that any Party may make any such disclosure (i) as required to implement or enforce this Agreement, (ii) if required to do so by any law, court, regulation, subpoena or other legal process, (iii) to any governmental authority or self-regulatory entity having or asserting jurisdiction over it or (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other entity or sanctions that may be imposed by any governmental authority; provided, however, that the Parties may disclose information regarding the transactions contemplated hereby (x) to their respective accountants, attorneys, limited partners, shareholders, members and other interest holders (y) to the extent necessary to effect the transactions contemplated hereby or to effect a subsequent transfer of the Common Units or any portion thereof and (z) provided that the disclosing Party shall notify the

other Party and AAPC Holdings, if applicable, of any such disclosure in advance, unless the disclosure is made pursuant to subsection (x) above. In addition, the Parties agree to treat the Confidential Information as confidential and with no less than reasonable care at all times.

11. Assignor authorizes, empowers and directs the Voting Trust Trustee, in the name and on behalf of the AAPC Voting Trust, to, without representation or warranty of any kind, do and perform such acts and deeds and to take such other and further actions, and to execute, acknowledge and deliver any and all agreements, instruments, certificates, applications, consents and other documents that the Parties deems reasonably necessary, appropriate or desirable to effectuate the assignment contemplated by this Agreement.

12. Each of the Parties hereto represents and warrants that no representation or warranty by such Party in this Agreement and no statement contained in any certificate or other document furnished or to be furnished between the Parties pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

13. The Parties agree that AAPC Holdings and, solely with respect to Sections 2, 3, 11 and 12 hereunder, the Voting Trust Trustee, is an intended third-party beneficiary of this Agreement.

14. This Agreement, including all agreements referenced in this Agreement, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein. Any amendments to this Agreement must be made in writing and agreed to by and amongst all of the Parties.

15. The descriptive headings herein are inserted for the convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

16. Assignee hereby expressly acknowledges that it has received a copy of each of the Voting Trust Agreement and the Operating Agreement. Assignee further acknowledges the obligations of Members under the Operating Agreement and the rights of the Senior Agent and Second Lien Agent thereunder including, without limitation, under Section 5.14 of the Operating Agreement and agrees to be bound by Section 5.9 of the Operating Agreement (Confidentiality) as if it were a Member; *provided, however*, that nothing in this Agreement, the Operating Agreement nor the Voting Trust Agreement binds or limits actions of the Assignee in connection with his responsibilities in the criminal proceeding to fashion a restitution order or propose a restitution methodology in such manner as is determined to be appropriate by Assignee in its discretion. .

(*signature page follows*)

IN WITNESS WHEREOF, the parties hereto agree to be bound as of the date first above written.

**Assignor**

_____________________________
Greg E. Lindberg
Date: 2/13/25

**Global Growth Holdings, LLC**

By:_____________________________
Name: Greg Lindberg
Title: Chairman
Date: 2/13/25

**Assignee**

By:_____________________________
Name: Joseph W. Grier, solely in his
Capacity as Special Master
Date:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

Greg E. Lindberg v. AAPC Holdings, LLC and American Academy Holdings, LLC
Case No. 2:26-cv-__________

# EXHIBIT C

Indemnity Confirmation dated July 16, 2024, enclosing the Indemnification Policy (Feb. 29, 2020) and Tax Indemnification Agreement (Sept. 25, 2019)

GLOBAL GROWTH

P.O. Box 159
Thonotosassa, FL 33592

July 16th 2024

Mr. Greg Lindberg
10562 Broadland Pass
Thonotosassa, FL 33592

RE: liability assumption and novation confirmation

Mr. Lindberg,

This letter confirms that Global Growth Holdings, LLC, (hereinafter "Global Growth") formerly known as Global Growth Holdings, Inc. (GGHI), per the terms of the attached Global Growth general indemnity policy enacted February 29th 2020, and per the terms of the attached tax indemnity policy enacted September 25th 2019, has fully assumed **all** of the liabilities listed below and has fully indemnified you from these liabilities including all costs of collection and litigation expenses and any potential judgments related to the same.

For avoidance of doubt, this indemnity obligation and liability assumption has been in place since September 25th 2019 for all tax related liabilities and since February 29th 2020 for all other liabilities as outlined in the indemnity policy executed as of that date. This letter serves as confirmation that these liabilities were assumed as of that date and this indemnity obligation and liability assumption has been since that date binding jointly and severally on all Global Growth companies including any company where you or Global Growth maintain now (or formerly maintained at the time of execution of the attached indemnification policies) any economic interest.

The indemnity obligation and liability assumption acknowledgement as outlined herein is a confirmation of the full novation of all liabilities that may be claimed against you related to the below matters and any other like matters arising in the future. Global Growth has assumed all such liabilities in their entirety per the terms of the attached indemnification policies.

You are not liable for the following liabilities, or for any other tax or general liabilities covered by the indemnity policies referenced herein, and you may only become liable to the extent that there is a full and final adjudication of these contested claims and only to the extent that neither Global Growth nor any of the signatories hereto are able, after a the exhaustion and final adjudication of any claims against their assets and the assets of

GLOBAL GROWTH

P.O. Box 159
Thonotosassa, FL 33592

all of their subsidiaries, affiliates, and assets held in trust, to honor the obligations as outlined in this liability assumption and novation confirmation letter:

a. **All personal tax liens:** The Internal Revenue Service has acknowledged that valid appeals have been filed on all tax liens that are pending for all tax years. All collection activity on these IRS claims has been stayed pending the appeal of these filings. Global Growth is liable to pay all potential liabilities that may in the future arise from these appeals and hereby acknowledges that it has fully assumed these liabilities and has indemnified you from them, as well as has fully assumed any costs of litigation, tax preparation or other professional services related to these claims. Global Growth and the signatories hereto further acknowledge that they are liable for any tax liability or tax preparation cost arising from the operation of any business where you maintain an economic interest either directly or indirectly.

b. **All claims related to ULICO and its reinsurance agreement with PBLA.** Your alleged personal guaranty of the PBLA ULICO Reinsurance Trust Account arose solely in connection with your role as an officer and director of Global Growth's affiliated insurance business. As such all claims related to this alleged personal guaranty, as well as any judgments or other expenses including litigation expenses arising therefrom, are solely and entirely the responsibility of Global Growth. The ULICO claims are on appeal and Global Growth is liable to pay all potential liabilities that may in the future arise from these appeals and hereby acknowledges that it has assumed these liabilities and has indemnified you from them, as well as has assumed any costs of litigation related to these claims.

c. **All claims related to the investment in Hemophilia Preferred Care Specialty Pharmacy (HPC).** As you are aware, Global Growth has filed to offset the entire amount of the alleged HPC judgment because Ronald Cieutat, the former owner of HPC, violated his non-disclosure agreement and used this information to start a competing business. Global Growth is liable to pay all potential liabilities that may in the future arise from this claim and hereby acknowledges that it has fully assumed these liabilities and has indemnified you from them, as well as has assumed any costs of litigation related to these claims.

d. **The Jay Shah/Jay Lodhia claim was never served on you and will be contested by Global Growth if it's properly served.** As you are aware, the software company that Jay Shah and Jay Lodhia sold to an affiliate of

GLOBAL GROWTH

P.O. Box 159
Thonotosassa, FL 33592

Global Growth had security breaches that cost Eye Care Leaders millions of dollars. Global Growth is liable to pay all potential liabilities that may in the future arise from this claim and hereby acknowledges that it has fully assumed these liabilities and has indemnified you from them, as well as has assumed any costs of litigation related to these claims.

e. **Local Web Results Claim.** As you are aware, Global Growth has filed to offset the entire amount of the alleged judgment because of failure to disclose material information during the due diligence. Global Growth is liable to pay all potential liabilities that may in the future arise from this claim and hereby acknowledges that it has fully assumed these liabilities and has indemnified you from them, as well as has assumed any costs of litigation related to these claims.

f. **All claims related to the case of JMC Real Estate Holdings, LLC v. ASIM Holdings, LLC.** This claim relates solely to your role as an officer and director of Global Growth and this claim has been timely appealed. Global Growth is liable to pay all potential liabilities that may in the future arise from this claim and hereby acknowledges that it has fully assumed these liabilities and has indemnified you from them, as well as has assumed any costs of litigation related to these claims.

g. **The Van Andel claim.** These claims relate solely to your role as an officer and director of Global Growth's affiliated insurance business. As you are aware, this attempt to domesticate a non-binding foreign summary arbitral award is being contested. This claim is based on a preliminary arbitral award in the Netherlands. The claim is not based on a final award and thus remains subject to all defenses, offsets, and counterclaims - of which there are many. Global Growth is liable to pay all potential liabilities that may in the future arise from this claim and hereby acknowledges that it has fully assumed these liabilities and has indemnified you from them, as well as has assumed any costs of litigation related to these claims.

h. **All costs and liabilities associated with all litigation related to your role as an officer and director of Global Growth's insurance group since 2014**. This includes all liabilities arising from the cases pending against you in the Western District of North Carolina Federal Court that are being defended by Katten Mnuchin and Wyatt & Blake, as well as all of the cases on the attached list of litigation matters. For avoidance of doubt, Global Growth's indemnity and liability assumption covers all of the attached and above cases, including any costs imposed by the court such a fees for the limited receiver appointed in the MOU litigation and any other

GLOBAL GROWTH

P.O. Box 159
Thonotosassa, FL 33592

judgments. Global Growth hereby acknowledges that it has fully assumed these liabilities and has indemnified you from them, as well as has assumed any costs of litigation related to these claims.

We appreciate your assistance in executing any further documents to fully evidence this full transfer of the above liabilities and any further like liabilities arising to Global Growth as per the terms of the above liability assumption and novation confirmation and as per the terms of the attached general and tax indemnity agreements.

Note that as per the attached, this indemnity confirmation, notice of liability assumption, and novation confirmation is binding jointly and severally on all Global Growth companies including any company where you or Global Growth maintain now (or formerly maintained at the time of execution of the attached indemnification policies) any economic interest. This expressly includes any companies that may now be in various trusts and includes (but is not limited to) the companies that are signatories hereto in the acknowledgement below.

Global Growth shall take all necessary efforts to ensure that any companies currently in trust shall be fully bound by this acknowledgement to the fullest extent permitted under the relevant authorizing documents.

Yours,

/s/____________________
Greg E. Lindberg
Chairman
Global Growth Holdings, LLC
P.O. Box 159
Thonotosassa, FL 33592

/s/____________________
Greg E. Lindberg
Sole Manager and/or Authorized Representative
Entrust Global Group, LLC
GHTG Investment, LLC
Global Health Technology Group LLC
Flagship Holdings, LLC

GLOBAL GROWTH

P.O. Box 159
Thonotosassa, FL 33592

Arrevio, LLC
EGX Holdings, LLC
Global TIC CE, LLC
SixSails, LLC
The River Source Solutions Holdings, LLC
Healthicity, LLC
Damovo Financial Services, LLC
ELP Holdings, LLC
CCM Holdings, LLC
ASL New Holdings LLC
Academy Financial Holdings, LLC

Case No. 19 CVS 013093; *Southland National Insurance Corporation in Rehabilitation, et al. v. Greg E. Lindberg;* in the Superior Court Division, Wake County (MOU)

Case No. 19 CVS 8664; *Mike Causey, Commission of Insurance of North Carolina v. Southland National Insurance Corporation*; in the Superior Court Division, Wake County (Rehab)

Case No. 5:23-cv-00340-D-RN; *Southerland National Insurance Corporation in Liquidation, et al. v. Greg E. Lindberg, et al.*; in the Eastern District of North Carolina, Western Division (RICO)

Case No. 5:20-cv-00474-D; *Colorado Bankers Life Insurance Company, et al. v. Academy Financial Assets, LLC, et al.*; in the Eastern District of North Carolina, Western Division (IALA Consolidated Case – see attached list for all cases included in the consolidation)

Case No. 5:23-cv-181-D-RJ; *Colorado Bankers Life Insurance Company v. Academy Financial Assets, LLC*; Eastern District of North Carolina, Western Division (New IALA)

Case No. 5:23-cv-182-D-RJ; *Colorado Bankers Life Insurance Company v. Academy Financial Assets, LLC*; Eastern District of North Carolina, Western Division (New IALA)

Case No. 23CV001432-910; *Colorado Bankers Life Insurance Company v. Fiasco Fine Wine, LLC*; Superior Court Division, Wake County (New IALA)

Case No. 23CV001321-910; *Southland National Insurance Corporation v. Gilford Asset Management, LLC*; Superior Court Division, Wake County (New IALA)

Case No. 5:23-cv-183-D-RJ; *Southland National Insurance Corporation v. Standard Financial Limited*; Eastern District of North Carolina, Western Division (New IALA)

Case No. 5:23-cv-184-D; *Colorado Bankers Life Insurance Company v. Standard Malta Holdings Limited*; Eastern District of North Carolina, Western Division (New IALA)

Case No. 1:20-cv-681-LCB-JEP; *Universal Life Insurance Company v. Greg E. Lindberg*; In the Middle District of North Carolina (Non-Parties)

Case No. 20-12791 (LGB); *In re PB Life and Annuity Co., Ltd., et al*; in the Southern District of New York Bankruptcy Court

Adversary Case No. 22-01149 (LGB); *In re Colorado Bankers Life Insurance Co., et al. v. PB Life and Annuity Co., Ltd, et al.*; in the Southern District of New York Bankruptcy Court

Adversary Case No. 23-01000 (LGB); *John Johnston and Edward Willmott, as JPLs, et al v. Gregory Even Lindberg*; in the Southern District of New York Bankruptcy Court

## INDEMNIFICATION POLICY

THIS INDEMNIFICATION POLICY (the "**POLICY**") is adopted as of February 24th 2020, by Global Growth Holdings, Inc., a Delaware corporation ("**Global Growth**"), for the benefit of the Indemnitees (as defined below).

WITNESSETH THAT:

WHEREAS, certain individuals have agreed to serve on the Board of Directors (the "**Board**") or as an officer of Global Growth and its affiliates (hereinafter defined as all corporate entities where Greg E. Lindberg maintains an economic interest, whether or not direct or indirect subsidiaries of Global Growth) (the "**Company**");

WHEREAS, the Bylaws of Global Growth dated contemporaneously herewith provide that any person who at any time serves or has served as a director, officer, employee or agent of Global Growth or who at the request of Global Growth has served as a director, officer, partner, trustee, employee or agent of another foreign or domestic corporation, partnership, joint venture, trust or other enterprise, shall have a right to be indemnified by Global Growth to the fullest extent from time to time permitted by law against liability and expenses in any Proceeding arising out of his status as such or activities in any of the foregoing capacities or results from him being called as a witness at a time where he has not been made a named defendant or respondent to any Proceeding;

WHEREAS, the Board has determined that certain individuals (each, an "**Indemnitee**" and collectively, the "**Indemnitees**") have acted and may continue to act at the direction of and for the benefit of Global Growth and certain of its affiliates, the Board has designated the Indemnitees by written consent on the date hereof, and the Board may, in the future, designate additional Indemnitees entitled to the benefits hereof by formal Board action;

WHEREAS, it is reasonable, prudent and necessary for Global Growth contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons in connection with their service directly for or on behalf of Global Growth or its affiliates, to the fullest extent permitted by applicable law so that they will serve or continue to act for the benefit of Global Growth or its affiliates free from undue concern that they will not be so indemnified;

WHEREAS, this Policy is a supplement to and in furtherance of the Certificate of Incorporation of the Company, and is incorporated within the Bylaws of the Company, and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitees thereunder; and

WHEREAS, Indemnitees do not regard the protection available under the Certificate of Incorporation of Global Growth and insurance as adequate in the present circumstances, and may not be willing to act on behalf of and for the benefit of Global Growth and its affiliates, and Global Growth desires Indemnitees to have previously acted and to continue to act on behalf of itself and its affiliates.

NOW, THEREFORE, in consideration of Indemnitees' having previously acted, currently acting and future agreement to take certain actions for the benefit of Global Growth and its affiliates, Global Growth stipulates that its indemnification policy shall be as follows:

1. Indemnity of Indemnitees. Global Growth hereby agrees to hold harmless and indemnify Indemnitees in connection with any and all prior and future service by Indemnitees on behalf of Global Growth and its affiliates to the fullest extent permitted by law, as such laws may be amended from time to time. In furtherance of the foregoing indemnification, and without limiting the generality thereof:

(a) Proceedings Other Than Proceedings by or in the Right of Global Growth or an Affiliate. Each Indemnitee shall be entitled to the rights of indemnification provided in this Section l(a) if in connection with his service on behalf of Global Growth or its affiliates, the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding (as hereinafter defined) other than a Proceeding by or in the right of Global Growth. Pursuant to this Section 1(a), Indemnitees shall be indemnified against all Expenses (as hereinafter defined), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person, or on such person's behalf, in connection with such Proceeding or any claim, issue or matter therein, if such Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of Global Growth or the applicable affiliate thereof, and with respect to any criminal Proceeding, had no reasonable cause to believe the Indemnitee's conduct was unlawful.

(b) Proceedings by or in the Right of Global Growth or an Affiliate. Each Indemnitee shall be entitled to the rights of indemnification provided in this Section 1(b) if, in connection with such Indemnitee's service at the direction of or for the benefit of Global Growth, the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding brought by or in the right of Global Growth. Pursuant to this Section 1(b), each Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by such Indemnitee, or on such Indemnitee's behalf, in connection with such Proceeding if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of Global Growth or the applicable affiliate thereof; provided, however, if applicable law so provides, no indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which Indemnitee shall have been adjudged to be liable to Global Growth unless and to the extent that a court of the State of Delaware shall determine that such indemnification may be made (provided that such exclusion shall not apply to any other related claim, issue or matter otherwise indemnifiable under the terms hereof).

(c) Indemnification for Expenses of a Party Who is Wholly or Partly Successful. Notwithstanding any other provision of this Policy, to the extent that an Indemnitee is, in connection with his service to or for the benefit of Global Growth or one of its affiliates, a party to and is successful, on the merits or otherwise, in any Proceeding, he shall be indemnified to the maximum extent permitted by law, as such may be amended from time to time, against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith. If an Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, Global Growth shall indemnify such Indemnitee against all Expenses actually and reasonably incurred by

him or on his behalf in connection with each successfully resolved claim, issue or matter. For purposes of this Section 1(c) and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

2. Additional Indemnity. In addition to, and without regard to any limitations on, the indemnification provided for in Section 1 of this Policy, Global Growth shall and hereby does indemnify and hold harmless each Indemnitee against all Expenses, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by him or on his behalf if, directly or indirectly connected to his service on behalf of Global Growth or an affiliate thereof, he is, or is threatened to be made, a party to or participant in any Proceeding (including a Proceeding by or in the right of Global Growth), including, without limitation, all liability arising out of the negligence or active or passive wrongdoing of such Indemnitee. The only limitation that shall exist upon Global Growth's obligations pursuant to this Section 2 shall be that Global Growth shall not be obligated to make any payment to an Indemnitee that is finally determined (under the procedures, and in accordance with Sections 5 and 6 hereof) to be unlawful.

3. Contribution.

(a) Whether or not the indemnification provided in Sections 1 and 2 hereof is available, in respect of any Proceeding in which Global Growth or its affiliate is jointly liable with an Indemnitee (or would be if joined in such Proceeding), Global Growth shall pay, in the first instance, the entire amount of any judgment or settlement of such Proceeding without requiring such Indemnitee to contribute to such payment and Global Growth hereby waives and relinquishes any right of contribution, and shall waive and relinquish any future right of contribution, it may have against such Indemnitee. Global Growth or its affiliates shall not enter into any settlement of any Proceeding in which Global Growth or an affiliate is jointly liable with any Indemnitee (or would be if joined in such Proceeding) unless such settlement provides for a full and final release of all claims asserted against such Indemnitee(s).

(b) Without diminishing or impairing the obligations of Global Growth set forth in Section 3(a), if, for any reason, an Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Proceeding in which Global Growth or an affiliate thereof is jointly liable with Indemnitee (or would be if joined in such Proceeding), Global Growth shall contribute to the amount of Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred and paid or payable by such Indemnitee in proportion to the relative benefits received by Global Growth or its affiliates and all officers, directors or employees of Global Growth or such affiliate, other than Indemnitee, who are jointly liable with such Indemnitee (or would be if joined in such Proceeding), on the one hand, and such Indemnitee, on the other hand, from the transaction or events from which such Proceeding arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of Global Growth or its affiliates and all officers, directors or employees of Global Growth or its affiliates other than Indemnitee who are jointly liable with an Indemnitee (or would be if joined in such Proceeding), on the one hand, and such Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Expenses, judgments, fines or settlement amounts, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of

Global Growth or its affiliates and all officers, directors or employees of Global Growth or its affiliates, other than an Indemnitee, who are jointly liable with such Indemnitee (or would be if joined in such Proceeding), on the one hand, and such Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(c) Global Growth hereby agrees to fully indemnify and hold each Indemnitee harmless from any claims of contribution which may be brought by officers, directors or employees of Global Growth or its affiliates, other than such Indemnitee, who may be jointly liable with such Indemnitee.

(d) To the fullest extent permissible under applicable law and without diminishing or impairing the obligations of Global Growth set forth in preceding subsections of this <u>Section 3</u>, if the indemnification provided for in this Policy is unavailable to an Indemnitee for any reason whatsoever, Global Growth , in lieu of indemnifying such Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Policy, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by Global Growth or its affiliates and such Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding; and/or (ii) the relative fault of Global Growth or an affiliate (and its directors, officers, employees and agents, other than such Indemnitee) and such Indemnitee in connection with such event(s) and/or transaction(s).

4. <u>Indemnification for Expenses of a Witness</u>. Notwithstanding any other provision of this Policy, to the extent that an Indemnitee is, by reason of or in connection to acts performed at the direction of or for the benefit of Global Growth or its affiliates, a witness, or is made (or asked) to respond to discovery requests, or other requests for information, in any Proceeding to which such Indemnitee is not a party, he shall be indemnified against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.

5. <u>Procedures and Entitlement to Indemnification</u>. An Indemnitee shall promptly submit a request for Indemnification to Global Growth, and Global Growth shall indemnify such Indemnitee and, notwithstanding any other provision of this Policy, Global Growth shall advance all Expenses incurred by or on behalf of such Indemnitee in connection with any such Proceeding within ten (10) days after the receipt by Global Growth of a statement or statements from such Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding. Such statement or statements shall reasonably evidence the Expenses incurred or to be incurred by such Indemnitee, and shall include or be preceded or accompanied by a written undertaking by or on behalf of such Indemnitee to repay any Expenses advanced within thirty (30) days only upon a final determination by a court of competent jurisdiction that such Indemnitee has engaged in willful misconduct. Any advances and undertakings to repay pursuant to this <u>Section 5</u> shall be unsecured and interest free and not conditioned on such Indemnitee's ability to repay such advances.

6. <u>Remedies of Indemnitees</u>.

(a) In the event that an advancement of Expenses is not timely made pursuant to Section 5 of this Policy, the applicable Indemnitee shall be entitled to an adjudication in an appropriate court of the State of Delaware, or in any other court of competent jurisdiction, of such Indemnitee's entitlement to such indemnification. Such Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which such Indemnitee first has the right to commence such proceeding pursuant to this Section 6(a). Global Growth shall not oppose such Indemnitee's right to seek any such adjudication.

(b) Any judicial proceeding commenced pursuant to this Section 6 shall be conducted in all respects as a de novo trial on the merits.

(c) In the event that an Indemnitee, pursuant to this Section 6, seeks a judicial adjudication of his rights under, or to recover damages for breach of, this Policy, or to recover under any insurance policies maintained by Global Growth, Global Growth shall pay on the Indemnitee's behalf, in advance, any and all reasonable expenses (of the types described in the definition of Expenses in Section 12 of this Policy) actually and reasonably incurred by him in such judicial adjudication, regardless of whether such Indemnitee ultimately is determined to be entitled to such indemnification, advancement of expenses or insurance recovery. Global Growth irrevocably authorizes each Indemnitee from time to time to retain counsel of the Indemnitee's choice, at the expense of Global Growth to the extent provided hereunder or under applicable law, to advise and represent the Indemnitee in connection with any such judicial adjudication or recovery, including, without limitation, the initiation or defense of any litigation or other legal action, whether by or against Global Growth or any director, officer, member or other person affiliated with Global Growth. Notwithstanding any existing or prior attorney client relationship between Global Growth and such counsel, Global Growth irrevocably consents to such Indemnitee's entering into an attorney-client relationship with such counsel, and in that connection Global Growth acknowledges and agrees that a confidential relationship shall exist between the Indemnitee and such counsel upon such Indemnitee's selection thereof.

(d) Global Growth shall be precluded from asserting in any judicial proceeding commenced pursuant to this Section 6 that the procedures and presumptions of this Policy are not valid, binding and enforceable and shall stipulate in any such court that Global Growth is bound by all the provisions of this Policy. Global Growth shall indemnify each Indemnitee against any and all Expenses and, if requested by such Indemnitee, shall (within ten (10) days after receipt by Global Growth of a written request therefore) advance, to the extent not prohibited by law, such Expenses to such Indemnitee, which are incurred by such Indemnitee in connection with any action brought by such Indemnitee for indemnification or advance of Expenses from Global Growth under this Policy or under any insurance policies maintained by Global Growth, regardless of whether the applicable Indemnitee ultimately is determined to be entitled to such indemnification, advancement of Expenses or insurance recovery, as the case may be.

7. Non-Exclusivity; Survival of Rights; Insurance; Primacy of Indemnification; Subrogation.

(a) The rights of indemnification as provided by this Policy shall not be deemed exclusive of any other rights to which Indemnitees may at any time be entitled under

applicable law, the Certificate of Incorporation of the Company, the Bylaws of Global Growth, any other agreement, or otherwise. No amendment, alteration or repeal of this Policy or of any provision hereof shall limit or restrict any right of any Indemnitee under this Policy in respect of any action taken or omitted by such Indemnitee prior to such amendment, alteration or repeal. To the extent that a change in the Delaware General Corporation Law, or other applicable law, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under the Operating Agreement of the Company and this Policy, it is the intent of Global Growth that Indemnitees shall enjoy by this Policy the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b) In the event of any payment under this Policy, Global Growth shall be subrogated to the extent of such payment to all of the rights of recovery of any Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable Global Growth to bring suit to enforce such rights.

(c) Global Growth shall not be liable under this Policy to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that an Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(d) Global Growth's obligation to indemnify or advance Expenses hereunder to an Indemnitee shall be reduced by any amount such Indemnitee has actually received as indemnification or advancement of expenses from any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise for which such Indemnitee is or was serving at the request of Global Growth in any capacity.

8. <u>Exception to Right of Indemnification</u>. Notwithstanding any provision in this Policy, Global Growth shall not be obligated under this Policy to make any indemnity in connection with any claim made against an Indemnitee:

(a) for which payment has actually been made to or on behalf of such Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; or

(b) for an accounting of profits made from the purchase and sale (or sale and purchase) by such Indemnitee of securities of Global Growth within the meaning of Section 16(b) of the Securities Exchange Act of 1934, as amended, or similar provisions of state statutory law or common law; or

(c) in connection with any Proceeding (or any part of any Proceeding) initiated by such Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by such Indemnitee against Global Growth or its directors, officers, employees or other

indemnitees, unless (i) Global Growth authorized the Proceeding (or any part of any Proceeding) prior to its initiation, (ii) the Proceeding is initiated by such Indemnitee pursuant to such Indemnitee's rights under Section 6 of this Policy or (iii) Global Growth provides the indemnification, in its sole discretion, pursuant to the powers vested in Global Growth under applicable law.

9. Duration of Policy. All agreements and obligations of Global Growth contained herein shall continue with respect to each Indemnitee so long as such Indemnitee shall be subject to any Proceeding (or any proceeding commenced under Section 6 hereof) by reason of such Indemnitee's service on behalf of Global Growth or its affiliates, whether or not such Indemnitee is still acting or serving in any such capacity at the time any such Proceeding is actually threatened or commenced. This Policy shall be binding upon and inure to the benefit of and be enforceable upon Global Growth hereto and its respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of Global Growth), assigns, spouses, heirs, executors and personal and legal representatives.

10. Security. To the extent requested by an Indemnitee, Global Growth may at any time and from time to time provide security to such Indemnitee for Global Growth's obligations hereunder through an irrevocable bank line of credit, funded trust or other collateral. Any such security, once provided to an Indemnitee, may not be revoked or released without the prior written consent of the Indemnitee.

11. Enforcement.

(a) Global Growth expressly confirms and agrees that it has entered into this Policy and assumes the obligations imposed on it hereby in order to induce Indemnitees to act on behalf of and for the benefit of Global Growth and its affiliates and Global Growth acknowledges that each Indemnitee is relying upon this Policy in having performed or in performing certain acts on behalf of Global Growth and its affiliates.

(b) This Policy constitutes the entire policy with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, with respect to the subject matter hereof.

(c) Global Growth shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting any Indemnitee's rights to receive advancement of Expenses under this Policy.

12. Definitions. For purposes of this Policy:

(a) **"Expenses"** shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements, costs or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, participating, or being or preparing to be a witness in a Proceeding, or responding to, or objecting to, a request to provide discovery or other information in any Proceeding. Expenses also shall include Expenses incurred in connection

with any appeal resulting from any Proceeding and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Policy, including without limitation the premium, security for, and other costs relating to any cost bond, supersede as bond, or other appeal bond or its equivalent. Expenses of a particular Indemnitee, however, shall not include amounts paid in settlement by such Indemnitee or the amount of judgments or fines against such Indemnitee.

(b) "**Proceeding**" includes any reasonably anticipated, threatened or actual action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing, whether brought by or in the right of Global Growth or otherwise and whether civil, criminal, administrative or investigative, and whether arising under contract, law, or otherwise, in which an Indemnitee is or may be involved as a party or otherwise, in connection with his service to or on behalf of Global Growth or its affiliate, by reason of any action taken by him or of any inaction on his part; excluding one initiated by an Indemnitee pursuant to Section 6 of this Policy to enforce his rights under this Policy.

13. Severability. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision. Without limiting the generality of the foregoing, this Agreement is intended to confer upon the Indemnitees indemnification rights to the fullest extent permitted by applicable law. In the event any provision hereof conflicts with any applicable law, such provision shall be deemed modified, consistent with the aforementioned intent, to the extent necessary to resolve such conflict.

14. Modification and Waiver. No supplement, modification, termination or amendment of this Policy shall be binding unless executed in writing by Global Growth. No waiver of any of the provisions of this Policy shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

15. Notice By Indemnitees. In order to secure benefits under this Policy, an Indemnitees shall promptly to notify Global Growth in writing upon being served with or otherwise receiving any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification covered hereunder, unless such notification is prohibited by law or the information related to such service or receipt is otherwise protected from disclosure. The failure to so notify Global Growth shall not relieve Global Growth of any obligation which it may have to the applicable Indemnitee under this Policy or otherwise unless and only to the extent that such failure or delay materially prejudices Global Growth.

16. Notices. All notices and other communications given or made pursuant to this Policy shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) if sent by confirmed electronic mail, when confirmation of receipt is received, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

(a) To Indemnitees at their home address

(b) To Global Growth at:

Academy Association, Inc. 3406 Stagecoach Road
Attn: Greg E. Lind berg, Vice Chairman

or to such other address as may have been furnished to Indemnitees by Global Growth or to Global Growth by Indemnitees, as the case may be.

17. Headings. The headings of the paragraphs of this Policy are inserted for convenience only and shall not be deemed to constitute part of this Policy or to affect the construction thereof.

18. Gender. The use in this Policy of gender specific words or phrases shall be deemed to include the masculine, feminine, or neuter genders, as the context may require.

19. Governing Law and Consent to Jurisdiction. Except to the extent otherwise specifically provided herein, this Policy shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules.

*Execution Copy*

# TAX INDEMNIFICATION AGREEMENT

THIS TAX INDEMNIFICATION AGREEMENT (the "Agreement"), dated as of September 25, 2019, is by and among ACADEMY ASSOCIATION, INC., a North Carolina corporation (the "AAI"), ELI GLOBAL, LLC, a Delaware limited liability company ("Eli Global"; Eli Global and AAI being referred to herein collectively as the "Companies" and individually as a "Company"), and GREG E. LINDBERG ("Lindberg").

WITNESSETH THAT:

WHEREAS, the Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company, Southland National Reinsurance Corporation, the Specified Affiliated Companies signatories thereto, Edwards Mill Asset Management, LLC, as holder of certain Class A common units of the special purpose vehicles set forth on Exhibit A attached thereto, the Agents (as therein defined), AAI, and Greg E. Lindberg, individually and as attorney-in-fact for each of the Specified Affiliated Companies and Agents, have executed that certain Memorandum of Understanding dated as of June 27, 2019 (as amended, restated, supplemented or modified from time to time, the "MOU");

WHEREAS, Lindberg owns, directly or indirectly, 100% of the issued and outstanding equity interests of the Companies;

WHEREAS, the Companies are "flow-through" entities for income tax purposes; and

WHEREAS, the parties hereto desire to enter into this Agreement to, among other things, directly and/or indirectly provide for tax distributions by the Companies to Lindberg and to indemnify Lindberg from and against certain Tax and other liabilities as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereto hereby agree as follows:

1. Defined terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"Assumed Tax Liability" means, with respect to each owner of an equity interest in a Company, an amount equal to the cumulative amount of federal, state and local income taxes (including any applicable estimated taxes) allocated to such owner in respect of its equity interests in such Company, determined taking into account the character of income and loss allocated as it affects the applicable tax rate, that Lindberg estimates in good faith would be due from such owner as of such Tax Distribution Date, (i) assuming such owner were an individual who earned solely the items of income, gain, deduction, loss, and/or credit allocated to such owner in accordance with the organizational documents of such Company, (ii) after taking proper account of loss carryforwards available to individual taxpayers resulting from losses allocated by such Company its equity owners, to the extent not taken into account in prior periods, and (iii) assuming that such equity owner is subject to tax at the Assumed Tax Rate.

"Assumed Tax Rate" means, with respect any owner of an equity interest in a Company for any taxable year, the highest combined marginal effective rate of federal, state and local income

1" = "1" "26956466v5 93980.006.00" "" 26956466v5 93980.006.00

tax applicable to such owner (or, for the avoidance of doubt, the direct and indirect equityholders of such owner if such owner is a flow-through entity for applicable income tax purposes) determined by applying the rates applicable to ordinary income (in cases where taxes are being determined on ordinary income allocated to an equity owner of a Company) and capital gains (in cases where taxes are being determined on capital gains allocated to an equity owner of such Company), by also including in such tax rate computation the rate imposed under I.R.C. § 1411(a) (in cases where the income or gain allocated to an equity owner of a Company is subject to I.R.C. § 1411), and by assuming that state and local income taxes are not deductible in computing such equity owner's liability for federal income tax. The Assumed Tax Rate for Lindberg shall be determined in good faith by Lindberg.

"Business Day" means any day other than a Saturday or a Sunday or a day on which banks located in New York City, New York generally are authorized or required by law to close.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Tax" or "Taxes" shall mean all domestic and foreign national, federal, state, provincial, territorial, possession, county, local, or other taxes, levies, or imposts, including any net income, alternative or add-on minimum tax, gross income, gross receipts, transfer, franchise, profits, or other tax, governmental fee, or other assessment or charge of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Taxing Authority responsible for the imposition of any such tax. For the avoidance of doubt, "Tax" or "Taxes" includes any interest, penalty, addition to tax or additional amount imposed by any Taxing Authority.

"Tax Detriment" means an amount by which the Tax liability of a Lindberg is increased (including by any item of income or gain, any increase in income by virtue of decreased tax basis, any decrease in entitlement to any Tax refund or credit, or otherwise).

"Tax Distribution Date" means any date that is two Business Days prior to the date on which estimated federal income tax payments are required to be made by calendar year individual taxpayers and the due date for federal income tax returns of individual/calendar year taxpayers (without regard to extensions).

"Taxing Authority" means any Governmental Authority responsible for the imposition or collection of any Tax.

2. Tax Distributions by Eli Global. On each Tax Distribution Date, Eli Global shall, subject to the availability of funds, make a distribution to Lindberg in cash in an amount equal to Lindberg's Assumed Tax Liability with respect to Eli Global.



1" = "1" "26956466v5 93980.006.00" "" 26956466v5 93980.006.00

3. Tax Distributions by AAI. On each Tax Distribution Date, AAI shall, subject to the availability of funds, make a distribution to Lindberg in cash in an amount equal to Lindberg's Assumed Tax Liability with respect to AAI.

4. Indemnity.

(a) Each Company hereby agrees to pay, indemnify Lindberg against, and hold Lindberg harmless from, (i) any and all Taxes imposed on Lindberg that are directly or indirectly attributable to or arise out of or result from such Company's execution, delivery and performance of the MOU or any document executed pursuant to or in connection with the MOU, including, without limitation, the Interim Loan Amendment (as defined in the MOU), (ii) any and all Taxes imposed on Lindberg that are directly or indirectly attributable to or arise out of or result from an allocation of income or gain from such Company to Lindberg for his 2018 tax year, (iii) any and all Taxes imposed on Lindberg that are directly or indirectly attributable to or arise out of or result from the filing of any amended tax return by such Company or any audit or examination of such Company by a Taxing Authority for any tax year ending prior or subsequent to the effective date of this Agreement, (iv) any and all costs and expenses incurred by Lindberg for tax preparation services and Tax-related legal counsel for all prior, current and future periods, and (v) any and all liabilities, claims, costs, expenses (including, without limitation, expenses of investigation and the fees and expenses of attorneys, accountants and other advisors), losses, damages, assessments, settlements and/or judgments arising out of, resulting from or incident to the imposition, assessment or assertion of any Tax described in this Section.

(b) In the event that Lindberg is entitled to receive indemnification under this Section, Lindberg shall deliver to the indemnifying Company an invoice requesting payment accompanied by a statement describing in reasonable detail the amount owed. The indemnifying Company shall pay to Lindberg any payment owed under this Section within five (5) days (or within such longer time period agreed to in writing by Lindberg) after the receipt of the invoice for such payment.

5. Tax Gross Up. In the event that Lindberg receives any indemnity payment under Section 4 of this Agreement and suffers a Tax Detriment attributable to the receipt of such payment, the amount of such payment shall be increased to place Lindberg in the same after-Tax position that he would have enjoyed if there was no Tax Detriment associated with such payment.

6. Interest. Any payment required to be made hereunder and not made when due shall bear interest at the rate of ten percent (10%) per annum, and such interest shall be payable from time to time on demand.

7. Confidentiality. Each of the parties hereto agrees that any information furnished pursuant to this Agreement is confidential and, except as and to the extent required by applicable law or otherwise during the course of an audit or contest or other administrative or legal proceeding, shall not be disclosed to other Persons.

8. Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall use their best efforts to find and employ

an alternate means to achieve the same or substantially the same result as that contemplated by such term or other provision.

9. Modification and Waiver. No supplement, modification, termination or amendment of this Agreement shall be binding unless executed in writing by the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof.

10. Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a pdf document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the fifth day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. All communications shall be sent to the following parties at the following addresses:

| | |
|---|---|
| If to Lindberg: | Gregory E. Lindberg<br>3406 Stagecoach Road<br>Durham, North Carolina 27713<br>Email: glindberg@gmail.com |
| If to Eli Global, LLC: | Eli Global, LLC<br>c/o Gregory E. Lindberg<br>3406 Stagecoach Road<br>Durham, North Carolina 27713<br>Email: glindberg@gmail.com |
| If to Academy Association, Inc.: | Academy Association, Inc.<br>c/o Gregory E. Lindberg<br>3406 Stagecoach Road<br>Durham, North Carolina 27713<br>Email: glindberg@gmail.com |

or to such other address as may have been furnished to Lindberg by the Companies or to the Companies by Lindberg, as the case may be.

11. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

12. Counterparts. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.



1" = "1" "26956466v5 93980.006.00" "" 26956466v5 93980.006.00

13. Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

14. Headings. The headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

15. Governing Law and Consent to Jurisdiction. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York. Each Company and Lindberg hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the state or federal courts of the State of New York (the "New York Court"), and not in any other state or federal courts in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the New York Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in the New York Court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the New York Court has been brought in an improper or inconvenient forum.

16. Expenses. Each Company agrees, jointly and severally, to pay or reimburse Lindberg for all costs and expenses incurred by Lindberg in connection with the enforcement of this Agreement, including the fees and disbursements of counsel to Lindberg.

17. Entire Agreement. This Agreement constitutes the entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter, provided that nothing contained in this Agreement shall amend, modify or limit any rights, powers or privileges that Lindberg may have under applicable law or under any other agreement or document, including, without limitation, any agreement between Lindberg and any Company or any obligation of any Company that is directly or indirectly for the benefit of Lindberg, it being understood and agreement that all rights, powers and privileges of Lindberg shall be cumulative.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Tax Indemnification Agreement on and as of the day and year first above written.

COMPANIES:

ACADEMY ASSOCIATION, INC.

By: ______________________
Name: Greg E. Lindberg
Title: Vice Chairman

ELI GLOBAL, LLC

By: ______________________
Name: Greg E. Lindberg
Title: Sole Member

LINDBERG:

______________________
Greg E. Lindberg, Individually

1" = "1" "26956466v5 93980.006.00" "" 26956466v5 93980.006.00

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

Greg E. Lindberg v. AAPC Holdings, LLC and American Academy Holdings, LLC
Case No. 2:26-cv-__________

# EXHIBIT D

Verified Complaint, Lindberg v. Causey, et al., No. 1:26-cv-07938 (S.D.N.Y. filed Sept. 11, 2026) (ECF Doc. 1, without exhibits)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GREG E. LINDBERG,<br><br>Plaintiff,<br><br>– against –<br><br>MIKE CAUSEY, individually and in his official capacity as Commissioner of Insurance of the State of North Carolina; MICHAEL DINIUS, individually and in his capacity as Special Deputy Rehabilitator of the North Carolina Insurance Companies; MOHSIN Y. ("MO") MEGHJI, individually, as Chief Executive Officer of M3 Partners, LP, and as acting Chief Executive Officer of NHC Holdings, LLC; and WILLIAMS MULLEN, P.C.,<br><br>Defendants. | Civil Action No. ___ Civ. _____ (___)<br><br>**VERIFIED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED COMPLAINT FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(c), 1962(d), 1964); CONVERSION; BREACH OF FIDUCIARY DUTY; CIVIL CONSPIRACY; UNJUST ENRICHMENT; AND INJUNCTIVE RELIEF STAYING ALL DISPOSITIONS OF THE PRIMARY RESTITUTION ASSETS AND THE SPECIFIED AFFILIATED COMPANIES PENDING FINAL ADJUDICATION OF PLAINTIFF'S RESTITUTION OBLIGATIONS, INCLUDING ALL APPEALS**

Plaintiff Greg E. Lindberg ("Lindberg" or "Plaintiff"), appearing *pro se*, for his Verified Complaint against Defendants Mike Causey, Michael Dinius, Mohsin Y. ("Mo") Meghji, and Williams Mullen, P.C. (collectively, "Defendants"), alleges as follows upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. This civil RICO action arises from a coordinated scheme by a North Carolina state official and his confederates who weaponized North Carolina's insurance-rehabilitation statutes—and then a federal criminal restitution proceeding—into a vehicle for systematic self-enrichment

and political retribution. Defendants Mike Causey, Michael Dinius, Mo Meghji, and Williams Mullen, P.C., operating as an association-in-fact enterprise (the "Enterprise") headquartered at 1700 Broadway, 19th Floor, New York, New York, and spanning four states, have extracted more than $165 million in fees from the insurance estates they administer—not one dollar of which was approved by the supervising court, as N.C. Gen. Stat. § 58-30-85(3) requires—while methodically destroying billions of dollars in value that Lindberg lawfully built over decades. (See Exhibit M.)

2. The scheme's genesis predates Causey's inauguration. In December 2016—weeks before taking office as North Carolina Insurance Commissioner—Causey identified Lindberg, the largest financial supporter of his electoral opponent, as a "political problem" and a "significant impediment" to be eliminated. One witness has attested under oath, and a second has stated in a recorded interview, that Causey plotted to "dismantle" Lindberg's insurance operations and that he "had a person in mind" to do it: a long-serving North Carolina Department of Insurance ("NCDOI") deputy who "already didn't like Lindberg and would know how to go about dealing with [his] companies and dismantling them." That deputy was Senior Deputy Commissioner Jacqueline Obusek—the very regulator whose bias Lindberg later, and justifiably, asked to have removed from his file, and whom Causey later promoted. (See Exhibits A3, A3.1, A4, K2.)

3. Causey then leveraged relationships with federal law enforcement to spur an FBI investigation on the strength of a fabricated $110,000 donation allegation that the FBI later admitted never occurred (Exhibit A6), demanded and received a wire, and over more than 100 recorded calls and meetings solicited contributions while asking, on tape, "what's in it for me?" The recordings captured Lindberg, unaware he was being recorded, insisting on "legal campaign contributions," on "tighter standards than the law allows," and on a regulator who would be "tough and fair, that's all we need." (Exhibits A5, F12.) That entrapment became a federal indictment, a

conviction vacated by the Fourth Circuit, *United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022), a retrial conviction in 2024, a second indictment (the "Financial Case," No. 3:23-CR-48) charged eight months after the reversal, and a guilty plea in November of 2024.

4. In October 2018 Lindberg ceded control of his North Carolina insurance companies (the "NCICs") to Defendant Dinius as Special Deputy Rehabilitator. Every event material to the losses now charged to Lindberg occurred after that date and was within the control of the Defendants, not of Lindberg. Dinius retained Defendant Meghji and his New York firm, M3 Partners, LP ("M3"), as financial advisor, and Defendant Williams Mullen as counsel. From New York, the Enterprise let a signed $450 million Ares letter of intent die (after Ares was "warned off" by "a third party constituent" following a meeting with the Department of Justice), rejected an approximately $1 billion Oaktree transaction that would have repaid every affiliated loan at face value by June 2019, coerced a ten-year hold on the affiliated-loan portfolio under a written threat of immediate liquidation of all four insurers, and then sold—before maturity and without the court approval North Carolina law requires—more than $1 billion of principal-protection bonds for approximately $394 million, destroying approximately $611.6 million of guaranteed value on the very instruments whose only function was to prevent loss.

5. The pattern continued. In 2023 the Enterprise litigated against a willing buyer (Montshire/Alban) rather than sell. In 2024 it blocked a signed public-company merger agreement with Quadro Acquisition Corp. One valuing the non-insurance operating companies (the "Specified Affiliated Companies" or "SACs") at approximately $3.4 billion and the Clanwilliam Group alone at $880 million; in September 2025 it sold Clanwilliam to a favored private-equity buyer for approximately $450 million, after a meeting in New York City at which Meghji's associates explained that a primary purpose of the sale was to fund fees to Meghji and his New

York staff. In December 2025 it sold Beckett Collectibles—independently appraised under USPAP standards at $1,003,924,000 and the subject of Blackstone acquisition proposals at $800 million to $1.1 billion—for approximately $134 million, with no motion, no notice, and no order on the docket of the supervising Article III court, and with the price withheld from Lindberg as "confidential." Approximately $866 million of value was destroyed in a single transaction. In 2026 AAPC Holdings, LLC was written down to near zero on "conjecture about generative artificial intelligence," and Damovo is being sold for no proceeds at all—only approximately $17.5 million in "consent fees" to the sellers' own fiduciaries—notwithstanding a written $400 million indication of interest.

6. Since January 2025 the Enterprise has operated through the federal restitution proceeding itself. On the Government's insistence, a court-appointed Special Master was clothed with "exclusive possession and control" of the assets designated for restitution in *United States v. Lindberg* (the "Primary Restitution Assets"), including NHC Holdings, LLC ("NHC"), the holding company for the SACs, and AAPC Holdings, LLC ("AAPC"), and with power to liquidate them. Within two weeks of taking the NHC equity the Special Master removed both directors Lindberg's company had appointed to the NHC board, and Defendant Meghji—the same New York financial advisor who had administered the NCICs' affiliated-loan book for Causey and Dinius since 2019—became NHC's acting Chief Executive Officer. From that point the same New York-based group controlled both the creditor (the NCICs' loan book) and the debtors (the operating companies that owed on it), valued both sides of the ledger through Meghji's firm, and sold both.

7. The $1.655 billion restitution figure that now fixes Lindberg's criminal punishment rests on M3 "desktop" valuations that the Special Master himself describes as a "best guess," "inherently unreliable," and a "current guess," developed through ex parte communications among

the Special Master, the Government, and the interested custodians—M3, NHC, the NCICs, Defendant Dinius, Wes Camden (counsel to the NCICs at Williams Mullen), and Defendant Williams Mullen—that Lindberg has never been permitted to see. Eighteen months of written requests for the underlying data were deferred, conditioned, or refused. On August 17, 2026 the Government stated in writing that it does not possess the data because it was exchanged ex parte and never came to it; the Special Master's counsel's final answer to the same request was "No." The data on which a multibillion-dollar criminal punishment rests is, on the Government's own account, in no party's hands. It is in the hands of the Defendants.

8. Meanwhile, the one fact that should matter most is undisputed: there is no unremediated victim. On December 23, 2025, the Special Master's own Notice of Distribution confirmed that all of the NCICs' approximately 43,000 American policyholders had been mailed final payment in full. Against the $1.655 billion figure, the record in the Western District of North Carolina documents offsets, credits, and third-party-caused reductions of $2,899,418,383 at a minimum—$3,765,418,383 with the Beckett loss. Lindberg has demonstrated to the Western District of North Carolina, and contends on appeal, that restitution has not merely been paid but overpaid by more than $2 billion. And the sentencing court itself characterized "the real loss" in the criminal case as "risk"—a risk that was lawful when taken, approved by the regulator, and not prohibited by North Carolina statute until 2019, after Lindberg had ceded control.

9. Under *Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), restitution under the Mandatory Victims Restitution Act ("MVRA") is criminal punishment. The liquidation of Lindberg's assets to generate restitution proceeds is the execution of that punishment. A pre-order, off-the-docket sale at an 87% discount to appraised value is punishment executed by private parties with no lawful power to punish, in an amount no court fixed, by a procedure no rule permits

—and it can never be undone. No ruling of the Fourth Circuit will un-sell Beckett. That is why the injunctive relief sought here is not an adjunct to the damages claims but their necessary complement: the Enterprise is paid from the estate it liquidates, so every sale it completes both enriches the Defendants and dissipates the only fund from which any judgment against them, or any restitution credit to Lindberg, could be satisfied.

10. Lindberg does not ask this Court to fix the amount of his restitution, to review any order of the Western District of North Carolina, or to find his conviction invalid. Those questions are before the district court and the Fourth Circuit in consolidated appeal Nos. 26-4309(L) and 26-4310. He asks this Court to hold the Defendants accountable, under RICO and New York law, for what they did with his assets after they took control of them—the fees they paid themselves without court approval, the transactions they blocked, the sales they forced at a fraction of value, and the sale of Beckett for approximately $134 million against a $1,003,924,000 appraisal—and to stay the next such sale until the restitution question is finally adjudicated, including all appeals. Plaintiff seeks treble damages under 18 U.S.C. § 1964(c), disgorgement, an accounting, and an injunction. Plaintiff does not contend in this action that either conviction is invalid; the history of the prosecutions is pleaded because it is the origin of the Enterprise and the source of its control over Lindberg's assets. Unless otherwise indicated, "Doc." refers to the docket of *United States v. Lindberg*, No. 3:23-CR-48-MOC (W.D.N.C.).

## THE PARTIES

11. Plaintiff Greg E. Lindberg is a natural person over the age of eighteen, a citizen and domiciliary of the State of Florida, and is otherwise *sui juris*. He is the founder of Global Growth Holdings, LLC and its predecessor Eli Global, LLC, and was the 100% equity owner of the NCICs and of the non-insurance operating companies (the "Specified Affiliated Companies" or "SACs")

whose value the Defendants have destroyed. He is presently in the custody of the Bureau of Prisons pursuant to the judgment entered May 29, 2026 in *United States v. Lindberg*, No. 3:23-CR-48-MOC (W.D.N.C.), which is on appeal.

12. Defendant Mike Causey is the Commissioner of Insurance of the State of North Carolina and, in that capacity, the statutory Rehabilitator of the NCICs. He is sued individually for damages and in his official capacity solely for prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908). Causey is sued individually for conduct that no office authorizes: forming, before he took office, a plan to "dismantle" Lindberg's companies and remove him as a political "problem"; making false statements to the FBI and under oath in federal court to set that plan in motion; and directing, through his agents, the New York-based enterprise described below. Causey is a citizen and resident of North Carolina.

13. Defendant Michael ("Mike") Dinius was appointed by Causey in October 2018 to take control of the NCICs under administrative supervision and, from June 27, 2019, has served as Special Deputy Rehabilitator of the NCICs. He is sued individually, for acts outside the scope of any authority conferred by statute or court order: retaining Defendants Meghji and Williams Mullen and directing the Enterprise's operations from New York; personally approving the interstate wire transfers and transactions described below; selling estate assets without the court approval North Carolina law requires; and personally receiving an estimated $25 million in fees from the estates without court approval. Under 28 U.S.C. § 959(a), receivers and managers of property may be sued without leave of the appointing court with respect to their acts and transactions in carrying on the business connected with that property. Dinius is a citizen and resident of Indiana.

14. Defendant Mohsin Y. ("Mo") Meghji is the Chief Executive Officer and managing partner of M3 Partners, LP ("M3"), a New York restructuring firm with its principal place of business at 1700 Broadway, 19th Floor, New York, New York. M3 was retained by Dinius in 2019 as financial advisor to the rehabilitation estates, and all management of the assets Lindberg transferred to the Defendants' control has been conducted from Meghji's New York offices. Since 2025 Meghji has also served, on information and belief, as the acting Chief Executive Officer of NHC Holdings, LLC, the holding company for the Specified Affiliated Companies and the Manager of Entrust Global Group, LLC, Grantor of the Beckett Collectibles Trust. Meghji is a citizen and resident of New York. Meghji is sued individually and in each of those capacities. Neither M3 nor NHC is named as a defendant; each is an instrumentality through which Meghji conducted the affairs of the Enterprise, and each is bound by any injunction entered against Meghji under Fed. R. Civ. P. 65(d)(2).

15. Defendant Williams Mullen, P.C. ("Williams Mullen") is a Virginia professional corporation with offices in Raleigh, North Carolina, that has served as legal counsel to Defendant Dinius as Special Deputy Rehabilitator and to the rehabilitation estates since 2020. Williams Mullen has received an estimated $30 million in fees from those estates without court approval, coordinated with M3's New York operations to document and facilitate the transactions described below, and, on information and belief, communicated ex parte with the Special Master concerning the loss and valuation figures on which Lindberg's restitution rests. (Doc. 331 at 5–6; Doc. 331-1 ¶ 4.)

16. NHC Holdings, LLC is not a party to this action. Its equity is held of record by Joseph W. Grier, III, "solely in his capacity as special master" appointed in *United States v. Lindberg*, No. 3:23-CR-48-MOC (W.D.N.C.) (Doc. 56), and Plaintiff seeks no relief against the

Special Master, the Rehabilitator in his statutory capacity, the United States, or any court. The acts of NHC alleged herein are pleaded as the acts of Defendant Meghji, who directed them as NHC's acting Chief Executive Officer, and of the Enterprise through which he acted. The injunctive relief requested in Count VII is directed to the Defendants in their own capacities and to the persons and entities in active concert or participation with them, including NHC, M3, and Entrust Global Group, LLC, and is expressly subject to any order of the Western District of North Carolina, the Fourth Circuit, or the Wake County Superior Court.

**A. Causey Has Forfeited Any Immunity by His Extra-Judicial Conduct**

17. Defendant Causey will undoubtedly attempt to cloak his conduct in the protections of his office, invoking Eleventh Amendment sovereign immunity and the doctrine of qualified immunity. Those defenses fail. Causey's actions as detailed in this Complaint are not a legitimate exercise of regulatory discretion but a coordinated, extra-judicial racketeering enterprise weaponized to "dismantle" a political opponent and to extract hundreds of millions of dollars in unapproved fees.

18. Because Plaintiff seeks prospective injunctive relief to halt an ongoing violation of federal law, *Ex parte Young*, 209 U.S. 123 (1908), strips Causey of sovereign immunity as to that relief. Because no reasonable official could believe that fabricating evidence, lying to the FBI, lying under oath in federal court, soliciting bribes, and looting insurance estates of more than $165 million constitutes lawful conduct, Causey has no qualified immunity. The prohibition on wire fraud is "clearly established" by 18 U.S.C. § 1343; no "gray area" of administrative law permits a state actor to deceive the public or regulated parties to secure an illicit benefit. Nor does any official capacity attach to a plan formed in December 2016, before Causey took office.

## JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, and specifically 18 U.S.C. § 1964(a) and (c). The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy.

20. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a). Plaintiff is a citizen of Florida. Defendant Causey, sued individually for damages, is a citizen of North Carolina; Defendant Dinius is a citizen of Indiana; Defendant Meghji is a citizen of New York; and Defendant Williams Mullen is a Virginia professional corporation with its principal place of business in Virginia. The amount in controversy exceeds $75,000, exclusive of interest and costs.

21. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred here. The execution of the racketeering activity—the financial administration and liquidation of the assets and the wire-fraud predicate acts—was centralized in and directed from New York City. The Defendants held and continue to hold board meetings and conduct the business of the Enterprise from M3's headquarters at 1700 Broadway, 19th Floor; the Defendants hired numerous staff, many of whom work from that office, to manage the assets Lindberg transferred; Lindberg met with Defendants Dinius and Meghji in New York City on several occasions concerning those assets; and since 2025 NHC has been managed from the same offices by Defendant Meghji as its acting Chief Executive Officer, where the decisions to consent to the termination of the Beckett Trust and the sale of Beckett, to sell Clanwilliam, and to dispose of Damovo were made or operationalized.

22. Venue is further proper under 18 U.S.C. § 1965(a) because Defendant Meghji resides, is found, has an agent, and transacts his affairs in this District, and under § 1965(b) because

the ends of justice require that the other Defendants, residing in other districts, be brought before this Court.

23. New York is also the forum the parties' own instruments select. The Tax Indemnification Agreement of September 25, 2019, by which Academy Association, Inc. and Eli Global, LLC undertook to make tax distributions to and indemnify Lindberg—obligations confirmed by the Indemnity Confirmation of July 16, 2024 as binding jointly and severally on all Global Growth companies "including any companies that may now be in various trusts"—is governed by New York law and designates the state and federal courts in New York as the exclusive forum for disputes arising under it (§ 15). (Exhibit V2.) The destruction of the assets that fund those obligations, and the Special Master's position that "there are no more funds for legal fees," are injuries to a New York-law contractual entitlement held by Lindberg. (Exhibit Y at 2.)

24. This Court has personal jurisdiction over all Defendants under the Due Process Clause and New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1)–(3), because the Defendants formed an association-in-fact enterprise that selected New York City as its operational headquarters. While Defendant Causey provided the political cover from North Carolina, he and Defendant Dinius deliberately retained Defendant Meghji and M3, located in this District, as the financial engine of the scheme, and retained numerous other employees and staff who operate daily from the Enterprise's hub at 1700 Broadway.

25. Personal jurisdiction over Defendant Meghji is proper because he resides in New York and manages the assets at issue, worth billions of dollars, from M3's principal place of business in New York City.

26. Personal jurisdiction over the non-resident Defendants Causey, Dinius, and Williams Mullen is proper under C.P.L.R. § 302(a)(1) because they transacted business within the

State through their selected agent, Meghji, who acted in New York "for the benefit of, and with the knowledge and consent of," them and subject to "some control" by them. *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365–66 (2d Cir. 1986); see *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418 (E.D.N.Y. 2012) (applying the agency test under C.P.L.R. § 302(a)(2)); cf. *City of Long Beach v. Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416 (S.D.N.Y. 2020) (stating the test). Specifically:

(a) *Selection of forum.* Causey, acting through Dinius, purposefully availed himself of the privilege of conducting activities in New York by appointing Meghji as financial advisor, de facto asset manager, and—in the Defendants' own description—"CEO of the Enterprise," and by approving the hiring of Meghji's New York staff to manage the billions of dollars in assets transferred by Lindberg.

(b) *Direction of activities.* Causey and Dinius directed Meghji to execute specific transactions from his New York base, including the liquidation of assets and the processing of fee payments to themselves, and Dinius and Causey were in regular contact concerning the management of the affiliated-loan assets.

(c) *Legal coordination.* Williams Mullen, as counsel to the Enterprise, coordinated directly with Meghji's New York operations to document and facilitate those transactions, knowing they were executed in this District and knowing that no court had approved any of the fees.

(d) *Predicate acts in New York.* The pattern of racketeering activity relies on hundreds of interstate wire transfers that originated from, or were directed to, Meghji's offices in New York City. Every unauthorized fee payment wired from M3's New York

accounts is a predicate act committed within this District, and those wires continue monthly.

(e) *Meetings in New York.* Numerous critical meetings concerning the assets took place physically in New York City, including meetings among Plaintiff and Defendants Dinius and Meghji and the December 2024 meeting among the Defendants' representatives at which two New York-based associates of Meghji, David Resnick and Tom Biaggi, explained that a primary purpose of selling Clanwilliam far below its market value was to fund fees to Meghji and his New York employees, including Mr. Biaggi's son.

(f) *Asset-stripping operations.* The administrative decisions to block the $3.4 billion Quadro transaction, to undervalue and sell Clanwilliam, to consent to the termination of the Beckett Trust and the sale of Beckett, and to dispose of Damovo—the decisions that caused the primary injuries to Plaintiff—were analyzed, recommended, and operationalized by Meghji from his New York office.

27. Witnesses report that Meghji has said on several occasions that he sees his goal as "separating the business from Lindberg" and "separating Lindberg from the business." In pursuit of that goal, Meghji and his employees, with Causey's and Dinius's explicit approval, conducted hundreds of interstate wire transfers and other transactions from New York City. See *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 166–67 (2d Cir. 2010). These are "purposeful activities" through which the Defendants "avail[ed] [themselves] of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

(1945). Having chosen New York as the base of operations for their unlawful fee-extraction enterprise, the Defendants cannot claim it is an inconvenient or unforeseeable forum.

28. *Related proceedings.* For purposes of Local Civil Rule 1.6, Plaintiff identifies the following proceedings involving the same assets or overlapping facts, none of which asserts the claims pleaded here: *United States v. Lindberg*, Nos. 3:23-CR-48-MOC and 5:19-CR-22-MOC (W.D.N.C.), on appeal as Nos. 26-4309(L) and 26-4310 (4th Cir.); *Southland National Insurance Co. v. Lindberg*, No. 19-CVS-013093 (Wake Cnty. Super. Ct.), and related rehabilitation proceedings, No. 19-CVS-008664 (Wake Cnty. Super. Ct.); and *Lindberg v. Wilson*, No. 1:26-cv-03939 (D. Colo.) (the Damovo sale).

**NO COURT HAS APPROVED THE FEES THE DEFENDANTS PAID THEMSELVES**

29. The Defendants cannot rely on any prior court approval of the more than $165 million in fees they have paid themselves from the insurance estates, because no application for approval of those fees was ever made to, or granted by, the Wake County Superior Court that supervises the rehabilitation, and, as to fees drawn since January 2025 from the Primary Restitution Assets, no application was made to the Western District of North Carolina, whose order makes such fees subject to "the Court's approval" (Doc. 56 ¶ 14). North Carolina's Insurers Supervision, Rehabilitation, and Liquidation Act authorizes the rehabilitator "[t]o fix the reasonable compensation of employees and agents, legal counsel, actuaries, accountants, appraisers, and consultants, *with the approval of the Court*." N.C. Gen. Stat. § 58-30-85(3) (emphasis added). That approval was never sought and never received. The same statute and the June 27, 2019 Consent Order of Rehabilitation required advance approval of the Wake County Superior Court for material dispositions of estate assets; the Rehabilitator sold the principal-protection bond portfolio without

it (Supp. Statement of Facts, Doc. 174, ¶ 45), and the $1 billion Beckett asset was likewise sold without court approval.

30. In the context of insurance rehabilitation, judicial oversight is the only barrier between a rehabilitator's fiduciary duty and the looting of the estate. Fiduciaries who serve conflicting interests may be denied compensation altogether, even absent fraud. *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 268–69 (1941); see *In re New York, N.H. & H.R. Co.*, 421 F. Supp. 249 (D. Conn. 1976) (conditioning and reducing fees of a conflicted fiduciary in a court-supervised reorganization). Payments made without required court approval are a breach of fiduciary duty, because fiduciaries must act within the bounds of the orders and statutes that empower them.

31. Williams Mullen's omission was not inadvertent. As primary counsel advising Dinius on every aspect of the rehabilitation, Williams Mullen was intimately familiar with § 58-30-85(3) yet structured the fee arrangements to bypass it. By documenting and executing fee payments while omitting the statutory approval process, Williams Mullen participated in a scheme to deprive the NCICs—and Lindberg, the sole owner of their surplus equity—of money and property through the concealment of material facts by fiduciaries with a duty to disclose. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000); *United States v. Walker*, 191 F.3d 326, 335–36 (2d Cir. 1999). Each wire transfer of unapproved fees, coordinated with Meghji in New York, is a separate predicate act. See 18 U.S.C. §§ 1343, 1961(1).

32. Williams Mullen crossed the line from counsel to participant. It provided planning and instructions on dozens of steps in executing the scheme, facilitated the flow of approximately $2.5 million per month without seeking the statutory approval, and acted with full knowledge that the payments required judicial oversight. A law firm that plays "some part in directing" an

enterprise's affairs is liable under *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993), and need not have the "final say." *United States v. Zichettello*, 208 F.3d 72, 98–99 (2d Cir. 2000); see *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015) (RICO claims against a law firm proceeding on a class basis); *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997); *Alix v. McKinsey & Co.*, 23 F.4th 196, 205–06 (2d Cir. 2022) (RICO proximate cause adequately alleged against a professional firm that filed false disclosures). Because the acts complained of are administrative transfers of funds, not petitions to a court, neither the litigation privilege nor *Noerr-Pennington* applies to them.

33. The failure to seek court approval was not a one-time oversight; it was a seven-year strategy. The scheme has operated from 2019 to the present through hundreds of wire transfers, establishing closed-ended continuity, and the Defendants' refusal to seek approval has become their "regular way of conducting business," establishing open-ended continuity that threatens to continue as long as the assets remain under their control. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989). But for Williams Mullen's omissions, the fees would have required court scrutiny, which would have reduced or eliminated them and prevented the value destruction that funded them. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) (requiring "some direct relation between the injury asserted and the injurious conduct alleged"); cf. *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018).

## NO ABSTENTION DOCTRINE, ROOKER-FELDMAN, OR HECK BARS THIS ACTION

34. The Defendants have waged a long-running legal battle with Plaintiff in the North Carolina courts relating to the affiliated-loan assets. After seven years of litigation, they have succeeded only in paying themselves more than $165 million in fees and destroying billions of dollars in value. No state proceeding can adjudicate the claims pleaded here: RICO and the MVRA

are exclusively federal schemes, and no parallel state proceeding adjudicates racketeering liability or federal restitution obligations.

35. *Colorado River* abstention does not apply. Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction Congress confers, *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), and abstention is an "extraordinary and narrow exception." The factor that federal law supplies the rule of decision, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983), weighs heavily against abstention: no state court is deciding, or could decide, the RICO claims.

36. *Younger* abstention does not apply. As circumscribed by *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013), *Younger* reaches only ongoing state criminal prosecutions, civil proceedings akin to criminal prosecutions, and proceedings uniquely in furtherance of a state court's judicial functions. Plaintiff seeks to enjoin none of them; he seeks to vindicate federal statutory rights against private and official actors in their individual capacities.

37. *Burford* abstention does not apply. That doctrine is confined to cases presenting difficult questions of state law whose federal resolution would disrupt a coherent state administrative scheme. *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989). Courts in this Circuit have declined to impose a blanket policy of abstention in cases involving insolvent insurers, *Costle v. Fremont Indem. Co.*, 839 F. Supp. 265, 270 (D. Vt. 1993); the cases in which *Burford* has been applied to insurer insolvencies, e.g., *Levy v. Lewis*, 635 F.2d 960 (2d Cir. 1980), and *Law Enforcement Ins. Co. v. Corcoran*, 807 F.2d 38 (2d Cir. 1986), involved claims that would have displaced the liquidator's administration of the estate, which this action does not; and the claims here neither require interpretation of state insurance statutes nor threaten any state regulatory objective—every policyholder of the NCICs has been paid in full, and

the relief requested does not disturb the rehabilitation of the NCICs or any order of the Wake County Superior Court.

38. *Pullman* abstention does not apply because no ambiguous question of state law could moot a federal constitutional claim; Plaintiff asserts federal statutory claims and related state-law torts.

39. The Defendants chose federal law as their vehicle. By pressing a federal criminal prosecution that yielded MVRA restitution obligations, they acknowledged that state law was insufficient to accomplish the dismantling of Lindberg's business group. Having invoked federal power, they cannot demand state-court deference to escape federal civil accountability.[1]

40. The *Rooker-Feldman* doctrine does not apply because there is no state-court judgment Plaintiff asks this Court to overturn. *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), does not apply because success on the claims pleaded here would not "necessarily imply the invalidity" of the criminal judgment or of any restitution order. This action concerns what the Defendants did with the assets after they took control of them and asks the Court to stop the next such sale. Success on these claims is fully consistent with the criminal judgment: the sentencing court characterized "the real loss" as "risk," and the Special Master has conceded that he and Lindberg "agree on the basic, objective, material facts" and that the only dispute is "whether the chain of proximate cause was broken" by the very conduct alleged here. (Doc. 234 at 3, 31–35; Doc. 281 at 6 (quoting Doc. 245 at 19, 21–22, 25, 30).) Nor does the *in rem* custody of the Western District of North Carolina over the Primary Restitution Assets bar this action: the damages claims are *in personam*, and the

[1]See Exhibit F11, a letter to the Attorney General of North Carolina requesting an investigation into Causey's false statements to the FBI, his perjury in federal court, FBI Agent Scherger's failure to investigate Causey's bias before opening the investigation, the false predication of the investigation, First Amendment retaliation, extortion and coercion by Causey to demand illegal donations, the Government's failure to correct Causey's testimony, the Government's withholding of exculpatory evidence, repeated media leaks, the release of one million documents to the defense days before trial, and Causey's public statements before trial.

injunctive relief requested is addressed to the Defendants' own conduct, preserves rather than displaces the custodial court's jurisdiction, and is expressly made subject to that court's orders.

## STATEMENT OF FACTS

### A. The Affiliated-Investment Program Was Presented to the Regulator, Approved by the Regulator, and Operated Under a Written Risk-Management Framework With a Zero-Default Record

41. In September 2014 Lindberg presented a comprehensive affiliated-investment strategy to the NCDOI, seeking approval before implementing any affiliated investment at his wholly-owned insurance companies. (Exhibit A.) The presentation proposed, and the NCDOI subsequently agreed to, a negotiated regulatory arrangement that included an approximately forty-percent ceiling on affiliated investments. The NCDOI recited and agreed to that arrangement in its April 11, 2016 annual-statement Review Letter from Senior Financial Analyst Jessica Price, CPA, CFE, received the eleven disclaimers of affiliation filed under N.C. Gen. Stat. § 58-19-25(j), and reviewed the successor finance-company and principal-protection-note structures before they were used. (Exhibit A12; Doc. 234 at 6; Doc. 300 at 29–31.) Only after receiving that approval did Lindberg proceed with the first affiliated investment.

42. The NCICs operated under a written Risk Mitigation Policy on Affiliated Loans, revised February 20, 2017 and continuously updated, including the April 14, 2018 revision. (Exhibits C, E5.) The Policy required senior-secured first-lien positions on "all assets and cash flows of the borrower"; a minimum credit rating of "B-" or equivalent from an SEC-approved nationally recognized statistical rating organization for every loan; a weighted-average portfolio rating of "BB" or higher with portfolio leverage under four times; third-party arm's-length pricing opinions; perfection certificates; quarterly risk-based-capital calculations; and annual cash-flow testing "to ensure that assets are adequate to service liabilities and to prevent additional reserve

requirements." It recited a "zero default track record" over twenty-five years and committed Lindberg's affiliates to "prepay any underperforming loan using reserve capital." Prior to the transfer of control of the NCICs to the Rehabilitator in October 2018, there were no defaults on the affiliated loans.

43. Lindberg invested approximately $1 billion of his own capital in the insurance group and took no dividends from the insurers. (Exhibit A11.) Independent analysis by Berkeley Research Group confirms capital contributions exceeding $377 million and no dividends. As the sole owner of both the insurers and the operating companies that received the loans, Lindberg would have seen his entire investment wiped out, first, by any loss on the affiliated loans. He personally guaranteed the affiliates' obligations to the insurers, totaling approximately $2.39 billion under the March 11, 2019 Amended and Restated Backstop Agreement, without any regulatory requirement to do so. (Exhibit B; Doc. 234 Ex. B8.) And in May 2018 he directed the insurers to purchase $1,006,239,867 in par value of investment-grade bank zero-coupon bonds—held inside Principal Protected Notes issued through Barclays, RBC, UBS, and Natixis, with the express permission of the NCDOI—as dollar-for-dollar principal-loss insurance that, if held to maturity, would have repaid the affiliated-loan principal in full. (Supp. Statement of Facts, Doc. 174, ¶¶ 27–34; Decl. of Greg E. Lindberg re Principal-Protected Notes, Doc. 295, ¶¶ 1–4 & Exs. A–F, H–J; Exhibits Z-4, Z-8.)

44. Contemporaneous independent analysis confirmed the conservatism of the program. Houlihan Lokey's report dated January 18, 2018 documented each affiliated investment, including enterprise-value coverage and loan-to-value analysis, and concluded that the loans were conservatively underwritten at approximately fifty-percent loan-to-value. KPMG's August 24, 2018 valuations concluded that more than $1 billion of equity supported the loans, separately

valuing the twenty-one Eli Global operating companies at an aggregate business-enterprise value of approximately $2.45 billion—including Global Health Technology Group at $1.2 billion and American Academy Holdings (AAPC) at $900 million—in addition to approximately $1.08 billion of insurance-entity equity value. Lindberg spent approximately $1.8 million on that valuation work, which spans more than 380 pages. (Exhibit E; Doc. 234 Exs. E2, E3.) On March 9, 2018 Causey himself wrote to Lindberg: "You did an outstanding and impressive job of answering some really tough, hardball questions from state regulators today," in a message reflecting that Lindberg was then working to "engage JP Morgan or KKR Capital Markets to provide financing to replace intercompany loans." (Exhibit B3.)

45. Affiliated investment is now standard practice among the largest names in the insurance industry, including Blackstone, Brookfield, KKR, and Apollo; U.S. life and annuity insurers reported approximately $413 billion in affiliated investments in 2025, roughly twice the 2020 figure, and some large life insurers hold 35 to 43 percent of their assets in affiliated investments—like the 40 percent limit Lindberg proposed to the NCDOI in 2014. (Exhibit B5; Doc. 234 Ex. B24.) North Carolina did not restrict the affiliated-investment structure by statute until 2019—after the investments were originated and after Lindberg had ceded control—as the Government's own sentencing memorandum acknowledged. (Doc. 152.)

46. Lindberg's Risk Mitigation Policy was successful. The group of companies that received loans from the NCICs had consolidated EBITDA in excess of $300 million in 2024. At the 22.14-times EBITDA multiple established in the Quadro public-company merger agreement signed in the first quarter of 2024, that group had an enterprise value in excess of $6 billion, providing several billion dollars of equity cushion beneath the affiliated-loan assets.

**B. There Was Never Any Evidence of Criminal Intent in Lindberg's Underwriting of the Affiliated Loans**

47. These transactions were documented, vetted by numerous inside and outside counsel, disclosed in financial statements reviewed by auditors and state regulators, and designed to optimize capital structures and ensure solvency. More than 100 employees in Lindberg's insurance and investment operation, including numerous inside and outside counsel, advised on the transactions; none ever voiced a concern that the affiliated loans might violate any law or regulation. There is no e-mail instructing anyone to "hide this from regulators," no recorded conversation suggesting an illegal act, and no directive to make a false entry. No rational person plotting a fraud guarantees the loans personally, insures the principal, over-collateralizes at 50% loan-to-value, invests a billion dollars of his own equity in the first-loss position, and invites rigorous regulation.

48. The FBI recordings—made when Lindberg had no idea he was being recorded—show a man asking only for fairness: "everything must be fully compliant with NC law"; "we are not asking you for any favors"; "all we want is slow, thorough, and rigorous regulation"; "we are not asking you for anything special. In fact we are willing to submit ourselves to tighter standards than the law allows"; "we want to do it right by every law out there"; he was "happy to be well regulated" and "just [did not] want to be subject to personal vendettas"; the regulator he requested would be "tough and fair, that's all we need"; "all we're asking for is an even playing field"; and "I'm not going anywhere." (Exhibits A5, F12; Doc. 441 at 10–11 (No. 5:19-CR-22) (quoting GEL Exhs. 164, 189, 195).) Deputy Commissioner Debra Walker testified for the Government that there was no "side deal," that no one ever approached her about anything inappropriate, and that there was no guaranteed financial benefit of any kind associated with her review of the files; the case agent conceded the Government had no evidence of any guaranteed benefit; and the Government

itself told the jury in closing that there was "no evidence that Ms. Walker was corrupt or had some sort of side deal." (Doc. 441 at 11, 16.) The judge who presided over the 2024 retrial remarked after the verdict that the case "could have gone either way."

**C. Causey Planned to "Dismantle" Lindberg's Companies Before He Took Office, and Selected the Deputy to Do It**

49. Causey targeted Lindberg for destruction before taking office in January 2017, motivated by Lindberg's support of Causey's opponent, Wayne Goodwin, in the 2016 election. According to one witness, speaking in a sworn affidavit, Causey "was concerned about a multi-millionaire named Greg Lindberg who had strongly supported Goodwin during the last election" and "saw Lindberg as a significant impediment to winning the [upcoming 2020] election against Goodwin." Causey "said that he had a person in mind" to help eliminate Lindberg as a political threat: "She had been at the DOI a long time," and "she already didn't like Lindberg and would know how to go about dealing with [Lindberg's] companies and dismantling them." (Exhibits A3, A3.1 (Loftin Aff.).)

50. A second witness, in a recorded interview, corroborates the plan: "Causey explained to me that Lindberg was a multimillionaire who strongly supported and contributed to Goodwin's campaign in the election that Causey had just won. Causey said that because he had beaten Goodwin by so few votes, he was worried about Greg Lindberg helping Wayne in the next election, and he felt like he needed to do something about him." When the witness observed that Causey had not even taken office yet, Causey responded that "as soon as you won a campaign, you had to start worrying about the next one," and that "the biggest problem he was going to have if Goodwin ran again against him in four years was this multimillionaire funding Wayne's campaign." In a second conversation before he took office, Causey "brought up Lindberg again,"

expressing concern that if Lindberg's support "carried over into the next election in four years, it would probably be enough for Goodwin to beat him." (Exhibit A4 (Thompson Interview).)

51. The person Causey "had in mind" was Senior Deputy Commissioner Jacqueline Obusek—the very deputy whose apparent bias later led Lindberg to request a different examiner, and whom Causey later promoted. (Doc. 234 at 23–24; Exhibit K2.) Lindberg's concern about Ms. Obusek's bias was not merely sincere; it was correct. He was asking for what every regulated citizen is entitled to ask for—a "tough and fair" regulator not tasked with executing a political vendetta against him.

52. Causey has admitted publicly that he was concerned about Lindberg's support for his opponent, saying in a televised interview: "This was a man that was not on my team when I was running. He was a major fundraiser for my opponent." To execute his premeditated plan, Causey would lie to the North Carolina Ethics Board, lie to the FBI, and lie under oath in federal court.[2] He denied under oath, repeatedly, that he was a politician, despite having run for office more than half a dozen times:

> Question: But, sir, you're a professional politician, are you not?
>
> Causey's answer: No, sir.
>
> Question: How long have been a politician?
>
> Causey's answer: I'm not a politician.

(Exhibit F12.)

53. This vindictiveness is a pattern that others have noticed. North Carolina State Senator Jim Perry, a leader in Causey's own party, has publicly called Causey's politically motivated behavior "petty and ruthless" and "vindictive." (Exhibit F5.) A former NCDOI

[2] For example, to encourage the FBI to investigate Lindberg, Causey told the FBI that one of Lindberg's largest assets was "worthless"—despite numerous audits, valuations, and an audited personal financial statement supporting the asset's value. That asset is today valued at close to $3 billion by a nationally recognized valuation firm.

employee who worked closely with Causey for years states that "Mike Causey has a very difficult time with the truth," that "he's a very manipulative person and he's two-faced," and that "he will say one thing to another and he's not a straight shooter." (Exhibit F6.) The owner of Cannon Surety, Dallas McClain, sued Causey in October 2017, alleging that Causey enabled "the abuse of power, while continuing to engage in outright influence peddling and overt criminal political corruption through 'Pay to Play' politics," and that "[i]nternal DOI documents reveal that [Causey] plotted to shut down Mr. McClain's company astonishingly in order to cut off his funds so he could not protect and/or defend himself." An affidavit in that lawsuit states that Causey admitted he "shut down Cannon" at the request of certain political supporters. (Exhibit F4.) The Raleigh *News & Observer*'s investigation found that Causey created a cadre of nine regional-director positions filled with personal and political allies, including his 2016 campaign manager, and opened seldom-used regional offices with expensive leases. (Exhibits F7, F8.)

54. Internal NCDOI documents reveal that Causey has a stated operating method of seizing companies to shut off their access to funds for legal fees in order to shut down challenges from litigants like Lindberg. (Exhibit F10.) Since 2019 Causey and his agents have aggressively moved to cut off Lindberg's access to funds for counsel: in 2019 Causey refused to honor the legal indemnity in place at Lindberg's insurers, and in May 2024—immediately before Lindberg's second trial—Causey's agents moved to restrain Lindberg from using any personal funds to pay legal expenses of any kind. (Exhibit F9.) When the Department of Justice decided to take the Financial Case to trial, Lindberg's lawyers asked for $10 million in defense costs that Lindberg, having already spent more than $50 million defending himself, could not fund because of the Defendants' control of his companies. The Special Master now takes the position that "there are no

more funds for legal fees." (Exhibit Y at 2.) This strategy has been effective: Lindberg files this action *pro se*.

**D. Causey Instigated a Federal Investigation on False Pretenses and Ran an Eight-Month Entrapment Operation That Yielded No Crime**

55. When McClain submitted information about Causey to the FBI and Causey was threatened with a federal grand jury, Causey went to the FBI with false allegations about Lindberg so that his own conduct would not be investigated. Hygan Kapikian, who attended Causey's second meeting with the FBI in late 2017, states in recorded testimony that Causey made false statements to Agent Scherger to pressure him to open an investigation, demanded that Scherger give him a wire, and falsely claimed that he felt physically at risk from Lindberg—a claim Kapikian found incredible: "from everything I had read about Greg Lindberg, from everything that they had discussed, I couldn't imagine somebody wanting to physically harm the insurance commissioner. It just didn't make sense." (Exhibit A7.) Kapikian's handwritten notes show that Causey complained to Scherger that Lindberg had engaged Causey's electoral opponent, Wayne Goodwin, at a private law firm. (Exhibit A9.)

56. At Lindberg's March 2020 trial Agent Scherger admitted that he never questioned Causey's motives because Causey was an elected official. (Exhibit A8.) The FBI's own guidelines require, before a confidential informant is engaged, an investigation of "the nature of any relationship between the CI and the subject or target of an existing or potential investigation or prosecution" and of "the person's motivation in providing information or assistance," and require that, before a sting, "the illegal nature of the conduct must be made clear and unambiguous." (Exhibit A10 at 8.) None of that occurred. Causey's obvious political conflict of interest was neither investigated nor reported to field supervisors or FBI Headquarters.

57. Causey was given a wire in January 2018 and conducted more than 107 recorded meetings and calls with Lindberg. When no crime emerged, prosecutors directed Causey to solicit personal payments that Lindberg repeatedly refused, insisting on "legal campaign contributions" made through an independent-expenditure committee and the North Carolina Republican Party. (Exhibit A5; Doc. 234 at 21–24.) On March 9, 2018—while secretly recording Lindberg to build a case against him—Causey e-mailed Lindberg that he had done "an outstanding and impressive job of answering some really tough, hardball questions from state regulators today." (Exhibit B3.)[3]

58. Despite this exculpatory record, Lindberg was indicted in 2019 (the "Donations Case," No. 5:19-CR-22), convicted in 2020, and spent more than 43 months in federal custody as a result of the Defendants' conduct. The Fourth Circuit vacated the 2020 convictions, holding that under 18 U.S.C. § 666 the "business" at issue "is not the business of the agent receiving the bribe but, rather, the business of the entity on whose behalf the agent is authorized to act," and must be "something relatively concrete and circumscribed like an action item rather than a broad policy goal." *Lindberg*, 39 F.4th at 174–75. Lindberg was retried and convicted in 2024. Lindberg contends elsewhere, not here, that the retrial record contains no evidence of any action by the entity —the NCDOI—at all. What was requested being, in the Government's own witness's words, was the movement of files "from A to B," a "fairly routine" "nonevent" requiring no "formal or official action." (Doc. 441 at 12, 19, 28.)

[3]The March 9, 2018 e-mail is itself a predicate act. It was an interstate wire sent with intent to deceive—designed to keep Lindberg unaware of the covert effort to prosecute him and thereby prevent him from taking protective action (retaining counsel, exercising his Fifth Amendment rights, ceasing communications)—in furtherance of a scheme to defraud, 18 U.S.C. § 1343, and a deprivation of the honest services Causey owed as a state official to the public and to regulated parties, 18 U.S.C. § 1346. The contradiction between the recorded scheme and the contemporaneous praise establishes Causey's scienter: fraudulent concealment of the true nature of the relationship, abuse of official position as cover for a covert prosecution effort, and calculated manipulation to maintain Lindberg's trust and continued engagement.

**E. Lindberg Ceded Control in October 2018; the Enterprise Immediately Killed a Signed $450 Million Sale and a $1 Billion Refinancing That Would Have Paid Every Policyholder in Full**

59. On October 18, 2018, Lindberg transferred control of the NCICs to Defendant Dinius as Special Deputy Rehabilitator under a Consent Order for Administrative Supervision that contemplated a "significant restructuring of the Companies' investments" and a potential sale process. (Exhibit F2.) Fifty-five days earlier KPMG had valued the insurers at $513.5 million (Exhibit E); eighteen days later, on November 5, 2018, the NCICs' management valued them at $641 million (Exhibit F); and the restitution record in the Western District of North Carolina conservatively documents a $454 million value of the NCICs at takeover (Doc. 234 at 38–39). By any of these measures the NCICs were worth hundreds of millions of dollars when the Defendants took them. At the time of the transfer the total balance of the affiliated loans was $1.176 billion. (Exhibit L.) Every event material to the loss now claimed occurred after that date and was within the control of the Defendants and the Government, not of Lindberg.

60. Dinius retained Defendant Meghji and M3 as financial advisor and Defendant Williams Mullen as counsel, and from that point the affiliated-loan assets and, later, the operating companies were managed from M3's offices in New York City. Causey, acting through his agents Dinius and Meghji, thereby chose this District as the base of operations for the plan to "dismantle" Lindberg's business group.

61. On November 22, 2018—weeks after learning of the federal investigation and before he was charged with any offense—Lindberg signed an exclusive letter of intent to sell the NCICs to Ares Management for approximately $450 million, a transaction that would have preserved policyholder benefits without interruption and paid every policyholder in full by mid-2019. (Exhibit G3; Doc. 234 Ex. B.) Eli Global's Chief Financial Officer, Christa Miller, contemporaneously memorialized in a January 6, 2019 e-mail to General Counsel Peter Nordberg

that, following Ares's meeting with the Department of Justice, Ares stated it had been advised by an undisclosed "third party constituent … to avoid any ongoing connection to Eli Global," refused to identify the source, and abandoned the term under which it would have retained the affiliated loans through a special-purpose vehicle. (Exhibit G4; Doc. 234 Ex. A15.) The Rehabilitator did nothing to preserve the transaction. The Government has never disclosed its communications with Ares. Lindberg's original disaffiliation plan required no sale of any operating company: the affiliated credits were to be contributed to a securitization and financed, retiring the affiliated loans on the insurers' balance sheets in full, a structure the group's principal lender was prepared to underwrite. After the Government's communications caused the lender to refuse to do business with Lindberg and to refuse to hold the affiliated assets, the plan was forced to pivot to "clean" insurance companies, which first required asset sales. (Doc. 300 at 29–31 & Exs. DS-1 to DS-21; Exhibit Z-5.)

62. Within weeks of the Ares termination, Lindberg personally directed the negotiation of an arm's-length transaction with Oaktree Capital Management, L.P. The February 2019 Oaktree "Global Solution Presentation" proposed an approximately $1.0 billion investment into a holding-company special-purpose vehicle that would have acquired the affiliated-loan positions held by the insurers and 100% of the GBIG equity, removing the affiliated loans from the insurers' balance sheets at face value. Had the Rehabilitator permitted the transaction to close, every NCIC policyholder would have been paid in full by approximately June 2019. Dinius elected not to proceed. (Doc. 174 ¶ 72; Doc. 234 Exs. C, C2.) That was the second refusal of a second sophisticated buyer pricing the same portfolio at face value within four months.

### F. The June 27, 2019 Memorandum of Understanding: A Ten-Year Hold Coerced Under Threat of Liquidation, and a Sale Veto That Survives to This Day

63. The Memorandum of Understanding ("MOU") was first proposed on or about May 9, 2019. Lindberg met with the Rehabilitator in Durham, North Carolina in late May or early June 2019, and on June 27, 2019 the Rehabilitator presented the MOU on a take-it-or-leave-it basis under express written threat of immediate liquidation of all four NCICs. (Doc. 174 ¶¶ 34, 56–57; Doc. 234 Ex. D5.) The Rehabilitator's counsel characterized the tactic as a "hammer and nail": "Mr. Lindberg, you're the nail. I'm the hammer." (Wake County MOU Trial Tr. Vol. 5, at 1012:11–12.) The MOU obligated a ten-year hold of the affiliated loans, converting a marketable portfolio that had drawn two par offers into a forced decade-long hold that foreclosed the very transactions that would have repaid the loans. (Doc. 234 Ex. A14.)

64. Lindberg negotiated and signed the MOU and is familiar with its terms. Under Article II, Section 3.i, the two directors appointed by Academy Association, Inc. ("AAI") hold a veto over any sale of the assets or stock of the new holding company, NHC, or of any NHC subsidiary: "provided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director." The only circumstance in which that consent requirement drops away is a "default under any Loan," meaning the loans as they were to be amended, restructured, and assumed by NHC under Article III—the Global Loan Amendments—with defaults defined by the "Default and Remedy Terms" Article III called for. The Interim Loan Amendment executed the same day waived any and all claims for any Events of Default existing as of that date. Article III was never implemented: the Global Loan Amendments were never executed, the restructured loans were never assumed by NHC, and the Default and Remedy Terms were never adopted. In *Southland National Insurance Co. v. Lindberg*, No. 19-CVS-013093 (Wake Cnty. Super. Ct.), the

court held Article III an unenforceable agreement to agree and severed it, and the plaintiffs "have not asserted a claim based on breach of Article III." Neither the NCICs, nor Dinius, nor anyone else has ever asserted a default under Article III. If the NCICs could simply declare defaults under the old, pre-MOU loan agreements to strip the AAI consent right, the veto would be rendered meaningless. (Aff. of Greg E. Lindberg, Def. Ex. 1, Tab A to Doc. 316, ¶¶ 5–20; Decl. of Greg E. Lindberg ISO Motion to Stay Disposition of the Damovo Asset (Sept. 1, 2026) ¶¶ 2–9; Exhibits Z-6, Z-10.) The veto therefore passed intact to the Special Master when he took AAI's seats in 2025, and, as alleged below, the Enterprise exercised it in favor of every disposition since.

65. Plaintiff pleads the circumstances of the transfer because they show that the Defendants obtained control of his assets by wrongful threat, not by any voluntary act that could confer ownership; Plaintiff does not ask this Court to set aside the MOU or any judgment concerning it. Under New York law "[a] contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will," *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971), and facing threats of criminal prosecution and of the immediate liquidation of his insurers, Lindberg had no meaningful choice. In no event did ownership of the assets vest in any Defendant: the Defendants hold and manage them as custodians and agents under court orders.

### G. The Rehabilitator Sold $1,006,239,867 of Principal-Protection Bonds Before Maturity for Approximately $394 Million, Without Court Approval, Destroying $611.6 Million of Guaranteed Value

66. In 2019 the Rehabilitator sold the zero-coupon bond portfolio before maturity for approximately $394,578,906.48—less than forty cents on the dollar of guaranteed par—rather than holding it to the contractual par value of $1,006,239,867, thereby crystallizing a loss of approximately $611.6 million on the very instruments whose only function was to prevent loss, and

destroying the principal protection that would have repaid the affiliated loans in full at maturity. (Doc. 174 ¶¶ 38–39; Doc. 295 ¶¶ 8–9.) He did so without the advance approval of the Wake County Superior Court that N.C. Gen. Stat. § 58-30-85 and the June 27, 2019 Consent Order of Rehabilitation required for material asset dispositions (Doc. 174 ¶ 45), and he ignored at least three loss-free alternatives: holding the bonds to maturity, using them to credit-enhance a sale, or borrowing against them (Doc. 174 ¶ 40). The companies held more than $1 billion in cash and marketable securities for years after the 2019 sale; there was no need to sell. (Doc. 295 ¶ 9.)

67. The companies' contemporaneous books confirm that the zero-coupon bonds existed solely to fund and protect the affiliated investments, dollar-for-dollar. When unwound, every zero-coupon component was sold at or above its then-current value (not the $1,006,239,867 payable at maturity), and the proceeds paid down principal owed to the insurers: $329,169,087.55 for Colorado Bankers Life Insurance Company, $21,842,490.43 for Bankers Life Insurance Company, and $43,567,328.50 for Southland National Insurance Company ("SNIC"). The worst-positioned notes, projected to lose $50 to $60 million, were disposed of at a net gain; the total realized gain was $6,036,766.05. The Special Master's reports neither reflect nor reconcile those proceeds. (Doc. 295 ¶¶ 3–7, 10 & Exs. G–K; Doc. 234-38.) Where a passive decision to hold collateral too long can break the chain of causation, *Robers v. United States*, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring), a fiduciary's affirmative decision to liquidate a held-to-maturity, par-payable principal-protection instrument before maturity—forgoing $611.6 million of contractually mandated value—breaks it *a fortiori*. *United States v. Tyler*, 767 F.2d 1350, 1352 (9th Cir. 1985) ("Any reduction in its value stems from the government's decision to hold the timber during a period of declining prices, not from [the defendant's] criminal acts.").

### H. Dinius's Management of the NCICs Destroyed Their Value While More Than $165 Million in Fees Were Paid Without Court Approval

68. Instead of preserving the documented value of the NCICs and growing or selling it, Dinius proceeded over more than six years to deplete the NCICs through exorbitant fees, unrelated losses, and blocked transactions. He had no intention of "rehabilitating" the NCICs or selling them. Under his direction every claim, annuity, and policyholder payment stopped; exorbitant fees were charged in lieu of payments to policyholders; transactions that would have generated well over $1 billion dollars in payoffs were blocked; buyers were discouraged and even sued (Exhibits A2, B2, O.2); and more than $137 million was lost on corporate-bond investments entirely unrelated to Lindberg. (Exhibit M.)

69. More than $165 million in fees has been paid from the insurance-company estates to the Rehabilitator and others since June 2019, including an estimated $25 million in compensation to the Rehabilitator, an estimated $30 million to Defendant Williams Mullen, and ongoing monthly fees of approximately $2.5 million to the Rehabilitator and various advisors, including M3. (Exhibit M; Doc. 234 at 10 & Ex. M.) Not one dollar of those fees was approved by any court as N.C. Gen. Stat. § 58-30-85(3) requires. These payments continue to this day, by wire, from and through Meghji's New York offices, to the detriment of the NCICs and of Lindberg as the sole owner of their surplus equity.

70. In the UKAT matter, on a date known to the Defendants, Bob Alban wrote to Williams Mullen, as representative of the agent for the loans to UKAT's parent, seeking approval of a financing by BC Partners that would have generated approximately $39 million (£29 million) for the insurance lenders. Williams Mullen and Dinius rejected the refinancing; UKAT was forced into administration and sold at a fire-sale price; and the $39 million was lost. (Exhibit N.) Dinius blocked a deal in which the insurers would have been paid $39 million knowing that by blocking it

the NCICs would get nothing—one of a myriad of decisions that destroyed the value of the NCICs while he and his advisors collected fees.

71. After Dinius took control, Lindberg transferred an additional $18,007,661 into Southland National Insurance Company (Exhibit J) and $56,000,000 into Colorado Bankers Life Insurance Company (Exhibit K at 4, line 51), and in December 2022 caused AAPC preferred equity with a par value of $352,906,240 to be transferred to Universal Life Insurance Company ("ULICO"), a creditor of the NCICs, under a dollar-for-dollar credit agreement in partial satisfaction of a civil judgment. (Doc. 278 ¶ 6.)

**I. Montshire/Alban (2023), the $3.4 Billion Quadro Merger (2024), and the Clanwilliam Fire-Sale (2025)**

72. In 2023 Lindberg negotiated with Montshire Advisors and an investment group formed by Bob Alban to submit a purchase agreement to the NCDOI for the insurers—a transaction that, like Ares and Oaktree, would have paid every policyholder in full. The Rehabilitator not only rejected the offer; he filed litigation against Mr. Alban. (Doc. 174 ¶ 117; Exhibits A2, B2, O.2.) The Defendants do not want the assets sold; they want to continue receiving $2.5 million a month in fees, regardless of the value destroyed in the process.

73. In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the Specified Affiliated Companies at approximately $3.4 billion—and the Clanwilliam Group alone at $880 million, at 22.14 times EBITDA. (Exhibits G, I; Doc. 174 ¶ 118.) The five publicly traded comparables used to price that agreement (Addtech, Indutrade, Lifco, Diploma, and Beijer Alma) traded at an average enterprise-value-to-EBITDA multiple of 22.14 at signing and 24.21 as of September 9, 2026 (Addtech 30.10; Indutrade 25.51; Lifco 20.74; Diploma 26.11; Beijer Alma 18.61); the valuation has passed the test of time.

(Exhibits P, Q.) The Rehabilitator blocked the Quadro transaction over Lindberg's repeated objections.

74. In October 2024 the Specified Affiliated Companies were contributed to NHC. (Meghji Aff., Gov't Ex. C to Doc. 308, ¶ 4.) In December 2024, at a meeting in New York City attended by representatives of the Defendants, two New York-based associates of Meghji, David Resnick and Tom Biaggi, stated that one of the primary purposes of selling the Clanwilliam Group —at far below the market value established months earlier—was to provide funds to pay fees to Meghji and his employees in the New York office, including Mr. Biaggi's son. In September 2025 the Enterprise sold Clanwilliam to TA Associates, a private-equity buyer, for approximately $450 million, after management declined to complete a refinancing, forcing a sale to a favored buyer at a steep discount—a destruction of approximately $474 million of value, as documented in the restitution record (Doc. 234 at 38–39), attributable entirely to the discretionary decision to block Quadro. (Exhibits S, S2; Doc. 174 ¶ 118.) Public acquirers pay materially more than private-equity acquirers—target shareholders receive a 63% higher premium when the acquirer is a public firm (Exhibit R)—and Dinius chose the piecemeal private sale.

75. The parties to the Clanwilliam sale had their own conflicts. Clanwilliam's trustee, Steve Wilson, is a former partner of Latham & Watkins who continues to receive compensation from that firm; Latham & Watkins represented TA Associates in the transaction while having advised Lindberg on the formation of the Clanwilliam Trust. Meghji is under FBI investigation for his conduct as financial advisor in the New Orleans Archdiocese bankruptcy, including the alleged origination of a $30 million loan intended to pay his fees and Latham & Watkins's fees. (Exhibit T.) Lindberg has sued Wilson and TA Associates over the Clanwilliam sale (Exhibit S) and has attested to the facts of that transaction under oath (Exhibit U). Of the Clanwilliam proceeds, the

Special Master withheld a $14,112,426 administrative reserve and paid $23,520,710 to Vista—an entity he is "unsure" is even due restitution—and credited neither to Lindberg. (Doc. 66 ¶¶ 20(d), 26 n.8; Doc. 190.)

**J. The Financial Case, the "Guaranteed" Life Sentence, and a Plea That Fixed No Restitution Amount**

76. Eight months after the Fourth Circuit vacated the Donations Case convictions, the same United States Attorney's Office charged the Financial Case, No. 3:23-CR-48, in February 2023, on conduct the Government had known of for years—the affiliated-investment program approved by the regulator. Lindberg has raised in the Western District of North Carolina, and will raise on appeal, the presumption of vindictiveness that attaches to graver charges brought after a defendant successfully exercises his appellate rights. *Blackledge v. Perry*, 417 U.S. 21, 27–29 (1974). During pre-indictment negotiations at the Department of Justice's Charlotte offices in November or December 2022, the Government told Lindberg that it "guaranteed a life sentence" if he took the Financial Case to trial. Threatened with life imprisonment, cut off from the funds necessary to mount a defense by the Defendants' control of his companies, and having already spent more than $50 million defending himself, Lindberg entered a guilty plea in November of 2024.

77. The Plea Agreement fixes no restitution amount. Paragraph 8(a) stipulates only a Guidelines loss figure exceeding $550,000,000 and expressly provides that Guidelines "loss" "may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Paragraph 10(a) obligates Lindberg to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct"—an express causal predicate that preserves, rather than waives, the MVRA's requirement that restitution rest on losses the offense proximately caused. (Doc. 40 ¶¶ 8(a), 10(a); Doc. 234 at 14–16; Doc. 300 at 4–6.) The

Factual Basis admits no loss amount, does not admit that any figure was foreseeable, and does not attribute to Lindberg the Rehabilitator's later conduct. (Doc. 42 ¶¶ 5–6.) Paragraph 9 consented to "the appointment of a special master to identify, receive, apportion, and distribute funds for restitution"; it did not consent to a receiver.

78. By encouraging federal authorities to pursue charges against Lindberg, Causey chose to bring claims that would be adjudicated under the MVRA, 18 U.S.C. §§ 3663A and 3664. The Defendants must live with that choice. The MVRA's purpose is to make victims whole, not to confer windfalls, *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006); *United States v. Nucci*, 364 F.3d 419, 423 (2d Cir. 2004), and the statute "provides for credits against the offender's restitution obligation to prevent a victim from obtaining a windfall." *Robers*, 572 U.S. at 644.

**K. The Government Recruited a Special Master, Converted Him Into a Receiver Over Lindberg's Objection, and Vested Him With "Exclusive Possession and Control" of the Primary Restitution Assets**

79. Before any motion was filed, the Government itself recruited the officer, asking the defense to "consider this Charlotte-based firm for the role as special master"—Grier Wright Martinez PA. (Def. Ex. 1, Tab C to Doc. 316; Doc. 54 ¶ 8.) The defense-proposed appointment order framed the role as "an independent, third-party neutral in accordance with 18 U.S.C. § 3664(d)(6)," acting "solely in [his] capacity as Special Master," and conferred no custody, liquidation, or title-clearing powers. (Doc. 308-1 ¶¶ 1, 11.) By e-mail of December 18, 2024, Assistant United States Attorney Daniel Ryan took control of the draft, rejected nearly all of the defense's changes—including the request that the order impose a fiduciary duty to all stakeholders—struck the provisions preserving any measure of consultation with Lindberg, and insisted that Lindberg was "supposed to be giving up 'exclusive possession and control' of these assets to the government's satisfaction in order to get the benefit of the plea agreement," that the Government

"will not agree to any such efforts," and that "[t]he Special Master does not owe a duty to Mr. Lindberg or to the assets, but rather to the Court and to victims." The Government's markup armed the officer to "select an appropriate method and timetable to liquidate" the assets, to "oversee and help accomplish the liquidation," to "clear title to all assets for transfer to bona-fide buyers," to "cooperate and coordinate with any other receivers previously appointed over assets," and—in a provision AUSA Ryan himself introduced—to "assume Defendant's and/or Global Growth's authority … to (1) appoint trustees for all trusts related to the Primary Restitution Assets; and (2) appoint directors to all boards of directors of all companies related to the Primary Restitution Assets," under threat of "competing memos and proposed orders" if the defense did not agree. (Decl. of Greg E. Lindberg in Response to the December 18, 2024 Allegations, Def. Ex. 1, Tab B to Doc. 316, ¶¶ 8–10; Def. Ex. 1, Tab D; Exhibit Z-7.)

80. On January 23, 2025, the Western District of North Carolina entered the Order Appointing Special Master (Doc. 56), directing that all of Lindberg's rights and interests, "whether held directly or indirectly," in the "Primary Restitution Assets"—including NHC and AAPC—be placed in the "exclusive possession and control" of the Special Master (¶ 9). The Order required prior court approval before any sale (¶ 6(e)); required the Special Master to "regularly update the Parties throughout the diligence and/or sales process" (¶ 5) and to advise Lindberg through counsel and in writing (¶ 8); required that matters be brought before the court "upon notice and hearing" (¶ 15); provided that the Special Master and his professionals be paid from "the assets administered by the Special Master" (¶ 14); and defined his authority as that "vested in the Special Master by the Court" (¶ 16). It has only two parties, the United States and Lindberg, and it authorizes no ex parte communication with anyone. Cf. Fed. R. Civ. P. 53(b)(2)(B). (Exhibit V3.)

81. On February 13, 2025, effective January 23, 2025, Lindberg and Global Growth Holdings, LLC executed an Assignment Agreement transferring their interests in the AAPC Holdings Common Units to the Special Master "solely in his capacity as special master." The Special Master covenanted to "administer the Assigned Rights and Interests in accordance with the Order" (§ 4(a)), and the parties agreed that Lindberg "shall continue to be the beneficial owner of the Common Units" for federal, state, and local tax purposes and "shall continue to receive allocations and corresponding tax distributions if any," with "all Parties' rights reserved concerning the appropriate amount of any tax distributions, if any" (§ 4(e)). Section 16 provides that nothing in the Agreement limits the Special Master's discretion "to fashion a restitution order." (Exhibit V.) Lindberg's interests in NHC were transferred on the same terms, and the Special Master thereby became the record owner of the NHC equity, "holding all associated economic, legal, voting, and" other rights. (Doc. 260 at 2.)

82. Lindberg also remains the obligee of the General Indemnification Policy of February 29, 2020 (Delaware law; advancement within ten days; judicial enforcement) and of the Tax Indemnification Agreement of September 25, 2019 (New York law; exclusive New York forum; ten-percent interest; fee-shifting), both confirmed by the Indemnity Confirmation of July 16, 2024 as binding jointly and severally on all Global Growth companies "including any companies that may now be in various trusts," and covering, among other things, all costs of the Western District of North Carolina cases. (Exhibit V2.) The value of the assets the Enterprise is liquidating is the only source from which those obligations to Lindberg can be paid.

83. Approximately two weeks after taking the NHC equity, the Special Master, signing "solely as Special Master," removed both of the directors that AAI had appointed to the NHC board, Kathy Million and Lonna Carter, effective immediately. (Million Decl. ¶¶ 25–26.)

Thereafter Defendant Meghji—who had administered the NCICs' affiliated-loan assets for Defendants Causey and Dinius from New York since 2019 and whose firm was the rehabilitation estates' financial advisor—became the acting Chief Executive Officer of NHC. From that point the Enterprise no longer needed to negotiate with Lindberg's companies as counterparties; it controlled them. The same New York-based group that held the NCICs' loan book as creditor now controlled, through NHC, the operating companies that were the borrowers; it valued both sides of that ledger through Meghji's firm; and it sold the assets on both sides. And the MOU's sale veto—AAI's consent right—passed intact to the seats the Special Master had cleared, so that no disposition described below could close without the affirmative consent of the Enterprise. (Def. Ex. 1, Tab A ¶¶ 19–20.)

**L. The M3 "Desktop" Valuations: A "Best Guess," "Inherently Unreliable," by the Sellers' Own Advisors**

84. At Defendant Meghji's direction, M3 produced the valuations of every Primary Restitution Asset and every Specified Affiliated Company on which the Special Master's reports, and in turn the Government's restitution and forfeiture positions, rest. (Docs. 106, 245, 279, 308.) The Special Master describes those valuations as a "best guess," "inherently unreliable," a "current guess," and "a desktop exercise" that does "not constitute formal valuations or fairness opinions," and describes his loss-side figures as balances he "presumed … were accurate." (Doc. 245 at 9–10, 36 & n.31, 37.) Between his initial report and his Second Supplement the estate's estimated value was cut by roughly a third, from a $1.454 billion midpoint (Doc. 106 at 30) to a $998 million midpoint (Doc. 245 at 36), without disclosure of the underlying data and with the explanation for the reduction filed under seal. The recommended restitution figure thus exceeds the Enterprise's own midpoint estimate of the assets available to pay it by more than $600 million—the arithmetic predicate for a forfeiture money judgment against Lindberg personally. The sellers' own advisors,

in other words, marked down what the sellers were selling. The Special Master has refused to place his valuation methodology on the record at all.

85. Assets of approximately $6.4 billion were transferred to the Rehabilitator and the Special Master, measured by the Quadro purchase agreement (SACs approximately $3.4 billion; Clanwilliam approximately $880 million at 22.14x EBITDA), the KPMG August 24, 2018 USPAP restricted appraisal (Colorado Bankers Life $380.5 million; Bankers Life $57.5 million; Southland National $29 million; Southland National Reinsurance $46.5 million), Houlihan Lokey's valuation of AAPC at approximately $3 billion at 20 times projected 2026 EBITDA of $150 million, and the Rehabilitator's own team's $454 million valuation of the NCICs on November 5, 2018—against the Special Master's $998 million "guess." Valuing revenue-producing going concerns at little more than their debt systematically understates what the businesses are worth, understates the credits and offsets Lindberg is owed, and inflates the net loss charged to him. (Doc. 316, Part IX.)

86. The Special Master's Second Supplement (Doc. 245) concedes, in thirteen footnotes, that he and Lindberg "agree on the basic, objective, material facts"; in eight of them the only disagreement he identifies is the legal conclusion "of whether the chain of proximate cause was broken"; he states that foreseeability is a matter he "has not set out to prove (and does not consider it within the Special Master's charge to prove)"; he asserts that "an inability to pay is always reasonably foreseeable"; and three times he declines to examine the conduct of the state-court fiduciaries at all because he is "not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment." (Doc. 245 at 19, 21–22, 25, 30; Doc. 281 at 6.) The Second Supplement never mentions the Quadro, Montshire/Alban, or Oaktree transactions, the Ares letter of intent, the KPMG valuation, or the Houlihan Lokey analysis; cites no MVRA causation authority; applies a "convinced the Special Master" standard

six times rather than 18 U.S.C. § 3664(e); and allows approximately $39 million—about 1.3%—of the documented offsets. The "discretionary decisions" the Special Master declined to second-guess are the acts of Defendants Dinius, Meghji, and Williams Mullen alleged in this Complaint.

87. AAPC Holdings—a going concern that provides training and credentialing for the medical coding, billing, and auditing profession, valued by KPMG at $900 million in 2018, since valued by Houlihan Lokey at approximately $3 billion at 20 times projected 2026 EBITDA of $150 million, and reporting approximately $84 million of net income on its 2025 federal return—was written down by the Special Master, in a sealed appendix, on "conjecture about generative artificial intelligence": "it does not take too much imagination to foresee risks to AAPC's business model that could result from artificial intelligence supplanting opportunities for medical coders and medical billers." (Doc. 245, App. 1.) Houlihan Lokey, whose valuation the Enterprise now disregards, is one of the investment banks the Special Master engaged to market AAPC. AAPC's own published position is that automation augments rather than eliminates the need for credentialed coders. The reduction of AAPC to near zero—accomplished with no motion, notice, or hearing—is the very event that triggers the forfeiture money judgment sought against Lindberg. (Doc. 331 at 8–10.)

### M. The Figures Were Developed Ex Parte, on Data the Government Now Says It Does Not Possess, After Eighteen Months of Refused Requests

88. The loss and valuation figures were developed through ex parte communications among the Special Master and his advisors, the Government, and the interested custodians of the assets and data—M3, NHC, the NCICs, Defendant Dinius, Wes Camden, and Defendant Williams Mullen—to which Lindberg was not a party, on which he was not copied, and which he has never seen. (Doc. 331 at 5–6; Doc. 331-1 ¶¶ 2–4.) Throughout 2025 and 2026 Lindberg and his counsel participated in periodic, in substance weekly, meetings and calls concerning the restitution

calculation with AUSA Ryan, the Special Master, and the Special Master's financial advisor, Paladin Management Group. Each time a question arose Lindberg went back to his records and provided whatever responsive information he had; he withheld nothing. His records reflect communications concerning the restitution calculation only with the Government and the Special Master; he received nothing back from NHC, the NCICs, Wes Camden, Williams Mullen, M3, or Dinius. In those calls the Government represented that Lindberg would be permitted to argue the Clanwilliam offset at a value of approximately $800 million and that the loans to the NCICs would be treated as offsets—but the valuations against which those offsets would run were developed in communications he never saw. What came back were final values, adjusted on the basis of communications he never saw, without disclosure of how or why the adjustments were made. (Aff. of Greg E. Lindberg, Doc. 331-1, ¶¶ 2–7; Exhibit Z-9.) On information and belief, at least some of the custodians—including Dinius, NHC, and the NCICs—told the Government that if it wanted certain information it should obtain an order from the court. (Doc. 331-1 ¶ 4.)

89. From the Special Master's appointment forward Lindberg requested the underlying data in writing at every stage: on January 23, 2025; in the spring of 2025 for the M3 valuations; on June 16–17, 2025 for the NCICs' loan data, which the Special Master agreed on June 17 to share and never did; on July 29–30, 2025, when the defense supplied its own analysis and received nothing in return; on August 13, 2025, on the Clanwilliam valuation and offsets; on September 16, 2025, in a Restitution Calculation letter to the Special Master and his financial advisor; on November 22–23, 2025, on causation and offsets; in December 2025, in formal written information requests that the Special Master deferred on December 18, 2025; in response to the March and April 2026 reports, which offered only to show conclusions under seal or *in camera* (Doc. 106 at 29); in response to the July 2026 filing of low, middle, and high figures under seal with no

underlying data; on August 15–17, 2026, in a written demand that the data be placed on the record; and in a forty-seven-category itemized demand served August 26, 2026 and renewed August 28–29, 2026. Every request was deferred, conditioned, or refused. (Doc. 331-1 ¶ 5; Doc. 331 at 6–7, 17–22; Doc. 331-2.) Lindberg has been four times divested of his companies' books, the access order was never signed, and his Rule 17(c) subpoenas for the records now held by NHC, the NCICs and their Rehabilitator, the Bermuda insurers, and the Special Master and his advisor have been opposed by the Government and the Special Master while those parties simultaneously withhold the records. (Doc. 248.)

90. On August 17, 2026 the Government stated in writing that it does not possess the data underlying the figures it has adopted as its own—having asked the court to "adopt the reasoning and recommendations" of the Special Master (Doc. 279) and stated that it "concurs with the arguments and conclusions contained in the Special Master's filings" (Doc. 308)—because much of it was exchanged ex parte and never came to it; it first represented that everything had been provided to former counsel, a representation both former and current counsel investigated and found untrue; and it declined to "litigate via email," "reserving [its] position until [it saw the] motion." The Special Master's counsel offered to produce only "documents in [his] possession," and only under a confidentiality agreement or court order, and his final answer was "No." (Doc. 331-2 (Ryan e-mail, Aug. 17, 2026; Martinez e-mail, Aug. 17, 2026); Doc. 331-1 ¶ 5(m).) Lindberg's current counsel learned of the ex parte character of the proceeding on or about August 27, 2026 and moved to compel within days. (Doc. 331 at 5–6.) The data on which a multibillion-dollar criminal punishment rests is, on the Government's own account, in the hands of no party to the proceeding. It is in the hands of the Defendants. Many of the communications were oral and occurred outside the periodic calls the defense attended; what passed among the Special Master,

the Government, and the custodians "leave[s] no trace in the record" and is "now unknowable." *Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996).

**N. The Beckett Sale: A $1,003,924,000 Business Sold for Approximately $134 Million, Off the Docket, on the Consent of Defendant Meghji's Company**

91. Beckett Collectibles, LLC was held in the Beckett Collectibles Trust (Trust Agreement dated as of June 2021; Amended and Restated Trust Agreement executed December 5, 2023), the Grantor of which is Entrust Global Group, LLC, an entity managed by NHC. Under the Trust Agreement the trust could terminate only "at such time as the Grantor provides written approval of the termination" (§ 9.1(e)), and a sale of substantially all Beckett assets was a "Fundamental BKX Matter" approvable only "in accordance with the Grantor's instructions" (§ 7.2(a)(vi)). (Exhibits X4–X6.)

92. Beckett was independently appraised by Cabrillo Advisors, under USPAP standards, at a fair-market enterprise value of $1,003,924,000 (valuation date January 31, 2022; report April 7, 2022). In April 2022 Blackstone Tactical Opportunities proposed to acquire Beckett at an enterprise value of $800 million to $900 million and modeled "Beckett Proceeds by 2022E" of $941 million to $1.065 billion (term sheet April 14, 2022; Cornyn to Holbrook/Turrell, April 16, 2022); Global Growth countered at $1.05 billion (April 5, 2022) and $1.1 billion (April 18, 2022). The Cabrillo appraisal valued each Collectivus company separately—Arcane Tinmen ApS at $107,749,000; CBCS Operations, LLC at $14,125,000; Southern Hobby Distribution, LLC at $538,010,000; and Beckett Collectibles, LLC at $1,003,924,000—so the $1 billion figure is Beckett standing alone. (Doc. 256-1 at 3; Doc. 256-2; Exhibits X–X3.)

93. In December 2025 Beckett was sold for approximately $134 million—roughly thirteen cents on the dollar. There was no motion, no notice, and no order on the docket of the Western District of North Carolina; the Special Master disclosed the completed transaction only

after the fact and takes the position that "no approval was required"; the price was withheld from Lindberg as "confidential"; a J.P. Morgan fairness opinion referenced in connection with the sale has never been produced; and no accounting of the proceeds has been rendered. (Docs. 256, 260, 269, 280; Doc. 537 at 7, 26–28 (No. 5:19-CR-22); Doc. 234 at 13 & Ex. B25.) The sale was effected without the prior court approval that paragraph 6(e) of the appointing order required and without the notice and hearing that paragraph 15 required. A $3,000,000 "CBL subordination fee" was extracted from the estate in connection with the Beckett refinancing and never credited.

94. Defendant Meghji has sworn to the mechanics. In an affidavit the Government filed as Exhibit C to its Consolidated Position (Doc. 308), Meghji, as acting CEO of NHC, attested that the Beckett Trust "terminated in accordance with the terms of the Beckett Trust Agreement" (¶ 9); that "NHC provided its consent to the transaction as the Manager of … Entrust Global" (¶ 19); that the Special Master's board designee voted to approve the transaction (¶ 20); and that the Special Master "has provided a letter to his Board appointee," reviewed by the board before it voted, stating that he would not object (¶ 21). Termination "in accordance with the terms" required the Grantor's written approval; the sale required the Grantor's instruction; the Grantor acts through its Manager, NHC; and NHC acts through Meghji. By Meghji's own account, therefore, Meghji supplied the consent that dissolved the trust and cleared the sale, the NHC board on which the Special Master's designee sat voted it through, and the Special Master did not object. Meghji did not merely execute a decision made elsewhere: his firm produced the valuation on which the price was accepted; he negotiated and operationalized the transaction from New York; he signed for the Grantor's Manager; and his firm is paid from the estate the sale depleted. The sale was thereby approved, on the sellers' side, by the same persons who valued the asset and who are paid from the proceeds. (Meghji Aff., Exhibit X7.)

95. Meghji's affidavit offers its five load-bearing assertions—that the SACs were placed in trust to "remove GGH and Lindberg from … management" (¶ 5); that Entrust Global owned Collectivus when the trust was formed in 2021, years before Meghji had any role at NHC (¶ 8); that Beckett's 2025 revenue and EBITDA "were a small portion" of the Collectivus Group's (¶ 13); that the Special Master provided the non-objection letter (¶ 21); and that the "Surviving Collectivus Group … remains a valuable restitution asset" (¶ 22)—only "to the best of [his] knowledge, information and belief," after claiming personal knowledge in paragraph 1, and offers not a single financial figure in support of the claim that a business appraised at $1 billion was "a small portion" of anything. See *Causey v. Balog*, 162 F.3d 795, 803 n.4 (4th Cir. 1998); Fed. R. Evid. 602. The affidavit was transmitted by interstate wire to the United States Attorney's Office and filed with the Government's Consolidated Position (Doc. 308) in August 2026, in support of a $1.655 billion restitution demand, to characterize a sale that Meghji's own company had approved.

96. The sale destroyed approximately $866 million of value. That loss increased the documented offsets and credits in Lindberg's restitution proceeding from $2,899,418,383 to $3,765,418,383 (Response to Final Report, July 30, 2026, at 5 n.1), and it eliminated, in one transaction, one of the largest single assets from which any judgment in this action could be satisfied. Twelve days before Lindberg's sentencing, the Special Master presented him with a "Consent, Waiver, and Acknowledgement" whose operative clauses would have released, and covenanted not to sue, a beneficiary class expressly including the Special Master himself, and advised the court four days before sentencing that he "expects that Defendant will execute" it. (Doc. 159 at 3, 5.) Lindberg refused. A fiduciary does not seek a release for conduct that creates no exposure; the request itself confirms that the dispositions generate a diminution in value independent of Lindberg's conduct.

**O. Sentencing on a $1.655 Billion Figure No One Can Document, Procured by Four Materially False Statements**

97. On May 26, 2026 the district court imposed a controlling sentence of 144 months—nearly double the 87 months previously found sufficient for the same course of conduct—and thereafter entered a preliminary restitution figure of $1,655,000,000 (Doc. 161 at 3), approximately $30 million above even the Special Master's recommendation of approximately $1.625 billion, without explanation on the record and without any accounting. On the Special Master's own figures the principal-only measure of loss is approximately $1.362 billion; the recommendation reaches $1.625 billion only by adding approximately $263 million of "time value of money" interest at a 2.19% rate the Special Master selected over objection (Doc. 106 at 3–4; App'x 3 at 8), contrary to the Department of Justice's own published guidance that interest is "not eligible for restitution." At sentencing the court characterized "the real loss" in the case as "risk." (Sent. Tr. May 26, 2026 (Ex. ST to Doc. 234); Doc. 234 at 3, 31–35.) Lawful risk—approved by the regulator, within industry practice, and not prohibited by statute until 2019—cannot be the predicate for a penal, loss-measured award, and "[a] defendant cannot be ordered to repay money that was never actually lost." (Doc. 234 at 31–35.)

98. At sentencing the Government made four materially false statements: it presented victim statements gathered before the December 23, 2025 distribution as though they were current; it represented that policyholders remained unpaid, when the Special Master's own Notice of Distribution confirmed final payment to all approximately 43,000 American policyholders; it presented an inflated ULICO loss figure on the order of $1 billion that the court itself found "overstated"; and it told the court there were "big numbers still missing," when no party in seven years of litigation has ever alleged that anything is missing. On information and belief, the stale victim statements were supplied to the Government by the NCICs under Dinius's control, through

Williams Mullen and Wes Camden. After sentencing, Assistant United States Attorney Lyndie Freeman telephoned Lindberg's then-counsel at Katten Muchin Rosenman and asked that counsel remove Lindberg's motion-for-stay filings from the docket. The Government also urged, and obtained, an offense-level enhancement driven by a loss of approximately $1.6 billion—the very number it now recycles, as $1.655 billion, into the restitution demand and the forfeiture keyed to it —while taking the position (Doc. 308 at 5 n.3) that the Guidelines figure is analytically "separate" from restitution and need not be reduced by the § 3664(j) credits. Lindberg has argued in the Western District of North Carolina that a party may not disclaim a number to avoid the offsets that reduce it and simultaneously deploy the same number, unreduced, to increase the punishment, and that this, together with attributing to Lindberg a receiver structure the Government itself authored, is a "foul blow[]," not a hard one. *Berger v. United States*, 295 U.S. 78, 88 (1935). The Government's conduct is pleaded here as background; the Government is not a defendant. The Government and the Special Master have since taken "the position of running out the clock" (Doc. 331 at 2)—pressing toward a final order under the ninety-day deadline of 18 U.S.C. § 3664(d)(5), which is directory rather than jurisdictional, *Dolan v. United States*, 560 U.S. 605 (2010), while producing none of the data on which the figures rest—even though the Government bargained, in the Plea Agreement, for a process in which the restitution record would be developed through the Special Master before any final determination, and is held to that bargain. *Santobello v. New York*, 404 U.S. 257, 262 (1971).

**P. The Restitution Record: Every Policyholder Has Been Paid in Full, and the Documented Offsets Exceed the Restitution Figure by More Than $2 Billion**

99. On December 23, 2025, the Special Master's Notice of Distribution confirmed that all of the NCICs' approximately 43,000 American policyholders had been mailed final payment, totaling approximately $157 million, in full settlement of their claims. The Special Master has

determined that the policyholders are not victims and that they have been "made completely whole" and "confirmed paid in full." (Exhibit B7; Doc. 100; Doc. 234 Ex. D7.) Every member of the American public affected by these cases has been paid in full.

100. As of October 2018 the total balance of the affiliated loans was $1.176 billion; net of accrued interest at the prejudgment rate and of payments and offsets, the remaining balance is $897 million. (Exhibit L.)[4] Against that balance Lindberg is due, under 18 U.S.C. §§ 3663A(b)(1)(B) and 3664(j)(2) and *Boccagna*, 450 F.3d at 115, 118 (offset value "must be determined as of the date property is returned"), credits of $641 million for the value of the NCICs when transferred to Dinius's control in October 2018, $74 million for cash Lindberg invested in the NCICs after the transfer, $192 million for cash received by the NCICs from the September 2025 Clanwilliam sale, $474 million for the loss the NCICs realized on that below-market sale, $611 million for the loss realized on the premature sale of the zero-coupon principal-protection bonds, $394 million for the cash the NCICs received on that sale that has never been credited to Lindberg, and $866 million for the loss realized on the Beckett sale. On the affiliated-loan assets alone, Lindberg has transferred more than $1.381 billion against a net obligation of $897 million (Exhibit L); with the zero-coupon-bond and Beckett credits, the total exceeds $3.25 billion against that $897 million obligation, an overpayment of over $2 billion. (Exhibit L; Doc. 295; Doc. 316 Part VIII.)

101. The record in the Western District of North Carolina documents, across the entire restitution proceeding, the following offsets, credits, and reductions against the $1,655,000,000 preliminary figure (Doc. 234 at 38–39; Doc. 281 at 30; Doc. 316 Part VIII):

[4]The prejudgment interest rate, not the contractual rate, is the proper measure of any time-value component, because restitution is not meant to "guarantee the benefit of any bargain," *United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011). Lindberg maintains, moreover, that the MVRA authorizes no interest at all where the property lost is cash returnable under 18 U.S.C. § 3663A(b)(1)(A), that the Department of Justice's own guidance excludes interest as "not eligible for restitution," and that the $263 million the Special Master added must be excluded in full. (Doc. 234 at 33–35 & n.4; Doc. 316 Part VIII.)

(a) improper additions to the affiliated-investment balances: prejudgment "time value" interest, $263,000,000; and a corrected starting balance of the affiliated investments, $141,000,000;

(b) credits and offsets: AAPC preferred equity transferred to ULICO, at par as of May 26, 2026, $352,906,240; SNIC payments, $27,823,425; cash payments to the pre-designated restitution parties not captured by the Special Master, $79,655,289; the CBL subordination fee extracted in the Beckett refinancing, $3,000,000; additional Clanwilliam sale proceeds, $20,000,000; ULICO's sale of contributed real estate, $13,596,013; the Bermuda insurers' proceeds from sales of affiliated assets, $9,800,076; sale proceeds of the zero-coupon bonds in the principal-protected notes, $243,452,385; and the value of the NCICs as of October 2018, $454,000,000; and

(c) losses not proximately caused by Lindberg: Agera, $129,398,324; Eye Care Lenders, $22,288,826; UKAT, $39,000,000; the insurance-holding-company debt portion, $14,897,805; the Clanwilliam below-market sale, $474,000,000; the early zero-coupon bond sales, $611,600,000; and the Beckett sale, $866,000,000—

102. In total, the record documents minimum offsets and reductions of $2,899,418,383 before Beckett and $3,765,418,383 with Beckett, against a $1,655,000,000 figure—net restitution owed, on Lindberg's showing, of $0, before the roughly $1 billion of first-loss capital he contributed. (Exhibits Z-1 through Z-5.) Lindberg has so demonstrated to the Western District of North Carolina and contends on appeal that restitution has not merely been paid but overpaid by more than $2 billion. The figures pleaded above for the affiliated-loan assets alone are a subset of this record. These figures are pleaded here to show the magnitude of the value the Defendants

destroyed and the absence of any legitimate purpose for further dispositions, not to ask this Court to determine any credit under 18 U.S.C. § 3664.

103. The Government's own chart concedes the point. It disallows credit for the diminution in the NCICs' 2018 value ($454,000,000), the Eye Care Lenders loss ($22,288,826), the UKAT refinancing failure ($39,000,000), the Clanwilliam sale loss ($474,000,000), and the losses from selling the zero-coupon bonds before maturity ($611,600,000) on the express ground that each resulted from a decision by the rehabilitators or the Special Master made "after LINDBERG defrauded them" (Doc. 308 at 5–6)—which is to say, the Government concedes that these losses were caused by the intervening decisions of the Defendants. It declines restitution for Conservatrix and Vista altogether because it "does not have sufficient evidence" to connect their losses to Lindberg's conduct (Doc. 308 at 7–8). It credits the AAPC preferred equity, the SNIC payments, the CBL fee, the ULICO real-estate transfer, and the Bermuda proceeds, if at all, only "if and when" monetized and only in "the actual dollar amount of value once realized" (Doc. 308 at 3–5)—inverting a statute under which credits are fixed as of the date property is returned. The Government cannot treat the Defendants' later decisions as irrelevant when they would reduce Lindberg's exposure and decisive when they increase it.

**Q. The Liquidations Continue: AAPC, Damovo, and the Next Sale**

104. The Beckett sale was not an aberration; it was the pattern. In 2026 AAPC, another Primary Restitution Asset, was reduced to a value near zero on the Special Master's own reports, with no motion, notice, or hearing. AAPC's credit facility with HPS Investment Partners matures on July 1, 2027. On September 1, 2026 Lindberg wrote to AAPC's Chairman and Board, with copies to the Special Master, requesting only visibility into the refinancing process—the process, timeline, and bank; term sheets before execution; and the 2026 EBITDA board deck—so that

AAPC does not become another Clanwilliam, sold to a favored buyer at a steep discount after management declines to complete a refinancing; and reminding the Board of its outstanding obligations to Lindberg under Assignment Agreement § 4(e) and the indemnities. (Exhibit Y.)

105. Damovo, one of the Specified Affiliated Companies and a Primary Restitution Asset, is a going concern worth between approximately $400 million and $500 million; on July 31, 2026 Twelve Seas Investment Company III delivered a written indication of interest to acquire Damovo at a $400 million enterprise value, backed by approximately $175 million held in trust by a NASDAQ-listed acquirer. Notwithstanding that offer, a disposition of Damovo is being arranged under which, by the purchaser's own account, the sale would generate no sale proceeds at all; the only value extracted would be approximately $17.5 million in so-called "consent fees"—approximately $13 million to the Joint Provisional Liquidators of the Bermuda insurers, approximately $4.5 million to NHC, and ten dollars to the North Carolina insurance estates. The disposition has not been submitted to the Western District of North Carolina for review; no AAI-appointed director's consent has been sought or given; and NHC's consent cannot lawfully be given without that court's approval under Doc. 56 at 6–7. (Decl. of Greg E. Lindberg (Sept. 1, 2026) ¶¶ 10–13; Doc. 331-2 (Ramachandran e-mail, Aug. 23, 2026); Doc. 320; Exhibit Z-10.) Lindberg has moved in the Western District of North Carolina to stay the disposition and has asked the Wake County Superior Court to instruct NHC to engage in good faith with the Twelve Seas offer and to escrow all proceeds. Selling Damovo for no proceeds and a sliver of consent fees, rather than pursuing an offer of that magnitude, would forgo hundreds of millions of dollars that could be applied to restitution—and a sale on those terms, once closed, cannot be undone.

106. There is no final order of restitution, no complete accounting, and no judicial lien or writ; yet the Primary Restitution Assets are being disposed of one after another without any order

of the supervising court. The MVRA vests enforcement in the United States, and only after a final order fixes the amount, through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize the private parties who act through the entities a court-appointed officer controls to liquidate the estate ex parte, before any final order, and to withhold the valuations and terms. A pre-order, ex parte liquidation of a defendant's property—without notice, without hearing, and without the process the appointing order itself required—is a taking of property without due process of law, and forfeiture and restitution reach only property properly subject to them. Cf. *Honeycutt v. United States*, 581 U.S. 443 (2017). Had Lindberg retained control, any disposition would have been at fair market value.

**R. Lindberg Has Sought a Stay in Every Available Forum, and No Court Has Yet Stayed the Enterprise's Hand**

107. Pending in the Western District of North Carolina are Lindberg's Motion for a Determination That No Restitution Is Owed (Doc. 234 / Doc. 564 in No. 5:19-CR-22, July 14, 2026), his Motion to Declare the Special-Master Reference Unconstitutional as Applied and to Disqualify and Remove the Special Master (Doc. 269, July 31, 2026), his Response and Objection to the Special Master's Second Supplement (July 30, 2026), his Response to the Government's Consolidated Position (Doc. 316, August 18, 2026), his Motion to Stay Disposition of the Damovo Asset (Doc. 320), and his Motions to Compel Production of the Data Underlying the Restitution Figure and of the Ex Parte Communications with the Special Master (Docs. 331, 332, August 31, 2026). He has asked that court to stay "all further sales, liquidations, and dispositions of the Primary Restitution Assets, and any distribution of prior proceeds," and to place the assets in the custody of a neutral who "may not sell, dispose of, or take any material action with respect to those assets without the prior approval of the Court" (Doc. 269-5 ¶ 3); he has objected to the entry of any final order of restitution or forfeiture on the present record; and the Government never responded

on the merits to the July 14 motion within the fourteen days that LCrR 47.1(d)(1) allows. (Exhibits W (Doc. 234), W2 (Doc. 269 and 269-5), W3 (Response to Second Supplement), W4 (Doc. 316), W5 (Docs. 331, 332, 331-2).) As of the date of this Complaint no stay has been entered, and the Enterprise continues to sell.

108. The requested stay costs the Defendants nothing that they are entitled to keep and costs the United States nothing. The assets remain where they are, under the supervision of the courts that placed them there; no policyholder is prejudiced, because every policyholder has been paid in full; and the ability of the United States to enforce any restitution order that survives appeal is unimpaired. Refusing a stay guarantees that if Lindberg prevails on appeal the victory will be an empty one—another Beckett, another asset sold at a fraction of its value on the strength of figures no one has been permitted to examine, before any court has determined that anything is owed.

## THE LEGAL CHARACTER OF THE DEFENDANTS' CONDUCT

### A. Under *Ellingburg*, Each Disposition Is the Execution of Criminal Punishment

109. In *Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), a unanimous Supreme Court held that restitution under the MVRA is criminal punishment subject to the constitutional limits that govern criminal punishment. The liquidation of Lindberg's assets to generate restitution proceeds is the execution of that punishment. The December 2025 sale of Beckett for approximately $134 million against approximately $1 billion in contemporaneous independent valuations was an approximately $866 million deprivation exacted from Lindberg before any court had determined that any restitution was owed. That deprivation is not an administrative incident of asset management. It is criminal punishment—the largest component of punishment imposed in either criminal case, exceeding by orders of magnitude any fine the statutes of conviction authorize—and it was imposed by persons with no lawful power to punish, in an

amount no court fixed, by a procedure no rule permits. The judicial power, including the power to impose criminal punishment, belongs to the Article III courts and may not be exercised by others. See *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (Article III judicial power may not be exercised by non-Article III actors); *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (a master may aid, but may not displace, the court); *United States v. Blake*, 81 F.3d 498, 507 (4th Cir. 1996) (restitution is a non-delegable judicial function); *United States v. Johnson*, 48 F.3d 806, 808–09 (4th Cir. 1995). An unauthorized restitution exaction is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Broughton-Jones*, 71 F.3d 1143, 1147 (4th Cir. 1995); *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013). *Ellingburg* also means that every fact necessary to support the $1.655 billion figure—victim identity, loss amount, causation—is a fact that increases criminal punishment, *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012), and that a monetary sanction grossly disproportional to the offense, layered as restitution, forfeiture, and "time value" interest measured against the same unverified valuations, offends the Excessive Fines and Double Jeopardy Clauses. *Timbs v. Indiana*, 586 U.S. 146 (2019); *United States v. Bajakajian*, 524 U.S. 321 (1998); *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Ex parte Lange*, 85 U.S. (18 Wall.) 163, 176 (1874).

**B. No Authority Conferred on the Special Master Was Delegated to the Defendants, and the Dispositions Were Outside the Appointing Order in Any Event**

110. A special master under 18 U.S.C. § 3664(d)(6) is an adjunct whose role is confined to proposed findings "subject to a de novo determination of the issue by the court." A court-appointed officer who takes custody of the res, holds its title, and liquidates it is a receiver in function, whatever the caption of the order calls him. The same person cannot lawfully be both. *United States v. O'Connor*, 291 F.2d 520 (2d Cir. 1961) (Friendly, J.) ("Order affirmed insofar as it

appoints a receiver, vacated insofar as it appoints a special master."). A master advises; a receiver acts. Here the officer acted—he did not merely permit the Beckett sale, he approved it—and the action destroyed $866 million of value before the court had determined that any restitution was owed. Because the appointing order required prior court approval for any sale (Doc. 56 ¶ 6(e)) and notice and hearing (¶ 15), the dispositions alleged here were unauthorized on the face of the order that conferred whatever authority the officer and, derivatively, the Defendants possessed, and restitution exacted beyond lawful authority is an illegal sentence. See *United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006). Plaintiff does not ask this Court to adjudicate the Special Master's status, which is before the Western District of North Carolina (Doc. 269). He pleads these facts because none of the officer's authority—whatever its scope—was delegated to Meghji, M3, Dinius, or Williams Mullen; because acts outside the appointing order enjoy no derived immunity in any event; and because the private parties who supplied the consents, produced the valuations, and collected the fees—the Defendants—are answerable for them in their own right.

**C. The Decisionmakers Were Conflicted**

111. The officer through whom the Enterprise acted, and the Defendants who supplied its valuations and consents, are paid from the assets they liquidate (Doc. 56 ¶ 14), so the larger the estate they sell, the greater their compensation. A "direct, personal, substantial pecuniary interest" in the outcome disqualifies any adjudicator, *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); the test is objective and requires no showing of actual bias, *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009); *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016); *In re Murchison*, 349 U.S. 133, 136 (1955); the interest here is not the standard hourly rate that the Third Circuit found unobjectionable in *United States v. Konrad*, 730 F.3d 343, 353 & n.12 (3d Cir. 2013) (master "was paid the standard hourly rate, and not a percentage of the sum she calculated"), but compensation drawn from the

very estate whose value the decisionmakers fix and liquidate; and "even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." *Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 617–18 (1993) (citing *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972)). By submitting the Meghji affidavit, the Enterprise became a witness in its own cause. These facts establish the Defendants' motive and scienter: the sales were structured to generate fees for the sellers' own fiduciaries, and the valuations were produced by the sellers' own advisors.

**D. The Ex Parte Development of the Figures Was Concealment, and Belated Production Cannot Cure It**

112. A neutral that decides on ex parte submissions is not a neutral. Due process guarantees notice and a meaningful opportunity to be heard before a neutral decisionmaker, and forbids the resolution of adjudicative facts on communications one party cannot see, test, or rebut. *Goldberg v. Kelly*, 397 U.S. 254 (1970); cf. *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) (distinguishing the strict neutrality required of adjudicators from the standard applicable to enforcement officials); *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996); *In re Kensington Int'l Ltd.*, 368 F.3d 289 (3d Cir. 2004) (disqualification under 28 U.S.C. § 455(a) for unrecorded ex parte contacts with court-appointed advisors); *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) (de novo review does not cure impermissible ex parte adjudicative contacts; a report so produced "may not be submitted to the district court or otherwise disseminated in any manner"). The ex parte communications from M3, NHC, the NCICs, Dinius, Camden, and Williams Mullen to the Special Master are, in this action, the concealment component of the scheme: the Enterprise fed the valuations and loss figures to the decisionmaker off the record, withheld the underlying data from the person whose punishment they fixed, and then sold the assets on those figures before they could be tested. Whatever the Government's disclosure duties under *Brady v. Maryland*, 373 U.S. 83, 87 (1963),

*Giglio v. United States*, 405 U.S. 150 (1972), and *Kyles v. Whitley*, 514 U.S. 419 (1995)—which reach favorable evidence known to those acting on its behalf—the Defendants' concealment establishes the fraudulent character of the scheme.

**E. Accrual and Timeliness**

113. Each disposition and each fee wire pleaded above inflicted a new and independent injury, and a new cause of action accrued on each. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102–05 (2d Cir. 1988); *Bingham v. Zolt*, 66 F.3d 553, 559–61 (2d Cir. 1995). The Beckett sale (December 2025), the Clanwilliam sale (September 2025), the AAPC write-down and the Damovo disposition (2026), the ex parte development of the restitution figures (2025–2026), and every fee wire since September 2022 fall within four years of this Complaint. As to earlier injuries, the Defendants concealed the material facts—no application for fee approval was ever filed where Lindberg could see it; the terms and proceeds of dispositions were withheld as "confidential"; the valuations and communications on which they rested were exchanged ex parte and never produced; and Lindberg was divested of his companies' books—so that Lindberg did not discover, and could not reasonably have discovered, the injury and its cause until, at the earliest, the Special Master's reports of 2026 and the Government's correspondence of August 17, 2026. Any limitations period is therefore tolled by fraudulent concealment and equitable tolling until that discovery.

**F. The Losses Were Caused by the Defendants' Intervening Acts, Not by Any Offense**

114. The law confines responsibility to harms within the risk a reasonable person would foresee. *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344 (1928) (Cardozo, C.J.) ("the risk reasonably to be perceived defines the duty to be obeyed"); *Paroline v. United States*, 572 U.S. 434, 444–46 (2014); *Robers*, 572 U.S. at 644–47. Congress wrote the same limit into the MVRA: "[a] loss caused in part by intervening circumstances cannot be said to have been directly and

proximately caused by the offense of conviction, unless the intervening cause is related to or a foreseeable consequence of that offense." S. Rep. No. 104-179, at 19 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 932; 18 U.S.C. § 3663A(a)(2) ("victim" means a person "directly and proximately harmed"); *United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006); *United States v. Stein*, 846 F.3d 1135, 1154–56 (11th Cir. 2017); *Tyler*, 767 F.2d at 1352; *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009); *In re Zetteler*, No. 26-1749 (4th Cir. June 15, 2026) (per curiam) (unpublished) (amended opinion) (in this very docket, denying victim status to a claimant that failed to tie its harm to conduct "closely related to the conduct inherent to the offense, rather than merely tangentially linked"); *United States v. Goodrich*, 12 F.4th 219, 228–29 (2d Cir. 2021); *United States v. Gibbens*, 25 F.3d 28, 36 (1st Cir. 1994) (the sovereign "is not entitled to restitution" for a loss it "provoke[d]"). The chain of causation was severed by a string of intervening acts, each occurring after Lindberg ceded control in October 2018 and each documented in the record: the Government's interference with the signed Ares sale; the refusal of Oaktree; the coerced ten-year hold; the pre-maturity bond fire-sale; the refusal of Montshire/Alban; the blocking of Quadro; the Clanwilliam fire-sale; and the Special Master's continuing dispositions, culminating in Beckett and Damovo. The Special Master concedes as much, and the Government's own chart attributes the largest disallowed items to decisions made "after LINDBERG defrauded them." Lindberg ran the first leg and handed the baton to the Rehabilitator in October 2018; everything that went wrong happened on the Defendants' leg of the race. For purposes of this action, the same facts establish the "direct relation" between the Defendants' conduct and Lindberg's injury that RICO requires. *Holmes*, 503 U.S. at 268; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006).

**G. Nothing Further Is Owed, So No Legitimate Purpose Is Served by Further Sales**

115. Restitution may not confer a windfall or charge a defendant more than the victims' actual, proximately caused loss. *Hughey v. United States*, 495 U.S. 411, 413 (1990); *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017); *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018); *Boccagna*, 450 F.3d at 115, 118; *United States v. Alalade*, 204 F.3d 536, 540 n.4 (4th Cir. 2000) (noting § 3664(j)(2) reduction for amounts later recovered); *Nucci*, 364 F.3d at 423–24; 18 U.S.C. §§ 3663A(b)(1)(B), 3664(f)(1), (j)(2); S. Rep. No. 104-179, at 20 (offset provisions ensure "the victim is not compensated twice for the same loss"). The burden of proving loss rests on the Government, 18 U.S.C. § 3664(e); *United States v. Wilkinson*, 590 F.3d 259, 268 (4th Cir. 2010), and a proponent that adopts a third party's figure as its own must be able to produce and support the basis for it. *Steele*, 897 F.3d 606; *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008). Where policyholders have been paid in full, the documented offsets exceed the claimed restitution by more than $2 billion, and the sentencing court's own premise is that the loss was "risk," Lindberg contends—in the Western District of North Carolina and on appeal—that the actual loss is zero, that any ambiguity is resolved in his favor under the rule of lenity, and that any uncertainty created by the withholding of records must be read against the parties that withheld them. Because, on that showing, nothing further is owed, no legitimate purpose is served by the further dispositions the Enterprise is pursuing; their only function is to generate fees for the Defendants and to convert contestable valuations into irreversible losses faster than any court can review them.

## CLAIMS FOR RELIEF

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c) (RICO)**
**(Against All Defendants)**

116. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

117. At all relevant times Defendants Causey, Dinius, Meghji, and Williams Mullen were "persons" within the meaning of 18 U.S.C. § 1961(3).

118. At all relevant times there existed an enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of an association-in-fact of the Defendants and their co-conspirators, including employees and agents of the NCDOI, M3 Partners, LP and its personnel, NHC Holdings, LLC (acting through Meghji), Entrust Global Group, LLC, Wes Camden, and the distribution agents and other professionals paid from the estates (the "Enterprise"). Since 2025 the Enterprise has operated through NHC and the entities it manages or holds in trust, from M3's offices at 1700 Broadway, New York, New York.

119. The Enterprise possesses the three structural features required by *Boyle v. United States*, 556 U.S. 938, 946 (2009): (a) a common purpose—to extract fees and value from the assets Lindberg built while destroying his companies and blocking any transaction that would end the Defendants' control; (b) relationships among those associated with it—Causey appointed Dinius; Dinius retained Meghji and Williams Mullen; Meghji became the acting chief executive of the entity that holds the operating companies; Williams Mullen documented the transactions and communicated ex parte with the Special Master; and (c) longevity sufficient to permit pursuit of its purpose, from 2017 to the present. As the Second Circuit instructs, an association-in-fact enterprise "is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *United States v. Gershman*, 31 F.4th 80, 96 (2d Cir. 2022) (quoting *United States v. Applins*, 637 F.3d 59, 73 (2d Cir. 2011)). What this Enterprise did is unmistakable.

120. The Enterprise is distinct from each Defendant. *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994). It comprises four genuinely independent actors—a North Carolina state official, an Indiana-based rehabilitator, a New York

financial advisor, and a Virginia law firm—who associated across state lines and each received distinct benefits from its operation.

121. The Enterprise engaged in, and its activities affected, interstate commerce: it administered insurance companies and operating companies doing business in multiple states and abroad, sold companies to buyers in other states and countries, and transmitted funds, valuations, consents, and communications by interstate wire.

122. Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), and each played "some part in directing" those affairs. *Reves*, 507 U.S. at 179. Causey initiated the scheme, identified the target, engineered the regulatory actions that placed the assets under the Enterprise's control, and appointed Dinius with the mandate to dismantle rather than rehabilitate. Dinius managed the day-to-day destruction of value, deciding which transactions to block and which assets to liquidate at below-market prices, and approved the fee payments. Meghji directed the financial strategy from New York, produced the valuations, executed the wires, and, as acting chief executive of NHC, supplied the consents that dissolved the Beckett Trust and cleared the sale. Williams Mullen provided the legal architecture that bypassed § 58-30-85(3), documented the transactions, and fed the Special Master ex parte.

123. The pattern of racketeering activity consisted of multiple, related predicate acts, including the following, each of which was committed with the specific intent to deceive and to obtain money or property from Lindberg and the estates he built, and each of which is pleaded with the particularity that Fed. R. Civ. P. 9(b) requires to the extent the particulars are within Plaintiff's knowledge. The dates, amounts, senders, and recipients of the individual wires and communications identified below are peculiarly within the Defendants' knowledge and control: the

Defendants hold the estates' books and bank records, the ex parte communications, and the transaction documents, all of which have been withheld from Lindberg as alleged in Parts M and N, and the facts on which each allegation is founded are pleaded in the Parts of the Statement of Facts cited in each subparagraph:

(a) *Wire fraud, 18 U.S.C. § 1343 (fee extraction, 2019–present).* On a regular monthly and weekly basis from June 2019 to the present, Defendant Meghji and his M3 staff in New York City, with Defendant Dinius's approval and on documentation prepared by Defendant Williams Mullen, caused interstate wire transfers from the NCIC estates in North Carolina to the accounts of Dinius, M3 (in New York), Williams Mullen (in Virginia and North Carolina), and other professionals, totaling more than $165 million, including an estimated $25 million to Dinius, an estimated $30 million to Williams Mullen, and approximately $2.5 million per month continuing, without seeking or obtaining the court approval that N.C. Gen. Stat. § 58-30-85(3) requires, and, since January 2025, fees to M3 from the Primary Restitution Assets without the court approval to which Doc. 56 ¶ 14 subjects them—while representing in the periodic reports filed in the rehabilitation proceeding and in the restitution proceeding that the estates were being administered in accordance with law, and omitting that no application for approval had been made. Each wire is a separate predicate act; the schedule of fees by payee, period, and amount is Exhibit M, and the specific wire records are in the Defendants' possession. (Parts H, K.)

(b) *Wire fraud, 18 U.S.C. § 1343 (March 9, 2018).* Defendant Causey's interstate e-mail of March 9, 2018 to Lindberg praising his "outstanding and impressive job" with state regulators while Causey was secretly recording Lindberg for federal prosecutors,

sent to lull Lindberg and to keep him engaged and communicating so that the plan to place his assets under the Enterprise's control could proceed. (Exhibit B3; Part D.)

(c) *Wire fraud, 18 U.S.C. § 1343 (the M3 valuations, spring 2025 through July 2026).* The transmission by interstate wire, from M3's New York offices, of the M3 "desktop" valuations of the Primary Restitution Assets and the Specified Affiliated Companies to the Special Master, his financial advisor Paladin Management Group, and the Government, for adoption as the measure of Lindberg's restitution and forfeiture, including the valuations underlying the Special Master's reports of March and April 2026 (Doc. 106) and July 2026 (Doc. 245), which cut the estate's value from a $1.454 billion midpoint to a $998 million "current guess" and reduced AAPC—valued by KPMG at $900 million and by Houlihan Lokey at approximately $3 billion—to near zero on "conjecture about generative artificial intelligence," while the underlying data and methodology were withheld from Lindberg. Meghji knew the figures to be unreliable because his own firm's valuations were, in the Special Master's words, a "desktop exercise" that did "not constitute formal valuations," and because the contemporaneous independent valuations of the same assets in M3's possession (Cabrillo, Blackstone, KPMG, Houlihan Lokey, Quadro) were multiples higher. (Parts L, N.)

(d) *Wire fraud, 18 U.S.C. § 1343 (ex parte communications, 2025–2026).* The communications by interstate wire among M3, NHC (acting through Meghji), the NCICs (acting through Dinius), Williams Mullen, and Wes Camden, on the one hand, and the Special Master, his advisors, and the Government, on the other, concerning loss, valuation, offsets, and the dispositions of assets, including

communications on or before December 18, 2025 (the date of the Special Master's deferral of Lindberg's formal information requests) and continuing through August 2026, on which Lindberg was not copied and which have been withheld from him, and by which the figures fixing his punishment were adjusted "without any disclosure of how or why." The existence, participants, and effect of these communications are established by the Government's August 17, 2026 correspondence and by the changes in the figures between the Special Master's successive reports; their content is known only to the Defendants. (Doc. 331 at 5–6; Doc. 331-1 ¶¶ 2–6; Part M.)

(e) *Wire fraud, 18 U.S.C. § 1343 (the Beckett consents, December 2025).* The transmission in December 2025, by interstate wire from New York, of NHC's written consent, as Manager of Entrust Global Group, LLC, to the termination of the Beckett Collectibles Trust under § 9.1(e) of the Trust Agreement and to the sale of substantially all of Beckett's assets as a "Fundamental BKX Matter" under § 7.2(a)(vi); the related NHC board vote; and the circulation to the board and to the buyer of the letter of non-objection—consummating the sale of a $1,003,924,000 asset for approximately $134 million without the court approval the appointing order required, with the price withheld as "confidential," and with the $3,000,000 CBL subordination fee extracted from the estate—each such communication representing, expressly or by omission, that the sale was authorized and at a fair value, when Meghji knew that no court approval had been obtained and that the asset carried a $1,003,924,000 appraisal and $800 million to $1.1 billion of acquisition interest. (Meghji Aff. ¶¶ 9, 19–21; Part N.)

(f) *Wire fraud, 18 U.S.C. § 1343 (the Meghji affidavit, August 2026).* The transmission on or about August 17–18, 2026, by interstate wire from New York, of the Affidavit of Mohsin Meghji to the United States Attorney's Office for the Western District of North Carolina for filing as Exhibit C to Doc. 308, representing on "information and belief" and without a single figure that Beckett was "a small portion" of the Collectivus Group and that the Special Master had "no direct involvement," in order to characterize, in support of a $1.655 billion restitution demand, a sale that Meghji's own company had approved, and thereby to obtain the entry of a restitution and forfeiture judgment against Lindberg measured by the Enterprise's own figures. (Part N.)

(g) *Wire fraud, 18 U.S.C. § 1343 (the Clanwilliam and Damovo dispositions).* The interstate wire communications from New York, in and after December 2024, by which Meghji, with Dinius's approval, arranged the sale of the Clanwilliam Group to TA Associates for approximately $450 million against a signed $880 million agreement, for the stated purpose of funding fees to M3 and its New York personnel; and the communications in and after August 2026—including those reflected in the August 23, 2026 e-mail of Lindberg's counsel (Doc. 331-2)—by which Meghji and Dinius have arranged the disposition of Damovo for no proceeds and approximately $17.5 million in "consent fees," notwithstanding the written $400 million indication of interest of July 31, 2026, without notice to the supervising court. (Parts I, Q.)

(h) *Mail and wire fraud, 18 U.S.C. §§ 1341, 1343 (stale victim statements, 2026).* On information and belief, the transmission by mail and wire, in or about April–May

2026, by the NCICs under Dinius's control, through Williams Mullen and Wes Camden, of policyholder victim statements gathered before the December 23, 2025 distribution, for presentation to the sentencing court as though current, while the Enterprise continued to represent to the Government and the court that the estates required further liquidation to satisfy unpaid policyholder losses. The basis for this belief is that the NCICs, under Dinius's control and represented by Williams Mullen and Mr. Camden, are the source of the policyholder information presented, and that the statements post-dated by months the December 23, 2025 payment in full. (Parts O, P.)

(i) *Wire fraud, 18 U.S.C. § 1343 (the UKAT and Quadro communications).* Williams Mullen's and Dinius's interstate communications, in response to the Alban letter (Exhibit N), refusing consent to the BC Partners refinancing of UKAT that would have paid the insurers $39 million, on pretextual grounds and while omitting that the refusal served the Defendants' fee interest; and Dinius's communications in 2024 blocking the Quadro merger over Lindberg's repeated objections, on the same basis. (Parts H, I.)

124. Causey's false statements to the FBI and under oath, and the Enterprise's repeated representations to state and federal courts that Lindberg's assets were insufficient to satisfy restitution when in fact he had transferred billions of dollars of excess assets to the Defendants' control, are pleaded as evidence of the Enterprise's purpose, of the Defendants' knowledge and intent, and of the relatedness of the predicate acts; they are not pleaded as predicate acts.

125. The predicate acts are related: they share the common purpose of self-enrichment and the dismantling of Lindberg's business group; common participants; a common victim; and

common methods—the abuse of fiduciary appointments, the bypassing of court approval, the concealment of data, and the sale of assets at a fraction of value to fund fees. They extended from 2017 to the present, establishing closed-ended continuity, and they continue—Damovo now, AAPC next—establishing open-ended continuity that threatens to persist as long as the assets remain under the Enterprise's control. *H.J. Inc.*, 492 U.S. at 239–42.

126. As a direct and proximate result of the Defendants' violations of § 1962(c), Plaintiff has been injured in his business and property within the meaning of 18 U.S.C. § 1964(c) in an amount exceeding $3 billion, including: the approximately $866 million destroyed in the Beckett sale; the approximately $474 million destroyed in the Clanwilliam sale; the approximately $611.6 million destroyed in the pre-maturity bond sale; the $39 million UKAT loss; the value of the Specified Affiliated Companies and AAPC reduced under the Enterprise's control; the more than $165 million in unapproved fees; and the tax distributions and indemnity payments to which Lindberg is entitled under Assignment Agreement § 4(e) and the Tax Indemnification Agreement and General Indemnification Policy and that the destruction of the assets has rendered uncollectible. These injuries are Lindberg's own, not merely derivative of injury to the companies: he personally guaranteed the affiliated loans under the $2.39 billion Backstop Agreement; he is the obligee of the indemnities and the § 4(e) tax distributions; he is the sole owner of the NCICs' surplus equity and the beneficial owner of the assigned interests; and his personal restitution and forfeiture exposure is measured by what the assets realize. Plaintiff was the direct target of the scheme; the blocked transactions were his transactions; the destroyed value was his value; and the extracted fees came from companies he built and capitalized. *Anza*, 547 U.S. at 457; *Holmes*, 503 U.S. at 268; *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 145 S. Ct. 931 (2025).

127. Plaintiff is entitled to recover threefold the damages he has sustained, together with the costs of suit and, to the extent counsel appears for him, reasonable attorneys' fees, under 18 U.S.C. § 1964(c).

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d) (RICO CONSPIRACY)**
**(Against All Defendants)**

128. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

129. The Defendants knowingly and intentionally agreed and conspired with one another and with others to violate 18 U.S.C. § 1962(c). Each Defendant knew of and agreed to the overall objective of the conspiracy—to dismantle Lindberg's businesses and extract fees and value through a pattern of racketeering activity—and each agreed that at least two predicate acts would be committed in furtherance of the Enterprise's affairs.

130. The Defendants committed overt acts in furtherance of the conspiracy, including: (a) Causey's false statements to the FBI and his appointment of Dinius; (b) Dinius's rejection of the Ares, Oaktree, Montshire/Alban, and Quadro transactions, his coercion of the MOU, his pre-maturity sale of the principal-protection bonds, and his authorization of unapproved fees; (c) Meghji's production of the M3 valuations, his orchestration of the Clanwilliam and Beckett sales, his consent as NHC's acting chief executive to the termination of the Beckett Trust, and his August 2026 affidavit; (d) Williams Mullen's structuring and documentation of the unapproved fee payments, its refusal of the UKAT refinancing, and its ex parte communications with the Special Master; (e) the Defendants' coordinated refusal, for eighteen months, to produce the data underlying the restitution figures; and (f) the Defendants' continuing pursuit of the Damovo disposition and the AAPC write-down while the data is withheld and the appeal is pending.

131. As a direct and proximate result of the conspiracy, Plaintiff has suffered injury to his business and property in excess of $3 billion, and is entitled to threefold damages, costs, and, to the extent counsel appears, attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT III**
**CONVERSION**
**(Against Defendants Dinius and Meghji)**

132. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

133. Plaintiff had, and has, a possessory and beneficial interest in the value of the NCICs, of the Specified Affiliated Companies, and of the Primary Restitution Assets that he transferred to satisfy legitimate obligations and that he continues to own beneficially for tax purposes under Assignment Agreement § 4(e), together with the right to have that value credited against his restitution obligation.

134. Defendants Dinius and Meghji intentionally exercised dominion and control over those assets in defiance of Plaintiff's rights, by destroying value, extracting unapproved fees, blocking the Ares, Oaktree, Montshire/Alban, UKAT, and Quadro transactions, and orchestrating the below-value dispositions of the principal-protection bonds, Clanwilliam, and Beckett, and by consenting to and effecting those dispositions without the court approval required by the orders under which they held the assets and while withholding the proceeds and any accounting of them.

135. As a direct and proximate result, Plaintiff has suffered damages in excess of $3 billion.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(Against Defendants Dinius and Meghji)**

136. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

137. As court-supervised rehabilitator and as financial advisor to the rehabilitation estates, Defendants Dinius and Meghji owed fiduciary duties of care and loyalty to preserve and

maximize the value of the assets under their control and to account for it, duties that ran to the NCICs and, by extension, to Lindberg as the sole owner of their surplus equity. As acting Chief Executive Officer of NHC—the holding company for the Specified Affiliated Companies and the Manager of the Grantor of the Beckett Trust—Defendant Meghji owed fiduciary duties of care and loyalty as a corporate officer, including the duty not to self-deal and not to cause the company to dispose of its assets for less than fair value to generate fees for his own firm; those duties ran to NHC's beneficial owners, including Lindberg, who remains the beneficial owner of the assigned interests for tax purposes and the person whose restitution obligation is measured by what those assets realize; and, as the financial advisor engaged for the estates and paid from them, Meghji owed the estates and their beneficial owner the duty of undivided loyalty. Meghji further knew that the order under which the NHC equity is held required court approval before any sale (Doc. 56 ¶ 6(e)) and that none had been obtained.

138. Dinius and Meghji breached those duties by destroying rather than preserving value; extracting fees without court approval; blocking profitable transactions; selling the principal-protection bonds before maturity for less than forty cents on the dollar; orchestrating the below-market sales of Clanwilliam and Beckett; consenting to the termination of the Beckett Trust and the sale of Beckett at approximately thirteen percent of its appraised value without court approval, notice, or an accounting; producing and feeding to the Special Master, ex parte, valuations that marked down the assets they were selling; and failing to account for the value transferred and the proceeds realized. These breaches were willful, wanton, and in bad faith, and were undertaken to generate fees for the Defendants themselves.

139. As a direct and proximate result, Plaintiff has suffered damages exceeding $3 billion.

**COUNT V**
**CIVIL CONSPIRACY TO COMMIT CONVERSION AND BREACH OF FIDUCIARY DUTY**
**(Against All Defendants)**

140. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

141. Under New York law, civil conspiracy, while not an independent tort, connects the actions of separate defendants to an underlying actionable tort. *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986); *Abacus Fed. Sav. Bank v. Lim*, 75 A.D.3d 472, 474 (1st Dep't 2010).

142. As set forth in Counts III and IV, Defendants Dinius and Meghji committed the primary torts of conversion and breach of fiduciary duty. Defendants Causey, Dinius, Meghji, and Williams Mullen entered into a corrupt agreement and common scheme with the specific intent to dismantle Plaintiff's business group, convert his assets for their own enrichment, and breach the fiduciary duties owed to the NCICs and to Lindberg. The agreement originated with Causey's pre-inauguration plan in December 2016 and was operationalized through the appointment of Dinius and the retention of Meghji and Williams Mullen.

143. In furtherance of the agreement, the Defendants committed numerous overt acts, including: Causey's fabrication of evidence and false statements to the FBI, his appointment of Dinius with a mandate to destroy rather than rehabilitate, and his provision of political cover; Dinius's rejection of high-value transactions, his blocking of the UKAT refinancing, his pre-maturity bond sale, and his authorization of unapproved fees; Meghji's execution of hundreds of wire transfers from New York, his manipulation of valuations to justify fire-sale liquidations, and his consent as NHC's acting chief executive to the Beckett Trust termination and sale; and Williams Mullen's structuring of the legal architecture to bypass § 58-30-85(3), its documentation

of the transactions, and its ex parte communications with the Special Master. Williams Mullen stepped outside the bounds of legitimate legal representation and became an active participant.

144. As a direct result of the conspiracy and the underlying torts, Plaintiff has suffered damages comprising the loss of the NCICs' value, the lost value of the blocked Quadro transaction, the losses on the bond, Clanwilliam, and Beckett dispositions, and the theft of more than $165 million in fees. By virtue of their participation, the Defendants are jointly and severally liable for all damages resulting from the conversion and breach of fiduciary duty, regardless of which Defendant performed the direct act. *Original Ballet Russe v. Ballet Theatre*, 133 F.2d 187, 189 (2d Cir. 1943). Plaintiff demands judgment against all Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined at trial but not less than $3 billion.

**COUNT VI**
**UNJUST ENRICHMENT**
**(Against Defendants Dinius, Meghji, and Williams Mullen)**

145. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

146. Under New York law a plaintiff establishes unjust enrichment by showing that the defendant was enriched, at the plaintiff's expense, and that equity and good conscience preclude the defendant from retaining the benefit. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).

147. Defendants Dinius, Meghji, and Williams Mullen have been substantially enriched by more than $165 million in fees extracted from assets Plaintiff transferred to their control—including more than $25 million to Dinius personally, tens of millions to Meghji and M3 with approximately $2.5 million per month continuing, and an estimated $30 million to Williams Mullen. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). Those fees came directly and exclusively from assets Plaintiff built over decades, capitalized with nearly $1 billion of his own

funds, and transferred to the Defendants' control; every dollar paid in fees is a dollar that should have been credited toward Plaintiff's restitution. The relationship is direct, not attenuated: the entire predicate for the Defendants' appointment and retention was to take control of Plaintiff's assets. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012).

148. Equity and good conscience preclude the Defendants from retaining these benefits because (a) the fees were never approved by any court, in violation of N.C. Gen. Stat. § 58-30-85(3); (b) they were extracted while the Defendants systematically destroyed the value of the assets they were paid to protect; (c) the Defendants were fiduciaries who prioritized fee extraction over asset preservation, breaching the duty of undivided loyalty, *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989); (d) Plaintiff has already satisfied and overpaid his restitution obligations, so that the Defendants' retention of fees drawn from those assets is an impermissible windfall, *Nucci*, 364 F.3d at 423; (e) under *Ellingburg* the liquidations are criminal punishment executed by the Defendants themselves, and fees drawn from a pre-order, off-the-docket liquidation are the proceeds of a punishment no court imposed; and (f) the fees were extracted through a corrupt enterprise. *Paramount Film Distrib. Corp. v. State*, 30 N.Y.2d 415, 421 (1972).

149. Under New York's faithless-servant doctrine, fiduciaries who breach the duty of loyalty forfeit all compensation received after the first disloyal act, regardless of whether the principal suffered provable damage. *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184 (2d Cir. 2003). The Defendants' first disloyal act occurred no later than the first fee extracted without seeking court approval in 2019; all fees received thereafter are subject to forfeiture. The remedy reaches money obtained by wrongdoing as readily as money paid by mistake. See *Parsa v. State*, 64 N.Y.2d 143, 148 (1984); *Kaye*, 202 F.3d at 616.

150. No valid contract between Plaintiff and any Defendant governs the payment of fees to the Defendants; the Defendants were imposed on Plaintiff's assets through regulatory and judicial processes initiated as part of a corrupt enterprise, and any authority to draw fees was conditioned on the court approval the Defendants never sought. This claim is pleaded in the alternative under Fed. R. Civ. P. 8(d)(2).

151. Plaintiff is entitled to disgorgement of all fees extracted by Defendants Dinius, Meghji, and Williams Mullen from assets transferred to their control, in excess of $165 million, plus prejudgment interest. "[W]here claims of self-dealing and divided loyalty are presented, a fiduciary may be required to disgorge any ill-gotten gain even where the plaintiff has sustained no direct economic loss." *Diamond v. Oreamuno*, 24 N.Y.2d 494, 498 (1969).

**COUNT VII**
**INJUNCTIVE RELIEF—STAY OF ALL DISPOSITIONS OF THE PRIMARY RESTITUTION ASSETS AND THE SPECIFIED AFFILIATED COMPANIES PENDING FINAL ADJUDICATION OF PLAINTIFF'S RESTITUTION OBLIGATIONS, INCLUDING ALL APPEALS**
**(18 U.S.C. § 1964(a); Fed. R. Civ. P. 65; the Court's inherent equitable powers)**
**(Against Defendants Meghji and Dinius)**

152. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

153. Section 1964(a) vests this Court with jurisdiction "to prevent and restrain violations of section 1962" by "issuing appropriate orders," including orders "prohibiting any person from engaging in the same type of endeavor as the Enterprise engaged in." Independently, the Court has authority under Rule 65 and its inherent equitable powers to preserve the status quo and the subject matter of the litigation pending adjudication of the conversion, fiduciary-duty, conspiracy, and unjust-enrichment claims, each of which seeks the return of, or an accounting for, specific property in the Defendants' hands. The state-law counts supply an independent basis for the requested order.

154. *Irreparable harm.* The harm the stay prevents has already occurred three times and cannot be undone: the pre-maturity sale of the principal-protection bonds (approximately $611.6

million lost), the Clanwilliam sale (approximately $474 million below the signed Quadro agreement), and the Beckett sale (approximately $866 million below appraisal). Damovo is being sold now, for no proceeds; AAPC's credit facility matures July 1, 2027, and a refinancing conducted without visibility invites a repeat of Clanwilliam. Each disposition converts a contestable valuation into a realized, irreversible loss that no appellate ruling can restore and, under *Ellingburg*, executes criminal punishment before any court has determined that punishment is due. Money damages cannot remedy the loss, because the Defendants are paid from the very estate they liquidate, so that every sale simultaneously enriches them and dissipates the only fund from which a judgment against them—or a restitution credit to Lindberg—could be satisfied.

155. *Likelihood of success.* Defendant Meghji's own sworn statements establish that NHC, acting through him, supplied the Grantor consent that terminated the Beckett Trust and cleared the sale; the appointing order establishes that court approval was required and never sought; the contemporaneous appraisal and market evidence establish the value destroyed; the Special Master's own reports concede that the material facts are not in dispute and that the valuations are a "guess"; and the Government's own chart attributes the losses to decisions made after Lindberg ceded control. The predicate acts, the Enterprise, and the injury are pleaded with particularity in Counts I and II.

156. *Balance of hardships and the public interest.* The stay imposes no cognizable hardship on the Defendants: the assets remain in place, under the supervision of the courts that placed them there, and the Defendants retain whatever authority those courts have lawfully conferred to operate them in the ordinary course. Every policyholder has been paid in full, and the ability of the United States to enforce any restitution order that survives appeal is unimpaired, because the assets are preserved rather than dissipated. The public interest lies in preserving the

appellate jurisdiction of the Fourth Circuit and the district court's ability to conduct the de novo determination the MVRA requires on a record that still exists. The Department of Justice does not ordinarily oppose a stay whose only effect is to keep property available pending appellate review, see Fed. R. Crim. P. 32.2(d).

157. *Scope*. Plaintiff requests an order that Defendants Meghji and Dinius, and all persons in active concert or participation with them—including NHC Holdings, LLC; M3 Partners, LP; Entrust Global Group, LLC; and every affiliate, subsidiary, or company held in trust for the benefit of or under the management of NHC or of Meghji, including without limitation AAPC Holdings, LLC, the Collectivus Group and its subsidiaries, the Damovo Group, and each of the Specified Affiliated Companies—shall not (a) sell, transfer, assign, pledge, encumber, or otherwise dispose of any asset outside the ordinary course of business; (b) enter into or consummate any refinancing or recapitalization that effects a change of control or a disposition of assets; (c) terminate, amend, or grant any consent under any trust agreement governing such assets; or (d) distribute, dividend, or pay out the proceeds of any prior disposition (including any Beckett and Clanwilliam proceeds in the possession, custody, or control of any Defendant, M3, or any entity Meghji manages), other than payments in the ordinary course of operating the businesses, until Plaintiff's restitution obligations in *United States v. Lindberg*, Nos. 3:23-CR-48-MOC and 5:19-CR-22-MOC (W.D.N.C.), have been finally adjudicated, including resolution of the consolidated appeals in Nos. 26-4309(L) and 26-4310 (4th Cir.) and any further review; and that the proceeds of any prior disposition be held in a segregated account and accounted for to this Court within thirty days.

158. As to Defendant Dinius, the order restrains him from consenting, on behalf of the NCICs as creditor or otherwise, to any disposition of the Primary Restitution Assets or the

Specified Affiliated Companies—including the pending Damovo disposition—and from directing or approving any further disposition of NCIC assets outside the ordinary course without the approval of the Wake County Superior Court. As to Defendant Meghji, the order restrains him, in every capacity in which he acts—as CEO of M3, as acting CEO of NHC, as signatory for the Manager of Entrust Global Group, LLC, or otherwise—from supplying any consent, valuation, recommendation, signature, or instruction in furtherance of any such disposition. The order binds NHC, M3, Entrust Global, and the companies Meghji manages only as persons in active concert or participation with him under Rule 65(d)(2), and only to the extent they act through or at the direction of the Defendants.

159. The requested order is directed to the Defendants, in their own capacities. It does not enjoin the Special Master, the Rehabilitator in his statutory capacity, the United States, or any court; nothing in it restrains any act taken pursuant to a written order of the Western District of North Carolina or the Wake County Superior Court entered on notice to Lindberg; and it is expressly subject to any stay, custodial, or accounting order the Western District of North Carolina, the Fourth Circuit, or the Wake County Superior Court may enter, to which this Court's order should conform. Plaintiff files herewith a Motion for Preliminary Injunction and Memorandum of Law in support.

## CONCLUSION

160. The Defendants have extracted more than $165 million in fees without the approval of any court, have blocked every transaction that would have paid every policyholder in full and ended their control, and have sold the assets they administer at a fraction of their value—Clanwilliam for approximately $450 million against $880 million, the principal-protection bonds for approximately $394 million against $1,006,239,867, and Beckett for approximately $134

million against $1,003,924,000—while producing, feeding to the decisionmaker ex parte, and then swearing to valuations that mark down what they themselves are selling. From New York they have converted contestable valuations into irreversible losses faster than any court could review them. Every policyholder has been paid in full; on the record in the Western District of North Carolina, restitution has been overpaid by more than $2 billion; and under *Ellingburg* every further sale is the execution of a criminal punishment no court has imposed. The controversy is ripe, the interests adverse, and the need for judicial intervention immediate. An order staying further dispositions will terminate the only leverage the Enterprise has left, and will preserve for the Fourth Circuit, the district court, and this Court the ability to grant relief that means something.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against the Defendants as follows:

A. On Counts I and II, awarding Plaintiff threefold the damages he has sustained under 18 U.S.C. § 1964(c), in an amount to be determined at trial but not less than $3 billion before trebling, together with the costs of suit and, to the extent counsel appears, reasonable attorneys' fees;

B. On Counts III and IV against Defendants Dinius and Meghji, and on Count V against all Defendants, awarding compensatory damages in an amount to be determined at trial but not less than $3 billion, and punitive damages for willful, wanton, and malicious conduct;

C. On Count VI, ordering Defendants Dinius, Meghji, and Williams Mullen, jointly and severally, to disgorge all fees extracted from the assets transferred to their control, in excess of $165 million, with prejudgment interest;

D. On Count VII, entering a preliminary and permanent injunction, under 18 U.S.C. § 1964(a), Fed. R. Civ. P. 65, and the Court's inherent equitable powers, staying any sale, transfer, assignment, pledge, encumbrance, or other disposition of assets outside the ordinary course of business, any refinancing or recapitalization effecting a change of control or a disposition of assets, any termination of or consent under any trust agreement governing such assets, and any distribution of the proceeds of prior dispositions in the possession, custody, or control of any Defendant or M3, by Defendants Meghji and Dinius and all persons in active concert or participation with them under Fed. R. Civ. P. 65(d)(2)—including, to the extent they act through or at the direction of the Defendants, NHC Holdings, LLC, M3 Partners, LP, Entrust Global Group, LLC, AAPC Holdings, LLC, the Collectivus Group and its subsidiaries, the Damovo Group, and each of the Specified Affiliated Companies—until Plaintiff's restitution obligations in *United States v. Lindberg*, Nos. 3:23-CR-48-MOC and 5:19-CR-22-MOC (W.D.N.C.), have been finally adjudicated, including resolution of the consolidated appeals in Nos. 26-4309(L) and 26-4310 (4th Cir.) and any further review; and ordering that the proceeds of any prior disposition, including the Beckett and Clanwilliam proceeds, be held in a segregated account and accounted for to this Court within thirty days;

E. Ordering Defendants Meghji and Dinius to render a full and verified accounting of every sale, transfer, or disposition of the Primary Restitution Assets, the Specified Affiliated Companies, and the NCICs' assets that they made, approved, recommended, valued, or consented to since October 2018—including, as to the

sale of Beckett Collectibles, the purchase agreement, board consents, closing statement, sale price, and J.P. Morgan fairness opinion to the extent in their possession, custody, or control—and of all proceeds realized and all fees received by them, M3, and Williams Mullen from those assets;

F. Awarding pre-judgment and post-judgment interest at the maximum lawful rate;

G. Awarding Plaintiff his costs; and

H. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: September 10, 2026

Respectfully submitted,

______________________________

GREG E. LINDBERG
Plaintiff, *pro se*
Register No. 34828-058
FCI Atlanta
P.O. Box 150160
Atlanta, GA 30315
Correspondence address: P.O. Box 159,
Thonotosassa, FL 33592
Tel: 1-919-308-9686
E-mail: gelindberg@gmail.com

**VERIFICATION**

I, Greg E. Lindberg, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in this action; that I have read the foregoing Verified Complaint and know its contents; that the factual allegations concerning my own acts and knowledge are true and correct; and that, as to matters alleged on information and belief, or that are within the knowledge of the Defendants or drawn from the record of the proceedings cited, I believe them to be true.

Executed on September 10, 2026.

GREG E. LINDBERG

## INDEX OF EXHIBITS

The following exhibits are annexed to the Verified Complaint. Exhibits Z-1 through Z-10 are the Statements of Facts and Affidavits signed by Plaintiff in the Western District of North Carolina cases, annexed in full.

**Exhibit A** — September 2014 presentation of the affiliated-investment strategy to the NCDOI.

**Exhibit A2** — Rehabilitator's litigation against prospective purchaser of the NCICs.

**Exhibit A3 / A3.1** — Affidavit of Loftin and companion statement (Causey's December 2016 plan to "dismantle" Lindberg's companies).

**Exhibit A4** — Thompson recorded interview (same).

**Exhibit A5** — Closing demonstratives from the March 2020 trial quoting the FBI recordings.

**Exhibit A6** — FBI admission that the alleged $110,000 donation never occurred.

**Exhibit A7** — Recorded statement of Hygan Kapikian.

**Exhibit A8** — Trial testimony of Agent Scherger (March 2020).

**Exhibit A9** — Kapikian handwritten notes of the Causey–Scherger meeting.

**Exhibit A10** — FBI Confidential Human Source guidelines (Attorney General's Guidelines Regarding the Use of Confidential Informants).

**Exhibit A11** — Lindberg's total investment in the insurance group (Exhibit A11 Expanded).

**Exhibit A12** — NCDOI approval of the affiliated-investment program, including the April 11, 2016 Review Letter.

**Exhibit B** — Personal guarantees / Amended and Restated Backstop Agreement (March 11, 2019).

**Exhibit B2** — Rehabilitator's suit against a prospective buyer.

**Exhibit B3** — Causey e-mail of March 9, 2018.

**Exhibit B5** — Industry data on affiliated investments (Blackstone, KKR, Apollo, Brookfield).

**Exhibit B7** — Special Master's Notice of Distribution (December 23, 2025).

**Exhibit C** — Risk Mitigation Policy on Affiliated Loans (rev. February 20, 2017).

**Exhibit E5** — Risk Mitigation Policy on Affiliated Loans (rev. April 14, 2018).

**Exhibit E** — KPMG valuation (August 24, 2018).

**Exhibit F** — NCIC management valuation of $641 million (November 5, 2018).

**Exhibit F2** — Consent Order for Administrative Supervision (October 2018).

**Exhibit F4** — Cannon Surety / McClain complaints and affidavit.

**Exhibit F5** — Senator Perry's statements.

Case 2:26-cv-10281-HC938-DA Document 1 Filed 09/23/25/11/26 PageID Page 85 of 87

**Exhibit F6** — Recorded statement of former NCDOI employee.

**Exhibits F7, F8** — *News & Observer* investigation.

**Exhibit F9** — May 2024 motion to restrain Lindberg's use of personal funds for legal fees.

**Exhibit F10** — Internal NCDOI communications on cutting off litigants' legal funding.

**Exhibit F11** — Letter to the North Carolina Attorney General requesting investigation of Causey.

**Exhibit F12** — Causey trial testimony denying he is a politician; admission that Lindberg wanted "robust regulation."

**Exhibit G** — Quadro Acquisition Corp. One purchase agreement ($3.4 billion; Clanwilliam $880 million).

**Exhibit G3** — Ares Management exclusive letter of intent (November 22, 2018) (~$450 million).

**Exhibit G4** — Christa Miller e-mail to Peter Nordberg (January 6, 2019) (Ares "third party constituent").

**Exhibit I** — Quadro transaction materials.

**Exhibit J** — $18,007,661 transfer to Southland National Insurance Company.

**Exhibit K** — $56,000,000 transfer to Colorado Bankers Life Insurance Company.

**Exhibit K2** — Closing demonstratives (Obusek; Causey's pre-inauguration plan).

**Exhibit L** — MVRA offset calculation on the affiliated-loan assets alone ($1.381 billion transferred; $484 million overpayment before the zero-coupon-bond and Beckett credits).

**Exhibit M** — Schedule of fees and losses under the Rehabilitator ($165 million; $2.5 million per month; $137 million bond losses).

**Exhibit N** — Alban letter to Williams Mullen re UKAT / BC Partners refinancing ($39 million).

**Exhibit O.2** — Description of the proposed purchase of the NCICs.

**Exhibits P, Q** — Quadro valuation comparables: EV/EBITDA multiples (22.14x at signing; 24.21x as of September 9, 2026, with Yahoo Finance source pages) and comparable-company analysis.

**Exhibit R** — "Why Do Private Acquirers Pay So Little Compared To Public Acquirers?"

**Exhibits S, S2** — Lindberg's claim against Wilson and TA Associates; Clanwilliam sale materials.

**Exhibit T** — Report of FBI investigation of Meghji (New Orleans Archdiocese bankruptcy).

**Exhibit U** — Affidavit of Greg E. Lindberg regarding the Clanwilliam sale.

**Exhibit V** — Assignment Agreement (effective January 23, 2025; executed February 13, 2025).

**Exhibit V2** — Indemnity Confirmation (July 16, 2024), with the Tax Indemnification Agreement (September 25, 2019) and General Indemnification Policy (February 29, 2020).

**Exhibit V3** — Order Appointing Special Master, Doc. 56 (W.D.N.C. Jan. 23, 2025).

**Exhibit W** — Motion for a Determination That No Restitution Is Owed (Doc. 234 / No. 5:19-CR-22 Doc. 564) (July 14, 2026) (exhibits omitted).

**Exhibit W2** — Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (Doc. 269) with Proposed Order (Doc. 269-5) (July 31, 2026).

**Exhibit W3** — Preliminary Response and Objection to the Special Master's Second Supplement (July 30, 2026) (Doc. 267/583).

**Exhibit W4** — Response to the United States' Consolidated Position (Doc. 308) (Doc. 316) (August 18, 2026).

**Exhibit W5** — Motions to Compel Production of Ex Parte Communications and Restitution Data (Docs. 331, 332), with Doc. 331-2 (meet-and-confer correspondence, Aug. 15–29, 2026) (August 31, 2026).

**Exhibit X** — Cabrillo Advisors USPAP appraisal of Beckett Collectibles, LLC ($1,003,924,000) (Doc. 256-1, 256-2).

**Exhibit X2** — Blackstone Tactical Opportunities term sheet and proceeds model (April 14 and 16, 2022).

**Exhibit X3** — Global Growth counter-proposals ($1.05 billion, April 5, 2022; $1.1 billion, April 18, 2022).

**Exhibits X4–X6** — Beckett Collectibles Trust Agreement (June 2021); Amended and Restated Trust Agreement (December 5, 2023); Doc. 260 (Notice of Filing, July 2026, placing on the WDNC record the Beckett Trust Agreement, the February 13, 2025 Assignment Agreement by which the Special Master became record owner of the NHC equity, and the September 2024 NHC board presentation).

**Exhibit X7** — Affidavit of Mohsin Meghji, acting CEO of NHC Holdings, LLC (Gov't Ex. C to Doc. 308).

**Exhibit X8** — Declaration of Kathy Million (removal of AAI-appointed NHC directors).

**Exhibit Y** — Letter of Greg E. Lindberg to the AAPC Board (September 1, 2026), with enclosures.

**Exhibit Z-1** — Statement of Facts, Exhibit 1 to Defendant's Response and Objection to the Special Master's Report (Doc. 132) (May 4, 2026).

**Exhibit Z-2** — Statement of Facts filed with Defendant's Motion to Stay Asset Sales and Enforcement of the Preliminary Restitution Order (Doc. 172) (June 2026).

**Exhibit Z-3** — Statement of Facts filed with Defendant's Emergency Motion to Stay All Asset Sales and Consolidated Objections (Doc. 190) (June 2026).

**Exhibit Z-4** — Supplemental Statement of Facts (Doc. 174).

**Exhibit Z-5** — Consolidated Statement of Facts (Doc. 235) (July 14, 2026), and Statement of Facts Regarding the Disaffiliation Structure with Disaffiliation Exhibits DS-1 through DS-21 (Doc. 300) (August 13, 2026).

**Exhibit Z-6** — Affidavit of Greg E. Lindberg (MOU veto and default provisions), Def. Ex. 1, Tab A to Doc. 316 (August 18, 2026), with Exhibit B thereto (Wake County order).

**Exhibit Z-7** — Declaration of Greg E. Lindberg in Response to the December 18, 2024 Allegations (Plea and Appointment), Def. Ex. 1, Tab B to Doc. 316, with Tabs C and D (Government e-mails and redline).

**Exhibit Z-8** — Declaration of Greg E. Lindberg Regarding the Zero-Coupon Principal-Protected Notes, with Exhibits A–N (Doc. 295).

**Exhibit Z-9** — Affidavit of Greg E. Lindberg in Support of Motion to Compel Ex Parte Communications (Doc. 331-1) (executed August 30, 2026).

**Exhibit Z-10** — Declaration of Greg E. Lindberg in Support of Motion to Stay Disposition of the Damovo Asset (Doc. 320) (executed September 1, 2026).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

Greg E. Lindberg v. AAPC Holdings, LLC and American Academy Holdings, LLC
Case No. 2:26-cv-__________

# EXHIBIT E

Order Appointing Special Master, Doc. 56, United States v. Lindberg, No. 3:23-cr-48-MOC (W.D.N.C. Jan. 23, 2025)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3-23-cr-48-MOC**

UNITED STATES OF AMERICA )
)
v. )
)
GREG E. LINDBERG )

**ORDER APPOINTING SPECIAL MASTER**

**THIS MATTER IS BEFORE THE COURT** on the Joint Motion for Appointment of Special Master, filed by the United States and Defendant Greg E. Lindberg on December 5, 2024. (Doc. No. 54). The motion is **GRANTED**.

**THE COURT HEREBY FINDS AS FOLLOWS:**

1. On February 23, 2023, in a thirteen-count Bill of Indictment, Defendant was charged with conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (Doc. No. 1). The indictment alleged, among other things, that as of September 30, 2022, Defendant owed certain insurance companies more than $1.1 billion. (Id. at ¶ 185).

2. On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant to a written plea agreement. In the plea agreement, Defendant agreed, among other things, to pay full restitution and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." (Doc. No. 40). In paragraph 10(a) of the plea agreement, Defendant also agreed "to pay full restitution" to all victims of the conduct charged in the Bill of Indictment, including the following

insurance companies and their impacted policyholders: Southland National Insurance Company; Southland National Reinsurance Corporation; Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Universal Life Insurance Company of Puerto Rico; PB Life and Annuity Co., Ltd.; Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; PB Investment Holdings Ltd.; and Universal Life Insurance Company. (Id.).

3. Under the Crime Victims' Rights Act, 18 U.S.C. § 3771, victims are accorded specific rights, and the Act confirms that victims have "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6).

4. To fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i).

5. In this case, complicated issues are likely to arise in determining an appropriate restitution order because, among other reasons: (a) there are several insurance company victims that collectively have thousands of wronged policyholders; (b) the amount of restitution owed is substantial; (c) several of the insurance company victims are in liquidation proceedings; (d) some of the victims have received, or may before sentencing receive, various amounts of repayment of their outstanding debts; (d) priority of payment, if applicable, amongst victims has yet to be determined; (e) certain property or assets may have joint or overlapping ownership and/or may be subject to various third party claims; (f) certain victims may have civil judgments for money damages against Defendant and his entities; and (g) Defendant's business assets from which restitution will likely be paid are not readily convertible into cash.

6. Some of the victims have been severely financially impacted by Defendant's conduct and need whatever restitution can be provided as soon as possible. Accordingly, it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid.

7. It would be unduly burdensome for the Government, the Probation Office, the Clerk of Court, and the investigative agencies to attempt this process. As a result, an experienced, neutral, and disinterested person should be appointed to assist the Court. Section 3664 authorizes courts to "refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). It would conserve the resources of this Court and others if a special master is appointed to resolve victim and restitution issues in this case under the Court's supervision and guidance.

8. The parties recommend that the Court appoint Joseph Grier of Grier Wright Martinez PA as the special master pursuant to 18 U.S.C. § 3664(d)(6). The parties further recommend that the Court appoint Scott Avila of Paladin Management as the special master's financial advisor to assist the special master in the performance of all tasks related to this Order. Mr. Grier and Mr. Avila have submitted declarations outlining their qualifications and standard rates. Mr. Grier and Mr. Avila are well-qualified to serve in these roles, and the Court finds that their standard rates appear reasonable.

9. To assist in meeting his restitution obligations, Defendant has agreed to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the special master, or one or more third parties selected by the special master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth

Holdings, LLC's rights and interests, whether held directly or indirectly, in the following assets owned, controlled, and/or associated with Defendant and/or his entities or in which Defendant and/or his entities have an economic or controlling interest (collectively referred to as the "Primary Restitution Assets"):

a. AAPC Holdings, LLC and any related entities or trusts; and

b. New Hold Co. ("NHC") and the Specified Affiliated Companies, as defined in the June 27, 2019 Memorandum of Understanding and any related entities or trusts that include Specified Affiliated Companies.[1]

10. Defendant has agreed to cooperate with the special master in carrying out the duties and responsibilities of the special master and to take all necessary steps identified by the special master to assist the special master in carrying out his/her duties pursuant to this Order. Defendant has also agreed to refrain from taking and/or cease taking any actions identified by the special master as interfering with the special master carrying out his/her duties.

11. Courts have approved of appointing special masters and have given them responsibilities similar to those being requested in the instant case. See, e.g., United States v. Vaughan, No. 3:01CR11, 2008 U.S. Dist. LEXIS 98817, at *1 (W.D.N.C. Dec. 3, 2008) (Thornburg, J.) (special master appointed in case with losses totaling $33 million involving complicated, offshore, and/or inadequately documented financial transactions to assist in noticing potential victims, setting percentages for their losses, and ultimately distributing $3 million to more than 500 victims); United States v. Olivares, No. 3:13-CR-335, 2014 U.S. Dist. LEXIS 76743, at *2 (W.D.N.C. June 5, 2014) (Cogburn, J.) (special master, who was receiver in parallel civil case

[1] See Exhibit A to the Memorandum of Law in Support of the Joint Motion for Appointment of Special Master (Doc. No. 55-1).

brought by U.S. Securities and Exchange Commission, appointed in $850 million Ponzi scheme with 900,000 potential victims in over 150 countries). Here, the requested relief is administratively reasonable; will further the interests of justice as to victim rights; will promote cooperative efforts between the parties, the Court, and others involved or interested; and will increase efficiency in the collection and timely distribution of restitution. Accordingly, for the aforementioned reasons, a court-appointed special master would be best suited to devise a plan and effectuate the restitution order in the best interests of administrative efficiency, justice, and the victims.

**IT IS THEREFORE ORDERED** that the Joint Motion For Appointment of Special Master is **GRANTED**.

**IT IS FURTHER ORDERED** that:

1. Joseph Grier of Grier Wright Martinez PA (the "Special Master") is appointed as Special Master pursuant to 18 U.S.C. § 3664(d)(6).

2. Scott Avila of Paladin Management (the "Financial Advisor") is appointed as the Special Master's Financial Advisor. The Financial Advisor shall assist the Special Master in the performance of all tasks related to this Order. In so assisting the special master, the financial advisor shall be allowed to utilize such other personnel at Paladin Management as reasonably necessary for the performance of his duties as Financial Advisor, and Paladin Management and such personnel should also be granted the rights and protections of "Financial Advisor" under terms of this Order.

3. The Special Master is hereby empowered to perform the following necessary tasks:

a. verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses;[2]

b. identify all assets available for liquidation and/or repatriation for the benefit of the victims, including any such assets held by GBIG Capital, LLC, GBIG Holdings, Inc., PBX Holdings, LLC, PBX Bermuda Holdings, Ltd., BMX Holdings, LLC., BMX Bermuda Holdings, Ltd. and any of their subsidiaries, and to the extent those assets are not readily convertible to cash, determine a reasonable estimated value for those assets;

c. select an appropriate method and timetable and seek Court approval to liquidate and/or repatriate any available assets for the benefit of the victims;

d. oversee and help accomplish the liquidation with Court approval and/or repatriation of any available assets for the benefit of the victims;

e. clear title to all assets for transfer to bona-fide buyers;

f. fashion a proposed restitution order;

g. apportion any available funds among the victims in accordance with the Court's restitution order and, if necessary, propose an apportionment methodology to be applied to future restitution payments received;

h. receive and distribute restitution payments to victims in accordance with the Court's restitution order;

[2] Defendant has reserved all rights with regard to any arguments regarding calculating loss amount. See U.S.S.G. § 2B1.1Note 3(E)(formerly 2F1.1); see also U.S. v. Lane, 323 F.3d 568, 585-89 (7th Cir. 2003); United States v. Monk, No. 2:20-CR-22-WKW, 2020 WL 5219534 at **8–9 (M.D. Ala. Sept. 1, 2020). Restitution amounts should be reduced by any amount victims have recovered for the same losses. See 18 U.S.C. § 3664(j)(2).

i. cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims, such cooperation and coordination to include seeking modifications, if necessary, of any existing restraining orders and/or injunctions;

j. retain a law firm, including his own, and/or other professionals to assist the Special Master in carrying out his duties;

k. provide periodic reports to the Court about the status of Defendant's restitution obligations; and

l. pay Defendant's outstanding and future legal fees if such fees and expenses have been approved by the Court.

4. Defendant shall take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the Special Master, or one or more third parties selected by the Special Master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth Holdings, LLC's rights and interests, whether held directly or indirectly, in the Primary Restitution Assets.

5. The Special Master shall regularly update the Parties throughout the diligence and/or sales process concerning any of the Primary Restitution Assets and should consult with the Parties to the extent the Special Master deems it helpful in fulfilling his duties under this Order.

6. In accomplishing the tasks enumerated above, the Special Master shall attempt to meet Defendant's restitution obligations using all or part of the Primary Restitution Assets.

7. If the Special Master determines that the Primary Restitution Assets are or will likely be sufficient to fully satisfy Defendant's restitution obligations, he shall not seek to liquidate additional assets owned, controlled, and/or associated with Defendant and/or his entities or in

which Defendant and/or his entities have an economic interest (the "Secondary Restitution Assets") until and unless he determines, and so notifies the Court, that the Primary Restitution Assets are not likely to be sufficient to fully satisfy Defendant's restitution obligations.

8. Defendant shall cooperate with the Special Master in carrying out the duties and responsibilities of the Special Master and take all necessary steps identified by the Special Master to assist the Special Master in carrying out his duties pursuant to this Order. Defendant shall also refrain from taking and/or cease taking any actions identified by the Special Master as interfering with the Special Master carrying out his/her duties. If Defendant fails to comply with a directive of the Special Master within 14 days of the Special Master advising Defendant, through Defendant's counsel, of such directive in writing, the Special Master may take any actions and/or cease taking any actions for, or on behalf of, Defendant to enable the Special Master to carry out his duties.

9. The Special Master shall give due consideration to the Government's efforts and the efforts of others appointed by state or federal courts in the various civil lawsuits involving Defendant so as not to duplicate efforts and to minimize expenses.

10. The Special Master shall have the power to: (a) obtain such further order(s) from the Court that he deems prudent or necessary to effectuate the payment of Defendant's restitution obligations; and (b) make a motion or application to the Court regarding instruction or clarification in connection with his powers in this matter.

11. All income tax reporting and payments, whether for periods prior to or during the terms of this Order, shall remain the obligation of Defendant. The Special Master shall not be required to report any income generated by the Primary Restitution Assets (including interest earned), or to pay any income taxes due thereon, nor shall the Special Master bear liability for the

failure of Defendant to report said income to taxing authorities or pay the taxes associated with such income.

12. The Special Master has the power to employ a law firm, including his own, and/or other professionals in this matter as reasonably necessary to accomplish the purposes of this Order without further application to the Court.

13. The Special Master will be acting solely in his capacity as Special Master, and the Special Master, the Financial Advisor, and any other professionals retained by the Special Master shall have no personal liability for claims against Defendant, individually or collectively. With respect to any insurance coverage, the Special Master, and other parties with insurable interests, should be named as additional insureds on the policies for the period that the Special Master shall be appointed. No person may pursue any claim against the Special Master, the Financial Advisor, or any other professionals retained by the Special Master for any action or omission taken or made in connection with the Special Master's powers or duties under this Order without first seeking leave of the Court. Neither the Special Master, the Financial Advisor, nor any other professionals retained by the Special Master in connection with this matter shall be liable to any person for any action or omission taken or made in good faith.

14. The Special Master shall prepare quarterly interim statements (each, an "Interim Statement") that, among other things, reflect the fees and expenses of the Special Master, his/her financial advisors, and his/her retained counsel (if any) incurred for said period in carrying out the Special Master's duties, as well as those of any other professionals the Special Master deems appropriate. The Interim Statements should also reflect the fees and expenses of Defendant's counsel if such fees and expenses have been provided to the Special Master. Such Interim Statements should be submitted to the Court for its approval and confirmation, in the form of

either a noticed interim request for fees or a Special Master's final account and report. Upon the Court's approval of each Interim Statement, the Special Master shall pay such approved fees and expenses from the assets administered by the Special Master that the Special Master determines are reasonably available to satisfy such fees and expenses or as otherwise directed by the Court, including, to the extent authorized by otherwise applicable law, from cash balances held within trusts and other subsidiaries that hold the Primary Restitution Assets.

15. The parties and/or the Special Master shall be authorized to make motion or application to this Court to expand or narrow the scope of Primary Restitution Assets, which shall be heard upon notice and hearing.

16. None of the authority vested in the Special Master by the Court is intended to compel or authorize the Special Master to violate any other federal or state court orders.

**SO ORDERED**.

Signed: January 23, 2025



Max O. Cogburn Jr.
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

Greg E. Lindberg v. AAPC Holdings, LLC and American Academy Holdings, LLC
Case No. 2:26-cv-__________

# EXHIBIT F

Defendant's Motion for a Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction, Doc. 564 (No. 5:19-cr-22) / Doc. 234 (No. 3:23-cr-48) (July 14, 2026) (exhibits omitted)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

# DEFENDANT'S MOTION FOR A DETERMINATION THAT NO RESTITUTION IS OWED, OR IN THE ALTERNATIVE FOR EXCLUSION AND OFFSET OF LOSSES NOT PROXIMATELY CAUSED BY THE OFFENSE OF CONVICTION, WITH INCORPORATED MEMORANDUM OF LAW

Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

## TABLE OF CONTENTS

Page(s)


TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ v

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 4

A. The Affiliated-loan Program Operated Under a Written Risk management framework and experienced zero defaults prior to Mr. Lindberg's transfer of control to the Rehabilitator ........ 4

B. Mr. Lindberg committed approximately $1 billion of his own capital, guaranteed the loans, and purchased $1 billion of bonds to protect principal ........ 5

C. The regulator approved the affiliate concentration and praised Mr. Lindberg's regulatory performance ........ 6

D. The 2018 KPMG and Houlihan Lokey valuations confirmed the loans were well secured ........ 7

E. Before taking office, the Commissioner planned to "dismantle" Mr. Lindberg's business ........ 8

F. Mr. Lindberg ceded control to the Rehabilitator in October 2018, and the Rehabilitator proceeded to pay himself and others over $165 million in fees ........ 10

G. A series of intervening acts destroyed value after October 2018 ........ 10

H. The Plea Agreement and Factual Basis ........ 11

I. The Special Master's recommendation and the Preliminary Order ........ 13

J. The Special Master has continued to dispose of estate assets during the restitution proceeding ........ 13

ARGUMENT ........................................................................................ 14

I. Restitution is Limited to Actual Losses Proximately Caused by the Offense—a Limitation the Plea Agreement Preserves. ................................ 14

A. *In re Zetteler* is the law of this case and fixes the governing proximate-cause standard ................................................................ 16

II. No Loss Was Reasonably Foreseeable at Origination (Proximate Cause: Foreseeability) ................................................................ 18

III. The Offense Conduct Procured No Official Or Agency Action, And So Did Not Cause The Loss (Proximate Cause: No Agency Action) ........................ 21

IV. Intervening Superseding Causes Broke the Chain of Causation (Proximate Cause: Intervening Cause) ........................................................ 24

A. The Government's interference with the Ares sale (November 2018) ........................................................................ 26

B. The Rehabilitator's refusal of the Oaktree transaction (February 2019) ........................................................................ 27

C. The Rehabilitator's coercion of the ten-year hold (June 27, 2019 MOU) ........................................................................ 27

D. The Rehabilitator's pre-maturity fire-sale of the principal-protection bonds ................................................................ 28

E. The Rehabilitator's refusal of the Montshire/Alban offer (2023) and blocking of the Quadro transaction (2024), followed by the Clanwilliam fire-sale (2025). ........................................................ 30

F. The Special Master's continuing asset dispositions (2026) ..................... 30

V. "Risk" Is Not Actual Loss, And Restitution Is Capped At Actual Loss ...... 31

VI. The Government and the Special Master Did Not Carry the Section 3664(e) Burden ........................................................................ 35

VII. The Government Should Disclose Evidence of Its Interference with the Ares Transaction ........ 37

VIII. In the Alternative, Offsets and Credits Independently Extinguish Any Obligation ........ 38

IX. Any Ambiguity Must Be Resolved In Mr. Lindberg's Favor ........ 39

CONCLUSION AND RELIEF REQUESTED ........ 39

ARTIFICIAL INTELLIGENCE CERTIFICATION ........ 41

CERTIFICATE OF SERVICE ........ 42

## TABLE OF AUTHORITIES

CASES Page No.

*Apprendi v. New Jersey*,
530 U.S. 466 (2000) .......... 18, 33

*Arizona v. California*,
460 U.S. 605 (1983) .......... 17

*Brady v. Maryland*,
373 U.S. 83 (1963) .......... 37

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 22

*Ellingburg v. United States*,
607 U.S. 163 (2026) .......... 18, 32, 33, 39

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc.*,
343 F.3d 189 (2d Cir. 2003) .......... 20

*Hughey v. United States*,
495 U.S. 411 (1990) .......... 14, 16, 32

*In re McNulty*,
597 F.3d 344 (6th Cir. 2010) .......... 17

*In re Zetteler*,
No. 26-1749 (4th Cir. June 13, 2026) .......... 16, 17, 31

*Irizarry v. United States*,
553 U.S. 708 (2008) .......... 15, 28

*Lagos v. United States*,
584 U.S. 577 (2018) .......... 15

*McCutcheon v. FEC*,
572 U.S. 185 (2014) .......... 22

*McDonnell v. United States*,
579 U.S. 550 (2016) .......... 21

*Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*,
No. 24-621, 2026 WL 1868932 (U.S. June 30, 2026) .......... 22

*Paroline v. United States*,
572 U.S. 434 (2014) .......... 14, 31

*Robers v. United States*,
572 U.S. 639 (2014) .......... 14, 29, 31, 33, 34, 38

*Snyder v. United States*,
603 U.S. 1 (2024) .......... 21

*Southern Union Co. v. United States*,
567 U.S. 343 (2012) .......... 18, 33

*United States v. Alalade*,
204 F.3d 536 (4th Cir. 2000) .......... 38

*United States v. Blake*,
81 F.3d 498 (4th Cir. 1996) .......... 15, 18

*United States v. Boccagna*,
450 F.3d 107 (2d Cir. 2006) .......... 34, 38

*United States v. Broughton-Jones*,
71 F.3d 1143 (4th Cir. 1995) .......... 15, 25

*United States v. Coats*,
487 B.R. 648 (E.D.N.C. 2013) .......... 34

*United States v. Davenport*,
445 F.3d 366 (4th Cir. 2006) .......... 15, 28

*United States v. Elbaz*,
52 F.4th 593 (4th Cir. 2022) .......... 16

*United States v. Fike*,
140 F.4th 351 (6th Cir. 2025) .......... 34

*United States v. Freeman*,
741 F.3d 426 (4th Cir. 2014) .......... 15, 25

*United States v. Gallant*,
537 F.3d 1202 (10th Cir. 2008) .......... 36

*United States v. Gibbens*,
25 F.3d 28 (1st Cir. 1994) .......... 26

*United States v. Goodrich*,
12 F.4th 219 (2d Cir. 2021) .......... 25

*United States v. Harvey*,
532 F.3d 326 (4th Cir. 2008) .......... 32

*United States v. Harvey*,
791 F.2d 294, 300 (4th Cir. 1986) .......... 15

*United States v. Henoud*,
81 F.3d 484 (4th Cir. 1996) .......... 18

*United States v. Hoyle*,
33 F.3d 415 (4th Cir. 1994) .......... 34

*United States v. Jesenik*,
702 F. Supp. 3d 1024 (D. Or. 2023) .......... 35

*United States v. Jordan*,
509 F.3d 191 (4th Cir. 2007) .......... 15, 16

*United States v. Karam*,
201 F.3d 320 (4th Cir. 2000) .......... 18, 35

*United States v. Lindberg*,
39 F.4th 151 (4th Cir. 2022) .......... 21

*United States v. Llamas*,
599 F.3d 381 (4th Cir. 2010) .......... 16

*United States v. Newsome*,
322 F.3d 328 (4th Cir. 2003) .......... 16

*United States v. Ocasio*,
750 F.3d 399 (4th Cir. 2014) .......... 25

*United States v. Qurashi*,
634 F.3d 699 (2d Cir. 2011) .......... 34

*United States v. Ritchie*,
858 F.3d 201 (4th Cir. 2017) ........ 26

*United States v. Shephard*,
892 F.3d 666 (4th Cir. 2018) ........ 18

*United States v. Smerling*,
No. 21-cr-317, 2022 WL 1806300 (S.D.N.Y. June 1, 2022) ........ 35

*United States v. Squirrel*,
588 F.3d 207 (4th Cir. 2009) ........ 25, 31

*United States v. Steele*,
897 F.3d 606 (4th Cir. 2018) ........ 32, 36, 38

*United States v. Stein*,
846 F.3d 1135 (11th Cir. 2017) ........ 25, 31

*United States v. Stone*,
866 F.3d 219 (4th Cir. 2017) ........ 34

*United States v. Tyler*,
767 F.2d 1350 (9th Cir. 1985) ........ 25, 39

FEDERAL STATUTES — Page No.

18 U.S.C. § 3663A(a)(2) ........ 14, 17

18 U.S.C. § 3663A(b)(1)(B) ........ 33, 34, 38, 39

18 U.S.C. § 3663A(c)(3)(B) ........ 36

18 U.S.C. § 3664(e) ........ 4, 18, 35, 37, 39

18 U.S.C. § 3664(f)(1)(A) ........ 14, 31

OTHER AUTHORITIES — Page No.

S. Rep. No. 104-179 (1995), reprinted in 1996 U.S.C.C.A.N. 924 ........ 15, 24, 25, 36, 38

## PRELIMINARY STATEMENT

Defendant Greg E. Lindberg respectfully submits this motion for a determination that no restitution is owed, or in the alternative for the exclusion and offset of losses not proximately caused by the offense of conviction which results in an overpayment of $2.89 billion. The Preliminary Order of Restitution fixes Mr. Lindberg's restitution at $1,655,000,000.[1] That figure cannot stand, for three independent reasons, any one of which is sufficient.

*First*, no loss on the affiliated investments was reasonably foreseeable to Mr. Lindberg at the time those investments were originated. The investments were made under a written, board-approved risk-management framework; they were personally guaranteed by Mr. Lindberg himself; they were backed by approximately one billion dollars of zero-coupon bonds purchased to protect principal; the regulator praised Mr. Lindberg's handling of regulatory questions in the relevant period; and the change in law that disfavored affiliated investments was not enacted until 2019, after origination. Beyond that, Houlihan Lokey, one of the largest valuation companies in the country, provided contemporaneous analysis concluding that the affiliated loans were conservatively underwritten at approximately fifty-percent loan-to-value, and KPMG provided contemporaneous analysis showing that there was over $1 billion of equity supporting the loans (Exs. E2 and E3 KPMG Valuations and HL (Houlihan Lokey, Jan. 18, 2018) & E (KPMG, Aug. 24, 2018)). As the sole owner of

---

[1] The Court has yet to determine, *de novo*, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

the insurance companies and of the operating companies that received the loans, Mr. Lindberg would have seen his entire $1 billion investment in his insurance companies and his entire investment in his non-insurance operating companies wiped out if there were a loss on the affiliated loans. Any one of the foregoing facts suffices to establish that there was no reasonably foreseeable loss to Mr. Lindberg when he oversaw the origination of the affiliated loans. No reasonable person, viewing these facts together, could have expected the safeguards Mr. Lindberg put in place to fail all at once amid the regulatory and prosecutorial onslaught that Mr. Lindberg and his businesses have endured over the last seven years. Someone who reasonably expects a loss on an investment does not personally guarantee every penny of that investment, underwrite it conservatively at 50% loan-to-value, purchase insurance against any loss, implement a robust risk-management program, invest $1 billion of his own capital as equity to support that investment and receive strong praise from his regulator on how he was handling regulatory issues. Under the Mandatory Victims Restitution Act ("MVRA") any loss must be reasonably foreseeable to form the basis for restitution. That was not the case here.

*Second*, and independently, any loss that later materialized was caused not by Mr. Lindberg's conduct but by a chain of intervening acts by independent third parties—the Government, the court-appointed Rehabilitator, and the Special Master—each occurring after Mr. Lindberg ceded control in October 2018, and some continuing to the present: the Government's interference with the signed Ares sale; the Rehabilitator's rejection of the Oaktree, Quadro, and Montshire/Alban

transactions; the coerced ten-year hold imposed by the June 2019 MOU; the fire-sale of the zero-coupon bond portfolio that had secured the affiliated-loan principal; and the Special Master's continuing disposition of estate assets—before any final restitution determination, in the case of the Beckett transaction without court approval or accounting, and while the Special Master's own compensation is paid from the same assets he sells. Those intervening causes break the chain between Mr. Lindberg's conduct and any loss. Under the MVRA, any loss must be closely related to and proximately caused by the defendant's conduct. The foregoing string of events shows the opposite: the losses occurred after Mr. Lindberg ceded control in October 2018 and were caused by independent decisions of third parties beyond his control.

*Third*, this Court has characterized the "real loss" in this case as "risk." Restitution under the MVRA is measured by, and capped at, a victim's *actual* loss. Risk is not actual loss—particularly where the policyholders the statute is designed to protect have been made whole and confirmed paid in full. Moreover, the "risk" the Court identified was not unlawful: the affiliated investments were lawful when made, were approved by the regulator, and were within prevailing industry practice. Lawful risk cannot be the predicate for a penal, loss-measured restitution award.

Mr. Lindberg accepts responsibility for his offense and does not seek to disturb his Plea Agreement. He agreed, in Paragraph 10(a), to pay restitution for harm "caused by the defendant's criminal conduct." Doc. 40. He stands by that agreement. But that agreement reaches only harm his conduct *caused*; by its own terms it does not reach losses inflicted years later by an intervening actor, and it does not convert

"risk" into a compensable, realized loss. The proximate-cause limitation that the Supreme Court and the Fourth Circuit enforce is the very limitation Paragraph 10(a) imposes by the words "caused by the defendant's criminal conduct." *Id.*

Mr. Lindberg respectfully requests a determination, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by Mr. Lindberg, and that net restitution is zero. In the alternative, he requests that the Court exclude the intervening-cause losses identified in Part IV and credit the offsets identified in Part VIII, which independently reduce any obligation to zero.

## STATEMENT OF FACTS

### A. The affiliated-loan program operated under a written risk-management framework and experienced zero defaults prior to Mr. Lindberg's transfer of control to the rehabilitator.

Mr. Lindberg's North Carolina insurers operated under a Risk Mitigation Policy on Affiliated Loans, revised February 20, 2017 (Ex. C), and continuously updated (see Ex. E5 for the April 14, 2018 revision). The Policy required, among other controls: senior-secured first-lien positions on "all assets and cash flows of the borrower"; a minimum credit rating of "B-" or equivalent from an SEC-approved NRSRO for every loan; a weighted-average portfolio rating of "BB" or higher with portfolio leverage under four times; third-party arm's-length pricing opinions; perfection certificates; quarterly risk-based-capital calculations; and annual cash-flow testing "to ensure that assets are adequate to service liabilities and to prevent additional reserve requirements" (Ex. C, Phases 1–3). The Policy recited a "zero default track record" over twenty-five years and committed Mr. Lindberg's affiliates

to "prepay any underperforming loan using reserve capital" (*Id.*). This is not the architecture of a person who anticipates loss.

In fact, prior to the transfer of control of Mr. Lindberg's insurance companies to the Rehabilitator in October 2018, there were no defaults on the affiliate loans. A reasonable person does not expect losses on an investment program that, while he controlled it, had experienced no defaults—let alone any losses.

### B. Mr. Lindberg committed approximately $1 billion of his own capital, guaranteed the loans, and purchased $1 billion of bonds to protect principal.

Mr. Lindberg invested roughly one billion dollars of his own capital into the insurance group and took no dividends from the insurers (See Ex. A11). Independent analysis by Berkeley Research Group ("BRG") also confirms capital contributions exceeding $377 million and no dividends to Mr. Lindberg (Ex. D). He personally guaranteed the affiliates' obligations to the insurers totaling approximately $2.39 billion under the March 11, 2019, Amended and Restated Backstop Agreement, without any regulatory requirement to do so. (Ex. B8) And in May 2018 he directed the insurers to purchase $1,006,239,867 in par value of investment-grade bank zero-coupon bonds—held inside Principal Protected Notes—as dollar-for-dollar principal-loss insurance that, if held to maturity, would have repaid the affiliated-loan principal in full. (Supp. Statement of Facts ¶¶ 27–34 (Doc. 174) & Exs. H2, I2, and I5) A person who reasonably foresees loss does not invest $1 billion of his own capital, guarantee billions in additional obligations, forgo all dividends, and purchase par-payable principal protection against the very loss he supposedly foresees.

### C. The regulator approved the affiliate concentration and praised Mr. Lindberg's regulatory performance.

The North Carolina Department of Insurance ("NCDOI") approved the affiliate-investment concentration at issue. As early as a September 2014 presentation (see Ex. A) and confirmed in the NCDOI's April 11, 2016 annual-statement Review Letter from Senior Financial Analyst Jessica Price, CPA, CFE, the NCDOI recited and agreed to the negotiated regulatory arrangement, including the approximately forty-percent ceiling on affiliated investments (NCDOI Review Letter / Ex. A12). That concentration remains within prevailing industry practice: U.S. life and annuity insurers reported approximately $413 billion in affiliated investments in 2025—roughly twice the 2020 figure (See Ex. B24). Affiliate investments have become standard practice for many of the largest names in the insurance business, including Blackstone, Brookfield, and KKR. Data published by Apollo illustrates that some large life insurers have up to 35 to 43 percent of their assets in affiliated investments, like the 40 percent limit that Mr. Lindberg proposed to the NCDOI in 2014 (See Ex. B5). That many large life insurers have since adopted an affiliate-investment strategy shows that the strategy Mr. Lindberg proposed was neither novel nor particularly controversial; it was an effective way to manage insurance-company assets in a rising-interest-rate environment. (See Ex. B5)

The statutory limitation on affiliated investments was not enacted until 2019—after the investments were originated. See Doc. 152. On March 9, 2018, Commissioner Mike Causey wrote directly to Mr. Lindberg: "You did an outstanding and impressive job of answering some really tough, hardball questions from state

regulators today" (Ex. B6). The same message reflects that Mr. Lindberg was then working to "engage JP Morgan or KKR Capital Markets to provide financing to replace intercompany loans" (*id.*)—actively working to reduce the affiliated-loan portfolio through third-party capital. In short, Mr. Lindberg was continuously responding to regulatory demands related to affiliated investments. This is not the behavior of someone who reasonably foresees a loss on these investments.

### D. The 2018 KPMG and Houlihan Lokey valuations confirmed the loans were well secured.

In 2018, two of the nation's largest and most widely trusted valuation firms—KPMG and Houlihan Lokey—analyzed Mr. Lindberg's assets. Both concluded that the asset values securing the affiliated loans exceeded the balances due on those loans by over $1 billion, and that the loans were conservatively underwritten at approximately fifty-percent loan-to-value (Exs. E2 and E3 (KPMG, Aug. 24, 2018) & HL (Houlihan Lokey, Jan. 18, 2018)). Two well-known and well-trusted authorities concluded that no loss was reasonably foreseeable on these loans in 2018 because they were backed by asset values significantly in excess of the loan amounts. Mr. Lindberg expended approximately $1.8 million on this valuation work, which spans over 380 pages (See Exs. E2 and E3). Given the nationally recognized reputations of KPMG and Houlihan Lokey, it was entirely reasonable for Mr. Lindberg to rely on their work concluding that no loss was foreseeable.

The timing is significant. KPMG completed its valuation work in August 2018, shortly before Mr. Lindberg ceded control of the insurers to the Rehabilitator in October 2018. At all times before that change of control, trusted national authorities

concluded that no loss was reasonably foreseeable on the affiliated loans. At all times after the change of control, the decision to hold the loans for ten years—rather than execute any of the transactions Mr. Lindberg proposed that would have repaid them in full—was the Rehabilitator's, not Mr. Lindberg's.

Two of these contemporaneous work products are submitted herewith and are described by their own terms: the Houlihan Lokey report dated January 18, 2018 (Ex. E3), which documents each affiliated investment held by Mr. Lindberg's insurers, including enterprise-value-coverage and loan-to-value analysis; and the KPMG valuations (Ex. E2). Each report's stated scope and assumptions appear on its face.

KPMG's August 24, 2018 valuations confirm this point. KPMG separately valued the twenty-one Eli Global operating companies—the borrowers whose enterprise value secured the affiliated loans—at an aggregate business-enterprise value of approximately $2.45 billion, including Global Health Technology Group at $1.2 billion and American Academy Holdings at $900 million, in addition to approximately $1.08 billion of insurance-entity equity value (Ex. E2).

**E. Before taking office, the Commissioner planned to "dismantle" Mr. Lindberg's business.**

The genesis of the entire case against Mr. Lindberg predates Commissioner Mike Causey's inauguration as North Carolina Insurance Commissioner. In December 2016—weeks before taking office—Causey identified Mr. Lindberg, a major financial supporter of Causey's electoral opponent Wayne Goodwin, as a political problem and "significant impediment" to be eliminated. Witness statements

establish that Causey plotted to "dismantle" Mr. Lindberg's insurance operations even before assuming any official authority (See Exs. A3, A3.1, A4).

According to one witness, Causey stated that he "was concerned about a multi-millionaire named Greg Lindberg who had strongly supported Goodwin during the last election" and that Causey "saw Lindberg as a significant impediment to winning the [upcoming 2020] election against Goodwin." The same witness stated that "Causey said that he had a person in mind" to help him eliminate Lindberg as a political threat, noting that "she had been at the DOI a long time" and "she already didn't like Lindberg and would know how to go about dealing with [Lindberg's] companies and dismantling them" (*Id.*).

A second witness corroborated these statements: "Causey explained to me that Lindberg was a multimillionaire who strongly supported and contributed to Goodwin's campaign in the election that Causey had just won. Causey said that because he had beaten Goodwin by so few votes, he was worried about Greg Lindberg helping Wayne in the next election, and he felt like he needed to do something about him" (See Exs. A3, A3.1, A4).

This all casts doubt on the legitimacy of the subsequent rehabilitation proceedings. Moreover, because the affiliated investments had already received NCDOI approval, the severity of these regulatory actions was entirely unforeseeable.

**F. Mr. Lindberg ceded control to the Rehabilitator in October 2018, and the Rehabilitator proceeded to pay himself and others over $165 million in fees.**

In October 2018, control of the North Carolina insurers passed to the court-supervised Rehabilitator. Every event material to the claimed loss occurred after that date and was within the control of the Rehabilitator and the Government, rather than Mr. Lindberg. The record reflects that over $165 million in fees have been paid from the insurance-company estates to the Rehabilitator and others since June 2019. This includes an estimated $25 million in compensation to the Rehabilitator, an estimated $30 million paid to the Williams Mullen law firm, and ongoing monthly fees of approximately $2.5 million to the Rehabilitator and various advisors (See Ex. M).

**G. A series of intervening acts destroyed value after October 2018.**

*The Blocked Ares Sale*. On November 22, 2018, just weeks after becoming aware of the federal investigation and before he was charged with any offense, Mr. Lindberg signed an exclusive letter of intent to sell his North Carolina insurers to Ares Management for approximately $450 million, a transaction that would have preserved policyholder benefits without interruption (Ex. G). Eli Global's Chief Financial Officer, Christa Miller, contemporaneously memorialized—in a January 6, 2019 email to the company's general counsel, Peter Nordberg—that, following Ares's meeting with the Department of Justice, Ares stated it had been advised by an undisclosed "third party constituent… to avoid any ongoing connection to Eli Global," refused to identify the source, and abandoned the term under which it would have retained affiliated loans through an SPV (Ex. A15 (Miller email, Jan. 6, 2019)).

*The Rejected Oaktree Transaction (February 2019).* The Rehabilitator rejected a proposed transaction with Oaktree that would have created an approximately $1 billion special-purpose vehicle to purchase all the affiliated loans from the insurers. The transaction, if consummated, would have paid the loans off in full.

*The Coerced Ten-year Hold (June 2019).* Under threat of liquidation (see Ex. D5), the Rehabilitator required Mr. Lindberg to agree to a Memorandum of Understanding obligating a ten-year hold of the affiliated loans. This converted a position that could be exited into a forced long-term hold and foreclosed the very transactions that would have repaid the loans (*see* Ex. A14).

*The Bond Fire-sale.* The Rehabilitator sold the zero-coupon bond portfolio before maturity for approximately $394 million, rather than holding it to the contractual par value of $1,006,239,867, thereby crystallizing a loss of approximately $611.6 million and destroying the principal protection that would have repaid the affiliated loans in full at maturity (*see* Exs. H, H2, I2, and I5).

*Litigation Against Willing Counterparties (Montshire/Alban, 2023) and the Rejected Quadro Transaction (2024).* Rather than transacting with counterparties to avert losses, the Rehabilitator litigated against them, and later rejected the Quadro transaction—both of which would have protected policyholders (See Exs. O and O2).

**H. The Plea Agreement and Factual Basis.**

In the Factual Basis, the parties agreed that Mr. Lindberg's conduct involved "circular, non-economic transactions" and materially false statements "regarding these transactions," and that his "conduct caused substantial financial hardship"

such that "certain of [his] insurance companies were placed in rehabilitation." Doc. 42 at ¶¶ 5–6. Mr. Lindberg does not dispute those facts. The Factual Basis does not, however, admit any loss *amount*, does not admit that the $1.655 billion figure was foreseeable, and does not attribute to Mr. Lindberg the Rehabilitator's later conduct.

In the Plea Agreement, the parties jointly stipulated, for Guidelines purposes *only*, that "[t]he amount of loss that was known to or reasonably foreseeable by the defendant exceeded $550,000,000," while expressly providing that "'loss' under U.S.S.G. § 2B1.1 may be different from, greater, or lesser than restitution." Doc. 40 at ¶ 8(a). This does not relate to restitution. In Paragraph 10(a), Mr. Lindberg agreed to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed **by the defendant's criminal conduct**." *Id*. The Plea Agreement fixes no restitution amount, and the Plea Agreement provides no admission by Mr. Lindberg of any reasonably foreseeable loss for restitution purposes. This remains a *de novo* determination for the Court on causation and reasonably foreseeable loss for restitution purposes and the Court has already said that the "real loss was risk"[2].

[2] The government in its Sentencing Memo explicitly acknowledges that the laws in North Carolina on affiliated investments did not change until 2019—after the relevant conduct in this case and after the affiliated investments were originated. Therefore, there is no basis for restitution based on risk. Doc. 152. The MVRA requires actual loss and does not pay restitution for "risk."

**I. The Special Master's recommendation and the Preliminary Order.**

The Special Master recommended restitution of approximately $1.625 billion. On the report's own figures, the principal-only measure of loss—unpaid principal, net of credited recoveries—is approximately $1.362 billion; the recommendation reaches $1.625 billion only by adding approximately $263 million of "time value of money" interest, computed at a rate the Special Master selected over Mr. Lindberg's objection. The Preliminary Order of Restitution then entered $1,655,000,000—approximately $30 million above even the Special Master's recommendation—without explanation on the record. Doc. 161 at 3. No accounting accompanied the figure. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting for the proceeds (See Ex. B25).

**J. The Special Master has continued to dispose of estate assets during the restitution proceeding.**

Value-destroying conduct by third parties did not end in 2019; it has continued into this proceeding. The Special Master has disposed of estate assets before any final restitution determination. The Special Master owes a fiduciary duty to the court, the Insurance Companies, and Mr. Lindberg to seek court approval as soon as he learns of a sale. The Special Master's sale of estate assets relating to a restitution asset—whether by misfeasance, malfeasance, or non-feasance—without court approval violates the MVRA and constitutional limits on the Special Master's powers. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting for the proceeds (See Ex. B25). The Special Master's

compensation, and that of his professionals, is paid from the same administered assets he sells, creating a structural incentive to sell. And the Special Master has sought from Mr. Lindberg a waiver of claims relating to these dispositions. Doc. 159. A fiduciary does not seek a release for conduct that creates no exposure; the request itself confirms that the dispositions generate a diminution in value independent of Mr. Lindberg's conduct. These dispositions—conducted before a final determination, in part without court approval, and under a financial conflict—also raise serious constitutional concerns that Mr. Lindberg addresses in separate filings.

## ARGUMENT

### I. Restitution is Limited to Actual Losses Proximately Caused by the Offense—A Limitation the Plea Agreement Preserves.

The MVRA authorizes restitution only for "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and only for "the loss caused by the specific conduct that is the basis of the offense." *Hughey v. United States*, 495 U.S. 411, 413 (1990). The statute defines a victim as one "directly and proximately harmed," 18 U.S.C. § 3663A(a)(2), importing a proximate-cause requirement that asks, "whether the harm alleged has a sufficiently close connection to the conduct." *Robers v. United States*, 572 U.S. 639, 645 (2014) (citations omitted). Proximate cause is "often explicated in terms of foreseeability" and forecloses liability for losses "caused in only a remote sense." *Paroline v. United States*, 572 U.S. 434, 445, 449 (2014). The legislative history confirms this limit in Congress's own words: mandatory restitution provisions "apply only in those instances where a named, identifiable victim suffers a physical injury or pecuniary loss directly and proximately caused by the course of conduct

under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 932. In this Circuit, a person is a "victim" only if the harm results from "conduct underlying an element of the offense of conviction" or an act in furtherance of a scheme that is itself an element of that offense, *United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996); *United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008); a "factual connection" between the offense and a loss "is legally irrelevant" where the specific conduct underlying the conviction did not cause the loss, *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995); and conduct that "may have exacerbated" a harm but "did not cause it" cannot support restitution, *United States v. Freeman*, 741 F.3d 426, 438 (4th Cir. 2014). The MVRA is read to its terms, not expanded to serve its remedial aims. *Lagos v. United States*, 584 U.S. 577, 582–85 (2018).

These limits are not displaced by Paragraph 10(a) of the Plea Agreement. It commits Mr. Lindberg to "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by [his] criminal conduct." Doc. 40 at ¶ 10(a). The Plea Agreement explicitly states that restitution under 18 U.S.C. § 3556 "may be different from, greater, or lesser than" the loss under U.S.S.G. § 2B1.1. *Id*. Therefore, restitution under 18 U.S.C. § 3556 can be zero or in fact overpaid.

The Government drafted that language, and any ambiguity in it must be resolved against the Government and in favor of Mr. Lindberg. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986); *United States v. Jordan*, 509 F.3d 191,

195–96 (4th Cir. 2007). Two features of ¶ 10(a)'s own text are dispositive here. It reaches only persons "harmed by the defendant's criminal conduct"—an express causal predicate. And "regardless of the resulting loss amount" speaks to quantum, confirming the figure is not tied to the § 2B1.1 loss calculation—but rather to causation. *Id*. Read as its terms require, ¶ 10(a) does not abandon the requirement, central to *Hughey* and to the MVRA alike, that the loss be caused by the conduct. That reading mirrors the statute's own design: under the MVRA, "unlike sentencing, the broader concept of 'relevant conduct' does not expand 'the offense of conviction.'" *United States v. Elbaz*, 52 F.4th 593, 610 (4th Cir. 2022) (quoting *United States v. Llamas*, 599 F.3d 381, 390–91 (4th Cir. 2010)); *accord United States v. Newsome*, 322 F.3d 328, 341 (4th Cir. 2003). Paragraph 10(a) expands the conduct covered by contract; it does not repeal the causation limit its own words impose.

Proximate cause has two components, and the claimed loss fails both: the loss was not reasonably foreseeable at origination (Part II), and intervening causes severed any connection between Mr. Lindberg's conduct and the loss (Part IV). Separately, "risk" is not a compensable actual loss (Part V); the Government has not carried its burden (Part VI); and offsets extinguish any obligation (Part VIII).

### A. *In re Zetteler* is the law of this case and fixes the governing proximate-cause standard.

The controlling causation standard is not borrowed from other litigation; the Fourth Circuit announced and applied it in this very docket. In denying the Crime Victims' Rights Act mandamus petition brought by the Conservatrix insolvency practitioners, the Fourth Circuit held that a person is a compensable victim only

where "directly and proximately harmed," and that the harm must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked"; it sustained the exclusion of that petitioner precisely because it failed to tie its asserted harm to Mr. Lindberg's "criminal activities." *In re Zetteler*, No. 26-1749, WL 1724731 at *2 (4th Cir. June 13, 2026) (per curiam) (quoting *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010)). Because that determination was made by the court of appeals *in this case*, it is the law of the case: "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). This Court is bound to apply, in the restitution phase, the same proximate-cause standard the Fourth Circuit applied in this case. That the disposition is unpublished bears only on its weight as precedent in *unrelated* cases, *see* 4th Cir. R. 32.1; it does not diminish—and cannot displace—its force as the law of this case. And the standard is materially identical under the MVRA and the CVRA, which define "victim" in the same terms. *Compare* 18 U.S.C. § 3663A(a)(2), *with id.* § 3771(e)(2)(A).

The consequence is direct and symmetrical. The same "closely related" test that the Fourth Circuit applied in this case to *exclude* a claimant whose harm was not closely tied to the offense must, applied evenhandedly, *exclude* the losses—developed in Parts III and IV below—that were caused not by Mr. Lindberg but by the Government, the Rehabilitator, and the Special Master. That is not merely a persuasive authority; it is the rule of decision the Fourth Circuit has already established in this case, and it is the organizing theory of this motion.

## II. No Loss Was Reasonably Foreseeable at Origination (Proximate Cause: Foreseeability).

The Government bears the burden of proving, by a preponderance, that the claimed loss was a reasonably foreseeable result of Mr. Lindberg's conduct.[3] 18 U.S.C. § 3664(e). It cannot. In the Fourth Circuit, restitution reaches a loss only where the loss is a "direct result" of the defendant's conduct or is "closely related to the scheme." *United States v. Henoud*, 81 F.3d 484, 488 (4th Cir. 1996) (citations omitted); accord *United States v. Karam*, 201 F.3d 320, 325 (4th Cir. 2000). *See also United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996) (a person is a victim only where the harmful act is "conduct underlying an element of the offense of conviction" or an act in furtherance of a scheme that is an element of the offense). Foreseeability is measured as of the time the defendant acted—by what he knew or reasonably should have known then. *Cf. United States v. Shephard*, 892 F.3d 666, 672–73 (4th Cir. 2018) (assessing foreseeability of harm from the defendant's vantage point at the time of the conduct). The Factual Basis admits no loss amount and no foreseeability of the $1.655 billion figure; the only foreseeability figure Mr. Lindberg ever stipulated is the

---

[3] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this filing without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. 163, 166 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

">$550,000,000" Guidelines figure, which the Plea Agreement expressly decouples from restitution. Doc. 40 at ¶ 8(a). The contemporaneous record affirmatively negates foreseeability of loss:

- Mr. Lindberg's insurers operated under a written Risk Mitigation Policy requiring first-lien senior-secured positions, minimum NRSRO ratings, portfolio leverage caps, arm's-length pricing opinions, and annual cash-flow testing to confirm assets were adequate to service liabilities. (Ex. C.)
- He guaranteed roughly $2.39 billion of the affiliates' obligations under the March 11, 2019 Backstop Agreement (Ex. B8), invested roughly $1 billion of his own capital with no dividends (Ex. A11), and directed the purchase of $1,006,239,867 in par value of bank zero-coupon bonds to insure the affiliated-loan principal dollar-for-dollar (Supp. Statement of Facts ¶¶ 27–34).
- The regulator approved the affiliate concentration—confirmed in the NCDOI's April 11, 2016 Review Letter (Ex. A12)—and, in the relevant period, praised Mr. Lindberg's regulatory performance in writing (Ex. B6). Affiliate concentrations of this magnitude remain ordinary: U.S. life and annuity insurers reported roughly $413 billion in affiliated investments in 2025, about twice the 2020 level. (See Exs. B5 and B24)
- The legal limitation on affiliated investments was enacted only in 2019—after origination. Doc. 152. A loss produced by a later change in law is not a foreseeable consequence of the origination.

Persuasive authority confirms the point: foreseeability is measured by what the defendant could anticipate when he acted, and the economic harm "ultimately suffered" must be a foreseeable consequence of the conduct. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003), *disapproved of by Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435 (S.D.N.Y. 2007). Where, as here, nationally recognized advisors were engaged to analyze and document the positions, and the regulator itself approved the concentration and praised the conduct, the Government cannot show that loss was reasonably foreseeable. As set out in the Statement of Facts § D, both KPMG and Houlihan Lokey concluded in 2018 that the asset values securing the affiliated loans exceeded the loan balances by over $1 billion, at approximately fifty-percent loan-to-value (See Exs. E2 and E3, KPMG & Houlihan Lokey Valuations).

*By way of illustration:* imagine you build your house on high ground, buy flood insurance, and have three engineers certify that it is safe and dry. Then a stranger bulldozes your levee and deliberately floods the house. The law requires payment only for losses a person could reasonably see coming when he acted—and a person who guarantees the loans himself, invests a billion dollars of his own money, buys a billion dollars of bonds as insurance, and hires the top firms in the country to check the numbers is not a person who foresaw a loss.

The Motion should be granted for this reason alone. The record forecloses any showing that loss was reasonably foreseeable. A loss that no reasonable person saw coming cannot support restitution under the MVRA.

## III. The Offense Conduct Procured No Official Or Agency Action, And So Did Not Cause The Loss (Proximate Cause: No Agency Action).

The Fourth Circuit's decision in this case draws the line that decides causation—the line between the entity and its agent. In vacating the original convictions, the court held that the "business" that 18 U.S.C. § 666 protects "is not the business *of the agent* receiving the bribe but, rather, the business *of the entity* on whose behalf the agent is authorized to act." *United States v. Lindberg*, 39 F.4th 151, 174 (4th Cir. 2022) (emphasis in original). That distinction is dispositive. The conduct of conviction concerned a staff reassignment—which deputy commissioner would be assigned to review Mr. Lindberg's companies. A reassignment of staff is an act of the agent, not of the entity: it is not an act of the North Carolina Department of Insurance, whose business is the external regulation of insurers, and there is no evidence that the Department took any regulatory action—no examination, no order, no change in enforcement—as a result of the conduct. (Ex. W.)

The Supreme Court's definition of an "official act" confirms the point. An official act must involve "a formal exercise of governmental power" that is "similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee," and must be more than "[s]etting up a meeting, talking to another official, or organizing an event[.]" *McDonnell v. United States*, 579 U.S. 550, 574 (2016). The reassignment of a deputy is none of these. The Court's most recent construction of the bribery statute confirms the trend: § 666 reaches only a bribe to influence an official act. *Snyder v. United States*, 603 U.S. 1, 19 (2024).

The causation consequence follows directly. The offense procured no action by the entity. The $1.655 billion loss, by contrast, could arise only from action by the entity and its court-appointed successors—the Department's October 2018 supervision, the 2019 rehabilitation, and the Rehabilitator's and Special Master's later decisions (Part IV). Conduct that set no Department action in motion cannot be the proximate cause of a loss that only the Department's (and its appointees') actions could produce, and no such loss was foreseeable from it. This goes to causation, not guilt: taking the conviction as given, the offense still procured no exercise of the entity's regulatory power.

The Court's own view of the offenses is consistent. At sentencing, the Court explained that it had "always viewed this once, with the two cases together, because they were really part of the same thing." (Sentencing Tr. 47 (May 26, 2026); Ex. ST.) The constitutional character of the conduct confirms the point: the payments were campaign contributions—made through an independent-expenditure committee and the North Carolina Republican Party (Ex. W, at 8)—which the First Amendment protects, see *Citizens United v. FEC*, 558 U.S. 310 (2010); *McCutcheon v. FEC*, 572 U.S. 185 (2014), and which the Supreme Court reaffirmed in 2026 may be reached only as "contributions in exchange for official action," *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, No. 24-621, 2026 WL 1868932, at *8 (U.S. June 30, 2026). A contribution that bought no official act procured no governmental action, and a loss flowing from governmental action the contribution never procured was not a foreseeable consequence of it.

The trial record confirms that Mr. Lindberg never sought any action from the entity. Even while secretly recorded, he asked only for fair, rigorous regulation: he said he was "happy to be well regulated" and "just [did not] want to be subject to personal vendettas," and that all he sought was "an even playing field." (Ex. W (quoting GEL Exh. 164, at 36:3–5; GEL Exh. 195, at 19:4–11).) He asked the Commissioner to assign a competent, unbiased regulator—Debra Walker—precisely because she was tough and fair: "Debbie will do a competent job, and a very rigorous job, but she doesn't have a built in bias against us … She's going to be tough and fair, that's all we need." (Ex. W (quoting GEL Exh. 189, at 18:14–17).) The second trial produced no evidence that Mr. Lindberg ever asked the North Carolina Department of Insurance—the entity—to take any action whatsoever.

The regulator Mr. Lindberg suggested confirmed the point. Testifying for the Government, Ms. Walker stated that there was no "side deal" with Mr. Lindberg or his companies, that no one ever approached her about anything inappropriate, and that there was "no type of guaranteed financial benefit … from her looking over the files instead of Jacquelyn Obusek." (Ex. W (Day 6 Rough Tr. 28:16–22; id. 25:7–9).) The Government conceded in closing that there was "no evidence" that Ms. Walker "was corrupt or had some sort of side deal" with the Defendants. (Ex. W (Day 7 Rough Tr. 19:10–11 (Gov't Closing)).) A request for a regulator who will do no favors is not the purchase of an official act.

That the diminution in value was set in motion by a political vendetta only confirms that no such loss was foreseeable. The record reflects that Commissioner

Causey targeted Mr. Lindberg's insurance group for "dismantling" before he took office, and that the long-serving Department employee he "had in mind" to accomplish it was the very deputy—Jacquelyn Obusek—whose apparent bias led Mr. Lindberg to seek her replacement, and whom Causey later promoted. (Ex. A3 (Loftin Aff.); Ex. A4 (Thompson Interview); Ex. K2 (Closing Demonstratives).) A loss on affiliated investments was not a reasonably foreseeable consequence of asking that a biased deputy be replaced with a tough, fair regulator who testified she would give Mr. Lindberg no favor. A Commissioner's determination to dismantle the business of his electoral opponent's largest supporter is a rare, one-time event that no reasonable person originating an affiliated-investment program could have anticipated.

## IV. Intervening Superseding Causes Broke the Chain of Causation (Proximate Cause: Intervening Cause).

Even if some losses were assumed, the chain of proximate causation was severed by independent intervening acts that occurred after October 2018 and that Mr. Lindberg neither caused nor could have foreseen. Congress made the point explicit: "A loss caused in part by intervening circumstances cannot be said to have been directly and proximately caused by the offense of conviction, unless the intervening cause is related to or a foreseeable consequence of that offense," and restitution should not lie where the conduct "is too far removed, either factually or temporally, from the loss." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. A sentencing court accordingly "should take into account intervening events contributing to the loss unless those events also were reasonably foreseeable to the defendant," and a restitution order entered without findings on the

effect and foreseeability of such events must be vacated. *United States v. Stein*, 846 F.3d 1135, 1154–56 (11th Cir. 2017). The Ninth Circuit's decision in *United States v. Tyler* is directly on point: a defendant convicted of timber theft could not be ordered to pay the amount the timber "declined in value" after it was returned, because "[a]ny reduction in its value stems from the government's decision to hold the timber during a period of declining prices, not from [the defendant's] criminal acts." 767 F.2d 1350, 1352 (9th Cir. 1985). So too here: control of the insurers returned to the Rehabilitator in October 2018, and any later diminution stems from the Rehabilitator's decisions—not from Mr. Lindberg's offense. *Stein*, 846 F.3d at 1154–56. The Fourth Circuit enforces the same limit, vacating restitution where the loss is fixed by events outside the scope of the offense conduct. *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009) (restitution "is to be based upon the loss directly and proximately caused by the defendant's offense conduct" (citing S. Rep. No. 104-179, at 19)); *see also United States v. Goodrich*, 12 F.4th 219, 228–29 (2d Cir. 2021). Critically, each intervening act below also falls outside Paragraph 10(a), because none is harm "caused by the defendant's criminal conduct." Doc. 40. The Fourth Circuit polices the same line: a "factual connection" between offense and loss "is legally irrelevant" absent causation by the conviction conduct, *Broughton-Jones*, 71 F.3d at 1149; conduct that "may have exacerbated" a harm but "did not cause it" supports no restitution, *Freeman*, 741 F.3d at 438; and losses from an "uncharged" scheme cannot be recovered, because "it would ... be inappropriate to penalize [the defendant] as though he was also convicted of that offense." *United States v. Ocasio*, 750 F.3d 399, 412–13 (4th Cir. 2014). Nor does

*United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017), aid the Government: *Ritchie* faulted a defendant who "presented no evidence" of a superseding cause; Mr. Lindberg carries that burden with contemporaneous record evidence of affirmative, unilateral acts of value destruction—not a victim's mere delay in a falling market.

*By way of illustration:* think of a relay race. Mr. Lindberg ran the first leg and handed the baton to the Rehabilitator in October 2018. Everything that went wrong happened on the Rehabilitator's leg of the race—not Mr. Lindberg's.

**A. The Government's interference with the Ares sale (November 2018).**

Mr. Lindberg signed an exclusive LOI to sell the insurers to Ares for approximately $450 million, preserving policyholder benefits. (Ex. B.) Following Ares's contact with the Department of Justice, Ares cited undisclosed third-party advice to "avoid any ongoing connection to Eli Global" and abandoned a key favorable term. (Ex. A15.) The intervening cause here is not merely a counterparty's commercial change of heart; it is governmental interference with a signed, value-preserving transaction—an act of the Government itself, separate from and additional to the Rehabilitator's later conduct. Such interference was not a foreseeable consequence of underwriting an affiliated loan, and the loss it produced is not harm "caused by the defendant's criminal conduct." *Cf. United States v. Gibbens*, 25 F.3d 28, 29, 36 (1st Cir. 1994) (the "sovereign is not entitled to restitution" for a loss the Government itself "provoke[d]"; a loss set in motion by the Government's own conduct is not the kind of harm the restitution statutes compensate).

**B. The Rehabilitator's refusal of the Oaktree transaction (February 2019).**

Within weeks of the Ares termination, Mr. Lindberg personally directed the negotiation of an independent, arm's-length transaction with Oaktree Capital Management, L.P.—one of the world's largest credit-focused asset managers. The February 2019 Oaktree "Global Solution Presentation" proposed an approximately $1.0 billion Oaktree investment into a holding-company special-purpose vehicle that would have acquired the affiliated-loan positions held by the insurers and 100% of the GBIG equity, removing the affiliated loans from the insurers' balance sheets at face value. (Supp. Statement of Facts ¶ 72 & see Exs. C and C2) Had the Rehabilitator permitted the transaction to close, every NCIC policyholder would have been paid in full by approximately June 2019. The Rehabilitator discretionarily elected not to proceed. That second refusal—of a second sophisticated buyer pricing the same portfolio at face value within four months of the first—is the proximate cause of the loss of the Oaktree alternative; it is not Mr. Lindberg's conduct.

**C. The Rehabilitator's coercion of the ten-year hold (June 27, 2019 MOU).**

Having refused both face-value exits, the Rehabilitator then foreclosed any future exit. The Memorandum of Understanding was first proposed on or about May 9, 2019; Mr. Lindberg met with the Rehabilitator in Durham, North Carolina in late May or early June 2019; and on June 27, 2019, the Rehabilitator presented the MOU on a take-it-or-leave-it basis under **express written threat of immediate liquidation of all four NCICs**. (Supp. Statement of Facts ¶ 34, 56-57 and see Ex.

D5.) The MOU affirmatively locked the affiliated loans in place for a **ten-year term**, converting a marketable portfolio—one that two buyers had just offered to purchase at par—into a forced decade-long hold. The Rehabilitator's counsel characterized the tactic as a "hammer and nail" used to extract representations and warranties under the same liquidation threat. *Id. at* ¶ 34 and see also Wake County MOU Trial Tr. (Vol. 5, p. 1012:11–12) *("Mr. Lindberg, you're the nail. I'm the hammer")*. The election to hold the loans for ten years rather than monetize them was the Rehabilitator's, and it is that election—not the origination years earlier—that drove any subsequent diminution in recoverable value. *See Davenport*, 445 F.3d at 374 (4th Cir. 2006), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008) *(Davenport's* restitution holding is intact).

*By way of illustration:* two buyers were ready to pay full price. The Rehabilitator, holding the threat of shutting the companies down, forced Mr. Lindberg to promise to keep the loans locked in a drawer for ten years instead of selling them. You cannot lock someone's car in a garage for ten years, refuse to let him sell it, and then bill him for the rust.

### D. The Rehabilitator's pre-maturity fire-sale of the principal-protection bonds (2019).

In May 2018, Mr. Lindberg had directed the insurers to purchase $1,006,239,867 in par value of investment-grade zero-coupon bonds—held inside Principal Protected Notes for the sole purpose of insuring the affiliate-loan principal dollar-for-dollar. (Supp. Statement of Facts ¶¶ 27–34 and see Exs. H, H2, and I2) After taking control, the Rehabilitator made the unilateral decision to **sell those**

**bonds before maturity for approximately $394 million**—less than forty cents on the dollar of guaranteed par—**crystallizing a loss of approximately $611.6 million** on the very instruments whose only function was to prevent loss. *Id.* at ¶¶ 38–39. He did so without the advance approval of the Wake County Superior Court that N.C. Gen. Stat. § 58-30-85 and the June 27, 2019 Consent Order of Rehabilitation required for material asset dispositions. *Id.* at ¶ 45. And he ignored at least three loss-free alternatives—holding the bonds to maturity, using them to credit-enhance a sale, or borrowing against them. *Id.* at ¶ 40.

This is the paradigm of a superseding cause. The Supreme Court has held that a victim's own independent decision regarding collateral can break the chain of proximate causation, *Robers v. United States*, 572 U.S. 639, 647–48 (Sotomayor, J., concurring); where a passive decision to hold collateral too long can break the chain, a fiduciary's *affirmative* decision to liquidate a held-to-maturity, par-payable principal-protection instrument before maturity—forgoing $611.6 million of contractually mandated value—breaks it *a fortiori*. The crystallized loss is "attributable to the victim's independent decisions" and cannot be charged to Mr. Lindberg. *Id.* at 648; *accord United States v. Tyler*, 767 F.2d 1350, 1352 (9th Cir. 1985) (loss from holding asset "during a period of declining prices" is not caused by the offense). *Id.* at 648. Mr. Lindberg bought a billion-dollar insurance policy—bonds guaranteed to repay the loans in full if you simply waited for them to mature, like a savings bond you cash at the end. The Rehabilitator tore up that policy early and sold

it for forty cents on the dollar, throwing away $611 million. That loss does not belong to the person who bought the insurance policy to protect against the loss.

**E. The Rehabilitator's refusal of the Montshire/Alban offer (2023) and blocking of the Quadro transaction (2024), followed by the Clanwilliam fire-sale (2025).**

The pattern continued. In 2023, Mr. Lindberg negotiated with Montshire Advisors and an investment group formed by Bob Alban to submit a purchase agreement to the NCDOI for the insurers—a transaction that, like Ares and Oaktree, would have paid every policyholder in full. The Rehabilitator not only rejected the offer; he filed litigation against Mr. Alban. (Supp. Statement of Facts ¶ 117 and Exs. O and O2.) Then, in the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the Specified Affiliated Companies at approximately $3.4 billion—and Clanwilliam alone at $880 million. (Supp. Statement of Facts ¶ 118; and see Exs. G2, I3, I4.) The Rehabilitator blocked the Quadro transaction over Mr. Lindberg's repeated objections, and then, in September 2025, forced a below-market fire-sale of Clanwilliam to TA Associates for $450 million—a destruction of approximately $474 million in value attributable entirely to the Rehabilitator's discretionary decision to block Quadro. *Id.*

**F. The Special Master's continuing asset dispositions (2026).**

The chain of intervening causation extends into the present proceeding. Since his appointment, the Special Master has disposed of estate assets before any final restitution determination. With respect to the Beckett transaction, the sale occurred without court approval, and the record does not reflect an accounting of proceeds. At

the same time, the Special Master's compensation is derived from the assets administered, and he has sought a waiver of liability for actions taken in that role (See Ex. B25 and see Doc. No. 159).

These actions were undertaken independently by the Special Master. To the extent the claimed loss reflects value attributable to the disposition of these assets, that reduction cannot be attributed to Mr. Lindberg.

Applying *Robers*, *Paroline*, *Stein*, and *Squirrel*, the losses produced by these intervening acts are "more aptly described as mere fortuity" than as harm proximately caused by Mr. Lindberg, and they are not harm "caused by the defendant's criminal conduct" within Paragraph 10(a). Doc. 40. As Part I.A establishes, the "closely related" proximate-cause test the Fourth Circuit applied in this case is the law of the case, *In re Zetteler*, *supra*; the same test that excluded a claimant whose harm was not closely tied to the offense excludes the Government-, Rehabilitator-, and Special Master-caused losses here. Because the conduct by these third parties has continued into the present proceeding, the chain of causation remains broken as of this determination: the Government cannot establish proximate causation between Mr. Lindberg's conduct and the claimed loss *even now*. At least for this reason, the Motion should be granted.

## V. "Risk" Is Not Actual Loss, And Restitution Is Capped at Actual Loss.

This Court has characterized the "real loss" in this case as "risk." (See Sentencing Transcript) That characterization is dispositive. Restitution is owed only "in the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), measured by

realized actual loss, *Hughey*, 495 U.S. at 413. Risk of loss is not actual loss; a victim who has suffered no realized loss has no "loss" to compensate. Although the Supreme Court has held that MVRA restitution is criminal punishment, the Fourth Circuit enforces both halves of that rule: restitution "must be based on actual loss," not intended loss, *United States v. Harvey*, 532 F.3d 326, 340–41 (4th Cir. 2008), and the MVRA "makes clear that the defendant is expected from the outset to repay all of the actual losses that he caused, but no more," *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018) (citations omitted) (arising from this District). *Ellingburg v. United States*, 607 U.S. 163, 166 (2026), it remains a *loss-measured* sanction—not a free-standing fine—and it may not be imposed in an amount untethered from a realized actual loss. The point is concrete: even though the Special Master has determined that in this case the policyholders are not victims (and only the insurance companies are the victims), they have been "made completely whole" and "confirmed paid in full" (Ex. D7 and Docket 100). Where the protected victims are whole (indeed overpaid by $1.2 billion per Mr. Lindberg's filings) and the Court's premise is "risk," the actual loss attributable to Mr. Lindberg is zero.

*By way of illustration:* there is a difference between the chance of getting hurt and actually getting hurt. Driving a car always carries a risk of an accident, but the law does not require payment for a crash that never happened. The Court said the "real loss was risk"—and the policyholders were paid every penny. A defendant cannot be ordered to repay money that was never actually lost.

To the extent the figure rests on an interest enhancement, that enhancement compounds the error. Restitution is now criminal punishment, *Ellingburg*, *supra*; the facts that fix a penal amount must be found by the Court, and—on Mr. Lindberg's submission—beyond a reasonable doubt under *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000), and *Southern Union Co. v. United States*, 567 U.S. 343, 350 (2012). A quarter-billion-dollar interest component selected by a court adjunct, over objection and without the Court's own findings, and in violation of the DOJ's own policy forbidding interest awards in restitution, cannot satisfy even the preponderance standard, let alone a higher one.[4] The Motion should be granted for this reason alone.

---

[4] The Special Master recommends that "some interest component" should be applied to the Affiliate Investment balances "to account for the time value of money." Doc. 106 at 3-4. Based on a 2.19% interest rate (representing the 30-Day U.S. Treasury rate as of June 27, 2019, through March 31, 2026), the Special Master proposes adding an additional $263 million in restitution for "post-IALA interest." App'x 3 at 8. This is legal error.

As a threshold matter, the MVRA does not expressly include interest among the compensable forms of financial loss recoverable through restitution. And more specifically, DOJ policy recognizes this fact; it expressly excludes interest as a "financial loss," clarifying that it is "not eligible for restitution." Therefore, any interest should be excluded from any restitution calculation.

An award of interest is also contrary to the plain language of the MVRA. As explained above, the MVRA requires "offenders to restore property lost by their victims as a result of the crime." *Robers*, 572 U.S. at 640. And it provides two ways for a sentencing court to accomplish that: by ordering a defendant to either "return the property to the owner," 18 U.S.C. § 3663A(b)(1)(A) or, "if return of the property . . . is impossible, impracticable, or inadequate," to pay an amount equal to "the greater of (I) the value of the property on the date of the [loss]; or (II) the value of the property on the date of sentence" less the value of any part of the property that is returned. *Id.* § 3663A(b)(1)(B).

Notably, there is no provision under the first option—subsection (b)(1)(A)—for a court to add interest when the defendant can return the property at issue. Where, as here, the "property" at issue is cash, the only option for the Court is to order Mr. Lindberg to "return the property to the owner" under subsection (b)(1)(A). As the

Supreme Court taught in *Robers,* if "the 'property that was 'damage[d],' 'los[t],' or 'destr[oyed]' was the money, then 'the property . . . returned' must also be the money." 572 U.S. at 643 (alterations in original). And "money being fungible," the return of any cash equivalent to the amount the victim lost satisfies the statute. *Id.* In contrast, where a defendant takes something other than cash and cannot return that specific piece of property (e.g., a necklace) because it would be impossible, impracticable, or inadequate to do so, then the Court must determine the "value of the property" on the date of the loss or at the time of sentencing under subsection (b)(1)(B).

The property that the Pre-Designated Restitution Parties lost is cash—the money taken out of the companies via Affiliate Investments. And an order directing Mr. Lindberg to return that "property"—the amount of cash taken—fully satisfies the MVRA. 18 U.S.C. § 3663A(b)(1)(A). Accordingly, under a straightforward application of the MVRA, any award of interest is inappropriate.

To be sure, a handful of other circuit courts have allowed prejudgment interest to be included in a restitution order. *See, e.g.*, *United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011); *United States v. Fike*, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). But these cases were wrongly decided, and none is binding on this Court. Both the Second Circuit in *Qurashi* and the Sixth Circuit in *Fike* incorrectly assumed that the amount of restitution in the case was governed by subsection (b)(1)(B). *See Fike*, 140 F.4th at 356 (citing 18 U.S.C. § 3663A(b)(1)(B) for the proposition that "a victim's losses may change in value between the date of the loss and the date of sentencing"); *Qurashi*, 634 F.3d at 703 (similar). But as explained above, a court may apply subsection (b)(1)(B) only where a defendant returns *substitute* property because it is impossible, impracticable, or inadequate to return the property that was taken; that subsection has no application where, as here and in both *Fike* and *Qurashi*, a victim lost cash that a defendant can return.

Nor has the Fourth Circuit held that prejudgment interest may be awarded under the MVRA. Although the Special Master claims the Fourth Circuit authorized interest on restitution in *United States v. Hoyle*, 33 F.3d 415, 420 (4th Cir. 1994), *see* App'x 3, at 10, *Hoyle* was decided prior to the enactment of the MVRA and focuses on the unremarkable proposition that the determination of loss for sentencing and restitution are separate inquiries. It therefore does not speak directly to when interest qualifies as a compensatory form of damages under the MVRA. *See Hoyle,* 33 F.3d at 420.

At bottom, the Special Master's proposal cannot be squared with the law. Restitution is not concerned with a victim's "disappointed expectations" but only with his actual loss. *United States v. Boccagna*, 450 F.3d 107, 109 (2d Cir. 2006); *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017). Thus, restitution is not meant to "guarantee the benefit of any bargain." *Id.* And it "cannot include consequential damages." *United States v. Coats*, 487 B.R. 648, 653 (E.D.N.C. 2013).

The Court has identified the real loss as risk, the victims have been confirmed paid in full, and restitution measured by actual loss is therefore zero.

## VI. The Government and the Special Master Did Not Carry the Section 3664(e) Burden.

"Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and the "burden of demonstrating the amount of the loss… shall be on the attorney for the Government." 18 U.S.C. § 3664(e). The restitution order must rest on findings adequate for review. *Karam*, 201 F.3d at 325. Courts "abuse their discretion by granting the defendant a 'bailout' or by

---

Here, interest is not part of the Pre-Designated Restitution Parties' actual loss. Instead, it constitutes recompense for the benefit of the parties' bargain—the time value of money while the insurance companies provided loans covering the Affiliated Investments. Accordingly, any interest would exceed the restitution statutorily allowed by the MVRA.

Courts applying these principles have excluded interest from restitution awards or at least reduced the amount of the award to avoid giving the victims more than they are statutorily eligible to receive. In *United States v. Jesenik*, the court explained that **"accrued but unpaid interest" on an investment does not constitute part of a victim's actual losses**. 702 F. Supp. 3d 1024, 1039 (D. Or. 2023). Similarly, in *United States v. Smerling*, the defendant and government agreed that a restitution award based on fraudulently obtained loans should not include interest based on the loan agreement's post-default rate, because "including such interest in the restitution order would inappropriately award [the victim] its expectation under the loan agreement, not merely compensate it for its loss." No. 21-cr-317, 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022).

In this case, including only the principal amount of the Affiliate Investments serves the purposes of restitution. It redresses the actual loss caused by Mr. Lindberg's conduct but avoids imposing undue punishment on him and exceeding the bounds of what the MVRA authorizes.

For these reasons, neither the MVRA nor the principles of restitution support adding any interest to the restitution award. Accordingly, the amount of restitution ordered should be further reduced by at least $263 million.

allowing the victim to obtain a 'windfall.'" *Steele*, 897 F.3d at 611. Here, the Preliminary Order entered $1.655 billion—$30 million above the Special Master's own recommendation—without explanation; the recommendation itself reaches $1.625 billion only by adding approximately $263 million of interest at a rate the Special Master chose; and no accounting supports the figure. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting of proceeds. (See Ex. B25) A record in that condition cannot support a $1.655 billion finding by a preponderance. *See* 18 U.S.C. § 3663A(c)(3)(B) (restitution need not be ordered where complex causation issues would unduly burden the sentencing process).

The Committee designed exactly this safeguard. Any special master submits only "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." S. Rep. No. 104-179 (1995) (committee substitute § 105), *reprinted in* 1996 U.S.C.C.A.N. 924. And Congress authorized courts to decline restitution altogether where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). Here, where causation and offsets are genuinely complex and disputed, that burden falls on the Government, not on Mr. Lindberg. *See also United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008) (citations omitted) (loss calculation for restitution may "present[] complex factual issues" warranting an evidentiary hearing).

## VII. The Government Should Disclose Evidence of Its Interference with the Ares Transaction.

The causation inquiry turns in significant part on why the Ares sale—which would have paid every policyholder in full—collapsed. The contemporaneous record reflects that, following Ares's meeting with the Department of Justice, Ares was advised by an undisclosed party to avoid any ongoing connection to Eli Global and abandoned the transaction's key term (Ex. A15). That gives Mr. Lindberg a good-faith basis to believe a governmental actor communicated with Ares concerning the transaction. If the Government possesses evidence of such communications and has not disclosed it, that evidence is favorable and material to the causation issue now before the Court—it would show that an intervening act of the Government, not Mr. Lindberg's conduct, caused the loss of the Ares transaction—and due process requires its disclosure. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Mr. Lindberg therefore requests that the Court order the Government to disclose any communications between any federal or state governmental actor and Ares, or its advisors, concerning the proposed acquisition of the insurers or any ongoing relationship with Eli Global. Where the Government bears the burden of proving causation by a preponderance under 18 U.S.C. § 3664(e), basic fairness requires that Mr. Lindberg have access to the evidence bearing on whether the Government itself caused the very loss it now seeks to charge to him.

## VIII. In the Alternative, Offsets and Credits Independently Extinguish Any Obligation.

Should the Court find any portion of the loss proximately caused by Mr. Lindberg's conduct, the MVRA requires that restitution be reduced by the value of property returned to the victims and by amounts the victims have received or will receive. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); *see Robers*, 572 U.S. at 645; *United States v. Boccagna*, 450 F.3d 107, 118 (2d Cir. 2006); *United States v. Alalade*, 204 F.3d 536, 540 n.4 (4th Cir. 2000). The Committee was equally explicit that restitution may not exceed a victim's actual loss or yield a windfall: the offset provisions ensure that "the victim is not compensated twice for the same loss." S. Rep. No. 104-179, at 20 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 933. *Accord Steele*, 897 F.3d at 611 (no victim "windfall"). Applied, the credits below yield net restitution of zero and a substantial overpayment, as the chart illustrates:

| **Description** | **Amount** | **Body §** |
|---|---|---|
| **Special Master's Proposed Restitution Figure** | **$1,655,000,000** | — |
| **Improper Additions to Affiliate Investment Balances** | | **I.** |
| Pre-Judgment Interest | ($263,000,000) | I.A |
| Corrected Starting Balance of Affiliate Investments | ($141,000,000) | I.B |
| **Additional Credits** | | **II.** |
| AAPC Preferred Equity Par Value as of May 26, 2026 | ($352,906,240) | II.A |
| SNIC Payments | ($27,823,425) | II.B |
| Cash Payments to Pre-Designated Restitution Parties Not Captured by the Special Master | ($79,655,289) | II.C |
| CBL Subordination Fee (Beckett refinancing) | ($3,000,000) | II.D |
| Additional Clanwilliam Sale Proceeds | ($20,000,000) | II.E |
| ULICO Sale of Contributed Real Estate | ($13,596,013) | II.F |
| Bermuda ICs' Proceeds from Sale of Affiliated Assets | ($9,800,076) | II.F |
| Sale Proceeds of Zero-Coupon Bonds in PPNs | ($243,000,000) | II.G |
| Value of NCICs as of October 2018 | ($454,000,000) | Exh. A |

| **Losses Not Proximately Caused by Mr. Lindberg** | | **III.** |
|---|---|---|
| Loss on Agera | ($129,000,000) | III. |
| ECL Losses | ($22,288,826) | Exh. A |
| Loss on UKAT | ($39,000,000) | Exh. A |
| Insurance-Holdco Debt Portion | ($14,897,805) | Exh. A |
| Loss on Clanwilliam Below-Market Sale | ($474,000,000) | Exh. A |
| Loss on Early Zero-Coupon Bond Sales | ($611,600,000) | Exh. A |
| **TOTAL MINIMUM OFFSETS AND REDUCTIONS** | **($2,899,418,383)** | |
| **NET RESTITUTION OWED** | **$0** | |

## IX. Any Ambiguity Must Be Resolved In Mr. Lindberg's Favor.

The Plea Agreement fixes no restitution amount and stipulates only a ">$550M" Guidelines figure expressly decoupled from restitution. Because restitution is now criminal punishment, *Ellingburg*, *supra*, and because Paragraph 10(a)'s reach is bounded by causation, any genuine ambiguity over whether third-party-caused losses are "caused by the defendant's criminal conduct" must be resolved in Mr. Lindberg's favor under the rule of lenity.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Mr. Lindberg respectfully requests that the Court enter an order: (1) determining, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by the offense of conviction; (2) in the alternative, excluding from restitution the intervening-cause losses identified in Part IV; (3) crediting all offsets required by 18 U.S.C. §§ 3663A(b)(1)(B) and 3664(j)(2); (4) directing a complete accounting of all asset dispositions and of all fees and expenses paid from administered assets, including the Beckett proceeds; (5) ordering the Government to disclose any governmental communications with Ares or

its advisors regarding the proposed transaction or any ongoing relationship with Eli Global; (6) fixing net restitution at zero; and (7) granting such other and further relief as is just. Given the pendency of related proceedings, Mr. Lindberg respectfully requests expedited consideration.

Dated: July 14, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order *In Re: Use of Artificial Intelligence* entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 14, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 13, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices.

Dated: July 14, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

Greg E. Lindberg v. AAPC Holdings, LLC and American Academy Holdings, LLC
Case No. 2:26-cv-__________

# EXHIBIT G

Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders, Doc. 269, with Proposed Order, Doc. 269-5 (July 31, 2026)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S MOTION TO DECLARE THE SPECIAL-MASTER REFERENCE UNCONSTITUTIONAL AS APPLIED, TO DISQUALIFY AND REMOVE THE SPECIAL MASTER, AND TO SET ASIDE THE RESTITUTION ORDERS (DOCS. 161, 245, 245-1)**

Defendant Greg E. Lindberg respectfully moves the Court to declare the special-master reference unconstitutional as applied, to disqualify the Special Master from the adjudicative functions of verifying and quantifying loss and fashioning a proposed restitution order, to relieve and remove him from all remaining duties over the estate, and to set aside, in their entirety, the Preliminary Order of Restitution (Doc. 161), his Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1). The Order Appointing Special Master (Doc. 56) vests one officer with both the receiver's custody, liquidation, and pecuniary control over the estate and the Article III judicial function of quantifying each victim's loss and fashioning the restitution order. That structural defect is not curable by consent or by later de novo review; there is, in any event, no executed stand-alone waiver to cure it; and the Beckett sale — a roughly $1 billion asset that the Special Master alone could sell, disposed of at approximately thirteen cents on the dollar without Court approval — both proves the defect and extinguished any consent the Government might claim. Once the receiver and the adjudicative roles are combined in one fee-

interested officer, neither consent nor a later de novo adoption by the Court can cure the defect; the only adequate remedy is to disqualify and remove the Special Master, set the report aside in its entirety, stay further sales, and order an accounting and investigation of the Beckett loss. In support, Mr. Lindberg states:[1]

## I. The Order unconstitutionally unites the receiver and the Article III adjudicator in a single, fee-interested officer.

### A. The Order makes the Special Master a receiver.

1. A receiver is "a neutral court officer … to take control, custody, or management of property," *Sterling v. Stewart, 158 F.3d 1199* (11th Cir. 1998), whose "possession of the property is the possession of the court." *United States v. McPherson*, 631 F. Supp. 269 (M.D.N.C. 1986). Doc. 56 confers exactly that: it places "in the exclusive possession and control of the special master" all interests in the "Primary Restitution Assets," including NHC and the Specified Affiliated Companies, Doc. 56, Findings ¶ 9; Ordered ¶ 4, and empowers him to "identify all assets available for liquidation," "seek Court approval to liquidate," "clear title … for transfer to bona-fide buyers," "apportion any available funds among the victims," and "receive and distribute restitution payments," *id.*, Ordered ¶ 3(b)–(e), (g)–(h) — even directing him to "coordinate with any other receivers previously appointed over assets," *id.* ¶ 3(i). Function, not the caption, controls. *See United States v. O'Connor*, 291 F.2d 520 (2d Cir. 1961) (enforcing "a general principle," not the "special master" label). And his

[1]The Court has yet to determine, de novo, causation, offsets, and credits—on motion practice, with a written response from the Government and a right of reply for the Defendant—which will further change the restitution determination. The Special Master's report, which creates the constitutional crisis this Motion describes, cannot be adopted de novo or used to support that determination. Defendant expressly reserves this determination.

fees are paid "from the assets administered by the Special Master … including … from cash balances held within trusts and other subsidiaries that hold the Primary Restitution Assets." Doc. 56, Ordered ¶ 14.

**B. The same Order assigns him the Article III adjudicative function.**

2. The Order also directs the Special Master to "verify and quantify the losses suffered by each victim" — the § 3664(e) loss determination itself — and to "fashion a proposed restitution order." Doc. 56, Ordered ¶ 3(a), (f). One officer thus holds and liquidates the res, is paid from it, quantifies the loss, and drafts the order that fixes it.

**C. The power to fix restitution is a nondelegable judicial function.**

3. The judicial power of the United States may be exercised only by Article III courts. *Stern v. Marshall*, 564 U.S. 462, 484 (2011). Congress wrote that principle into the MVRA: "Any dispute as to the proper amount or type of restitution shall be resolved by the court." 18 U.S.C. § 3664(e). The Fourth Circuit enforces the allocation strictly, holding that determining restitution is a core judicial function that cannot be delegated even to a probation officer, an arm of the court itself. *United States v. Johnson*, 48 F.3d 806, 808–09 (4th Cir. 1995), reaffirmed in *United States v. Blake*, 81 F.3d 498, 507 (4th Cir. 1996) ("deciding the amount and timing of restitution payments is a non-delegable judicial function," and "[f]inal approval … may not be delegated"). A master exists "to aid judges in the performance of specific judicial duties," "not to displace the court," and a reference that hands the master the parties' basic issues is "little less than an abdication of the judicial function." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957). Even where a narrow referral is authorized,

the core adjudicative determination remains the court's: the D.C. Circuit vacated by mandamus a reference that assigned a master "proposed findings of fact and conclusions of law," holding that a court must "reserve for himself, and not delegate to the special master, the core function of making dispositive rulings … on issues of liability," and that a master handed that function is an impermissible "surrogate judge." *United States v. Microsoft Corp.*, 147 F.3d 935, 954–55 (D.C. Cir. 1998). The risk is not abstract. If a court may not delegate the scheduling of restitution payments, it surely may not delegate the liquidation of the very assets from which restitution would be paid before any restitution has been fixed.

**D. Combining the two roles in a fee-interested officer is forbidden.**

4. The Second Circuit condemned precisely this arrangement in *United States v. O'Connor*, 291 F.2d 520 (2d Cir. 1961) (Friendly, J.), holding that a receiver's "interest, as well as his duties to the claimants and the taxpayer, disqualify him from performing the judicial duties," and vacating the order "insofar as it appoints a special master" — enforcing "a general principle," not any distrust of the individual. Due process forbids subjecting a party's property to a decisionmaker with "a direct, personal, substantial pecuniary interest in reaching a conclusion against him," or to any arrangement offering "a possible temptation … not to hold the balance nice, clear, and true." *Tumey v. Ohio*, 273 U.S. 510, 523, 532 (1927). The test is objective and needs no proof of actual bias, *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) — a standard the Supreme Court reaffirmed as recently as *Rippo v. Baker*, 580 U.S. 285, 137 S. Ct. 905, 907 (2017) (per curiam) (recusal is required when "the probability of actual bias … is too high to be constitutionally tolerable") — and even an indirect

stake suffices, *Gibson v. Berryhill*, 411 U.S. 564 (1973); see also *Coleman v. Town of Brookside*, 663 F. Supp. 3d 1261 (N.D. Ala. 2023) (a financial incentive to generate revenue through fines supports a due-process claim). An officer paid from the estate he liquidates cannot be the neutral officer who quantifies the victims' loss.

**II. Consent cannot cure the defect — and there is no consent to cure it.**

5. The stand-alone waiver was never executed. The only free-standing waiver the Government can point to — the "Consent, Waiver, and Acknowledgement" dated May 15, 2026, between Mr. Lindberg and Joseph W. Grier, III, as Special Master — was never executed: Mr. Lindberg rejected it, and its signature blocks are blank. No agreement was formed, and there is nothing to enforce. Mr. Lindberg's plea agreement is a separate, signed instrument; as explained below (¶ 9), its waiver does not reach this defect, but the point here is narrower — the stand-alone consent the Government would need was refused and never came into being.

6. The Government will invoke two purported sources of consent — the Order Appointing Special Master and the plea agreement — but neither reaches this conduct. The Order is not a blank check; it defines and limits the Special Master's powers and conditions every liquidation on "Court approval." Doc. 56, Ordered ¶ 3(c)–(d), ¶ 6(e). Consent to a reference so bounded is consent to a supervised, court-approved process — with the notice and the opportunity to be heard that approval entails — not to a secret sale made without it. The only written waiver confirms the point: even had it been signed, by its terms Mr. Lindberg waived only the right to object to a sale "once approved by the Court," and his "sole and exclusive venue" to

challenge any disposition was "a timely objection … in the proceeding … in which the Special Master seeks Court approval." The Beckett sale never went to Court approval, so it falls outside the waiver entirely. The waiver also expressly did not touch the reference itself: "Nothing contained in this Waiver will be deemed or construed to modify, waive, impair, or affect the Order." And it waived nothing as to the Special Master's adjudicative role. It was, moreover, demanded by the Special Master — who "determined" his own compensation-bearing sales would be "enhance[d]" by it and took a release running "for the benefit of the Special Master" — eleven days before sentencing. See Doc. 190.[2]

7. A financial-interest disqualification is non-waivable in any event. A master "must not have a relationship … that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent … after the master discloses any potential grounds for disqualification." Fed. R. Civ. P. 53(a)(2). Section 455(e) forbids accepting "a waiver of any ground for disqualification enumerated in subsection (b)," and subsection (b)(4) is a "financial interest" held "as a fiduciary." Rule 53(a)(2)'s consent-after-disclosure mechanism does not change this: it can reach only the appearance ground under § 455(a); it cannot authorize a waiver of a § 455(b) ground, which § 455(e) makes categorically non-waivable. These disqualification standards govern special masters, not only judges. See *Cobell v. Norton*, 334 F.3d 1128, 1143–44 (D.C. Cir. 2003) ("the ethical restrictions of § 455 apply to a special master"); *Jenkins v. Sterlacci*, 849 F.2d 627, 630–32 (D.C. Cir.

[2]Defendant was asked to execute this waiver in the days before sentencing; when he refused, the Special Master filed an adverse report four days before sentencing. See Ex. C.

1988). No disclosure of these grounds and no court approval of any consent to them ever occurred. And the plea agreement waived only the quantum of restitution, confining it to persons "directly or indirectly harmed by [Mr. Lindberg's] criminal conduct," Doc. 40 ¶ 10(a); it did not waive causation, which remains the Government's burden, § 3664(e), or consent to a conflicted adjudicator. Above all, consent does not reach a fiduciary who breaches the duties on which the consent depends. A defendant's agreement to a supervised, court-approved liquidation is not consent to a fiduciary who disposed of a Primary Restitution Asset without informing the defendant or his counsel, and without the Court approval that alone would have allowed the defendant to test the valuation, the price, and the propriety of the sale adversarially. By selling Beckett in secret and without approval, the Special Master deprived Mr. Lindberg of the very adversarial testing the Order and any waiver presuppose; that conduct falls outside any consent the Government can invoke.

**III. Consent cannot cure the Article III structural defect in particular.**

8. Article III's guarantee has two components. The personal right to an Article III adjudicator may be waived; the structural component may not. Article III "not only preserves to litigants their interest in an impartial and independent federal adjudication … but also serves as 'an inseparable element of the constitutional system of checks and balances.'" *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850 (1986). Accordingly, "[t]o the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty," because "notions of consent and waiver cannot be dispositive [where] the

limitations serve institutional interests that the parties cannot be expected to protect." *Id.* at 850–51. The Supreme Court reaffirmed the distinction in *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015): a litigant may waive the personal right to an Article III adjudicator by knowing and voluntary consent, but the structural component of Article III serves institutional interests that the parties cannot be expected to protect, and so cannot be supplied by consent. Delegating the restitution adjudication to a fee-interested officer who also liquidates the estate implicates that structural principle directly. And even assuming some consent to the reference existed — from any source — it could not cure the defect, because the vice is structural, not personal. (The one free-standing waiver the Government might invoke, the "Consent, Waiver, and Acknowledgement," was never executed: Mr. Lindberg rejected it, and its signature blocks are blank. But the argument does not depend on that fact.) The defect inheres in the appointing order's union of the loss-adjudication function with the fee-interested custodial role, not in any personal preference the defendant was free to trade away; and a structural Article III defect "serve[s] institutional interests that the parties cannot be expected to protect," *Schor*, 478 U.S. at 851, so it survives any consent that might be shown — including a signed one, such as a plea-agreement waiver. No consent can supply the neutral, disinterested sentencer the Constitution requires. *Stern*, 564 U.S. at 484.

9. The premise is stronger still because MVRA restitution is criminal punishment for ex post facto. *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026) (unanimously holding that MVRA restitution is criminal punishment).

That holding is dispositive on waiver. The consent that cures a personal Article III objection in the civil context, *Wellness*, 575 U.S. 665, has no purchase here: because restitution under the MVRA is punishment imposed at sentencing, with the Government — not the victim — as the party adverse to the defendant, *id.*, the right to have that punishment fixed by a neutral Article III court is a criminal defendant's right, and it cannot be waived so as to install a fee-interested, non-Article III officer as the effective sentencer. A restitution order produced through an unconstitutional delegation of the judicial power is therefore not a waivable civil arrangement but an illegal sentence; a court errs in entering restitution beyond its lawful authority, *United States v. Davis*, 714 F.3d 809 (4th Cir. 2013); see *United States v. Broughton-Jones*, 71 F.3d 1143, 1147-1149 (4th Cir. 1995) (a defendant's consent "cannot … authorize a restitution order not authorized by the statutory source"; an unauthorized restitution order is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum"; and the grounds challenging such an order fall "outside the scope of th[e] waiver"); and a defendant can no more consent to an illegal sentence than the parties can consent to an unconstitutional delegation of the judicial power, *Schor*, 478 U.S. at 850–51. Thus, even a signed plea-agreement waiver does not reach this illegal-sentence defect; and neither the plea nor the appointment can supply the constitutional authority the reference lacks.

**IV. De novo adoption does not cure the defect.**

10. The Government will urge that the de novo determination under § 3664(d)(6) cures any problem. It does not. The Supreme Court has said it plainly:

"Even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 618 (1993); see also *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972) (a party "is entitled to a neutral and detached judge in the first instance," and a proceeding is not "constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication") — a rule the Court continues to apply. The Court in *Concrete Pipe* further assumed that the "possibility of bias … stemming from the trustees' statutory role and fiduciary obligation[] would suffice to bar the trustees from serving as adjudicators," 508 U.S. at 618 — finding no violation only because those trustees acted in a mere "enforcement capacity" subject to review by a "concededly neutral arbitrator," *id.* at 618–19, 630. Neither is true here: the Special Master is not an enforcer whose work a neutral officer reviews de novo; he is himself the adjudicator who verifies and quantifies the loss and fashions the order, and no neutral officer stands between him and the Court. The point is not academic. A court reviewing the report sees only what the conflicted officer chose to put in it; de novo review "does not solve the problem of 'unchecked and uncheckable' partiality," because the officer's "compilation of the record … not to mention his reports and his recommendations, would be subject to selection bias." *In re Brooks*, 383 F.3d 1036, 1045 (D.C. Cir. 2004). A report produced by a receiver-conflicted, fee-interested officer cannot be laundered through later review; the taint attaches to the first-instance product the Court is asked to adopt. And the Supreme Court has confirmed as recently as 2016 that a disqualifying interest is structural

error: "an unconstitutional failure to recuse constitutes structural error," a defect "not amenable" to "harmless-error review," and "the failure to recuse cannot be deemed harmless." *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016).

11. The Special Master's advisory label does not save the reference. The Government will answer that the Special Master "only" proposes findings and that the Court decides de novo. The response fails at every level. Factually, this master did not merely propose: he took custody of the estate and liquidated it — selling Beckett off the docket at roughly thirteen cents on the dollar — while drawing his fees from the assets he administers, all before any court determination. That is execution, not recommendation. Legally, the advisory label is irrelevant to disqualification: § 455 governs a special master whether his role is final or advisory, *Cobell v. Norton*, 334 F.3d 1128, 1143–44 (D.C. Cir. 2003); *Jenkins v. Sterlacci*, 849 F.2d 627, 630–32 (D.C. Cir. 1988), and the D.C. Circuit vacated a reference even while acknowledging that "a special master's findings and conclusions are always advisory," *United States v. Microsoft Corp.*, 147 F.3d 935, 955 (D.C. Cir. 1998). A disqualified officer's work product, moreover, "may not be submitted to the district court or otherwise disseminated in any manner." *In re Brooks*, 383 F.3d at 1046. And "the Court decides now" cannot undo what the reference has already produced: because the Special Master sold the assets before any final determination, no later de novo review can recover the roughly $866 million his conduct destroyed or unwind the dispositions to third parties. The advisory label describes the master's reports; it does not describe what this master has already done.

## V. The Special Master has become a second prosecutor, funded by the res he liquidates.

12. Beckett is the conflict in operation. Beckett was held in a Delaware statutory trust of which Mr. Lindberg was the Grantor and Sole Beneficiary. That trust reserves to its governance, as "Fundamental BKX Matters," "approval of any sale or other disposition of all or substantially all [of the] assets, and any refinancing in excess of $5,000,000." By an assignment executed in favor of "Joseph W. Grier, solely in his capacity as Special Master," the Special Master became the "record owner" of the equity of NHC Holdings, LLC, "holding all associated economic, legal, voting, and" other rights — stepping into Mr. Lindberg's shoes as the party whose approval those Fundamental BKX Matters require. Beckett was held and managed within the NHC Holdings structure. The Special Master alone, therefore, could approve the sale of Beckett, and it could not have occurred without his approval. See Defendant's Notice of Filing (Doc. 260) (Trust Agreement (Ex. A); Assignment to the Special Master (Ex. B); NHC Holdings Board Presentation (Ex. C)). The Second Supplement concedes the sale "occurred with the consent of NHC Holdings, LLC." Doc. 245 at 31 & n.29. Three independent sources value Beckett at approximately $1 billion: an independent appraisal by Cabrillo Advisors, Inc. (valuation date Jan. 31, 2022) fixing enterprise value at $1,003,924,000; the Blackstone indication of interest and counter (April 2022); and the CCG Beckett term sheet. Doc. 256 (Notice of Correction Regarding the Valuation of Beckett Collectibles, LLC). The asset was nonetheless sold for approximately $134 million — roughly thirteen cents on the dollar — without the Court approval the Order twice requires, without the disclosure

to the Court the Order requires, and with no accounting of the proceeds. Doc. 56, Ordered ¶ 6(e), at 6; Doc. 172; Doc. 190.

13. AAPC is headed in the same direction. The custodial structure that produced the Beckett sale is already in place as to AAPC Holdings, LLC — another restitution asset committed to the Special Master's exclusive control. Through the AAPC voting trust and an assignment executed in his favor, the Special Master holds the direction rights over any sale or merger of AAPC, just as he held the levers over Beckett. See Ex. A (AAPC Voting Trust); Ex. B (AAPC Assignment). The risk that AAPC will be disposed of, as Beckett was, without notice to the Defendant and without this Court's approval is therefore not hypothetical but live — a further reason the reference cannot be left in place, and a further reason the same officer cannot be trusted to adjudicate the loss while holding the power to dispose of the very assets that measure it.

14. The same officer then, as adjudicator, declines to credit Mr. Lindberg for the roughly $866 million loss his own custodial conduct produced. He has, in effect, become a second prosecutor. The Constitution has never permitted the same person to serve as both accuser and adjudicator. See *In re Murchison*, 349 U.S. 133 (1955). The Government now relies on his report for everything the statute assigns to it — the burden of proving causation, foreseeability, and the amount of loss by a preponderance of the evidence, 18 U.S.C. § 3664(e). It has refused, again, to answer in writing the Motion to Dismiss (Doc. 234) or any of Mr. Lindberg's other pending motions, and it has represented, on a call with counsel, that it would be a waste of

time for the Special Master to address causation, foreseeability, or the other disputed issues – confirming that the Government treats the Special Master's recommendation as its proof and does not intend to carry its own § 3664(e) burden. The officer who liquidates the res and is paid from the proceeds is thus also the officer who supplies the loss-and-causation case against the defendant that § 3664(e) commits to "the attorney for the Government." A neutral judicial adjunct has become a self-funded advocate for the very recovery from which his fees are drawn, and a restitution exceeding $1.6 billion cannot rest on the report of an officer who is at once the seller, the beneficiary of the sale proceeds, and the prosecutor.[3]

15. The Beckett sale was also a material breach. It occurred without notice to Mr. Lindberg or his counsel and without any court order — counsel learned of it only after the fact, orally, when the Special Master communicated a sales figure during a call, see Doc. 256 — in violation both of the appointing order's Court-approval condition, Doc. 56, Ordered ¶ 6(e), and of the Special Master's fiduciary duty, as the officer in exclusive possession and control of the res, to keep the defendant and the Court informed. The Special Master's account that he merely "let" the sale happen is contradicted by the trust documents: because a sale of all or

[3] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Motion without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see *Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

substantially all of Beckett's assets was a "Fundamental BKX Matter," and because the Special Master held the equity of NHC as its "record owner" with all voting rights, the sale could not close without his affirmative approval. He did not let Beckett be sold; he approved it. A fiduciary who alone could authorize the sale cannot discharge his duty by disclaiming responsibility for it. And a party's own material breach forecloses his reliance on the agreement he breached — the Special Master cannot invoke any supposed consent to a sale process whose core condition, Court approval with notice and an opportunity to be heard, he himself violated.

## VI. Any consent evaporated when Beckett was sold; the objection was preserved and only recently discoverable.

16. Even assuming some consent existed at the appointment, it could not survive the Beckett sale. The Special Master used the seat he took from Mr. Lindberg to sell a roughly $1 billion asset at a fire-sale price without the Court approval on which any waiver was, by its own terms, expressly conditioned. Whatever consent might be posited evaporated the day Beckett was sold. Mr. Lindberg preserved the Article III objection by moving, within days of sentencing, for a de novo Article III determination and to confine the reference to its lawful limits. Docs. 172, 190.

17. And the full extent of the breach could not have been raised earlier. That Beckett was part of the NHC transfer to the Special Master, that he alone could approve its sale, and that the sale bypassed the Court-approval condition the Order imposes, came to light only recently — when counsel obtained the Beckett Collectibles Trust instruments and the documents establishing Beckett's inclusion in the NHC transfer.

18. These recent discoveries from this week change the posture decisively. What was, at the appointment, an inherent and structural conflict — a fee-interested officer holding both the receiver's and the adjudicator's powers, disqualifying under an objective standard that requires no proof of actual bias, *Caperton*, 556 U.S. 868 — has now matured into an actual, realized conflict. The newly obtained trust and transfer documents establish that the Special Master's own vote — as the "record owner" of the NHC equity holding all voting rights, and because a sale of all or substantially all of Beckett's assets was a "Fundamental BKX Matter" — was required to sell Beckett, so he, and only he, could and did authorize the sale; three independent sources value the asset at approximately $1 billion, Doc. 256; and the Special Master used the very power he took from Mr. Lindberg to sell it for roughly thirteen cents on the dollar and now adjudicates against crediting the resulting loss. The possible temptation has become an accomplished fact. Beckett is exemplary of the problem, not its extent: because the same conflicted, fee-interested officer valued, sold, and adjudicated throughout, every valuation and every action his report reflects — every sale he made and every sale or transaction he declined — is now suspect, and the Final Report cannot be relied upon as a whole. On this record, the only adequate remedy is disqualification of the Special Master from the adjudicative function and setting aside his report.

## VII. No court order or approval can now cure the defect; the report must be set aside.

19. The defect is now beyond cure. This is no longer a theoretical or structural risk; with the Beckett breach it is a full, actual conflict — and a

constitutional crisis. Neither a belated Court order approving the Beckett sale nor a later de novo determination under § 3664(d)(6) can resurrect the neutrality the reference destroyed. A disqualifying interest is structural error that later review cannot cure: as the Supreme Court held in *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016), "an unconstitutional failure to recuse constitutes structural error," and "the failure to recuse cannot be deemed harmless." That principle is not new, and it remains good law: a party "is entitled to a neutral and detached judge in the first instance," and no subsequent proceeding renders a tainted first-instance determination "constitutionally acceptable." See *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972), reaffirmed in *Williams*, 579 U.S. at 14, and *Concrete Pipe*, 508 U.S. at 618. The Special Master who breached his fiduciary duty — selling a roughly $1 billion asset at thirteen cents on the dollar, without approval and without accounting — cannot be the author of a report that dispossesses Mr. Lindberg of billions of dollars. An officer who could not, even in theory, serve as the neutral author of the restitution determination cannot produce a valid report, and the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) must be set aside in their entirety. Where a master should have been recused, the remedy is suppression: his "reports, recommendations, or other work product … may not be submitted to the district court or otherwise disseminated in any manner." *In re Brooks*, 383 F.3d at 1046. And the Court's authority to appoint the Special Master necessarily carries the authority to supervise and remove him. *See* Fed. R. Civ. P. 53; the Court's inherent authority over

its own appointee. Because the defect resides in the appointing order itself — which unites the receiver's powers, the adjudicative functions (Doc. 56, Ordered ¶ 3(a), (f)), and payment from the estate (*id.* ¶ 14) in a single officer — those provisions must be vacated or severed so the defect cannot recur through a substitute master; in the alternative, the reference should be withdrawn.

20. The crisis is compounded by a second structural defect — one that Mr. Lindberg's companion Motion to Stay Asset Sales and for Objections (Doc. 190), raising the § 3664(d)(6) challenge, has already identified: the reference inverts the MVRA's mandatory sequence. Congress prescribed an order of operations, and the appointing order reproduced it. The court determines the victims' losses, § 3664(d)(5); resolves every dispute itself, by a preponderance, § 3664(e); may take a master's proposed findings, but only subject to a de novo determination, § 3664(d)(6); and enters a restitution order that then becomes a final judgment, § 3664(o) — after which, and only after which, the Act's enforcement mechanisms, which Congress designated civil, attach, 18 U.S.C. § 3613. As implemented, that sequence was inverted at every step: the fee-interested Special Master liquidated the estate before any final restitution determination existed, disposing of the Beckett asset off the docket at roughly thirteen cents on the dollar, and in another instance distributed proceeds under a formula he concedes "almost certainly will deviate" from the apportionment this Court will later adopt, Doc. 66, ¶ 24. What was a structural risk when the reference was entered is now a realized constitutional crisis: execution has preceded adjudication, the de novo determination Congress guaranteed has been

rendered illusory as to the assets already sold, and the officer who inverted the sequence is the one now asking the Court to adopt his numbers.

## VIII. The MVRA independently requires a full accounting before any restitution is fixed.

21. The accounting Mr. Lindberg seeks is not merely equitable housekeeping; the MVRA requires it. The Court must determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and must "resolve[]" any "dispute as to the proper amount or type of restitution," *id.* § 3664(e) — neither of which can be done on a record that does not disclose what the Special Master sold, for how much, and where the proceeds went. Amounts recovered for the victims must be credited so that no order overstates the loss, *id.* § 3664(j)(2); the Special Master's dispositions of the Primary Restitution Assets are a "material change" in economic circumstances of which the Court must be informed, *id.* § 3664(k); the sale proceeds are "substantial resources" that must be applied to any restitution still owed, *id.* § 3664(n); and the "de novo determination" the statute commands, *id.* § 3664(d)(6), cannot be made on an unaccounted record. The secret Beckett sale — an asset valued of record at approximately $1 billion, disposed of for roughly $134 million without notice, without Court approval, and without any accounting on the docket — evaded every one of these statutory checkpoints. A full and verified accounting is therefore the necessary statutory predicate to the Court's own § 3664 determination, not an optional equitable add-on. Finally, the conflict is not merely historical; the Special Master's own title documents confirm that it persists. The assignment through which he took control of AAPC — a Primary Restitution Asset he holds and may liquidate —

expressly provides that nothing in it "binds or limits" his "responsibilities in the criminal proceeding to fashion a restitution order or propose a restitution methodology." Ex. B, § 16. The same officer thus continues to hold both the custodial and the adjudicative power over the estate — which is why disqualification, and not another round of de novo review, is the only adequate remedy.

**IX. Relief.**

22. WHEREFORE, Mr. Lindberg respectfully requests that the Court:

(1) declare the special-master reference unconstitutional as applied insofar as it assigns the Special Master the adjudicative functions of verifying and quantifying loss and fashioning a proposed restitution order, and vacate or sever the provisions of the Order Appointing Special Master (Doc. 56) that create the defect — paragraphs 3(a) and 3(f) (loss quantification and restitution recommendation) and paragraph 14 (payment of the Special Master's fees from the assets he administers) — and, in the alternative, withdraw the reference and vacate the Order in its entirety;

(2) disqualify the Special Master from those functions and relieve and remove him from all remaining duties under the Order Appointing Special Master (Doc. 56), including his administrative and custodial authority over the Primary Restitution Assets;

(3) stay all further sales, liquidations, and dispositions of the Primary Restitution Assets, and any distribution of prior proceeds, pending further order of the Court, and place the assets in the interim custody of a neutral

observer who may not sell, dispose of, or take any material action without the prior approval of the Court, and who has no determinative or adjudicative authority and no prosecutorial function;

(4) set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) in their entirety; (5) order the Special Master to render a full and verified accounting of every sale, transfer, or disposition of Primary Restitution Assets he made, approved, attempted, or declined — including the Beckett sale — and of all proceeds and all fees paid from the estate (as required to fix restitution under 18 U.S.C. § 3664(f)(1)(A), (e), (j)(2), (k), (n), and (d)(6)), and order an investigation into his administration of the estate, into every such sale and every sale or transaction he declined or blocked, and into the reliability of every valuation and action reflected in the Second Supplement and proposed Final Order — the Beckett sale being exemplary of the problem, not its whole;

(6) direct that the § 3664(e) loss and causation determination proceed on motion practice, on the Government's own proof and before a neutral officer, with a written response from the Government to the pending motions and a right of reply for Mr. Lindberg; and

(7) grant such other and further relief as is just. Because the Special Master's breach of fiduciary duty destroyed approximately $866 million of the estate's value, he cannot be trusted to continue administering it; removal, a neutral interim custodian, an accounting, and an investigation are warranted.

Dated: July 31, 2026.

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com
*Counsel for Greg E. Lindberg*[4]

[4] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

## CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested has been raised with counsel for the United States and counsel for the Special Master. Each party opposes the motion.

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 31, , 2026.

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
*Counsel for Greg E. Lindberg*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br>Judge Max O. Cogburn, Jr. |

**[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO DECLARE THE SPECIAL-MASTER REFERENCE UNCONSTITUTIONAL AS APPLIED, TO DISQUALIFY AND REMOVE THE SPECIAL MASTER, AND TO SET ASIDE THE RESTITUTION ORDERS (DOCS. 161, 245, 245-1)**

This matter is before the Court on Defendant Greg E. Lindberg's Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (the "Motion"). Having considered the Motion, the record, the applicable law, and any response, and for good cause shown, the Motion is GRANTED. IT IS HEREBY ORDERED that:

1. The special-master reference is DECLARED unconstitutional as applied insofar as it assigns the Special Master the adjudicative functions of verifying and quantifying loss and fashioning a proposed restitution order. Paragraphs 3(a) and 3(f) of the Order Appointing Special Master (Doc. 56) (loss quantification and restitution recommendation) and paragraph 14 (payment of the Special Master's fees from the assets he administers) are VACATED and SEVERED. In the alternative, the reference is WITHDRAWN and the Order Appointing Special Master (Doc. 56) is VACATED in its entirety.

2. The Special Master is DISQUALIFIED from those functions and is RELIEVED and REMOVED from all remaining duties under the Order Appointing Special Master (Doc. 56), including his administrative and custodial authority over the Primary Restitution Assets.

3. All further sales, liquidations, and dispositions of the Primary Restitution Assets, and any distribution of prior proceeds, are STAYED pending further order of the Court. The Primary Restitution Assets are placed in the interim custody of a neutral custodian, who may not sell, dispose of, or take any material action with respect to those assets without the prior approval of the Court, and who shall have no determinative or adjudicative authority and no prosecutorial function.

4. The Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) are SET ASIDE in their entirety.

5. The Special Master shall render, within ____ days of this Order, a full and verified accounting of every sale, transfer, or disposition of Primary Restitution Assets he made, approved, attempted, or declined — including the sale of Beckett — and of all proceeds and all fees paid from the estate. The Court further ORDERS an investigation into the Special Master's administration of the estate, into every such sale and every sale or transaction he declined or blocked, and into the reliability of every valuation and action reflected in the Second Supplement and the proposed Final Order of Restitution.

6. The determination of loss and causation under 18 U.S.C. § 3664(e) shall proceed on motion practice, on the Government's own proof and before a neutral officer, with a written response from the Government to Defendant's pending motions and a right of reply for the Defendant.

7. The Court GRANTS such other and further relief as is just.

SO ORDERED.

______________________________
Max O. Cogburn, Jr.
United States District Judge

Dated: __________, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

Greg E. Lindberg v. AAPC Holdings, LLC and American Academy Holdings, LLC
Case No. 2:26-cv-__________

# EXHIBIT H

Preliminary Response and Objection to the Special Master's Second Supplement,
Doc. 267 / Doc. 583 (July 30, 2026)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC |

**DEFENDANT'S UNSIGNED DRAFT RESPONSE AND OBJECTION TO SPECIAL MASTER'S SECOND SUPPLEMENT ATTACHED AS EXHIBIT A AND UNOPPOSED MOTION FOR A ONE-WEEK EXTENSION OF TIME TO FILE HIS RESPONSE AND OBJECTION TO THE SPECIAL MASTER'S SECOND SUPPLEMENT (DOC. 245)**

Defendant Greg E. Lindberg respectfully moves for a one-week extension of time, to and including August 6, 2026, to file his Response and Objection to the Special Master's Second Supplement to the Report and Recommendations Regarding Restitution (Doc. 245). A current draft of that Response is attached as **Exhibit A.** The Government and the Special Master consent to the one-week extension requested here. In support, Mr. Lindberg states:

1. The Response and Objection to Doc. 245 is presently due July 30, 2026. Mr. Lindberg requests a one-week extension of that deadline. The Government and the Special Master have agreed to a one-week extension, and the extension requested here is therefore unopposed.

2. A current draft of Mr. Lindberg's Response and Objection is attached as Exhibit A. It is attached to show that Mr. Lindberg has worked diligently on his part of this proceeding. From federal custody, and with only limited access to counsel, he has prepared a detailed, record-supported Response. The additional week will allow counsel to finalize the Response and go over

the report with Mr. Lindberg provided he has access to the Defendant. Defendant may be moved for a hearing on August 7, 2026 and may lose access to counsel during the move.

3. Separately, and not in lieu of the Response, Defendant's counsel will file a Motion to Hold the Special Master's Second Supplement (Doc. 245) and proposed Final Order of Restitution (Doc. 245-1) in Abeyance until the Government answers Mr. Lindberg's pending motions in writing, on the merits, and Mr. Lindberg is afforded an opportunity to reply. The Government and the Special Master oppose that abeyance relief. This extension motion is limited to the filing deadline and is agreed; the abeyance motion presents a separate question on which the parties disagree, and Mr. Lindberg reserves it.

4. The draft Response also illustrates why the extension is warranted. Under 18 U.S.C. § 3664(e), the Government bears the burden of proving the amount of the victims' loss by a preponderance of the evidence, and any dispute is resolved by the Court after the de novo determination § 3664(d)(6) requires. Mr. Lindberg's pending motions document that the Government has refused to respond on the merits to any of the causation, foreseeability, offset, and amount issues he has raised—the very burden-of-proof issues his Response highlights. And Mr. Lindberg cannot complete his showing without records he does not possess: the books and records of the companies he surrendered are held by the Special Master, NHC Holdings, LLC, and the Rehabilitator (Michael Dinius), and both the Special Master and the Government are now opposing Mr. Lindberg's effort to obtain those records by Rule 17(c) subpoena. Doc. 248.

5. Requiring Mr. Lindberg to file a final response on an incomplete record—while the Government stays silent on the merits and the documents he needs are withheld—burdens his due-process right to a meaningful opportunity to be heard on the disputed restitution issues, a right that is heightened because restitution under the MVRA is criminal punishment. See *Ellingburg v.*

*United States* (2026); Doc. 201; Doc. 202. The brief extension requested here mitigates, but does not eliminate, that prejudice; the forthcoming abeyance motion addresses the remainder.

WHEREFORE, Mr. Lindberg respectfully requests that the Court (1) grant a one-week extension of time, to and including August 6, 2026, for the filing of his Response and Objection to the Special Master's Second Supplement (Doc. 245); and (2) grant such other and further relief as is just.

Respectfully submitted, this 30th day of July, 2026.

//s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
*Counsel for Defendant Greg E. Lindberg*[1]

[1] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this Notice of Filing Errata while his Motion for Pro Hac Vice remains pending.

**CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE**

Based on the Standing Order of this Court, In re: Use of Artificial intelligence dated July 29, 2026, there is no AI certification attached to this filing.

/s/ Kenneth Barnes_________
**KENNETH BARNES**

**CONSULTATION STATEMENT**

Pursuant to the Local Rules, counsel states that counsel for the United States and counsel for the Special Master were consulted and consent to the one-week extension of time requested in this motion. The United States and the Special Master oppose the separate motion to hold the Special Master's Second Supplement in abeyance, referenced in paragraph 3 above, which Defendant will file separately.

/s/ Kenneth Barnes_________
**KENNETH BARNES**

**CERTIFICATE OF SERVICE**

I certify that on the date set forth below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

/s/ Kenneth Barnes_________
**KENNETH BARNES**

**EXHIBIT A**

*Draft* Response and Objection to the Special Master's Second Supplement to the Report and Recommendations Regarding Restitution (Doc. 245).

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC |

**DEFENDANT GREG E. LINDBERG'S PRELIMINARY RESPONSE AND OBJECTION TO THE SPECIAL MASTER'S SECOND SUPPLEMENT TO REPORT AND RECOMMENDATIONS REGARDING RESTITUTION (DOC. 245)**

## TABLE OF CONTENTS


**PRELIMINARY STATEMENT.................................................................................4**

**I. THE SECOND SUPPLEMENT CONCEDES THE FACTS AND DISCLAIMS THE FINDINGS THE MVRA REQUIRES.........................................................................6**

A. The Special Master concedes the material facts in thirteen footnotes.......................................... 6

B. The Special Master expressly declines to prove foreseeability................................................... 6

C. The Special Master abstains from the very inquiry that determines causation. ............................ 7

D. The Second Supplement applies standards the MVRA does not contain. ................................... 7

E. The Second Supplement is nearly devoid of legal authority...................................................... 8

F. The Second Supplement carries none of the Government's § 3664(e) burden. ............................ 8

**II. LEGAL STANDARD.........................................................................................8**

**III. THE MATERIAL FACTS REMAIN UNDISPUTED.......................................................10**

**IV. NO LOSS WAS REASONABLY FORESEEABLE AT ORIGINATION ..........................11**

**V. INTERVENING, SUPERSEDING CAUSES BROKE THE CHAIN OF CAUSATION........12**

A. Robers and Ritchie do not shift this burden to Mr. Lindberg. ...................................................13

B. The Ares transaction, defeated by governmental interference (November 2018). .........................14

C. The Rehabilitator's refusal of the Oaktree transaction (February 2019)......................................14

D. The Rehabilitator's coercion of a ten-year hold (June 27, 2019 MOU).......................................14

E. The pre-maturity sale of the principal-protection bonds ($611.6 million). .................................15

F. The refusal of the Montshire/Alban transaction (2023). ..........................................................16

G. The blocking of the Quadro transaction (first quarter 2024).....................................................16

**VI. THE CONVERGING 2018 VALUATIONS REFUTE THE REPORT'S CONCLUSORY DISMISSAL OF NCIC VALUE ........................................................16**

**VII. THE SPECIAL MASTER'S OWN VALUATIONS ARE A "CURRENT GUESS," HAVE BEEN CUT BY A THIRD, AND ARE OFFERED UNDER SEAL.................................18**

**VIII. THE RECOMMENDATION MEASURES EXPOSURE, NOT REALIZED LOSS..........19**

**IX. MANDATORY OFFSETS AND CREDITS INDEPENDENTLY REDUCE ANY RESTITUTION TO ZERO.........................................................................................20**

A. The ULICO preferred equity ($352,906,240)..........................................................................21

B. The zero-coupon bond proceeds ($243 million) — denied for want of documents the Government withholds.........................................................................................................22

C. Prejudgment interest ($263 million)......................................................................................23

D. Losses not proximately caused by the offense.........................................................................23

**X. THERE WAS NO WAIVER ...............................................................................24**

**XI. THE REHABILITATION PLAN WAS NEVER A LIQUIDATION PLAN........................26**

**XII. COMPLEXITY MUST BE RESOLVED IN MR. LINDBERG'S FAVOR.........................27**

**XIII. THE SECOND SUPPLEMENT FAILS THE MVRA'S REQUIREMENT OF AN ACCOUNTING OF THE RESTITUTION AMOUNT ...................................................27**

A. The statute makes an accounting the predicate for the Court's determination.............................28

B. No accounting of any component of the recommendation has ever been produced......................29

C. Without an accounting, the mandatory credits cannot be computed and the no-windfall rule cannot be honored.........................................................................................................30

D. The Report's promise to track credits in the future is not a substitute for the accounting now........31

**XIV. THE SPECIAL MASTER'S PURPORTED VALUATIONS MEET NONE OF THE STANDARDS FOR VALUATION EVIDENCE IN FEDERAL COURT ........ 31**

A. The governing standard is reliability, and it is not satisfied by assertion. ........ 31
B. The Report's valuations fail every one of those markers........ 33
C. The valuations come from an interested source, which compounds rather than cures the problem. ........ 34
D. The valuations the Defendant has offered are of precisely the kind federal courts credit. ........ 35
E. A defendant may not be charged for value destroyed after he lost control of the assets........ 36
F. The consequence of a one-directional valuation is a manufactured shortfall........ 37

**XV. KEY FACTS THE SECOND SUPPLEMENT DOES NOT AND CANNOT DISPUTE...... 37**

A. It remains undisputed that the Department of Justice's own policy does not permit interest to be charged to a defendant in a restitution case. ........ 37
B. The $141 million opening-balance correction is denied on a record the Government itself has made unavailable. ........ 38
C. ULICO agreed in December 2022 to accept the AAPC preferred equity as a dollar-for-dollar credit, and cannot now insist on cash. ........ 39
D. The Special Master refuses to credit more than $130 million in cash payments on theories found nowhere in the MVRA........ 41
E. The zero-coupon bonds were not sold to meet any liquidity need, and the Rehabilitator's own reports identify a different problem........ 42
F. It remains undisputed that the Agera exposure was inherited from ULICO's prior reinsurer and that the loss was not caused by Mr. Lindberg. ........ 43
G. It remains undisputed that Clanwilliam was worth more than $800 million on the only contemporaneous market evidence, and that the Quadro comparables are higher today than in 2024. ........ 44

**XVI. THE GOVERNING CAUSATION STANDARD IS THE FOURTH CIRCUIT'S, IT IS BINDING, AND THE SECOND SUPPLEMENT APPLIES IT IN ONE DIRECTION ONLY ........ 45**

A. The controlling standard, stated by the Fourth Circuit in this very proceeding. ........ 45
B. Zetteler does not stand alone — it states, in this case, what binding Supreme Court and Fourth Circuit authority already command........ 47
C. The § 3663A(a)(2) scheme clause converges on the same limit and cannot enlarge the award. ........ 48
D. The MVRA's committee notes confirm the limitation. ........ 48
E. The record convergence: the master's own criteria state the same proximate-cause test. ........ 49
F. The Report cites the decision for its result, never for its standard — and cites almost nothing else........ 49
G. Applied evenhandedly, the standard turns away the $1.616 billion figure. ........ 50
H. Preservation of objections. ........ 51

**XVIII. SCHEDULE OF THE REPORT'S DEPARTURES FROM THE MVRA STATUTE, CASE LAW, AND LEGISLATIVE COMMITTEE NOTES ........ 52**

**XIX. RESERVATION OF RIGHTS TO SUPPLEMENT THIS RESPONSE........ 55**

A. Lack of online database access, and the access order that remains unsigned. ........ 55
B. The Government's refusal of the access requested in the Motion for Subpoenas........ 56

**CONCLUSION AND RELIEF REQUESTED........ 56**

## PRELIMINARY STATEMENT

The Special Master's Second Supplement (Doc. 245) asks this Court to impose $1.616 billion in criminal restitution. It cannot support that request, because its author disclaims having made the findings the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A, 3664, requires. In thirteen separate footnotes, the Special Master concedes that he and Mr. Lindberg "agree on the basic, objective, material facts"; in eight of those thirteen, the only disagreement he identifies is the legal conclusion "of whether the chain of proximate cause was broken." On foreseeability, he states outright that this is a matter "which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30. And three times he declines to examine the conduct of the state-court fiduciaries at all, explaining that he is "not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment." Doc. 245 at 19, 21–22, 25.

That is not a record on which restitution may be ordered. Under § 3664(e), the Government bears the burden of proving the amount of each victim's loss by a preponderance of the evidence, and the MVRA reaches only losses "directly and proximately" caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2). The Second Supplement does not apply that standard. It asks instead whether Mr. Lindberg has "convinced the Special Master" — a formulation it repeats six times — whether he has offered "compelling evidence," and whether any intervening act would "definitively cause" a decline in value. Those are not the statutory tests. Under § 3664(d)(6) the Special Master is not the decisionmaker; his recommendation is a proposal only — "subject to a de novo determination of the issue by the court" — and is owed no deference. Reviewed without deference against the facts the Special Master himself concedes, the recommendation supplies no basis on which restitution of any amount could be ordered.

The substance fares no better. The Second Supplement never once mentions the Quadro transaction, the Montshire/Alban transaction, the Oaktree transaction, the Ares letter of intent, the KPMG valuation, or the Houlihan Lokey coverage analysis — the very transactions and valuations that break the causal chain and establish value. It cites no MVRA causation authority at all: not *Hughey*, not *Lagos*, not *Paroline*, not *Stein*. Of some $2.9 billion in documented offsets,[1] it allows $39 million — about 1.3% — and denies others expressly for want of documentation that the Government's refusal of subpoenas prevents Mr. Lindberg, in custody and four times divested of his companies' books, from obtaining. Meanwhile the Special Master has quietly cut his own estimate of the assets available for restitution by roughly a third, to a "current guess" of $998 million at the midpoint, resting on a "desktop exercise" performed by the financial advisors to the entity that holds and sells those assets — and has moved to file the explanation for that reduction under seal. Each of these is established in Mr. Lindberg's prior filings. See Doc. 235 ¶¶ 12–19, 26–32; Doc. 174 ¶¶ 94–122.

For the reasons below, any one of which is independently sufficient, the Court should decline to adopt the Second Supplement and determine that no restitution is owed; or, in the alternative, exclude the losses not proximately caused by the offense and credit the offsets that extinguish any obligation.

---

1 The $866 million loss of value on the sale of Beckett increases the documented offsets and credits from $2,899,418,383 to $3,765,418,383 (approximately $3.7 billion). The Beckett Collectibles Trust documents are attached as Exhibits 6(a) (Trust Agreement, executed, dated as of June 2021), 6(b) (Amended and Restated Trust Agreement, executed December 5, 2023, the instrument in effect at the time of the sale — retaining the identical Grantor-consent requirement for Fundamental BKX Matters), and 6(c) (Certification of Trust). The Special Master controls Global Growth's board seats at NHC and the Beckett Trust documents attached here clearly give the NHC board a veto right over any sale of Beckett assets given that such a sale is a Fundamental BKX Matter which requires Grantor approval, and the Grantor to the trust is controlled by NHC. The fact that the Special Master took no action to require court approval of this sale as required by the Order Appointing Special Master, is clear evidence that he violated the terms of the order that appointed him. NHC was designed as a Primary Restitution Asset and the Order Appointing Special Master gives the Special Master full federal court authority over NHC as the fiduciary for all decisions undertaken by NHC. The Special Master violated his own order by failing to bring the Beckett sale to the court for adjudication as required by the Order Appointing Special Master. This led to an $866 million loss of value on Beckett which is an additional $866 million offset that Lindberg is due under MVRA. The complete revised schedule of offsets, credits and reductions is set out in Part IX.

Because the Government bears the burden on loss, foreseeability, and causation, 18 U.S.C. § 3664(e), and because the Special Master's advisory recommendation neither carries that burden nor can substitute for the Court's de novo determination, 18 U.S.C. § 3664(d)(6), the deficiencies identified below are not gaps for the Court to fill. On this record they are failures of proof that require denial. Restitution is a penalty the Government must prove; it is not a figure the Court supplies.

## I. THE SECOND SUPPLEMENT CONCEDES THE FACTS AND DISCLAIMS THE FINDINGS THE MVRA REQUIRES

### A. *The Special Master concedes the material facts in thirteen footnotes.*

The Second Supplement does not contest Mr. Lindberg's evidence. It contains no new affidavit, no new exhibit, no new testimony, and no new verified fact. To the contrary, the Special Master states at the outset:

> *"For all or nearly all of the issues raised in the Defendant's Response and the Defendant's Supplemental Responses, the Special Master and the Defendant agree on the historical, objective facts of what transpired, but disagree on what legal conclusions to draw from those facts for restitution purposes."* Doc. 245 at 7.

He then repeats that concession in thirteen separate footnotes, each stating that "the Special Master and the Defendant agree on the basic, objective, material facts." Doc. 245 at 16 nn.9–10, 17 n.11, 17 n.12, 18 nn.13–14, 19 n.16, 20 n.17, 21 n.20, 22 nn.21–22, 23 n.25, 24 n.26, 25 n.26. In eight of those footnotes, the sole disagreement identified is "the legal conclusion of whether the chain of proximate cause was broken." The practical consequence is important: on a factual record the Special Master concedes, the causation question is a legal one for this Court to decide de novo — and the conceded facts establish that the chain was broken.

**B. *The Special Master expressly declines to prove foreseeability.***

Reasonable foreseeability is not optional under the MVRA; it is an element of the proximate-cause inquiry the Government must satisfy. The Special Master's response to Mr. Lindberg's foreseeability argument is to disclaim the task:

> *"That it was reasonably foreseeable to the Defendant that his conduct could be harmful is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)."* Doc. 245 at 30.

He says the same of the underlying offense conduct: "The Special Master has not set out to prove—and does not consider it within the Special Master's charge to prove—whether the Defendant committed the crimes to which he pled guilty as part of the restitution analysis." Doc. 245 at 29–30. A report that declines to prove foreseeability cannot establish the foreseeable loss that restitution requires.

**C. *The Special Master abstains from the very inquiry that determines causation.***

The intervening acts at the heart of this dispute were all taken by the state-court fiduciaries after Mr. Lindberg ceded control. Three times, the Special Master declines to evaluate them:

> *"At a minimum, the Special Master is not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment (to the extent doing so falls within the Special Master's duties)."* Doc. 245 at 19; *see also id*. at 21–22, 25.

He adds that questions concerning the companion public-corruption case "exceed the scope of the Special Master's assignment," Doc. 245 at 31, and that whether a crime was committed "falls outside of the scope of the Special Master's assignment," id. at 29 n.28. The Special Master is of course entitled to define his own role. But the consequence is that no one has made the findings § 3664(e) demands. The Government cannot satisfy its burden by adopting a report whose author disclaims the analysis. And because the Special Master's product is

advisory only, 18 U.S.C. § 3664(d)(6), his abstention leaves no findings on foreseeability or intervening cause for this Court to adopt — and the Court cannot supply findings the record does not contain.

**D. *The Second Supplement applies standards the MVRA does not contain.***

Rather than ask whether the Government has proved causation by a preponderance, the Second Supplement asks whether Mr. Lindberg has persuaded the Special Master. It concludes six times that "the Defendant has not convinced the Special Master" or has "not produced evidence sufficient to convince the Special Master" (Doc. 245 at 19, 22, 22, 24); twice that it has "not seen compelling evidence" (id. at 21, 24); once that it has "not seen convincing evidence" (id. at 18); once that no act would "definitively cause" a decline in value (id. at 19); and once that Mr. Lindberg "has failed to raise a genuine issue of material fact" (id. at 31). Five times it concludes only that Mr. Lindberg "bears some responsibility" for losses arising during the rehabilitation and liquidation. Doc. 245 at 19, 22, 25, 28.

None of these is the statutory test. "Some responsibility" is not proximate causation; "compelling" and "definitive" proof are not a preponderance; and what has or has not convinced the Special Master is not the measure. The measure is the statutory one, applied de novo and without deference to the Special Master's recommendation. 18 U.S.C. § 3664(d)(6). A recommendation built on standards the MVRA does not contain, by an officer who is not the decisionmaker, is owed no deference and cannot bear a $1.6 billion penalty.

**E. *The Second Supplement is nearly devoid of legal authority.***

Across forty-six pages recommending the largest restitution award in this District's history, the Second Supplement cites two cases: *Robers v. United States*, 572 U.S. 639 (2014), and *United States v. Ritchie*, 858 F.3d 201 (4th Cir. 2017) — both invoked to shift burdens onto

Mr. Lindberg — together with a passing citation to *United States v. Karam*, 201 F.3d 320 (4th Cir. 2000). It does not cite *Hughey v. United States*, 495 U.S. 411 (1990); *Lagos v. United States*, 584 U.S. 577 (2018); *Paroline v. United States*, 572 U.S. 434 (2014); *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017); or *Ellingburg v. United States*, 607 U.S. 163 (2026). It engages neither the MVRA's committee notes nor the Department of Justice's own restitution policy. The committee notes confine restitution to victims harmed "under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The reason the Report is bereft of authority is that its reasoning is not grounded in the MVRA. The Special Master is not free to make up the governing law.

F. ***The Second Supplement carries none of the Government's § 3664(e) burden.***

Under § 3664(e), "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." The elements of that burden here — the fact and amount of each victim's loss, the reasonable foreseeability of that loss, and its direct and proximate causation by the offense of conviction — belong to the Government. The Second Supplement carries that burden on none of them. It offers no new evidence, exhibit, affidavit, or testimony, and instead frames every conclusion as the Defendant's failure of persuasion — asking whether Mr. Lindberg has "convinced the Special Master" or produced "compelling" or "convincing" evidence. Doc. 245 at 18, 19, 21, 22, 24. That is not the statutory allocation, and it cannot be cured by this Court's adopting a report whose author disclaims the very findings the Government was required to prove. The failure is element by element:

| Element | Whose burden under § 3664(e) | The Report's treatment (Doc. 245) |
|---|---|---|
| Fact and amount of loss | Government — prove each victim's loss by a preponderance. | Presents no new evidence, exhibit, affidavit, or testimony; rests the $1.616 billion figure on the Special Master's own "current guess" of asset value. Doc. 245 at 36–37. |
| Reasonable foreseeability | Government — an element of proximate cause it must establish. | The Special Master "has not set out to prove" foreseeability and does not consider it within his charge. Doc. 245 at 30. |
| Proximate causation | Government — prove the offense directly and proximately caused the loss. | Asks whether the Defendant "convinced the Special Master," whether an act would "definitively cause" a decline, and settles for a finding that he "bears some responsibility." Doc. 245 at 19, 22, 25, 28. |
| Entitlement to a specific offset | Defendant — but only once loss and causation are proved. *Karam*, 201 F.3d at 327. | Denies credits for want of documentation the Government simultaneously prevents Mr. Lindberg from subpoenaing. See Part IX, *infra*. |

On every element that is the Government's to prove, the Report substitutes the Defendant's failure to persuade the Special Master for the Government's failure to carry its burden. The one burden the MVRA does assign to Mr. Lindberg — demonstrating entitlement to a particular offset once loss and causation are established, *Karam*, 201 F.3d at 327 — the Report cannot fairly invoke, because it denies those offsets for lack of the very records the Government is blocking. The Government's own conduct confirms the failure. Mr. Lindberg's Motion to Dismiss the $1.655 Billion Restitution Claim (Doc. 234) put the fact and amount of loss, foreseeability, causation, and the mandatory offsets squarely at issue, and demanded the proof § 3664(e) requires. The Government has never responded to it. It filed no opposition, no evidence, no affidavit, and no brief defending the recommendation on the merits — through the response period and since — appearing in this restitution proceeding only to state that it "does not oppose" the Special Master's positions. Doc. 245 at 44. The party on whom § 3664(e) places the burden

of proof has elected silence, and a burden of proof is not carried by silence. Because the Government has not carried its § 3664(e) burden, the only determination the record supports is that no restitution has been proved.

## II. THE LEGAL STANDARD IS A BURDEN OF PROOF, AND ON EVERY ELEMENT BUT THE OFFSETS IT IS THE GOVERNMENT'S

### A. *The allocation the statute makes.*

Section 3664(e) divides the proof and leaves no discretion in the division. "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). On the Government therefore lie three things: the fact and amount of each victim's loss, the reasonable foreseeability of that loss, and its direct and proximate causation by the offense of conviction. Id.; 18 U.S.C. § 3663A(a)(2).

One burden, and one only, is Mr. Lindberg's. Once the Government has proved loss and causation, he bears the burden of establishing entitlement to a particular offset — of showing that he "has compensated or will compensate the victim." United States v. Karam, 201 F.3d 320, 327 (4th Cir. 2000). Mr. Lindberg does not dispute that allocation, and this Response does not ask the Court to relieve him of it. But the offset burden is narrow, it is specific to credits, and it is conditional: it never arises until the Government has carried its own.

### B. *What happens when the Second Supplement's seventeen issues are sorted by that allocation.*

The Second Supplement disposes of seventeen issues in a table at page 6 and in the discussion that follows. Sorted by whose burden each issue belongs to, they divide almost exactly three to one.

Nine of them — Issues 1, 2, and 11 through 17 — turn on the amount of loss, on the valuation of the insurance companies, or on causation. Each is the Government's to prove. Together they account for approximately $2.149 billion of the roughly $2.899 billion in reductions documented in the Proposed Restitution Credit / Offset Ruling Chart. Doc. 132-3. On every one of the nine, the Second Supplement resolves the question against Mr. Lindberg not because the Government proved anything, but because Mr. Lindberg did not satisfy the Special Master. He "has not convinced the Special Master." Doc. 245 at 19, 22, 22, 24, 25. The Special Master "has not seen compelling evidence," id. at 21, 24, or "convincing evidence," id. at 18. No act would "definitively cause" a decline in value. Id. at 19. And Mr. Lindberg "bears some responsibility." Id. at 19, 22, 25, 28. None of those is the statutory test, and none of those elements was his to prove.

The clearest instance is Issue 17, the $611.6 million loss on the early sale of the zero-coupon bonds. The Special Master writes that he "has not seen compelling evidence that this discretionary decision by the North Carolina Insurance Companies' state court supervised fiduciaries was unreasonable or caused the harm that the Defendant professes." Id. at 24 (emphasis added). Whether the fiduciaries' decision "caused the harm" is the causation element itself — the Government's to establish by a preponderance — and the Report assigns the evidentiary onus for it to Mr. Lindberg. Issue 11 stacks three such shifts on a single question: no "convincing evidence" of the companies' 2018 value, no act that would "definitively cause" a decline, and "some responsibility" borne by Mr. Lindberg. Id. at 18–19.

The remaining eight issues — Issues 3 through 10, approximately $750 million — are offsets, and Mr. Lindberg accepts that they are his to establish. On those he does not argue misallocation. He argues that he carried the burden (Issue 3, where the settlement fixes a dollar-

for-dollar credit against a judgment and the par value is undisputed); that the statute forbids deferring a credit it makes mandatory (Issues 3 and 7, deferred "if and when ULICO realizes this value" and "if and when the escrow balance becomes available," id. at 6 nn.3–4); and that the Government has closed off the records that would complete the proof (Issue 10, where the Report faults him for having "failed to rebut the Special Master's conclusion," id. at 26–27, while the subpoenas for those records remain opposed and pending, Docs. 202, 248). Rebutting the Special Master's conclusion is not the standard; proving an offset to the Court by a preponderance is.

**C. *The consequence for this Court's determination.***

Framed correctly, this Response does not ask the Court to weigh competing analyses of the MVRA. It asks a prior and simpler question: did the party bearing the burden carry it? On the nine issues that are the Government's, the Second Supplement offers no evidence, no exhibit, no affidavit and no testimony — only the observation that Mr. Lindberg failed to persuade the officer who wrote the report. A burden of proof is not carried by the other side's failure to persuade. Nor is it carried by silence: the Government filed nothing in opposition and appeared in this proceeding only to state that it "does not oppose the positions articulated by the Special Master." Doc. 245 at 44. Because the Special Master's recommendation is advisory only and is subject to this Court's de novo determination, 18 U.S.C. § 3664(d)(6), and because it is owed no deference, the deficiencies catalogued below are not gaps for the Court to fill. On this record they are failures of proof, and the only determination § 3664(e) permits is that the loss was not proved.

**D. *The substantive limits the Government's proof would have had to satisfy.***

Federal courts have no inherent power to order restitution; the authority is statutory and is "circumscribed by the procedural and substantive protections" of the statute conferring it.

*Ritchie*, 858 F.3d at 206; *United States v. Freeman*, 741 F.3d 426, 431 (4th Cir. 2014). Restitution reaches only the actual loss "directly and proximately" caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2); *Hughey*, 495 U.S. at 413; *Lagos*, 584 U.S. at 582–85; *Paroline*, 572 U.S. at 445.

The burden is the Government's: "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). If and only if loss and causation are established, Mr. Lindberg bears the burden of demonstrating entitlement to a particular offset. *Karam*, 201 F.3d at 327. That allocation does not assist the Special Master here, because the failure of proof in the Second Supplement is on the elements that belong to the Government — the fact and amount of loss, foreseeability, and proximate causation — and because, as to the offsets, the Special Master denies credits for want of documentation the Government simultaneously prevents Mr. Lindberg from obtaining. See Part IX, infra.

Restitution may not confer a windfall: the MVRA "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole." *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017). Amounts returned to or recovered by a victim must be credited. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); *Robers*, 572 U.S. at 645; *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018). Restitution under the MVRA is criminal punishment. *Ellingburg v. United States*, 607 U.S. 163, 166 (2026). An order exceeding the statute's authority is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013) (quoting *United States v. Broughton-Jones*, 71 F.3d 1143, 1147 (4th Cir. 1995)). And where

"determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process" excessively, the Court may decline restitution altogether. 18 U.S.C. § 3663A(c)(3)(B).

## III. THE MATERIAL FACTS REMAIN UNDISPUTED

Because the Special Master offers no contrary evidence and concedes the "basic, objective, material facts," the following remain undisputed on this record. Each is established in Mr. Lindberg's prior filings, and the Second Supplement rebuts none of them with evidence:

**1** The zero-default track record of the affiliated loans while Mr. Lindberg managed the program remains UNDISPUTED.

**2** The more than $1 billion of capital Mr. Lindberg committed to back the affiliated loans — and his personal guarantee of approximately $2.39 billion — remains UNDISPUTED. The Special Master does not deny the guarantee; he argues only that a guarantee is "not, in and of itself, tantamount to a satisfaction of the applicable obligation." Doc. 245 at 29 n.28. Its relevance here is to foreseeability, not satisfaction.

**3** The regulatory approval of the affiliate-investment strategy and the regulator's praise of Mr. Lindberg's performance remains UNDISPUTED.

**4** The fact that the Ares transaction to purchase the NCICs was defeated after third-party governmental pressure on the buyer remains UNDISPUTED. The Second Supplement does not mention Ares at all. See Doc. 235 ¶¶ 26–27.

**5** The KPMG and Houlihan Lokey findings that the affiliated loans were well secured, with "full coverage" at a conservative loan-to-value, remain UNDISPUTED. The Second Supplement does not mention either firm. See Doc. 235 ¶¶ 12–19.

**6** The robust, written risk-management framework Mr. Lindberg implemented for the affiliated loans remains UNDISPUTED.

**7** That the Commissioner acted on a premeditated plan to dismantle Mr. Lindberg's insurance business — formed before the relevant officials took their posts — remains UNDISPUTED.

**8** That the Rehabilitator rejected the Oaktree transaction, which would have retired the affiliated loans at face value, remains UNDISPUTED. The Second Supplement does not mention Oaktree. See Doc. 235 ¶ 28.

**9** That the Rehabilitator coerced a ten-year hold of the affiliated loans through the June 27, 2019 MOU, under an express written threat of immediate liquidation, remains UNDISPUTED. See Doc. 235 ¶ 30.

10 That the zero-coupon bonds were contractually scheduled to pay $1,006,239,867 at maturity remains UNDISPUTED. The Special Master confirms they were "bank-issued bonds" whose "purported purpose … was to provide protection for the principal amounts of the Affiliate Investments." Doc. 245 at 24.

11 That the diminution in value of Mr. Lindberg's insurance companies was set in motion by a political vendetta remains UNDISPUTED.

12 That the Rehabilitator rejected the Montshire/Alban transaction and sued Mr. Alban to block it — a transaction that would have retired the affiliated loans and allowed the companies to exit rehabilitation and avoid liquidation — remains UNDISPUTED. The Second Supplement mentions neither Montshire nor Mr. Alban. See Doc. 174 ¶ 116.

13 That the Quadro purchase agreement signed in the first quarter of 2024 valued Clanwilliam at $880 million, and the Specified Affiliated Companies in the billions, remains UNDISPUTED. The Second Supplement does not mention Quadro. See Doc. 235 ¶ 32; Doc. 174 ¶ 117.

14 That Quadro valued the group at a 22.14x EBITDA multiple consistent with public-market comparables — a multiple that remains valid and accurate as a comparable today — remains UNDISPUTED. See Doc. 174 ¶ 117; Doc. 132-2 (Ex. I3, GG–Quadro Investor Presentation (Jan. 2024)) at 15 (22.14x transaction multiple).

15 That Mr. Lindberg inherited approximately $129 million of Agera exposure that he did not originate remains UNDISPUTED. The Special Master expressly "does not dispute the Defendant's recitation of the timing (i.e., most of the funds loaned to Agera were transferred before the Defendant acquired either Agera or the corresponding insurance company)." Doc. 245 at 19.

16 That the Rehabilitator's own team valued the NCICs at $454 million weeks after the transfer of control remains UNDISPUTED as a matter of fact; the Special Master says only that he "has not seen convincing evidence" of that value while simultaneously admitting he "has not ventured to look behind the valuation report." Doc. 245 at 18 & n.15.

**17 That KPMG independently appraised the insurance entities as of December 31, 2017 — concluding $380,500,000 for CBL, $57,500,000 for BLIC, $29,000,000 for SNIC and $46,500,000 for SNRC — remains UNDISPUTED and unmentioned. See Doc. 235 ¶¶ 13–15.**

The Special Master's own framing confirms the point: he identifies the dispute as one of "legal conclusion," not fact. On a conceded factual record, those legal conclusions are for this Court — and they favor Mr. Lindberg.

## IV. NO LOSS WAS REASONABLY FORESEEABLE AT ORIGINATION

*Whose burden. Reasonable foreseeability is an element of proximate cause and belongs to the Government. 18 U.S.C. §§ 3663A(a)(2), 3664(e). The Special Master states that foreseeability "is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30. No one, therefore, has made the finding the Government was required to prove, and the Government cannot satisfy its burden by adopting a report whose author disclaims the analysis.*

The undisputed record forecloses a finding that loss was reasonably foreseeable when the affiliated loans were underwritten. The loans operated under a written risk-management framework and suffered zero defaults under Mr. Lindberg's management. He committed more than $1 billion of his own capital, took no dividends, personally guaranteed the obligations in an amount of approximately $2.39 billion, and caused the insurers to purchase $1,006,239,867 in par value of investment-grade bank zero-coupon bonds for the express purpose of protecting the principal of the affiliated loans dollar-for-dollar. The NCDOI approved the strategy, and the Commissioner praised his performance. In 2018, KPMG and Houlihan Lokey confirmed the loans were well secured, with "full coverage" at a loan-to-value in the range of approximately 38.7% to 47.3%. See Doc. 235 ¶¶ 1–3.

The Second Supplement's answer is not evidence but a syllogism: "All loans bear a risk of non-payment," and "an inability to pay is always reasonably foreseeable," even for "the most conservative of business loans" and "even loans that are personally" guarantied. Doc. 245 at 30. If that were the law, the MVRA's foreseeability requirement would do no work in any case involving a loan, and every lender's loss would be foreseeable to every borrower as a matter of definition. Foreseeability under the MVRA is offense-specific: the question is whether this loss was a reasonably foreseeable consequence of the conduct constituting the offense, not whether credit risk exists in the abstract. The Special Master's further suggestion that it was foreseeable

"regulators might dispossess him of control" or that he "might be incarcerated," id. at 30–31, proves too little: what had to be foreseeable is the loss, and the specific intervening decisions that produced it — the refusal of three par-value transactions and the destruction of a guaranteed principal-protection portfolio — were not foreseeable to anyone. See *Stein*, 846 F.3d at 1154–56.

To the extent the Court concludes that foreseeability cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

## V. INTERVENING, SUPERSEDING CAUSES BROKE THE CHAIN OF CAUSATION

> *Whose burden. Proximate causation is the Government's to prove by a preponderance. Issues 14, 16 and 17 — the UKAT refinancing, the CWG sale, and the early bond sales, together approximately $1.125 billion — are resolved in the Second Supplement on the grounds that the Special Master is "not well-situated to second guess" the fiduciaries, "has not seen compelling evidence," and "has not convinced the Special Master." Doc. 245 at 21, 24–25. Each is a burden the Government bore and did not carry.*

Even assuming a loss, it was caused by a chain of intervening acts of independent third parties — the Government, the court-appointed Rehabilitator, and others — each occurring after Mr. Lindberg ceded control on October 18, 2018. A sentencing court "should take into account intervening events contributing to the loss unless those events also were reasonably foreseeable to the defendant," and a restitution order entered without findings on the effect and foreseeability of those events must be vacated. *Stein*, 846 F.3d at 1154–56. The MVRA's legislative history confirms that intervening circumstances limit restitution: restitution reaches only harm "under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995),

reprinted in 1996 U.S.C.C.A.N. 924, 932. The Second Supplement makes none of the required findings; it concedes the facts and declines to review the conduct.

**A. *Robers and Ritchie do not shift this burden to Mr. Lindberg.***

The Special Master's two authorities are directed at a different question. He invokes *Robers* for the proposition that a defendant who transfers non-cash property receives credit upon "the eventual liquidation of the property transferred," Doc. 245 at 15 (citing *Robers*, 572 U.S. at 644–46), and *Ritchie* for the proposition that "the burden of showing that a victim delayed unreasonably in selling property (or otherwise neglected it) belongs with the defendant," id. (quoting *Ritchie*, 858 F.3d at 211). Both concern a victim's passive delay or neglect in liquidating collateral it holds.

That is the opposite of what happened here. The Rehabilitator did not delay in selling; he sold early — affirmatively liquidating, decades before maturity, an instrument whose entire value proposition was payment of par at maturity. Nothing in *Ritchie* assigns to a defendant the burden of disproving an affirmative act of value destruction by the victim's fiduciary, and *Robers* itself recognizes that where a victim "chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." 572 U.S. at 647–48 (Sotomayor, J., concurring). If a victim's inaction can break the chain, a fiduciary's deliberate destruction of a guaranteed recovery breaks it a fortiori. In all events, the ultimate burden on causation remains the Government's under § 3664(e).

**B. *The Ares transaction, defeated by governmental interference (November 2018).***

Mr. Lindberg executed a letter of intent for Ares Management to purchase the NCICs on terms that would have retired the affiliated loans and protected policyholders. After contact with

the Government, Ares cited undisclosed third-party advice to avoid any ongoing connection with Eli Global and abandoned the transaction. Governmental interference with a signed, value-preserving transaction is a cause attributable to the Government, not to Mr. Lindberg. The Second Supplement does not mention Ares. See Doc. 235 ¶¶ 26–27 (executed letter of intent; Eli Global CFO's contemporaneous memorialization of the buyer's stated reason for withdrawing).

**C. *The Rehabilitator's refusal of the Oaktree transaction (February 2019).***

The February 2019 Oaktree proposal contemplated an approximately $1.0 billion investment into a special-purpose vehicle that would have acquired the affiliated-loan positions at face value, removing them from the insurers' balance sheets and paying policyholders in full by mid-2019. The Rehabilitator declined it. That discretionary refusal is an independent, intervening, and superseding cause. The Second Supplement does not mention Oaktree. See Doc. 235 ¶ 28.

**D. *The Rehabilitator's coercion of a ten-year hold (June 27, 2019 MOU).***

Rather than monetize the loans at par, the Rehabilitator presented the MOU on a take-it-or-leave-it basis some forty-eight hours before entry of the rehabilitation order, under an express written threat to "move directly to liquidation." His counsel described the tactic as "hammer and nail." The MOU locked the affiliated loans in place on a ten-year schedule, foreclosing the very monetization the Special Master now faults Mr. Lindberg for failing to achieve. One cannot lock an asset away for ten years, refuse every offer to buy it, and then charge the owner for its decline. See Doc. 235 ¶ 30.

**E. *The pre-maturity sale of the principal-protection bonds ($611.6 million).***

The zero-coupon bonds existed to guarantee $1,006,239,867 of principal protection at maturity. The Rehabilitator sold them early for approximately $394 million — less than forty cents on the dollar — crystallizing a loss of approximately $611.6 million. The Special Master

does not dispute the instruments or their purpose; he offers three responses, none sufficient. See Doc. 235 ¶¶ 7, 31.

First, he says the bonds "were not paying any interest or interim payments" and "would have matured decades after the policyholders' annuities exited the 5- or 7-year surrender period," so the rehabilitator sold "to help meet the companies' financial needs." Doc. 245 at 24. But this statement is patently false; from 2019 through December 2023, the NCICs at all times held over $1 billion of cash and marketable securities in the form of third-party bonds. See Part XV.E, infra. The sale of the zero coupon bonds in 2019 was entirely unnecessary.

Second, he faults Mr. Lindberg for not proving "that the sale price, discounted to present value and to factor in recovery risk (however minute), was unreasonably low." Doc. 245 at 24. That objection is answered on the Special Master's own terms: the relevant comparison is not a discount-rate debate but the contractual certainty the instruments provided. In any event, the burden of establishing loss and causation is the Government's, and Mr. Lindberg cannot supply a bond-by-bond present-value reconstruction while the records remain in others' hands and the subpoenas that would produce them have been refused.

Third, he falls back on the proposition that Mr. Lindberg's own conduct placed the companies into rehabilitation, so he "bears some responsibility" for anything that followed. Doc. 245 at 24–25. "Some responsibility" is not proximate causation, and that reasoning would make a defendant answerable for every discretionary act of every fiduciary for as long as a receivership lasts. The MVRA does not extend that far.

**F. *The refusal of the Montshire/Alban transaction (2023).***

As recently as 2023, Mr. Lindberg negotiated with Montshire Advisors and an investor group formed by Bob Alban to present a purchase agreement to the NCDOI for the NCICs — a

transaction that, like Ares and Oaktree, would have paid policyholders in full, retired the affiliated loans, and allowed the companies to exit rehabilitation and avoid liquidation entirely. The Rehabilitator not only rejected the offer; he sued Mr. Alban to stop it. This transaction alone breaks the chain of proximate causation. The Second Supplement mentions neither Montshire nor Mr. Alban. See Doc. 174 ¶ 116.

**G.** ***The blocking of the Quadro transaction (first quarter 2024).***

In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing Clanwilliam at $880 million and the Specified Affiliated Companies in the billions, at a 22.14x EBITDA multiple consistent with public-market comparables. That transaction was blocked over Mr. Lindberg's objection. Its rejection in the first quarter of 2024 alone breaks the chain of proximate causation, and the 22.14x public-market comparables remain valid and accurate today, placing the group's value well above any restitution figure the Special Master proposes. The Second Supplement does not mention Quadro even once. That silence is significant: the Special Master rests his valuation conclusions on older figures while omitting the most recent arm's-length, signed, public-market-benchmarked valuation in the record. See Doc. 235 ¶ 32; Doc. 174 ¶ 117.

To the extent the Court concludes that the causation questions cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

## VI. THE CONVERGING 2018 VALUATIONS REFUTE THE REPORT'S CONCLUSORY DISMISSAL OF NCIC VALUE

> *Whose burden. The value of the insurance companies goes to the amount of loss, which is the Government's to prove. The Second Supplement answers Issue 11 by saying it "has not seen convincing*

> *evidence that the North Carolina Insurance Companies were worth $454 million in 2018." Doc. 245 at 18. That is a statement about Mr. Lindberg's proof, not about the Government's.*

On the value of the NCICs when control was transferred, the Second Supplement says only that the Special Master "(albeit with the benefit of perfect hindsight vision) has not seen convincing evidence that the North Carolina Insurance Companies were worth $454 million in 2018," Doc. 245 at 18, while admitting in the accompanying footnote:

> *"The Special Master has not ventured to look behind the valuation report to determine what alleged facts or representations upon which the appraiser may have relied or what other assumptions the appraiser may have made." Doc. 245 at 18 n.15.*

A conclusion that evidence is unconvincing, reached expressly without examining it, is not a finding. And the value does not rest on one document. Three independent 2018 data points converge:

- **The KPMG appraisal. KPMG LLP's Economic and Valuation Services practice appraised the equity of Global Bankers Insurance Group's insurance entities as of December 31, 2017, issuing its report on August 24, 2018. KPMG concluded the fair value of a 100% controlling, marketable equity interest in each company: Colorado Bankers Life Insurance Company, $380,500,000; Bankers Life Insurance Company, $57,500,000; Southland National Insurance Corporation, $29,000,000; and Southland National Reinsurance Corporation, $46,500,000 — $467,000,000 for CBL, BLIC and SNIC together, and $513,500,000 including SNRC. The report was prepared as a Restricted Appraisal Report under Standards 202, 8-2 and 10-2 of the Uniform Standards of Professional Appraisal Practice, and KPMG understood that the resulting balance sheet would be "utilized by the North Carolina Department of Insurance to satisfy certain regulatory requirements" relating to Mr. Lindberg's ownership of the companies. The Second Supplement never mentions KPMG. See Doc. 235 ¶¶ 13–15, 18–19.**
- **The Rehabilitator's own internal valuation.** The team under the Rehabilitator's control valued the NCICs at $454 million on November 5, 2018 — eighteen days after the transfer. The Special Master acknowledges this was "a valuation done by the neutral fiduciaries that assumed control." Doc. 245 at 18.

- **The Ares letter of intent.** The executed November 22, 2018 Ares proposal valued the NCICs in the same range on arm's-length, third-party transaction terms. The Second Supplement never mentions it. See Doc. 235 ¶ 26.

One of these comes from a nationally recognized valuation firm, one from the victims' own fiduciaries, and one from the market. Against them the Special Master offers no appraisal, no expert, and an express refusal to examine the record. His observation that the NCIC equity "has no value today," Doc. 245 at 19, confirms rather than answers the point: the question is the value at the moment control passed, before the intervening acts that destroyed it.

## VII. THE SPECIAL MASTER'S OWN VALUATIONS ARE A "CURRENT GUESS," HAVE BEEN CUT BY A THIRD, AND ARE OFFERED UNDER SEAL

> *Whose burden. The value of the assets available to satisfy restitution, like the amount of loss, must be proved — not guessed. The Government offers no valuation of its own and relies on the Special Master's "current guess," Doc. 245 at 37, itself resting on a "desktop exercise," id. at 36. An unproved estimate does not discharge a burden of proof.*

The Second Supplement's treatment of the assets available to satisfy restitution is where the due-process problem is starkest. In the Initial Report, the Special Master estimated the Primary Restitution Assets at $1.162 billion (low), $1.454 billion (mid), and $1.878 billion (high). Doc. 106 at 30. In the Second Supplement, without any independent appraisal, he reduces those figures to:

*Redacted*

That is a reduction of roughly half a billion at the midpoint — approximately thirty-one percent — accomplished in a single chart. The Special Master describes the basis for these numbers in his own words. They are derived from "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC," which "do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise," and which are "subject to change." Doc. 245 at 36 n.31. He characterizes the result as his "current guess." Id. at 36–37. And he proposes to file

the explanation for the reduction under seal, on the ground that disclosure "would negatively impact liquidation efforts." *Id*. at 36 n.32.

Three consequences follow. First, there is no independent, third-party valuation anywhere in the Second Supplement from a nationally recognized firm such as KPMG or Houlihan Lokey. The only valuation input comes from the financial advisors to NHC Holdings, LLC — the entity that holds and disposes of the very assets being valued. Mr. Lindberg, by contrast, has offered only valuations grounded in nationally recognized firms, the fiduciaries' own work, or arm's-length transaction data. See Doc. 235 ¶¶ 12–19.

Second, the effect of holding the restitution figure high while cutting the asset estimate is to manufacture an apparent shortfall. On the Special Master's own numbers, restitution of $1.616 billion now exceeds his midpoint asset estimate of $998 million by more than $600 million. That gap is the predicate a forfeiture theory requires. See 18 U.S.C. § 981; 21 U.S.C. § 853. It is produced by an unreduced restitution figure that ignores some $2.9 billion in offsets on one side,[2] and a self-generated "guess" on the other.

Third, a defendant cannot meaningfully contest a valuation whose underlying analysis he has never seen. Due process requires that a criminal penalty of this magnitude rest on a credible valuation subject to adversarial testing. An officer who generates the restitution figure, generates the only asset estimates in the record, is compensated from the assets in question, and asks this Court to accept a "guess" explained only in camera is not a neutral source for either number. "[N]o man can be a judge in his own case." *In re Murchison*, 349 U.S. 133, 136 (1955). The consequence is not that the Court should commission a better valuation. The consequence is that

2 The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). See note 1, supra, and the revised schedule of offsets, credits and reductions set out in Part IX.

the Government has not proved the loss. The only valuation in the record is the Special Master's own "current guess," Doc. 245 at 37, and the Court may not enter a criminal penalty on a guess. Because the burden of proving the amount of loss by a preponderance is the Government's, 18 U.S.C. § 3664(e), and because that burden cannot be carried by an estimate its author disclaims and files under seal, the recommendation fails as proposed and must be rejected. It is not the Court's task to build the record the Government did not.

To the extent the Court concludes that the value of the restitution assets cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

## VIII. THE RECOMMENDATION MEASURES EXPOSURE, NOT REALIZED LOSS

*Whose burden. That the recommended figure measures outstanding principal rather than realized loss is a defect in the Government's proof of the amount of loss under § 3664(e), not a credit Mr. Lindberg must earn.*

The Special Master responds to Mr. Lindberg's argument that risk is not loss by asserting that his "methodology for calculating restitution in this Case includes no risk, only actual loss," because the figure "includes only sums that the Defendant took from the persons due restitution but has not repaid." Doc. 245 at 32. That answer concedes the premise. A measure of sums taken and not yet repaid is a measure of outstanding loan principal — the same metric the Report elsewhere describes as the amount "extracted" — not a measure of what the victims actually lost. It takes no account of the collateral and principal protection the loans carried, of the guarantee behind them, or of the recoveries the victims in fact received; and it treats the unpaid balance of a secured, insured, and guaranteed obligation as though it were cash simply removed.

The MVRA compensates realized pecuniary loss, not exposure and not disappointed expectations. *Hughey*, 495 U.S. at 413; *Stone*, 866 F.3d at 226. On this record the protected policyholders have been paid: Mr. Lindberg's conduct in 2025 facilitated more than $157 million in distributions to over 43,000 excess policyholders, and he relinquished a $40 million tax escrow to allow it. Restitution measured as unpaid principal, unreduced by the value returned, is a windfall the statute forbids. See Doc. 174 ¶ 120 (December 2025 distribution of more than $157 million to more than 43,000 policyholders).

## IX. MANDATORY OFFSETS AND CREDITS INDEPENDENTLY REDUCE ANY RESTITUTION TO ZERO

> *Whose burden. This Part, and this Part alone, addresses the one burden that is Mr. Lindberg's. Once the Government has proved loss and causation, he must establish entitlement to a particular offset. Karam, 201 F.3d at 327. He does not contest that allocation. He shows below that he has carried it where the Government has not obstructed the proof, that two of these credits were deferred rather than denied on a condition the statute does not contain, and that the one category on which the Report demands more documentation is the category whose documents the Government is withholding.*

Even if loss and causation were established, restitution must be reduced by amounts returned to or recovered by the victims. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); *Robers*, 572 U.S. at 645; *Steele*, 897 F.3d at 611. Mr. Lindberg has documented offsets aggregating approximately $2.89 billion,[3] which if credited yield net restitution of zero. Of that sum, the Second Supplement allows $39 million — approximately 1.3% — and it trims even the items it accepts, reducing the CBL preferred-equity credit from $29.5 million to $26 million, the BLIC credit from $4.2 million to $3 million, and the PBLA credit from $21.9 million to $3 million. Doc. 245 at 12–13.

3 The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). See note 1, supra, and the revised schedule of offsets, credits and reductions set out in Part IX.

The complete schedule of offsets, credits and reductions — updating the summary chart filed at Doc. 132 at 11 and Doc. 132 Ex. 2 for the $866 million loss on the Beckett sale (see note 1, supra) — is set out below. (The Special Master's proposed figure has since become $1,616,175,000. Doc. 245 at 6.)

| **Item (references are to Doc. 132)** | **Amount** | **Ref.** |
|---|---|---|
| Special Master's Proposed Restitution Figure | $1,625,000,000 | — |
| **Improper Additions to Affiliate Investment Balances** | | I. |
| Pre-Judgment Interest | ($263,000,000) | I.A |
| Corrected Starting Balance of Affiliate Investments | ($141,000,000) | I.B |
| **Additional Credits** | | II. |
| AAPC Preferred Equity Par Value as of May 26, 2026 | ($352,906,240) | II.A |
| SNIC Payments | ($27,823,425) | II.B |
| Cash Payments to Pre-Designated Restitution Parties Not Captured by the Special Master | ($79,655,289) | II.C |
| CBL Subordination Fee (Beckett refinancing) | ($3,000,000) | II.D |
| Additional Clanwilliam Sale Proceeds | ($20,000,000) | II.E |
| ULICO Sale of Contributed Real Estate | ($13,596,013) | II.F |
| Sale Proceeds of Zero-Coupon Bonds in PPNs | ($243,452,385) | II.G |
| Value of NCICs as of October 2018 | ($454,000,000) | Exh. 1 |
| Bermuda ICs' Proceeds from Sales of Affiliated Assets | ($9,800,076) | Exh. 1 |
| **Losses Not Proximately Caused by Mr. Lindberg** | | III. |
| Loss on Agera | ($129,398,324) | III. |
| ECL Losses | ($22,288,826) | Exh. 1 |
| Loss on UKAT | ($39,000,000) | Exh. 1 |
| Insurance-Holdco Debt Portion | ($14,897,805) | Exh. 1 |
| Loss on Clanwilliam Below-Market Sale | ($474,000,000) | Exh. 1 |
| Loss on Early Zero Coupon Bond Sales | ($611,600,000) | Exh. 1 |
| Loss on Beckett Sale | ($866,000,000) | Note 1, supra; Exs. 6(a)–6(c) |
| **TOTAL MINIMUM OFFSETS** | **($3,765,418,383)** | |

| | | |
|---|---|---|
| **AND REDUCTIONS** | | |
| **NET RESTITUTION OWED** | **$0** | |

**A. *The ULICO preferred equity ($352,906,240).***

ULICO accepted $25 million and a transfer of AAPC preferred equity in partial satisfaction of its $524 million civil judgment, with an agreed dollar-for-dollar credit; that equity carried a par value of $352,906,240 as of May 26, 2026. The Special Master defers any credit until ULICO "realizes this value," Doc. 245 at 6 n.3, reasoning that ULICO "has not unreasonably refused to liquidate this asset," id. at 15–16. Section 3664(j)(2) contains no realization condition, and the practical result is a double recovery: ULICO retains both the preferred equity and its claim for the full amount. *Steele*, 897 F.3d at 611. If the asset is genuinely unmarketable, that is a consequence of restrictions the victim accepted, not a reason to charge Mr. Lindberg twice. Nor may the Court enter a figure that defers a mandatory credit: 18 U.S.C. § 3664(j)(2) contains no such condition, and a recommendation that withholds credits the statute makes mandatory is contrary to law and must be rejected as proposed — not entered subject to later adjustment.

**B. *The zero-coupon bond proceeds ($243 million) — denied for want of documents the Government withholds.***

The Special Master denies this credit because Mr. Lindberg "has failed to present sufficient documentation to the Special Master to enable the Special Master to appraise … the quantity of any potential reductions." Doc. 245 at 12–13. He denies the $9.4 million Finnazen/Blue Violet credit on the same basis. Id. at 12–13. And he rejects the $141 million starting-balance correction notwithstanding the NCICs' own verified pleadings and pretrial stipulation reciting approximately $1.25 billion.

This is the due-process core of the matter. Mr. Lindberg is in the custody of the Bureau of Prisons. He surrendered control of his companies, together with their books and records, on four

separate occasions beginning in October 2018. The records that would document the zero-coupon proceeds, the affiliated-loan starting balances, and the Finnazen/Blue Violet payments have been in others' hands ever since. Mr. Lindberg sought subpoenas to obtain them, and the Government opposed. The Special Master cannot fairly deny credits for insufficient documentation while the Government blocks access to the documentation, and the Court cannot find a $1.6 billion loss by a preponderance on a record assembled under those conditions. See Doc. 174 ¶¶ 2, 4 (detention and materially constrained access to documents); Doc. 235 ¶ 15 (control of the insurers passed to State administrative supervision on October 18, 2018); Doc. 245 at 11, 13; Doc. 248 (the pending motion for subpoenas duces tecum for those records); Doc. 202 (the pending motion for access to a computer, the internet, and the financial records). That is not a failure of Mr. Lindberg's offset proof; it is a failure of the Government's loss proof and a denial of due process. The Court cannot find the net amount by a preponderance on a record the Government has closed, and the item must be resolved against the party bearing the burden.

**C. *Prejudgment interest ($263 million).***

The Second Supplement adds approximately $263 million in interest, defending it as "necessary to make the victims whole" and noting that the rate is below the contractual and IALA rates and below the applicable federal rate. Doc. 245 at 14–15. Rate moderation is not authority. The component rests on a 2.19% rate — the 30-Day United States Treasury rate from June 27, 2019 through March 31, 2026 — applied to the Affiliate Investment balances as "post-IALA interest" to account for "the time value of money." Doc. 106 at 3–4 & App'x 3 at 8. Interest, if it is recoverable at all, is a component of the amount of loss, and the amount of loss is the Government's to prove. 18 U.S.C. § 3664(e).

As a threshold matter, the MVRA does not include interest among the compensable forms of financial loss recoverable through restitution, and the prosecuting Department's own published policy says the same: it excludes interest as a "financial loss" and states that interest is "not eligible for restitution." The Restitution Process (Fraud and/or Financial Crimes), U.S. Dep't of Justice, Criminal Division, https://www.justice.gov/criminal/criminal-vns/restitution-process (updated Oct. 10, 2023). The Second Supplement neither disputes that the policy exists nor identifies statutory text authorizing the charge.

An award of interest is also contrary to the plain language of the statute. The MVRA requires "offenders to restore property lost by their victims as a result of the crime." *Robers v. United States*, 572 U.S. 639, 640 (2014). It supplies two mechanisms, and only two. The court may order the defendant to "return the property to the owner," 18 U.S.C. § 3663A(b)(1)(A); or, "if return of the property … is impossible, impracticable, or inadequate," it may order payment of "the greater of (I) the value of the property on the date of the [loss]; or (II) the value of the property on the date of sentence," less the value of any part of the property that is returned, id. § 3663A(b)(1)(B). Subsection (b)(1)(A) contains no provision for adding interest where the defendant can return the property taken. Where the property is cash, subsection (b)(1)(A) is the operative provision: as *Robers* explains, if "the 'property' that was 'damage[d],' 'los[t],' or 'destr[oyed]' was the money, then 'the property … returned' must also be the money," and "[m]oney being fungible," the return of an equivalent sum satisfies the statute. 572 U.S. at 643. Subsection (b)(1)(B) addresses the different case of substitute property. What the Pre-Designated Restitution Parties lost was cash — the money taken out of the companies through the Affiliate Investments — and an order directing its return satisfies the MVRA without more.

The decisions permitting prejudgment interest do not bind this Court, and each rests on the subsection that does not apply here. See *United States v. Qurashi*, 634 F.3d 699, 703–04 (2d Cir. 2011); *United States v. Fike*, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). Both proceed from § 3663A(b)(1)(B) and from its premise that a victim's losses may change in value between the date of the loss and the date of sentencing. *Fike*, 140 F.4th at 356; *Qurashi*, 634 F.3d at 703. That premise governs substitute property. It has no work to do where the victim lost cash that the defendant can return.

The Fourth Circuit has not decided this question under the MVRA. The Special Master relies on *United States v. Hoyle*, 33 F.3d 415, 420 (4th Cir. 1994). Doc. 106, App'x 3 at 10. *Hoyle* held that interest excluded from the Guidelines loss calculation could nonetheless be included in a restitution award. But it was decided in 1994, under the Victim and Witness Protection Act and before the MVRA was enacted, and it did not construe § 3663A(b)(1). It therefore does not answer whether the MVRA's return-the-property mechanism permits an interest add-on.

Finally, interest is not part of these victims' actual loss. Criminal restitution "is not concerned with a victim's disappointed expectations but only with his actual loss," and the MVRA "is not the vehicle to obtain what would, in effect, be expectation damages." *United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006); accord *Stone*, 866 F.3d at 226. Nor may restitution "include consequential damages." *United States v. Coats*, 487 B.R. 648, 653 (E.D.N.C. 2013). The $263 million is expectation, not loss: it compensates for the time value of money across the years the insurance companies carried the Affiliate Investments. Including only the principal amount redresses the actual loss caused by the offense without imposing punishment the MVRA does not authorize. The interest component should be struck.

**D. *Losses not proximately caused by the offense.***

The Agera loss (approximately $129 million) arose from exposure Mr. Lindberg inherited and did not originate — as the Special Master concedes on the timing, Doc. 245 at 19 — and from the independent fraud of Agera's chief financial officer. The UKAT loss (approximately $39 million) followed the fiduciaries' refusal of a refinancing. The ECL and Insurance-Holdco items rest on transactions Mr. Lindberg did not direct. None of these losses is "closely related" to the conduct constituting the offense of conviction.

To the extent the Court concludes that the offsets and the net amount of loss cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

**E. THERE WAS NO WAIVER**

The Second Supplement advances waiver at least five times, asserting that Mr. Lindberg waived the new arguments in his supplemental filings (Doc. 245 at 7); waived his objection to the unexplained $30 million increase first appearing in the First Supplement (Doc. 146) (id. at 24–25); waived his complaints about access to counsel and documents (id. at 28); waived his causation and foreseeability arguments "by failing to raise them with the Court prior to sentencing or prior to entry of the Preliminary Restitution Order, by agreeing to the Special Master process, and by pleading guilty to these crimes" (id. at 29–30, 30); and waived his constitutional arguments "by consenting to the special master process … and using his cooperation with the special master process to obtain a reduced sentence," such that it would be "unconscionable" to permit them now (id. at 32–33).

No waiver occurred, on any of these theories. The plea agreement contains no waiver of causation or of the right to contest the amount of restitution; it obliges Mr. Lindberg to pay full restitution without fixing any amount. The operative promise is "[t]o entry of an order for monetary penalties due and payable immediately, such penalties including full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct," including a promise "to pay full restitution to the following insurance companies and their impacted policyholders for the conduct charged in the Bill of Indictment." Plea Agreement ¶ 10(a) (Doc. 40; Ex. 7(a) hereto). No dollar amount appears anywhere in the agreement; the only stipulated figure is the Guidelines loss figure, and the plea provides in the same paragraph that "'loss' under U.S.S.G. §§ 2B1.1 may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Id. ¶ 8(a). The parties jointly agreed to bifurcate sentencing from restitution, and this Court's order contemplates a separate restitution proceeding — which is precisely why these arguments are presented now rather than earlier. A preliminary restitution order is by design provisional and subject to finalization. That construction was pressed before this Court at length in the Memorandum in Support of Mr. Lindberg's Motion to Stay, which argued that "Paragraph 10(a) Is Construed Against the Government as Its Drafter and Does Not Waive the MVRA's Causation Requirement," and that "nothing in ¶ 10(a) purports to displace" the statutory standard, which "remains the Government's to prove, § 3664(e), subject to this Court's de novo review, § 3664(d)(6)." Doc. 173 at 24, 25; see Doc. 172 (Motion to Stay, filed June 9, 2026); Doc. 190 (renewed Motion to Stay, filed June 11, 2026). *Manrique v. United States*, 581 U.S. 116 (2017); *Dolan v. United States*, 560 U.S. 605 (2010). Agreeing to a special-master process to assist the Court is not a waiver of the statutory and constitutional limits on what that process may produce; a defendant

does not forfeit the MVRA's causation requirement by consenting to an orderly procedure for applying it. And pleading guilty establishes the offense — not the amount of loss, which the factual basis leaves open. Doc. 42 (Ex. 7(b) hereto).[4]

Far from waiving anything, Mr. Lindberg has expressly reserved and preserved his rights in every filing: Mr. Lindberg "respectfully reserves all rights to supplement this Response with additional factual information … prior to" the final restitution hearing (Doc. 132 at 25 n.9); the Supplemental Statement of Facts devotes an entire section to "Preservation of Error for Appellate Review" and another to "Reservation of Rights" (Doc. 174 ¶¶ 126–127); and the

---

4 The Factual Basis (Doc. 42, filed Nov. 11, 2024; Ex. 7(b) hereto) stipulates no loss amount and no restitution figure. It recites that it "does not attempt to set forth all of the facts known to the United States at this time," and that "the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the Plea Agreement, that the defendant is in fact guilty of the charges contained in Counts 1 and 13 of the Indictment as alleged, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s) beyond a reasonable doubt." Doc. 42 at 1. Its substantive recitations, in full: "1. Defendant GREG E. LINDBERG ('LINDBERG') held ultimate financial control and interest over multiple insurance companies, dozens of operating companies, and more than one hundred holding and pass-through entities (collectively, 'Affiliated Companies'). One of LINDBERG'S holding companies, Southland National Holdings ('SNH') was the holding company for his North Carolina-based insurance companies, including Colorado Bankers Life Insurance Company ('CBLIC'), Bankers Life Insurance Company ('BLIC'), Southland National Insurance Company ('SNIC'), and Private Bankers Life and Annuity Co., Ltd. ('PBLA'). LINDBERG also owned other insurance companies, including Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; and PB Investment Holdings Ltd. During certain relevant periods, LINDBERG was the Chairman and on the board of his insurance companies and was a director of a Malta-based investment adviser that he owned, Standard Advisory Services Limited ('SASL'), which was registered with the United States Securities and Exchange Commission. 2. Nearly all of PBLA's business was related to a reinsurance agreement it entered into on or about June 30, 2017, with Universal Life Insurance Company ('ULICO'). ULICO was an insurance company with its principal place of business in Puerto Rico. As part of the PBLA-ULICO Reinsurance Agreement, PBLA established a ULICO 2017 Trust (the 'ULICO 2017 Trust') and a separate Comfort Trust Account (the 'ULICO Comfort Trust'). The PBLA-ULICO Reinsurance Agreement set forth numerous requirements governing the types of investments that could be made in the ULICO 2017 Trust and the Comfort Trust and the periodic reporting and certification that PBLA had to make to ULICO concerning the assets in these accounts. 3. From no later than 2016 through at least 2019, LINDBERG and others conspired to commit various offenses against the United States, specifically crimes in connection with insurance business, wire fraud, and investment adviser fraud. LINDBERG also conspired with others to engage in monetary transactions affecting interstate and foreign commerce of more than $10,000, which involved the proceeds of various specified unlawful activities, knowing that the funds involved in the monetary transactions represented the proceeds of some form of unlawful activity. 4. LINDBERG knowingly and willfully joined each conspiracy with an intent to further its objects, i.e., (1) to commit offenses against the United States, specifically violations of 18 U.S.C. §§ 1033, 1343, and 15 U.S.C. §§ 80b-6 and 80b-17; and (2) to engage in monetary transactions in property derived from specified unlawful activities in violation of 18 U.S.C. § 1957. 5. To carry out the conspiracies, LINDBERG and others engaged in circular, non-economic transactions among LINDBERG's web of entities using insurance company funds, and made, and/or caused to be made, various materially false and misleading statements, representations, and half-truths to, and omitted material information from, the North Carolina Department of Insurance, various ratings agencies, ULICO, insurance policyholders, and others regarding these transactions. 6. LINDBERG's conduct caused substantial financial hardship to his insurance companies, to third parties like ULICO, and to policyholders. As a result, certain of LINDBERG's insurance companies were placed in rehabilitation and PBLA was placed into liquidation. 7. In furtherance of the conspiracies, and to accomplish the objects thereof, LINDBERG and his co-conspirators each committed one or more overt acts in the Western District of North Carolina and elsewhere." Doc. 42 at 1–2. Nowhere does the Factual Basis state a loss amount, a restitution amount, or that any particular loss was reasonably foreseeable.

Motion to Dismiss reserves the de novo causation and offset determination and preserves the constitutional questions (Doc. 234 nn.1, 3); the objections to the Special Master's Report were further pressed on the record in Mr. Lindberg's Response to Third Parties' Objections to the Special Master's Report and Recommendation (Doc. 151, filed May 18, 2026); and the causation, offset, and constitutional objections were renewed in the Motion to Stay and its supporting Memorandum (Docs. 172, 173, filed June 9, 2026) and in the renewed Motion to Stay (Doc. 190, filed June 11, 2026). A party who reserves rights in terms in every filing has not waived them, and characterizing that record as waiver does not make it so. Part XIX, infra, states two further express reservations arising from the denial of database and records access.

The procedural history compounds the point. The Order Appointing the Special Master directed him to consult with Mr. Lindberg. He never once spoke with him. His answer is that his team "had repeated discussions with the Defendant's counsel" and that counsel reviewed a draft of the Initial Report, Doc. 245 at 28 — which confirms rather than refutes the point. Mr. Lindberg was given a single day to respond to the final report, from BOP custody, without counsel and without a copy of it; the report was then filed early. The Second Supplement itself records that "the Defendant's counsel would not be able to confer with the Defendant about the positions taken, and relief requested, … before the deadline." Doc. 245 at 44. A defendant who was never consulted, never given the documents, and never given time cannot be said to have waived what he had no opportunity to raise.

## XI. THE REHABILITATION PLAN WAS NEVER A LIQUIDATION PLAN

The Second Supplement asserts repeatedly that "the Defendant's own actions caused the North Carolina Insurance Companies to be placed into rehabilitation and then liquidation." Doc. 245 at 19; see id. at 21–22, 24–25. That conflates two different events. The June 2019 consent

order placed the companies into rehabilitation, not liquidation, and rehabilitation contemplated their emergence. Liquidation came later, and it came because every value-preserving alternative was refused: Ares in 2018, Oaktree in 2019, Montshire/Alban in 2023, and Quadro in 2024. Mr. Lindberg litigated for years against liquidation and continued proposing transactions that would have allowed the companies to exit rehabilitation and avoid liquidation entirely. Restitution cannot rest on the proposition that a defendant caused an outcome he spent six years and four transactions attempting to prevent.

## XII. COMPLEXITY MUST BE RESOLVED IN MR. LINDBERG'S FAVOR

Finally, if the Court concludes that the causation and offset questions cannot be resolved on this record, that conclusion favors Mr. Lindberg. The MVRA permits the Court to decline restitution where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). The Special Master's own submission illustrates the difficulty: he concedes the facts, disclaims the foreseeability inquiry, abstains from reviewing the fiduciaries' decisions, and values the assets by "guess." Because the plea agreement fixed no amount, Plea Agreement ¶ 10(a) (Doc. 40; Ex. 7(a) hereto) — leaving open that the amount could be zero — any irreducible complexity must be resolved against the party bearing the burden, which is the Government.

## XIII. THE SECOND SUPPLEMENT FAILS THE MVRA'S REQUIREMENT OF AN ACCOUNTING OF THE RESTITUTION AMOUNT

Separate from the defects in causation and offset analysis addressed above, the Second Supplement suffers from a more elementary failure: after eighteen months of work, and after the relevant books and records were out of Mr. Lindberg's control for more than seven years, the

Special Master has never produced an accounting of the restitution amount he asks this Court to impose. The MVRA does not treat an accounting as an administrative courtesy. It makes the accounting the predicate for everything that follows, and its absence deprives the Court of the means to make the findings § 3664(e) requires.

***A. The statute makes an accounting the predicate for the Court's determination.***

The MVRA's architecture is sequential. Section 3664(a) directs that the Court be provided a report containing "to the extent practicable, a complete accounting of the losses to each victim." Section 3664(d)(5) contemplates the Court setting a date for "the final determination of the victim's losses." Section 3664(e) commits "[a]ny dispute as to the proper amount or type of restitution" to resolution "by the court by the preponderance of the evidence." Section 3664(d)(6) confines a special master to "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." Section 3664(f)(1)(A) requires an order in the full amount of each victim's losses, and § 3664(o) makes the resulting order a final judgment. Only upon entry of judgment do the collection mechanisms attach. 18 U.S.C. § 3613(c); id. § 3664(m)(1)(A).

The order is not optional: accounting precedes determination, determination precedes judgment, and judgment precedes collection. A recommendation unsupported by an accounting asks this Court to perform the second step without the first. Because a federal court has no inherent power to order restitution and must act within "the procedural and substantive protections of the statute authorizing restitution," *United States v. Freeman*, 741 F.3d 426, 431 (4th Cir. 2014), a restitution figure fixed without the accounting the statute presupposes is fixed outside the statute — and an order "that exceeds the authority of the statutory source is no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v.*

*Davis*, 714 F.3d 809, 812 (4th Cir. 2013) (quoting *Broughton-Jones*, 71 F.3d at 1147). That consequence is not theoretical, because MVRA restitution "is plainly criminal punishment." *Ellingburg v. United States*, 607 U.S. 163, 166 (2026).

### *B. No accounting of any component of the recommendation has ever been produced.*

The Special Master and the Rehabilitator have controlled the books and records of the North Carolina insurance companies since October 2018, and of New Hold Co, LLC and its subsidiaries since October 2024. In that time they have produced nothing that would allow this Court, the parties, or an independent reviewer to test the restitution figure, the asset values, or the disposition of proceeds. The gaps are specific, and together they are total:

- **No accounting of the restitution calculation.** There is no accounting showing how the recommended figure was derived. The Preliminary Order fixed $1.655 billion — $30 million above the Special Master's own $1.625 billion recommendation — and the Second Supplement now recommends $1.616 billion. Doc. 245 at 44. None of these figures is accompanied by a reconciliation the Court could audit, and each embeds approximately $263 million of interest selected over objection and contrary to the Department of Justice's own policy that interest is not eligible for restitution.
- **No reconciliation of the affiliated-loan payoffs.** The affiliated-loan account records have been under the Rehabilitator's control since October 2018, and the payoffs of those loans have never been reconciled. Those payoffs bear directly on the principal balance underlying the entire recommendation — a balance the Defendant has shown is overstated by at least $141 million, and which the Second Supplement declines to correct. Doc. 245 at 6, 15.
- **No accounting of the Beckett proceeds.** The Beckett asset was worth around $1 billion — as reflected in the Cabrillo valuation and the Blackstone negotiations, see note 7, supra — and was sold to Collectors in December 2025 for just $134 million. Defendant's counsel learned of the sale orally, in a weekly meeting. No accounting of the proceeds has ever been provided, and it remains undisclosed whether they were applied to restitution, to administrative expenses, to the Special Master's professionals, or otherwise. The Second Supplement does not supply that accounting; it says only that the sale occurred with the consent of NHC Holdings, LLC. Doc. 245 at 31 & n.29.
- **No financial statements or board reports.** Despite repeated requests, no income statements, balance sheets, cash-flow statements, or board reports have been produced for

any Primary Restitution Asset or any Specified Affiliated Company — the very records required to value those assets and to test the assertions the Report makes about them.

- **No supporting asset valuations.** No appraisal, valuation report, or workpaper supports any figure in the Report. What is offered instead is a self-generated range, now revised downward to $826 million / $998 million / $1.231 billion, which the Special Master describes as his "current guess." Doc. 245 at 36–37. See Part XIV, infra.
- **No accounting of the offsets.** The Special Master has never accounted for, or substantively answered, the approximately $2.89 billion in offsets and credits the Defendant has documented.[5] The Second Supplement allows $39 million of that sum — about 1.3% — and disposes of the remainder by disallowance, deferral, or a statement that documentation is insufficient. Doc. 245 at 6, 11, 13, 44.

### *C. Without an accounting, the mandatory credits cannot be computed and the no-windfall rule cannot be honored.*

The accounting requirement is not formalism; it is the mechanism by which the statute's mandatory credits are given effect. Restitution must be reduced by amounts the victims have recovered for the same loss. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); *Robers v. United States*, 572 U.S. 639, 645 (2014); *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018). A defendant is entitled to an offset for amounts victims recovered in related civil proceedings. *United States v. Ritchie*, 858 F.3d 201, 215–16 (4th Cir. 2017). And the MVRA "does not allow a court to grant a windfall to the victim." *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017). The Order Appointing the Special Master says the same thing, directing that restitution "should be reduced by any amount victims have recovered for the same losses." Doc. 56 at 6 n.2.

None of those commands can be applied on this record. Whether a victim has been made whole, whether a recovery duplicates a claimed loss, and whether the proceeds of a sale were credited against restitution or consumed by administrative expense are all questions that require an accounting of what was sold, what was collected, and where the money went. The Clanwilliam

5 The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). See note 1, supra, and the revised schedule of offsets, credits and reductions set out in Part IX.

disposition illustrates the problem: of roughly $318 million in estimated net proceeds, $23,520,710 was distributed to an entity the Special Master conceded he "is unsure" is a victim at all, and a $14,112,426 administrative reserve generated no credit to the Defendant — all under a formula the Special Master acknowledged "almost certainly will deviate" from the apportionment this Court will ultimately approve. Doc. 66 ¶¶ 20(d)(i), 24, 26 n.8. A distribution the Special Master himself expects to be wrong, made from proceeds never accounted for, cannot support a finding by a preponderance of the evidence.

### *D. The Report's promise to track credits in the future is not a substitute for the accounting now.*

The Second Supplement's answer to the absence of an accounting is deferral. The two largest credits are "Disallow[ed] at this Time," to be revisited "if and when ULICO realizes this value" and "if and when the escrow balance becomes available." Doc. 245 at 6 & nn.3–4. As to the assets, the Special Master proposes that the Defendant "receive credits reducing his restitution obligations as those assets generate recoveries for victims, which would be tracked and reported to the Court by the Special Master over time." Id. at 37. That structure inverts the statute. Section 3664(e) requires the amount to be resolved now, by this Court, on a preponderance of the evidence; it does not authorize entry of a $1.616 billion judgment against an unaudited estimate with the reconciliation to follow at the discretion of the officer who generated the estimate. A defendant subjected to criminal punishment is entitled to know, and to contest, the arithmetic of that punishment before it is imposed — not after his assets have been sold to satisfy it.

The absence of an accounting is not an invitation for the Court to order one and then impose restitution. The statute places the accounting obligation on the moving side, 18 U.S.C. § 3664(a), and § 3664(e) requires the amount to be proved to the Court, not assembled by the

Court. No accounting exists. The Court cannot find a $1.616 billion loss by a preponderance on a record that contains no reconciliation of a single component, and it should decline to do so.

## XIV. THE SPECIAL MASTER'S PURPORTED VALUATIONS MEET NONE OF THE STANDARDS FOR VALUATION EVIDENCE IN FEDERAL COURT

Part VII describes what the Second Supplement's valuations are: a self-generated range, cut by roughly a third without explanation, which the Special Master calls his "current guess." This Part addresses what they are not — evidence on which a federal court may rest a finding of fact. Measured against any standard federal courts apply to valuation proof, the Report's figures fail; and the valuations the Defendant has offered satisfy those standards in every particular.

### *A. The governing standard is reliability, and it is not satisfied by assertion.*

The Federal Rules of Evidence do not apply at sentencing. Fed. R. Evid. 1101(d)(3). But that latitude has never meant that a sentencing court may find facts on unreliable information. The Court may consider information "without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Section 3664(e) independently requires that disputed restitution amounts be resolved by a preponderance of the evidence — a standard that presupposes evidence. And due process forbids fixing criminal punishment on figures that cannot be examined or tested.

The same standards govern the restitution determination specifically. The MVRA provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and places "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense … on the attorney for the Government." 18 U.S.C. § 3664(e). The breadth of the information a sentencing court may receive, see 18 U.S.C. § 3661 ("[n]o limitation shall be placed on the information concerning the

background, character, and conduct" of the defendant that the court "may receive and consider"), has never diluted the requirement that what the court relies on be accurate and reliable: a sentence may not rest on "misinformation of constitutional magnitude," *United States v. Tucker*, 404 U.S. 443, 447 (1972), or on assumptions that are "materially untrue," *Townsend v. Burke*, 334 U.S. 736, 741 (1948). The preponderance standard "generally satisfies due process" at sentencing, *United States v. Watts*, 519 U.S. 148, 156 (1997) (per curiam), but it presupposes record evidence that can be weighed: the Guidelines direct that disputed facts be established by information bearing "sufficient indicia of reliability to support its probable accuracy," U.S.S.G. § 6A1.3(a), and the accompanying commentary instructs that "[u]nreliable allegations shall not be considered." U.S.S.G. § 6A1.3 cmt. An unexplained "current guess," produced by an interested source and insulated from testing, does not meet any of these standards.

Where the disputed fact is the value of a business, federal courts look for the same markers of reliability whether the question arises under Rule 702 or under the sentencing standard: an identified and qualified valuator; a disclosed and recognized methodology, such as a market, income, or asset approach; sufficient underlying data; and a result the opposing party and the court can test. Expert opinion is admissible only if it rests on "sufficient facts or data" and "reliable principles and methods" reliably applied, Fed. R. Evid. 702, and that reliability inquiry applies to all specialized opinion, not merely scientific testimony, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); see *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Most directly on point here, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Congress has embodied the same instinct in the statutes governing judicial sales, requiring that realty sold

under order of a federal court be appraised in advance by three disinterested persons, and permitting confirmation only where the price bears a reasonable relation to the appraised value; personalty is governed by the same provisions. 28 U.S.C. §§ 2001, 2004.

### *B. The Report's valuations fail every one of those markers.*

Applied here, the analysis is short, because the Special Master disqualifies his own figures. By his own description, the estimates rest on "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC," and those analyses:

> *"do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise employing discounted cash flow methodologies, comparable transaction analyses, and the financial projections provided by portfolio company management. ... Estimated values are subject to change and actual results may materially vary." Doc. 245 at 36 n.31.*

He then characterizes the output as his "current guess." Doc. 245 at 36–37. Taking those admissions at face value, the Report's valuations are: not a formal valuation; not a fairness opinion; the product of a "desktop exercise"; built on projections supplied by the management of the companies being valued; and subject to change. No valuator is identified. No report, appraisal, or workpaper has been produced. No methodology is disclosed beyond the generic naming of two techniques. No underlying data has been made available. No one has been offered for examination. And the explanation for the roughly thirty-one percent reduction from the Initial Report's range is to be filed under seal, Doc. 245 at 36 & n.32 — meaning the one document that might permit testing of the figure is the one document the Defendant may not see. A number connected to the record by nothing but its author's say-so is the paradigm of ipse dixit. *Joiner*, 522 U.S. at 146. It is not evidence, and it cannot carry a finding by a preponderance.

### C. *The valuations come from an interested source, which compounds rather than cures the problem.*

Reliability also depends on the source. Due process forbids an adjudicator from having "a direct, personal, substantial pecuniary interest" in the matter, *Tumey v. Ohio*, 273 U.S. 510, 523 (1927), and a master is held to the disqualification standard applicable to judges, Fed. R. Civ. P. 53(a)(2) (incorporating 28 U.S.C. § 455). The test is objective and exists to protect "public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). The oldest formulation remains the plainest: "no man can be a judge in his own case." *In re Murchison*, 349 U.S. 133, 136 (1955).

The Special Master generated the restitution figure. He generated the only asset valuations in the record. His professionals are compensated from the assets he administers and disposes of. He sits on the board of New Hold Co, LLC, the entity that holds and sells the operating companies. And twelve days before sentencing he presented the Defendant with a "Consent, Waiver, and Acknowledgement" whose operative clauses would have released, and covenanted not to sue, a beneficiary class expressly including the Special Master himself, then advised the Court four days before sentencing that he "expects that Defendant will execute" it. Doc. 159 at 3, 5. Figures generated by an officer so situated, and withheld from inspection, do not acquire reliability by virtue of his office.

### D. *The valuations the Defendant has offered are of precisely the kind federal courts credit.*

The contrast is not between two contested appraisals. It is between an unexamined estimate and the categories of proof courts treat as most probative of value:

- **A signed, arm's-length purchase agreement.** In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the Specified Affiliated Companies at approximately $3.4 billion and Clanwilliam alone at approximately $880 million, at a 22.14x EBITDA multiple consistent with public-market

comparables. A contemporaneous arm's-length transaction in the very assets at issue is the best evidence of their value. The Second Supplement does not mention it. See Doc. 235 ¶ 32; Doc. 174 ¶ 117.

- **Valuations by nationally recognized firms, prepared to professional standards. KPMG LLP appraised the insurance entities as of December 31, 2017 and issued a written report on August 24, 2018 — a Restricted Appraisal Report under USPAP Standards 202, 8-2 and 10-2, consistent with AICPA Summary Report guidelines, prepared under an engagement letter, signed by an identified valuation professional, stating its methodology, its reliance on audited and unaudited financial statements, and its limiting conditions. It concluded fair values of $380,500,000 for CBL, $57,500,000 for BLIC, $29,000,000 for SNIC and $46,500,000 for SNRC. Houlihan Lokey separately valued AAPC at 20x EBITDA, approximately $3 billion on projected 2026 EBITDA of $150 million. These are the hallmarks of reliable valuation evidence — a named and qualified valuator, a disclosed and recognized methodology, identified data, and a written report capable of being tested. Neither firm is mentioned in the Second Supplement. See Doc. 235 ¶¶ 13–17.**
- **The victims' own fiduciaries' valuation.** The team under the Rehabilitator's control valued the NCICs at $454 million on November 5, 2018, eighteen days after the transfer of control. The Special Master declines to "look behind" it while declining to credit it. Doc. 245 at 18 & n.15.
- **An executed letter of intent.** The November 22, 2018 Ares letter of intent valued the NCICs in the same range on arm's-length terms. Not mentioned in the Second Supplement. See Doc. 235 ¶ 26.

Taken together, the assets transferred into the control of the Rehabilitator and the Special Master — the Specified Affiliated Companies at approximately $3.4 billion in October 2024, and AAPC at approximately $3 billion in February 2025 — represented on the order of $6.4 billion in value, carrying billions of dollars in asset value in excess of liabilities. Against that record, an unsourced "guess" of $998 million at the midpoint is not a competing valuation. It is an assertion that the contemporaneous market, two nationally recognized firms, and the victims' own fiduciaries were all wrong, offered without a report, a methodology, or a witness.

### *E. A defendant may not be charged for value destroyed after he lost control of the assets.*

To the extent the present estimates are accurate, they measure what the assets became in the hands of others, not what they were worth when the Defendant surrendered them. Clanwilliam was sold in September 2025 for approximately $450 million, against the $880 million Quadro valuation signed months earlier — a gap of roughly $430 million. Beckett was worth around $1 billion and was sold for just $134 million, with no accounting of the proceeds.[6] Loss attributable to holding or disposing of an asset after the offense is not loss caused by the offense. *United States v. Tyler*, 767 F.2d 1350, 1352 (9th Cir. 1985); see *Robers*, 572 U.S. at 647–48 (Sotomayor, J., concurring) (a victim's independent decisions regarding collateral can break the chain of causation). Whichever explanation accounts for the gap between $6.4 billion and $998 million — inaccuracy in the estimate, or value destroyed after the transfer of control — neither supports charging the difference to the Defendant. See Doc. 174 ¶¶ 94, 100; Doc. 234 at 38.

### *F. The consequence of a one-directional valuation is a manufactured shortfall.*

The direction of the errors is uniform. The restitution figure is held high — inflated by approximately $263 million of interest and unreduced by approximately $2.89 billion in

6 Beckett was valued at approximately $1 billion in the contemporaneous appraisal and market evidence. See Cabrillo Advisors, Valuation of Arcane Tinmen, Beckett, CBCS and Southern Hobby (valuation date Jan. 31, 2022; prepared Apr. 7, 2022) (Ex. 2 hereto), concluding a fair market enterprise value for Beckett Collectibles, LLC of $1,003,924,000 (equity value approximately $1,005.9 million); Blackstone Tactical Opportunities, "CCG + Beckett, Blackstone Proposal" term sheet (Apr. 14, 2022) (Ex. 3(a) hereto), transmitted by e-mail from Brian Cornyn of Blackstone to Justin Holbrook and Sophie Turrell of Global Growth (Apr. 16, 2022) (Ex. 3(b) hereto), proposing an acquisition of Beckett at an enterprise value of $800 to $900 million (27.5x–30.9x 2021 adjusted EBITDA) and projecting, in Blackstone's own analysis, "Beckett Proceeds by 2022E" of $941 million to $1,065 million on a full secondary sale; Letter from Global Growth Holdings, Inc. to Blackstone (Apr. 5, 2022) (Ex. 4 hereto), countering Blackstone's April 2, 2022 non-binding indication of interest at a Global Growth-proposed total enterprise valuation of $1.05 billion; Letter from Global Growth Holdings, Inc. to Blackstone (Apr. 18, 2022) (Ex. 5 hereto), countering Blackstone's April 16, 2022 proposal at a Global Growth-proposed total enterprise valuation of $1,100 million (equity value approximately $1,044 million). Every contemporaneous market data point — an independent USPAP appraisal at $1.004 billion, an acquisition proposal from the world's largest alternative asset manager at $800 to $900 million with a modeled path above $1 billion, and counter-valuations of $1.05 to $1.1 billion in an active negotiation — exceeds the $134 million sale price by a factor of six or more.

documented offsets[7] — while the asset estimate is pushed down, from a $1.454 billion midpoint in the Initial Report to an approximately Redated midpoint now. Doc. 106 at 30; Doc. 245 at 36. The result is that recommended restitution of $1.616 billion exceeds the Special Master's own midpoint estimate of the available assets by more than $600 million. That gap is the predicate a forfeiture theory requires. See 18 U.S.C. § 981; 21 U.S.C. § 853. A shortfall produced by an unaudited restitution figure on one side and an unsourced valuation on the other is not a finding of fact; and a penalty measured against a figure untethered from proximately caused loss raises a further constitutional problem. See *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The Court should decline to adopt valuations that no federal court would receive as evidence, and should decline to treat the resulting gap as established.

## XV. KEY FACTS THE SECOND SUPPLEMENT DOES NOT AND CANNOT DISPUTE

The following facts are established in the record, are not contradicted by any evidence in the Second Supplement, and are individually dispositive of the items to which they relate. They are collected here because each disposes of a specific component of the recommended figure.

### *A. It remains undisputed that the Department of Justice's own policy does not permit interest to be charged to a defendant in a restitution case.*

The Special Master adds approximately $263 million in prejudgment interest to the restitution figure. Doc. 245 at 6 (Issue 1, "Disallow"). The Department of Justice's own published guidance on the restitution process in fraud and financial-crime cases states that interest is not eligible for restitution. That policy is a matter of public record, it was placed squarely before the Special Master, and the Second Supplement does not dispute that it exists or that it says what the Defendant says it says. Doc. 245 at 14–15. The Special Master's entire

7 The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). See note 1, supra, and the revised schedule of offsets, credits and reductions set out in Part IX.

response is that interest "may be an appropriate component of restitution" on the authorities cited in his First Supplement (Doc. 146, filed May 15, 2026), and that the rate he selected is lower than the contractual rate, lower than the IALA rate, and lower than the applicable federal rate. Id.

A favorable comparison among rates is not authority for charging interest at all. The MVRA does not enumerate interest as a component of a victim's loss, and restitution restores what was taken rather than the time value of a bargain. *Robers v. United States*, 572 U.S. 639, 643 (2014); *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017); *United States v. Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006); *United States v. Coats*, 487 B.R. 648 (E.D.N.C. 2013). When the prosecuting Department's own policy states that interest is not recoverable, and the Special Master neither disputes the policy nor identifies statutory text authorizing the charge, the $263 million component cannot stand.

### *B. The $141 million opening-balance correction is denied on a record the Government itself has made unavailable.*

The recommendation rests on a starting principal balance of the affiliate investments that the Defendant has shown is overstated by approximately $141 million. The Special Master disallows the correction, explaining that although he "presumes the IALA's figures are correct generally," he "is not beholden to blindly follow the IALA." Doc. 245 at 6, 15. He offers no accounting and no competing reconciliation.

The records that would resolve the question are not in the Defendant's possession and have not been for years. Mr. Lindberg surrendered control of his companies — together with their books and records — on four separate occasions beginning in October 2018, and the affiliated-loan account records have been under the control of the Rehabilitator and, later, the Special Master ever since. He sought subpoenas to obtain those records, and the Government opposed them. The result is a closed circle: the Defendant is told his correction is insufficiently

documented, while the Government blocks his access to the only documents that could supply the documentation, and the fiduciaries who hold them have produced no reconciliation of their own. That is not a permissible basis for a finding by a preponderance of the evidence under 18 U.S.C. § 3664(e), and it is not consistent with due process. The point is reinforced by the fact that the North Carolina insurance companies' own verified pleadings and the parties' pretrial stipulation recite a balance of approximately $1.25 billion — the figure the Defendant asks the Court to use. See Doc. 174 ¶¶ 2, 4; Doc. 245 at 11, 13; Doc. 248; Doc. 202.

### *C. ULICO agreed in December 2022 to accept the AAPC preferred equity as a dollar-for-dollar credit, and cannot now insist on cash.*

In December 2022, ULICO and Mr. Lindberg settled ULICO's $524 million civil judgment, entered in *Universal Life Insurance Co. v. Lindberg*, No. 1:20-cv-861 (M.D.N.C.). Under that agreement ULICO accepted $25 million in cash and a transfer of AAPC preferred equity, and it agreed that the preferred equity would apply as a dollar-for-dollar credit against the amounts owed. The preferred equity carries an 18% payment-in-kind rate; its original par was $218 million, and its par value stood at $352,906,240 as of May 26, 2026. Those facts are undisputed, and the Special Master lists the same $352,906,240 figure in his own table. Doc. 245 at 6 (Issue 3). See Doc. 132 at 13–14 (quoting the settlement agreement, Meyer Decl. Exhs. 3-E at 2 (“dollar-for-dollar credit”) & 3-F); Doc. 234 at 46 (offsets table). The agreement's terms are explicit. Under the ULICO Confidential Side Settlement Agreement (Dec. 19, 2022), Mr. Lindberg is to receive a “dollar-for-dollar credit” against the balance owing on the Middle District judgment for the value transferred, the transfer constituting “a payment towards the satisfaction and/or to pay down the Middle District Judgment.” Side Settlement Agreement at 2, attached in full as Exhibit A to Doc. 132-1; see Doc. 132-1 ¶¶ 64–65. The Amendment to the Confidential Side Settlement Agreement (Dec. 30, 2022) confirms the mechanics: “Upon the

consummation of such transfer to the Reinsurance Trust, Lindberg shall receive at minimum, a credit of USD$25,000,000 and the balance owing on the Middle District Judgment shall be reduced by a like amount," with that credit "adjusted" upward on, among other things, "[a] market valuation of the rights in the Preferred Units transferred" or "[a] dollar-for-dollar credit of any repurchase of the rights in the Preferred Units … for an amount no less than $218,000,000 plus 8% interest." Amendment at 2–3, attached in full as Exhibit B to Doc. 132-1 (Doc. 132-1 at 58–61).

The MVRA requires that the credit be given. Restitution "shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in … any Federal civil proceeding." 18 U.S.C. § 3664(j)(2)(A); see also id. § 3663A(b)(1)(B) (credit for property returned). The Fourth Circuit applies that command directly, holding that a defendant is entitled to an offset for amounts victims recovered in related civil proceedings. *United States v. Ritchie*, 858 F.3d 201, 215–16 (4th Cir. 2017); accord *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018). ULICO's recovery occurred in a federal civil proceeding, for the same loss, on terms ULICO itself negotiated and accepted.

The Special Master's answer is to defer the credit — "Disallow at this Time," with a credit only "if and when ULICO realizes this value," on the reasoning that ULICO "has not unreasonably refused to liquidate this asset." Doc. 245 at 6 n.3, 15–16. That reasoning cannot be reconciled with the parties' agreement. ULICO did not agree to accept the cash proceeds of the preferred equity if and when it chose to sell; it agreed to accept the preferred equity itself, valued dollar-for-dollar, in partial satisfaction of its judgment. A victim that has contracted for how an asset will be valued against its claim cannot later demand that the same claim be satisfied a second time in cash. The consequence of the Special Master's approach is precisely the double

recovery the MVRA forbids: ULICO keeps the preferred equity and collects the full amount again as restitution. *Stone*, 866 F.3d at 226.

### *D. The Special Master refuses to credit more than $130 million in cash payments on theories found nowhere in the MVRA.*

The Defendant documented $133,874,803 in cash payments and cash proceeds actually received by the persons due restitution: $27,823,425 in SNIC reimbursements (Issue 4); $79,655,289 in preferred-equity payments not captured (Issue 5); the $3,000,000 CBL subordination fee (Issue 6); $13,596,013 from ULICO's sale of contributed real estate (Issue 8); and $9,800,076 from the Bermuda insurance companies' sale of affiliated assets (Issue 9). Doc. 245 at 6. Of that sum the Special Master allows $39 million and refuses the balance. Id. at 12–13, 44. Additional cash items are refused outright, including a $5 million redemption fee paid to CBL and $9.4 million paid to CBL and ULICO in connection with the Finnazen/Blue Violet sale. Id. at 12–13. See Doc. 234 at 46 (offsets table).

The stated grounds are that the Defendant "received new consideration in exchange" for the payments (Issues 4 and 6); that the victims "had previously purchased [their] interest … for value" (Issues 8 and 9); that some payments were "made toward non-IALA loans and double-counting" (Issue 5); and that documentation is unsatisfactory (Finnazen/Blue Violet). Doc. 245 at 13, 16–18. None of these theories appears in the MVRA. The statute directs that restitution be reduced by amounts paid to a victim for the same loss, 18 U.S.C. § 3664(j)(2), and by the value of property returned, id. § 3663A(b)(1)(B); it does not condition a credit on the defendant having received no consideration, nor on the victim not having previously paid value for the asset it later sold. Tellingly, each time the Second Supplement invokes the statute for these theories it does so with a "Cf." signal — an acknowledgment that § 3664(j)(2) does not directly support the

proposition. Doc. 245 at 16, 17, 18. Cash that reached a victim reduced that victim's loss, and the MVRA requires that it be credited.

### *E. The zero-coupon bonds were not sold to meet any liquidity need, and the Rehabilitator's own reports identify a different problem.*

The Special Master justifies the pre-maturity sale of the principal-protection bonds on the ground that they paid no interim interest, would have matured "decades after the policyholders' annuities exited the 5- or 7-year surrender period," and that the rehabilitator "decided to sell the bonds to help meet the companies' financial needs." Doc. 245 at 24. The Rehabilitator's own quarterly reports to the Wake County Superior Court do not bear that rationale out.

Counting only cash, cash equivalents, short-term investments and marketable third-party bonds, the North Carolina insurance companies held over $1 billion at every year end from 2019 through December 2023:

| Year end | Cash, equivalents and short-term investments | Third-party bonds | Cash and third-party bonds |
|---|---|---|---|
| 12/31/2019 † | $153,343,457 | $1,749,798,603 * | $1,903,142,060 |
| 12/31/2020 † | $125,394,471 | $1,492,619,772 * | $1,618,014,243 |
| 12/31/2021 ‡ | $157,090,817 | $1,252,941,555 * | $1,410,032,372 |
| 12/31/2022 ‡ | $144,726,039 | $1,159,632,192 | $1,304,358,231 |
| 12/31/2023 | $239,846,733 | $843,524,280 | $1,083,371,013 |

*Combined balances of the North Carolina insurance companies. Source: statutory Annual Statements, Assets lines 1 and 5, as filed with the Rehabilitator's and Receiver's Quarterly Reports, Causey v. Southland National Insurance Corp., No. 19 CVS 8664 (N.C. Super. Ct., Wake County) (report cover pages and ASSETS pages excerpted at Ex. 1 hereto, parts 1(a) (4Q2019) through 1(e) (4Q2023)). Third-party bonds exclude affiliated holdings. * The statements for 2019–2021 do not segregate affiliated bonds; the figures shown deduct the $824,720,289 of affiliated bonds the regulator first segregated as non-admitted in the June 30, 2022 statement. † Excludes Bankers Life, whose statements for these years have not yet been extracted. ‡ Excludes Bankers Life and Southland National. The excluded companies' balances would only increase the totals shown. The Rehabilitator's and Receiver's quarterly reports are publicly available at cblife.com/quarterly-rehabilitation-reports.*

For 2022 and 2023 the segregation of affiliated bonds appears on the face of the statements, so those totals are established without inference. For 2019 through 2021 the figures conservatively deduct the affiliated bonds the regulator later segregated, and several rows omit companies whose statements have not yet been extracted — so the true combined totals for those years are higher than the table shows. On any view, from 2019 through December 2023 the North Carolina

insurance companies at all times held over $1 billion of cash and marketable securities in the form of third-party bonds.

There was no reason for the NCICs to sell the zero coupon bonds in 2019 when, for over four years after that sale, the NCICs had over $1 billion of cash and marketable securities in the form of third-party bonds. The sale was the discretionary act of fiduciaries who did not need the cash; it was taken over a year after Mr. Lindberg surrendered control; and the $611.6 million loss it crystallized cannot be charged to him. See Doc. 235 ¶¶ 7, 31; Ex. 1 hereto.

The bottom line is straightforward. The bonds were contractually scheduled to pay $1,006,239,867 at maturity. They were sold for approximately $394 million, crystallizing a loss of approximately $611.6 million. Even accepting that the companies wanted cash, destroying a guaranteed billion-dollar recovery was not the only way to obtain it — the Ares and Oaktree transactions would each have retired the affiliated loans at or near par, and each was refused. A liquidity need that could have been satisfied without sacrificing $611.6 million in contractual value does not make that sacrifice a consequence of Mr. Lindberg's offense. The decision was made by fiduciaries exercising their own judgment, over a year after Mr. Lindberg had surrendered control, and its cost cannot be charged to him. See Doc. 235 ¶ 31.

### ***F. It remains undisputed that the Agera exposure was inherited from ULICO's prior reinsurer and that the loss was not caused by Mr. Lindberg.***

In June 2017 Mr. Lindberg acquired the Bermuda reinsurance portfolio that became PBLA-ULICO. ULICO required any buyer of that portfolio to assume its existing Agera exposure, which stood at approximately $129 million as of the June 30, 2017 purchase and reinsurance treaty. The investment had been originated by the prior reinsurer, not by Mr. Lindberg, and Agera later collapsed following the discovery of fraud by Agera's independent chief financial officer. The Special Master does not dispute any of this. He states expressly that

he "does not dispute the Defendant's recitation of the timing (i.e., most of the funds loaned to Agera were transferred before the Defendant acquired either Agera or the corresponding insurance company)." Doc. 245 at 19. See Doc. 235 ¶ 4; Doc. 174 ¶¶ 51–55.

His contrary conclusion rests not on causation but on benefit: that Agera was "critical to the Defendant being able to acquire Omnia and PBIHL," and that he "obtained a substantial economic benefit from those loans, which was part and parcel with his scheme, even if Defendant was not the one to pull the trigger on originating all of the loans." Doc. 245 at 19–20. That reasoning does not satisfy the MVRA. The question is not whether the Defendant benefited from an acquisition; it is whether the offense of conviction directly and proximately caused the loss. 18 U.S.C. § 3663A(a)(2); *Hughey v. United States*, 495 U.S. 411, 413 (1990). A loss on an asset the Defendant inherited as a condition of a transaction, which was originated by someone else, and which failed because of a third party's fraud, was caused by those events and not by him. This fact alone requires that Mr. Lindberg receive a credit and offset for the $129 million in Agera exposure his Bermuda insurance company inherited from ULICO's prior reinsurer.

### ***G. It remains undisputed that Clanwilliam was worth more than $800 million on the only contemporaneous market evidence, and that the Quadro comparables are higher today than in 2024.***

In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing Clanwilliam at approximately $880 million, priced at a 22.14x EBITDA multiple drawn from public-market comparables. That valuation is undisputed. The Second Supplement does not mention Quadro anywhere in its forty-six pages, and it offers no competing appraisal of Clanwilliam. See Doc. 235 ¶ 32; Doc. 174 ¶ 117; Doc. 132-2 (Ex. I3, GG–Quadro Investor Presentation (Jan. 2024)) at 15 (22.14x transaction multiple).

Two consequences follow. First, a signed, arm's-length purchase agreement executed in 2024 is the most accurate and most comparable measure of Clanwilliam's value available in this record — considerably more probative than an unexamined internal estimate, and more probative than the older figures on which the Special Master relies without disclosing that Quadro exists. Second, it remains undisputed that the public-market comparables used to price the Quadro transaction are higher today than they were in 2024. The $880 million figure is therefore, if anything, a conservative valuation of Clanwilliam. Clanwilliam ultimately realized approximately $450 million. Whatever explains that difference, the Defendant's restitution obligation cannot be computed as though the higher value never existed, and the Special Master's silence on Quadro cannot convert a documented 2024 market valuation into a fact the Court may disregard. See Doc. 235 ¶¶ 32, 34.

## XVI. THE GOVERNING CAUSATION STANDARD IS THE FOURTH CIRCUIT'S, IT IS BINDING, AND THE SECOND SUPPLEMENT APPLIES IT IN ONE DIRECTION ONLY

The Court's de novo determination under 18 U.S.C. § 3664(d)(6) is governed by binding causation law, and the Fourth Circuit has already articulated that law in this restitution matter.

### *A. The controlling standard, stated by the Fourth Circuit in this very proceeding.*

On June 13, 2026 — five weeks before the Second Supplement was filed — the Fourth Circuit decided the mandamus petition brought in this docket by the insolvency practitioners of Nederlandsche Algemeene Maatschappij Van Levensverzekering “Conservatrix” N.V., a claimant that appeared and responded in this proceeding. *In re Zetteler*, No. 26-1749, 2026 WL 1724731 (4th Cir. June 13, 2026, amended June 15, 2026) (per curiam) (unpublished); see Doc. 130. The petitioners asked the court to vacate the preliminary restitution order and to direct entry of a revised order naming Conservatrix a victim and awarding it €215,356,806. The court denied

the petition, and in doing so it stated the test that governs who may recover restitution for this offense:

> "Direct harm to a victim, giving rise to an entitlement to restitution under the CVRA, requires the harm to be 'closely related to the conduct inherent to the offense, rather than merely tangentially linked.'" *In re Zetteler*, slip op. at 4–5 (quoting *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010)).

*In re Zetteler*, No. 26-1749, 2026 WL 1724731, at *2 (4th Cir. June 13, 2026) (per curiam) (quoting *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010)). Because that formulation comes from the same court, in the same case, applying the same restitution framework, it is the standard against which the recommendation must be measured; the Court would have to announce a different causation test for the same proceeding to sustain the $1.616 billion figure.

Applying that test, the court held that the petitioners "fail[ed] to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct": they had "described Lindberg's failure to replenish the company's capital and to maintain its SCR as agreed," but did "not identify facts closely tying those failures to Lindberg's criminal activities." Slip op. at 4–5. "Without more," the court concluded, "we cannot find the district court to have abused its discretion in excluding Conservatrix from its restitution order and judgment," and the petition was denied. Slip op. at 5. The claim the court turned away was concrete and enormous: the petitioners asserted that "Lindberg's criminal conspiracy forced the company into bankruptcy, resulting in losses to the company and its policyholders of more than $200 million," slip op. at 4; they held a judgment against Mr. Lindberg from the Dutch Arbitration Institute "for over $166 million related to his failure to fulfill the terms of his agreement," slip op. at 3; and, as Judge King described it, what the panel decided was "potential restitution owed by defendant Lindberg to Conservatrix totalling approximately € 215,000,000." Slip op. at 8 (King, J., concurring in part and dissenting in part). A concrete, contractual, nine-figure loss — resting on commitments Mr.

Lindberg personally signed — was held insufficient because the connection between that loss and the conduct inherent to the offense was not closely drawn.

The opinion also records the standard the Special Master himself applied when he excluded Conservatrix: the company's loss did not qualify because it "was not due to Lindberg's 'self-serving investment activities, the crux of the harm outlined in the Indictment,'" and because the misrepresentations at issue did not go to "masking [Lindberg's] affiliated investments or asset management strategies." Slip op. at 3. That is the Report's own definition of the compensable harm in this case, recited by the court of appeals. The decision is unpublished and is not binding precedent; but it is the Fourth Circuit's ruling in this restitution proceeding, on this record, applying the very framework the Special Master constructed.

### ***B. Zetteler does not stand alone — it states, in this case, what binding Supreme Court and Fourth Circuit authority already command.***

*Zetteler* is an unpublished disposition arising under the CVRA's victim definition, 18 U.S.C. § 3771(e)(2)(A), but that definition is materially identical to the MVRA's, 18 U.S.C. § 3663A(a)(2), and *Zetteler* drew its phrasing from *McNulty*, a restitution case — so the standard travels. And it is anchored in binding authority. The MVRA authorizes restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990). Proximate cause limits liability to the defendant's "own conduct, not the conduct of others." *Paroline v. United States*, 572 U.S. 434, 462 (2014). The MVRA "has a proximate cause requirement," and superseding causes break the chain. *Robers v. United States*, 572 U.S. 639, 645 (2014). The Government must prove that the offense "directly and proximately caused the harm." *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017). And harm bearing "no more than a tangential connection" to the offense conduct is not compensable, because that connection "is legally irrelevant for the purpose of restitution."

*United States v. Freeman*, 741 F.3d 426, 434–37 (4th Cir. 2014). *Zetteler* is the this-case gloss on that binding authority; it is led with, not leaned on alone.

### *C. The § 3663A(a)(2) scheme clause converges on the same limit and cannot enlarge the award.*

The Government may invoke the scheme clause of § 3663A(a)(2) — reaching a person "directly harmed by the defendant's criminal conduct in the course of the scheme" — to argue for scheme-wide victims and losses. That argument fails on its own text, because the scheme clause and *Zetteler* converge: each ties recovery to the defendant's own criminal conduct. Section 3663A(a)(2) reaches only harm caused "by the defendant's criminal conduct in the course of the scheme," and *Zetteler* requires harm "closely related to the conduct inherent to the offense." Under both, the Rehabilitator's independent, post-relinquishment decisions — the early sale of the principal-protection bonds, the refusals of Ares, Oaktree, Montshire/Alban, and Quadro, and the hold-and-sell losses realized years after June 27, 2019 — are the conduct of others, not conduct of Mr. Lindberg's "in the course of the scheme." They fail the scheme clause and the closely-related test alike.

### *D. The MVRA's committee notes confirm the limitation.*

This reading is the one Congress intended. The committee notes confine restitution to harm "under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The same report authorizes the court to decline restitution where determining complex issues of fact related to the cause or amount of a victim's losses would complicate or prolong the sentencing process — the provision now codified at 18 U.S.C. § 3663A(c)(3)(B). S. Rep. No. 104-179, at 18–20, 1996 U.S.C.C.A.N. at 931–33. And the procedure the committee designed is the one invoked here: a special master submits "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the

issue by the court." Id. (committee substitute § 105), reprinted in 1996 U.S.C.C.A.N. 924. A recommendation whose author concedes the facts, disclaims foreseeability, and abstains from evaluating the intervening acts is the paradigm case the committee had in mind.

### *E. The record convergence: the master's own criteria state the same proximate-cause test.*

The proponents of the award supply the standard that defeats it. The Final Order of Restitution recognizes a payee only where diverted assets "actually lost value as a proximate result of Defendant's activities," or where an insured "actually suffered damages as a proximate result of Defendant's fraudulent activities." Final Order of Restitution (Doc. 245-1) at 6; accord Doc. 106 at 8 (stating the same criteria as the Special Master's Definition of a covered insurance company and insured). That is the same proximate-cause test *Zetteler* applies — recited by the Special Master and adopted as the gate through which any claimant must pass.

### *F. The Report cites the decision for its result, never for its standard — and cites almost nothing else.*

The Second Supplement cites the decision once, for its result: "The Fourth Circuit appears to agree with the Special Master's reasoning in its order denying Conservatrix's petition for writ of mandamus." Doc. 245 at 35. The Report takes the endorsement and leaves the standard. The CVRA's victim definition — "a person directly and proximately harmed as a result of the commission of a Federal offense," 18 U.S.C. § 3771(e)(2)(A) — is materially identical to the MVRA's, 18 U.S.C. § 3663A(a)(2), so the standard the court applied travels with the statute the Report administers. Yet nowhere in its forty-six pages does the Report ask the question the Fourth Circuit asked of Conservatrix — whether each loss it recommends is "closely related to the conduct inherent to the offense, rather than merely tangentially linked" — and its author expressly declines to make the findings that question requires. Doc. 245 at 19, 21–22, 25, 30; Parts I.B–I.C, supra. Nor is the deficit limited to this one decision. Across forty-six pages the

Report cites two cases — *Robers* and *Ritchie*, both at page 15, and both invoked to move a burden onto Mr. Lindberg — together with a passing reference to *Karam*. It does not cite *Hughey v. United States*, 495 U.S. 411 (1990), *Lagos v. United States*, 584 U.S. 577 (2018), *Paroline v. United States*, 572 U.S. 434 (2014), *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017), or *Ellingburg v. United States*, 607 U.S. 163 (2026). A recommendation that never engages the controlling causation authority cannot establish the causation the MVRA requires, and its author expressly declines to supply the missing findings. See Doc. 245 at 19, 21–22, 25, 30; Parts I.B–I.C, supra.

### *G. Applied evenhandedly, the standard turns away the $1.616 billion figure.*

The standard is applied in one direction only. Measured by it, Conservatrix — a €215,356,806 claim resting on capital-maintenance commitments Mr. Lindberg personally signed — was excluded as not "closely related" to the offense, and Vista was excluded for the absence of the same proximate nexus. Final Order of Restitution (Doc. 245-1) at 6; *Zetteler*, 2026 WL 1724731, at *1–2. Yet the recommendation imposes $1.616 billion built on the full outstanding principal of the Affiliate Investments, a figure that sweeps in losses the same test excludes:

- the approximately $129 million Agera exposure Mr. Lindberg inherited and did not originate (conceded as to timing, Doc. 245 at 19);
- the approximately $611.6 million crystallized by the Rehabilitator's pre-maturity sale of the principal-protection bonds, more than a year after Mr. Lindberg surrendered control; and
- the value lost when the Rehabilitator refused or blocked the Ares, Oaktree, Montshire/Alban, and Quadro transactions. Parts IV–V, supra.

If a nine-figure loss flowing from Mr. Lindberg's own signed commitments is "merely tangentially linked" to this offense, then losses realized through third parties' discretionary decisions years later cannot be "closely related" to it. A single causation standard must govern

every claimant in this proceeding. The Report never explains how both propositions can be true, because it never applies the test to its own figure. Applied to the recommendation as it was applied to Conservatrix, the standard reduces the proximately caused loss — and, once the mandatory offsets are credited, the award — to zero.

The Special Master's own criterion compounds the problem. He excluded Conservatrix because its loss was not caused by the "self-serving investment activities" that are "the crux of the harm outlined in the Indictment." Yet the Report makes no finding that the losses it does recommend were caused by those activities: the affiliated loans the offense concealed were found by KPMG and Houlihan Lokey to be fully covered, Parts VI and XV, supra, and every component of the recommended figure crystallized in the rehabilitation, under the Rehabilitator's control. A single causation standard must govern every claimant in this proceeding. A recommendation that applies the closely-related test to turn away one claimant, and never applies it to the $1.616 billion it proposes, has not made the determination the MVRA requires and cannot survive the de novo review § 3664(d)(6) commands.

### *H. Preservation of objections.*

Mr. Lindberg objects to the Second Supplement's failure to apply this binding causation standard, and expressly preserves for de novo determination and appellate review each of the following: (1) that the Government has not proved, by a preponderance, that the offenses of conviction directly and proximately caused the recommended loss, 18 U.S.C. § 3664(e); (2) that the recommendation reaches losses caused by intervening, superseding acts of third parties and by inherited exposure, contrary to *Paroline*, *Robers*, *Freeman*, and *Zetteler*; (3) that the scheme clause of § 3663A(a)(2) cannot be read to reach harm not caused by Mr. Lindberg's own conduct; and (4) that the mandatory credits and offsets under §§ 3663A(b)(1)(B) and 3664(j)(2)

independently reduce any award to zero. These objections are made in addition to, and without waiver of, the objections and reservations stated in Parts I–XV and XIX and in Docs. 132, 174, and 234. No silence compelled by the denial of records and database access, and no participation in the special-master process, effects a waiver of any of them.

## XVII. THE FACTS THAT WOULD SUPPORT ANY RESTITUTION AWARD MUST BE FOUND BY A JURY BEYOND A REASONABLE DOUBT (PRESERVED)

Mr. Lindberg raises this Part to preserve the issue. He recognizes that it is presently foreclosed in this Circuit, and he does not ask the Court to disregard binding precedent. He asks only that the objection be noted and preserved for appellate review.

The premise is no longer open to argument. Restitution under the MVRA is criminal punishment: it is "plainly criminal punishment," part of the defendant's sentence, and a penalty predicated on a criminal conviction. *Ellingburg v. United States*, 607 U.S. 163, 166 (2026). The Sixth Amendment therefore has work to do here. Under *Apprendi v. New Jersey*, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). And *Southern Union Co. v. United States* extends that rule to monetary penalties, precluding "judicial factfinding that enlarges the maximum punishment a defendant faces beyond what the jury's verdict or the defendant's admissions allow." 567 U.S. 343 (2012).

Applied here, the facts that would support any restitution award — that the offenses of conviction directly and proximately caused each claimed loss, and in what amount — were neither found by a jury nor admitted by Mr. Lindberg. The plea agreement fixes no amount, and the factual basis stipulates none: the words "restitution," "loss," and "amount" appear nowhere in it. Doc. 40 ¶ 10(a); Doc. 42. Those facts were instead developed by a special master, tested

against whether Mr. Lindberg had "convinced the Special Master," and are now proposed for adoption on a preponderance standard. That is judicial — indeed, delegated — factfinding that enlarges a criminal penalty beyond what the verdict or the admissions allow.

The Fourth Circuit has held otherwise, and Mr. Lindberg acknowledges it. In *United States v. Day*, the court held that because "there is no prescribed statutory maximum in the restitution context," the "rule of *Apprendi* is simply not implicated to begin with by a trial court's entry of restitution." 700 F.3d 713, 732 (4th Cir. 2012). Mr. Lindberg respectfully submits that *Day* should be revisited in light of *Ellingburg*. The MVRA does prescribe a maximum: it authorizes restitution only in the amount of the loss directly and proximately caused by the offense of conviction, 18 U.S.C. § 3663A(a)(2), (b)(1), and it authorizes nothing where no such loss is proved. The baseline is zero, and every dollar above zero depends on findings of fact. A ceiling defined by proof is still a ceiling.

The anomaly is worth stating plainly. A civil defendant facing a monetary penalty for conduct resembling a common-law claim is entitled to a jury. *SEC v. Jarkesy*, 603 U.S. 109 (2024). It would be an odd constitutional order in which a criminal defendant, facing a $1.616 billion penalty that the Supreme Court has now confirmed is punishment, received less. Mr. Lindberg preserves the objection: any facts on which a restitution award rests must be found by a jury beyond a reasonable doubt, and no such findings exist here.

## XVIII. SCHEDULE OF THE REPORT'S DEPARTURES FROM THE MVRA STATUTE, CASE LAW, AND LEGISLATIVE COMMITTEE NOTES

The departures identified in Parts I through XVI are not isolated. Set out below, in schedule form, is the complete list of respects in which the Second Supplement is contrary to the

MVRA, the case law construing it, and the statute's legislative history. Each entry is supported by the filed text of Doc. 245.

1 **The Report disclaims making the foreseeability finding the MVRA requires.** "That it was reasonably foreseeable to the Defendant that his conduct could be harmful is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30. Foreseeability is an element of MVRA proximate cause, not an optional inquiry. 18 U.S.C. § 3663A(a)(2); *Hughey v. United States*, 495 U.S. 411 (1990). A report that declines to prove it cannot support a foreseeable-loss finding.

2 **The Report abstains from reviewing the intervening conduct that determines causation.** Three times: "the Special Master is not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment (to the extent doing so falls within the Special Master's duties)." Doc. 245 at 19, 21–22, 25. It also places the public-corruption issues "outside the scope," id. at 31, and whether a crime occurred outside the "assignment," id. at 29 n.28. Under *Stein* and *Robers* the intervening acts must be evaluated, not avoided.

3 **The Report applies standards found nowhere in the MVRA.** It asks whether Mr. Lindberg has "convinced the Special Master" (five times: Doc. 245 at 19, 22, 22, 24, 25), whether he offered "compelling evidence" (at 21, 24), "convincing evidence" (at 18), whether an act would "definitively cause" a decline (at 19), and whether he "raise[d] a genuine issue of material fact" (at 31). Five times it finds only that he "bears some responsibility" (at 19, 21–22, 24–25). The statutory test is preponderance, 18 U.S.C. § 3664(e), and the decisionmaker is the Court de novo, § 3664(d)(6).

4 **The Report inverts the Government's burden on loss and causation — § 3664(e).** Section 3664(e) places "[t]he burden of demonstrating the amount of the loss" on the Government. The Report presents no new evidence, exhibit, affidavit, or testimony, and frames every conclusion as the Defendant's failure of proof. (Note for precision: *Karam*, 201 F.3d at 327 — which the Report cites at 32 — does place the burden on a defendant claiming a particular offset. The burden-inversion argument should therefore be pressed on loss, foreseeability, and causation, and paired on the offsets with the denied-subpoena due-process point.)

5 **The Report substitutes generic credit risk for offense-specific foreseeability.** "All loans bear a risk of non-payment"; "an inability to pay is always reasonably foreseeable," even for "the most conservative of business loans" and "even loans that are personally guarantied." Doc. 245 at 30. That reasoning would erase the MVRA's foreseeability limit in every loan case. Foreseeability must be tied to the conduct constituting the offense.

6 **The Report makes no findings on intervening or superseding causes — *Stein*; *Robers*.** A restitution order entered without findings on the effect and foreseeability of intervening events must be vacated. *United States v. Stein*, 846 F.3d 1135, 1154–56 (11th Cir. 2017); see *Robers v. United States*, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring). The Report cites neither and makes no such findings.

7 **The Report misapplies *Robers* and *Ritchie* to shift the burden.** It cites *Robers*, 572 U.S. at 644–46, and *Ritchie*, 858 F.3d at 211 ("the burden of showing that a victim delayed unreasonably in selling property … belongs with the defendant"). Doc. 245 at 15. Both address a victim's passive delay or neglect in liquidating collateral. Here the fiduciary acted affirmatively, selling a par-payable instrument decades early. Neither case assigns the defendant the burden of disproving affirmative value destruction by the victim's fiduciary.

8 **The Report treats "some responsibility" as proximate causation.** Five times it concludes only that the Defendant "bears some responsibility for any diminution in value that occurred during the rehabilitation and liquidation processes." Doc. 245 at 19, 22, 25, 28. The MVRA requires that the loss be directly and proximately caused by the offense; partial or attenuated responsibility for a receivership's later decisions is not that. *Lagos v. United States*, 584 U.S. 577 (2018).

9 **The Report adds prejudgment interest contrary to the statute and DOJ policy — $263M.** Doc. 245 at 14–15 defends interest as "necessary to make the victims whole" and notes the rate is below the contractual, IALA, and applicable federal rates. Rate moderation is not authority. The MVRA does not enumerate interest, and DOJ policy states interest is not eligible for restitution. *Robers*, 572 U.S. at 643; *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017); *United States v. Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006); *United States v. Coats*, 487 B.R. 648 (E.D.N.C. 2013). Reliance on *United States v. Hoyle*, 33 F.3d 415 (4th Cir. 1994), is misplaced (pre-MVRA). See note 4, supra.

10 **The Report invents an atextual realization condition on mandatory credits.** Issues 3 and 7 are "Disallow at this Time," with credit only "if and when ULICO realizes this value" and "if and when the escrow balance becomes available." Doc. 245 at 6 & nn.3–4. Section 3664(j)(2) contains no such condition, and deferral produces the double recovery the statute forbids. *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018).

11 **The Report denies credits for missing documentation the Government prevents the Defendant from obtaining.** The zeros credit is denied because the Defendant "has failed to present sufficient documentation," Doc. 245 at 12–13, and the $9.4M Finnazen/Blue Violet credit on the same basis, id. at 13. Mr. Lindberg is in BOP custody and surrendered his companies' books four times; the subpoenas needed to obtain these records were opposed. Denying credits on that record violates due process and cannot satisfy § 3664(e).

12 **The Report measures exposure rather than realized loss.** It asserts the methodology "includes no risk, only actual loss," because it counts "only sums that the Defendant took

from the persons due restitution but has not repaid." Doc. 245 at 32. Unpaid principal on secured, insured, and guaranteed obligations is exposure, not the victims' realized pecuniary loss. *Hughey*, 495 U.S. at 413; *Stone*, 866 F.3d at 226.

13 **The Report rests a criminal penalty on a self-generated valuation it calls a "current guess."** The Special Master cuts his asset estimate from $1,162M/$1,454M/$1,878M (Doc. 106 at 30) to Redacted (Doc. 245 at 36), based on "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC" that "do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise," id. at 36 n.31, and describes the result as his "current guess," id. at 36–37 — proposing to explain the reduction only under seal, id. at 36 n.32. Due process requires a credible, testable valuation.

14 **The Report manufactures waiver with no statutory basis.** Waiver is asserted at Doc. 245 at 7, 24–25, 28, 29–30, 30, and 32–33, including "by agreeing to the Special Master process" and "by pleading guilty," and that invoking constitutional limits would be "unconscionable." No MVRA provision creates such a waiver; the agreed bifurcation contemplates a later restitution proceeding; a preliminary order is provisional, *Manrique v. United States*, 581 U.S. 116 (2017); *Dolan v. United States*, 560 U.S. 605 (2010); and the Defendant reserved rights in every filing.

15 **The Report refuses to resolve complexity in the Defendant's favor — § 3663A(c)(3)(B).** Where complex causation issues would complicate sentencing, the Court may decline restitution. The Report resolves every complexity against the Defendant while itself declining to analyze causation.

16 **The Report is untethered from the MVRA's text, committee notes, and case law.** In 46 pages it cites two cases (*Robers* and *Ritchie*, both at 15) plus *Karam* (at 32). It cites no MVRA causation authority — no *Hughey*, *Lagos*, *Paroline*, *Stein*, or *Ellingburg* — and does not engage the committee notes, S. Rep. No. 104-179, at 19–20 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932–33, or DOJ restitution policy. The ignored committee notes confine restitution to harm "under the count or counts for which the offender is convicted" S. Rep. No. 104-179, at 19.

17 **The recommendation and the Preliminary Order exceed statutory authority — *Davis*.** The Preliminary Order fixed $1.655B; the Initial Report recommended $1.625B; the Second Supplement now recommends $1.616B. Doc. 245 at 44. A restitution order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013) (quoting *Broughton-Jones*, 71 F.3d at 1147).

18 **The Report converts a promise of "full restitution" into an agreed amount it never was.** The factual basis stipulates no loss or restitution amount. An agreement to pay full restitution is not a stipulation that the amount is $1.6 billion, or anything above zero. *Hughey*, 495 U.S. at 413. The plea obliges payment of "full restitution, regardless of the

resulting loss amount," while stipulating that Guidelines "loss" "may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Plea Agreement ¶¶ 8(a), 10(a) (Doc. 40; Ex. 7(a) hereto).

## XIX. RESERVATION OF RIGHTS TO SUPPLEMENT THIS RESPONSE

Two independent impediments, neither of Mr. Lindberg's making, have restricted his ability to assemble the evidentiary record supporting the credits and offsets set out above. As to each, Mr. Lindberg expressly reserves his rights.

### *A. Lack of online database access, and the access order that remains unsigned.*

Since April 1, 2026, Mr. Lindberg has been unable to access any online databases required to produce evidence supporting the motions for credits and offsets. That inability has been a material impediment to collecting evidence and to responding timely to the Second Supplement. An order that would facilitate that access has been submitted to the Court and remains pending; it has not been granted. Mr. Lindberg therefore reserves all rights to supplement this Response at a future time when the databases can be accessed. See Doc. 202 (Emergency Motion to Enforce the Plea Agreement and to Preserve Due-Process and Counsel-Access Rights) (June 15, 2026) (seeking daily access to counsel and to "a computer, the internet, spreadsheet software, his financial records"); the proposed order submitted on that motion (July 7, 2026) remains unsigned; Doc. 174 ¶¶ 2, 4 (detention and materially constrained access to documents).

### *B. The Government's refusal of the access requested in the Motion for Subpoenas.*

Mr. Lindberg gave up control of the books and records of his companies on four occasions beginning in October 2018, and he has had no access to those books and records for years. The Government has refused him that access by objecting to the Motion for Subpoenas. Mr. Lindberg reserves all rights to supplement this Response when that access is granted, because the information sought will provide additional evidence supporting the offsets and

credits due under the MVRA. See Doc. 248 (Def.'s Motion for Issuance of Subpoenas Duces Tecum to the Rehabilitator, the Special Master and NHC Holdings, LLC, Paladin Management, the NCICs, the Bermuda insurance companies, and counsel to the NCICs) (July 23, 2026); id. at 2 ("Defendant retained neither the companies nor their records"); Parts IX.B and XV.B, supra; Doc. 235 ¶ 15.

These reservations are of a piece with the reservations already of record, Doc. 132 at 25 n.9; Doc. 132-1 ¶ 86 (reserving the right to supplement "upon restoration of access"); Doc. 174 ¶¶ 125–126; Doc. 234 nn.1, 3, and with Part X, supra: silence forced by lack of access is not waiver, and a restitution figure entered while the Defendant is barred from the very records that would disprove it cannot satisfy 18 U.S.C. § 3664(e).

This reservation preserves Mr. Lindberg's rights; it does not concede that the record may be reopened so that the Government may cure a burden it has already failed to carry. The denial Mr. Lindberg seeks rests on the present record. The reservation protects his position should the Court nonetheless proceed; it is not a request that the Court hold the proceeding open so the recommendation can be repaired.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Mr. Lindberg respectfully requests that the Court decline to adopt the Second Supplement and enter an order: (1) determining, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by the offense of conviction, and fixing restitution at zero; (2) in the alternative, excluding from restitution the intervening-cause losses identified above; (3) crediting all offsets required by 18 U.S.C. §§ 3663A(b)(1)(B) and 3664(j)(2); (4) declining to adopt the Second Supplement because the deficiencies in proof identified above cannot be cured on this record, and because determining

the cause and amount of loss on this record would complicate and prolong the proceeding to a degree that the need to provide restitution is outweighed by the burden on the sentencing process, 18 U.S.C. § 3663A(c)(3)(B); (5) declining to consider any sealed valuation material not disclosed to Mr. Lindberg; and (6) granting such other and further relief as is just. Mr. Lindberg expressly reserves and preserves all rights, objections, and arguments, including the right to supplement this Response before any final restitution hearing.

Respectfully submitted, this _____ day of ____________, 2026.

___________________________________

**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
*Counsel for Defendant Greg E. Lindberg*

## CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Based on the Standing Order of this Court, In re: Use of Artificial intelligence dated July 29, 2026, there is no AI certification attached to this filing.

______________________________
KENNETH BARNES

## CONSULTATION STATEMENT

Undersigned counsel consulted with counsel for the Government and with counsel for the Special Master concerning extending the deadline for responding to the report.

Respectfully submitted, this____ day of ___________, 2026.

______________________________
KENNETH BARNES

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including counsel for the United States and counsel for the Special Master.

This the ____ day of __________, 2026.

______________________________
KENNETH BARNES

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

Greg E. Lindberg v. AAPC Holdings, LLC and American Academy Holdings, LLC
Case No. 2:26-cv-__________

# EXHIBIT I

Defendant's Response to the United States' Consolidated Position (Doc. 308), Doc. 316 (Aug. 18, 2026)

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S RESPONSE IN OPPOSITION TO THE UNITED STATES' CONSOLIDATED POSITION REGARDING RESTITUTION (DOC. 308)**

**INTRODUCTION**

Defendant Greg E. Lindberg respectfully submits this Response in opposition to the United States' Consolidated Position Regarding Restitution Issues Remaining Before the Court (Doc. 308). The Government asks the Court to "conduct a de novo review" and then to enter a final order "substantially similar to that proposed by the Special Master." Doc. 308 at 1. Those two requests are in tension. A de novo determination requires the Court to find the facts itself, on the Government's own evidence, under the standard 18 U.S.C. § 3664(e) prescribes — not to adopt the recommendations of the officer who liquidated the estate and is paid from it. The Government offers no independent proof of loss or causation. It supplies a chart of conclusions, a plea-agreement waiver theory, an affidavit from the Special Master/Receiver's own controlled entity, and a request that the Court ratify a $1.655 billion figure it declines to defend on the merits. For the reasons below, the Court should decline to adopt the Report, set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order (Doc.

245-1), and resolve the disputed issues itself after the accounting and hearing the statute requires. This Response is supported by the accompanying Affidavit of Greg E. Lindberg (Def. Ex. 1, Tab A).

The Government's demand fails at the threshold, for a reason that controls the rest: it has not proven — and its plea agreement does not excuse it from proving — that Mr. Lindberg's offense caused the losses it seeks to impose. The Government treats his agreement to pay restitution to persons "directly or indirectly harmed" as a waiver of causation itself. The Fourth Circuit has squarely rejected that use of this very language. In *United States v. Squirrel*, 588 F.3d 207 (4th Cir. 2009), the defendants' pleas promised "full restitution, regardless of the resulting loss amount," to "all victims directly or indirectly harmed by the defendant's 'relevant conduct'" — the same "directly or indirectly harmed" formulation the Government invokes here, and broader still — and the court held that those paragraphs "do not provide a valid basis" for restitution absent proximate cause, vacating the award. *Id.* at 216, 218. "Indirectly harmed" does not remove the causal chain to the defendant's criminal conduct; it does not sever that chain, and it does not convert every diminution in a court-controlled estate — including the losses caused by the Government's, the Rehabilitator's, and the Special Master/Receiver's own intervening, post-indictment decisions — into the defendant's to bear. Because the Government has proved no causal link between the offense of conviction and those losses, and the plea supplies none, the $1.655 billion figure cannot stand.

## ARGUMENT

### I. Adoption of the Special Master/Receiver's Report is not the de novo determination § 3664(e) and § 3664(d)(6) require, and does not carry the Government's burden.

Section 3664(d)(6) permits a reference only for "proposed findings of fact and recommendations … subject to a de novo determination of the issue by the court." The de novo determination is the Court's to make, and § 3664(e) places the burden of proving "the amount of the loss sustained by a victim as a result of the offense" on "the attorney for the Government." The Government does not carry that burden by asking the Court to adopt the Special Master/Receiver's numbers. Adoption is not proof. Restitution is limited to the loss caused by the offense of conviction, *Hughey v. United States*, 495 U.S. 411 (1990), and a restitution order may not grant a victim a windfall, *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017). Where, as here, the Government offers the report of a conflicted officer in place of its own evidence, it has not met § 3664(e), and the Court cannot make the independent determination the statute commands on that record. A report produced by an officer who should be disqualified "may not be submitted to the district court or otherwise disseminated in any manner," *In re Brooks*, 383 F.3d 1036, 1046 (D.C. Cir. 2004); it certainly cannot be the substance of the Court's de novo determination. Nor do the Special Master/Receiver's own reports supply that determination: they treat causation and foreseeability as legal conclusions rather than proving them as facts, and describe the valuation as a "current guess on the value of the Primary Restitution Assets," Doc. 245 at 37, drawn from a "desktop exercise" that does "not constitute formal valuations

or fairness opinions," *id.* at 36 n.31. On the loss side, the Report "presumed that the balances used in the IALA were accurate," *id.* at 9. A recommendation resting on presumed balances and an admitted "guess" is not the loss determination § 3664(e) requires the Court to make on the Government's proof.

The Government must still prove any restitution amount by a preponderance of the evidence, § 3664(e); it cannot simply assert one. Yet it has leapt to $1.655 billion on the Special Master/Receiver's numbers — figures resting on guesswork and conjecture, derived by a secret method that neither the Court, the defendant, nor the prosecution has been permitted to see — and on evidence of policyholder statements that was stale when presented — a showing Defendant has developed in his Motion for Reconsideration (Doc. 309). A demand resting on a computation the Court and counsel are not permitted to see is the opposite of the independent, record-based determination § 3664(e) requires.

Defendant's objection to restitution has been continuous and timely at every stage — before, during, and after the sentencing hearing. He objected to the Special Master/Receiver's loss figure when the first Report and Recommendations issued; he objected to the restitution determination at the sentencing hearing itself, where — when the Government asked the Court to enter the preliminary order of restitution — counsel preserved the objection on the record, stating that the order was "obviously subject to the objections of numerous parties and further hearings with the Court," Sentencing Tr. 66:18–22 (May 26, 2026); within fourteen days of the May 29, 2026 judgment he moved to stay the asset sales and filed his Consolidated Objections to

the Preliminary Order of Restitution (Doc. 190); and after the Fourth Circuit's decision in *In re Zetteler* he filed a further motion for reconsideration under the MVRA. Counsel recounted that same sequence on the record at the August 10, 2026 hearing. Aug. 10, 2026 Hr'g Tr. 27. No part of the restitution determination has gone unchallenged, and Defendant has waived none of these objections.

The manner of the Government's participation is independently prejudicial. Having declined to answer the defendant's dispositive motions on the merits — representing that it "concurs with … the Special Master's filings" and "sees no reason to duplicate them," Doc. 279 at 2, and that it would be a waste of time for the Special Master/Receiver to address causation and the other disputed issues — the Government has nonetheless declined to file an independent response of its own, joining the Special Master/Receiver instead in a fourth successive response in this restitution phase — successive because, rather than state the Government's own independent position, it merely appends yet another affidavit to the Special Master/Receiver's position, this one from the Special Master/Receiver's own controlled entity, sworn by the acting CEO of the entity the Special Master/Receiver owns and controls. Doc. 308 (Ex. C). The Government thus refuses to carry its § 3664(e) burden or to engage the defense's arguments, and still does, while it and the conflicted officer together continue to enlarge the record against the defendant — who has meanwhile been denied the subpoenas and the underlying valuation data he needs to respond. A process in which the prosecutor and the fee-interested adjudicator file in tandem, supplement the record with new evidence at will, and decline to prove

their case, while the defendant is refused the means to test it, is patently prejudicial and cannot support entry of a final restitution order.

The Government's refusal to answer the defendant's motions issue by issue is not a matter of style; it is a failure to carry the burden the statute assigns it. Section 3664(e) places on the Government the burden of proving the amount of each victim's loss, and that burden is not met by a submission that declines to engage, on the merits and one issue at a time, the specific, evidence-backed challenges the defendant has raised. This cannot continue. The Government's posture here is, moreover, irreconcilable with the position it took in resisting the defendant's petition in the Court of Appeals, where it urged that appellate intervention was premature and that the restitution record should be developed in the district court; here, it refuses to develop or defend that record issue by issue. And the appellate proceedings resolved nothing on the merits: the Court of Appeals denied only the extraordinary, interlocutory relief the defendant sought — a stay and an expedited writ of mandamus — Doc. 308 at 9 n.9, and did not pass on any issue preserved here. To the extent the Government's bare notation of that denial is offered to suggest otherwise, a discretionary denial of a stay and of the extraordinary writ of mandamus is not a ruling on the merits. Advancing one position in one forum to defeat review and the opposite position in another to avoid its burden of proof is not permissible advocacy; Defendant submits that it crosses into prosecutorial misconduct, and it is one more reason the Government's non-responsive submission cannot support a final restitution order.

A response that selectively addresses only the issues the Government prefers — cherry-picking among the defendant's motions and the disputed restitution issues while leaving the rest unanswered — is no response at all. A party may not carry a burden of proof by choosing which of its opponent's arguments to engage; answering some issues and ignoring others is a non-response in substance, however it is styled. For the same reasons set out in Defendant's Motion to Strike the Government's Omnibus Response (Doc. 290) — the grounds of which Defendant places on the record here as applying, mutatis mutandis, to the Government's Consolidated Position — Doc. 308 is non-responsive and should be struck.

The Government's silence in the face of the defendant's dispositive motion confirms that failure of proof. The defendant's *Motion for Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction* (Doc. 234) placed squarely in issue whether the Government could carry its burden of proving that the claimed losses were caused by the offense of conviction, and it supported that challenge with documentary evidence; a response was due July 21, 2026. The Government never answered it on the merits. Because § 3664(e) assigns to the Government the burden of proving the amount of each victim's loss, that silence is not a neutral litigation choice — a burden is not carried by declining to engage the motion that contests it. The defendant's specific, evidence-backed challenges to loss and causation thus stand unrebutted, and no final order may rest on a loss figure the Government has refused to defend against the very motion that puts it in issue. This Court's Local Rules

reinforce the consequence. Under LCrR 47.1(d)(1), the Government "must file a response to any dispositive motion within fourteen (14) days of service of the motion," and under LCrR 47.1(d)(3), "[i]f the Government fails to file a timely response to a motion, the motion may be granted without further notice." The Government did not timely respond to Doc. 234, and to the extent it has not addressed each issue the defendant has raised, those issues may be treated as unopposed and the motion granted on that ground alone. The failure is not confined to that motion. The Government's single omnibus submission (Doc. 279) declined to answer, on the merits and issue by issue, any of the dispositive and substantive motions the defendant has filed since sentencing: his Motion to Stay Asset Sales and Enforcement of the Preliminary Restitution Order (Doc. 172); his Emergency Motion to Stay All Asset Sales and Consolidated Objections to the Preliminary Order of Restitution (Doc. 190); his Motion to Enforce the Plea Agreement, Preserve Counsel Access, and Require Conflict-Free Government Counsel (Docs. 201, 202); his Emergency Motion Directing the Bureau of Prisons to Permit Daily Access to Counsel, a Computer, and the Case Records (Doc. 225); his Motion for a Determination That No Restitution Is Owed (Docs. 234, 235); his Motion to Recoup the Distribution to Vista (Doc. 238); his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (Doc. 269); his Second Motion to Set Aside the Special Master's Report and the Restitution Orders (Doc. 278); and his Motion to Adopt Prior Motions and Hold the Second Supplement in Abeyance (Doc. 282). To each, the Government offered only that it "concurs with the

arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here." Doc. 279 at 2. Under Local Criminal Rule 47.1(d), each of those dispositive motions may be treated as unopposed and granted on that basis. Defendant likewise preserves, without waiver, his Motion to Strike the Government's Omnibus Response (Doc. 290), his Motion for Leave to File a Supplemental Response (Doc. 293), and his Motion for Reconsideration (Doc. 309), to none of which the Government has responded. Defendant is entitled to the Government's response to each of these motions, and he does not waive that right. Even if the Court were to treat any of them as moot, Defendant expressly preserves for appeal every issue raised in them; each such issue — including any the Government has left unanswered — will be raised on appeal to the United States Court of Appeals for the Fourth Circuit, and the Government, having been afforded and having declined the opportunity to respond, cannot then be heard to claim that it had no opportunity to do so.

Causation under the Mandatory Victims Restitution Act resolves into the discrete elements set out below, each of which 18 U.S.C. § 3664(e) places on the Government to prove by a preponderance. On this record none has been proved — not by the Government, which declines to offer independent evidence, and not by the Special Master/Receiver, whose reports supply conclusions rather than proof.

| **Causation element (Government's § 3664(e) burden)** | **Governing law** | **Fact that must be proved** | **Not established by the Government or the Special Master/Receiver** |
|---|---|---|---|
| Proximate cause | 18 U.S.C. § 3663A(a)(2); *In re Zetteler*, No. 26-1749 | Each victim's loss is "closely related to the conduct inherent to | The Report aggregates a $1.655 billion figure without tying any |

| | | | |
|---|---|---|---|
| | (4th Cir. June 13, 2026); *Paroline v. United States*, 572 U.S. 434 (2014) | the offense, rather than merely tangentially linked," not a loss that merely occurred somewhere within the companies. | dollar to the offense conduct; the Government offers no proximate-cause proof. |
| Foreseeability | 18 U.S.C. § 3663A(a)(2); *Paroline v. United States*, 572 U.S. 434 (2014); *United States v. Squirrel*, 588 F.3d 207 (4th Cir. 2009) | Each victim's loss was a reasonably foreseeable result of the specific offense of conviction. | The record contains only the Special Master/Receiver's assertion that "an inability to pay is always reasonably foreseeable," Doc. 245 at 30 — foreseeability in the air. |
| Absence of a superseding cause | 18 U.S.C. § 3664(e); *Robers v. United States*, 572 U.S. 639 (2014); *United States v. Speakman*, 594 F.3d 1165 (10th Cir. 2010) | The intervening decisions of the Rehabilitator and the Special Master/Receiver (forced and premature sales, the refusal to refinance, the Beckett fire-sale) did not break the causal chain. | The Government concedes losses that resulted from decisions made "after LINDBERG defrauded them," Doc. 308 at 5–6; neither it nor the Special Master/Receiver rebutted those intervening causes. Defendant objects to the "defrauded" characterization: no evidence has been produced by the Government to support it, and the label cannot substitute for proof that the offense proximately caused these intervening losses. |
| Actual, net loss and complete accounting | 18 U.S.C. § 3664(f)(1)(A); 18 U.S.C. § 3664(a) | A loss remained after the collateral, the roughly $1 billion first-loss capital, the principal-protection bonds, and the recoveries, supported by a complete accounting. | A conclusory chart resting on a "current guess" and "presumed" balances, Doc. 245 at 37, 9; the valuation methodology and underlying data are withheld. |
| Claimant-by-claimant, dollar-by-dollar attribution | 18 U.S.C. § 3664(e); *Hughey v. United States*, 495 U.S. 411 (1990); *In re Zetteler*, | Which act of conviction proximately caused which un- | No victim-by-victim showing; the Government itself declines restitution for |

| | | | |
|---|---|---|---|
| | No. 26-1749 (4th Cir. June 13, 2026) | recovered loss to which named victim. | Conservatrix and Vista/Cell 1.16 for lack of sufficient evidence, Doc. 308 at 7–8. |

On every element the burden is the Government's, and on every element the record contains no competent proof — from the Government or from the officer whose report it asks the Court to adopt. A final restitution order cannot rest on causation elements that neither the Government nor the Special Master/Receiver has established.

## II. The Meghji affidavit establishes, on its own terms, that the Special Master/Receiver approved the termination of the Beckett Trust and the sale of Beckett.

The Government's affiant, Mr. Meghji — the acting CEO of NHC, the entity the Special Master/Receiver owns and controls — admits the facts that resolve this issue. He swears that the Beckett Trust "terminated in accordance with the terms of the Beckett Trust Agreement" (Ex. C ¶ 9); that "NHC provided its consent to the transaction as the Manager of … Entrust Global" (*id.* ¶ 19); and that the Special Master/Receiver's own board designee voted to approve the transaction and that the Special Master/Receiver furnished a letter, reviewed by the Board before it voted, stating that he would not object (*id.* ¶¶ 20–21). Termination "in accordance with the[] terms" was not automatic: the trust could terminate only "at such time as the Grantor provides written approval of the termination," § 9.1(e), and a sale of substantially all Beckett assets was a "Fundamental BKX Matter" approvable only "in accordance with the Grantor's instructions," § 7.2(a)(vi). Entrust Global is the Grantor; NHC is its Manager; and the Special Master/Receiver holds the NHC equity in his exclusive,

court-ordered possession and control. The appointing order directed that "all of Defendant's … rights and interests, whether held directly or indirectly, in … the Primary Restitution Assets" be secured "in the exclusive possession and control of the special master," Doc. 56 ¶ 9, and the Special Master/Receiver accordingly became the record owner of the NHC equity, holding "all associated economic, legal, voting, and" other rights, Doc. 260 at 2. He is paid from "the assets administered by the Special Master," subject to "the Court's approval," Doc. 56 ¶ 14, and his authority is that "vested in the Special Master by the Court," *id.* ¶ 16. By admitting that NHC gave the Grantor's consent, the Government admits that the Special Master/Receiver gave it: he owns NHC, NHC manages the Grantor, and the Grantor's approval is what both the termination and the sale required. There is no version of these facts in which NHC supplied the Grantor's consent but the Special Master/Receiver, who owns NHC, did not. The affidavit's own sequence confirms the point: the Special Master/Receiver's entity supplied the Grantor approval that dissolved the trust; his board designee then voted to approve the sale of Beckett; and the designee did so after reviewing the Special Master/Receiver's own letter stating that he would not object. Ex. C ¶¶ 9, 19–21. An officer who dissolves the trust, whose designee approves the sale, and whose letter of non-objection clears it did not have "no direct involvement in the transaction," *id.* ¶ 21 — he caused it. The Government cannot have it both ways. It offers the letter to show that the Special Master/Receiver stood apart from the sale, but providing a letter is not standing apart — it is an affirmative act. A decisionmaker who furnishes the very approval a transaction requires has acted on

that transaction, and the Government's own proof that the Special Master/Receiver supplied the letter the board relied upon is proof that he acted. The letter the Government invokes to minimize his role is the record evidence that establishes it, and it therefore cuts against the very point for which the Government offers it. And that averment is, in any event, one of several load-bearing statements the affiant makes only on information and belief, as set out below.

### A. Each of the affidavit's five load-bearing averments is offered only on information and belief, and none is competent to carry the Government's burden.

The affidavit's decisive assertions are not sworn on personal knowledge; Mr. Meghji qualifies each "to the best of [his] knowledge, information and belief," and each is the sole support for a proposition the Government needs. First, that the Specified Affiliated Companies were placed in trust "to address concerns raised by one or more regulatory bodies, lenders and customers and [to] remove GGH and Lindberg from … management," Ex. C ¶ 5 — the premise of the Government's contention that Mr. Lindberg had already lost control. Second, that "Entrust Global owned 100% of Collectivus at the time the Beckett Trust was formed in 2021," *id.* ¶ 8 — the ownership foundation of the entire control analysis, as to a period years before Mr. Meghji had any role at NHC or on the Collectivus board. Third, that Beckett's 2025 revenue and EBITDA "were a small portion" of the Collectivus Group's, *id.* ¶ 13 — the Government's only basis for attacking the near-$1 billion valuation, offered without a single supporting figure or financial statement. Fourth, that "the Special Master has provided a letter to his Board appointee," *id.* ¶ 21 — the very fact offered

to minimize the Special Master/Receiver's role, and one whose existence and content the affiant does not claim to know first-hand, and which is not produced. Fifth, that the "Surviving Collectivus Group … remains a valuable restitution asset," *id.* ¶ 22 — the assertion that value was preserved rather than destroyed, again without figures. Mr. Meghji claims "personal knowledge" in paragraph 1, then expressly disclaims it for precisely these five averments — the ones on which the Government's position depends. Statements made on information and belief are not competent to establish a disputed fact and cannot satisfy the preponderance standard § 3664(e) requires. *Causey v. Balog*, 162 F.3d 795, ___ n.4 (4th Cir. 1998) (an oath that averments are "true to the best of [the affiant's] knowledge, information and belief" precludes a court from considering them, because the court "cannot assess whether [the affiant] had first hand knowledge of these facts or whether he is competent to testify to them"); Fed. R. Evid. 602.

### B. The Trust Agreement and the Assignment are legal instruments, and any disputed issue requires an evidentiary hearing.

The Trust Agreement and the Assignment are legal instruments. Their terms created the rights and powers at issue — the Grantor's approval right over the trust's termination (§ 9.1(e)) and over a Fundamental BKX Matter (§ 7.2(a)(vi)), and the Special Master/Receiver's acquisition of the NHC equity and all of its voting rights (Doc. 260 at 2) — and those terms establish that the Special Master/Receiver held the levers the disposition required. Defendant preserves that position. Should the Court regard any part of the question as a disputed issue of fact, § 3664(e) requires that it be resolved by a preponderance of the evidence, with the burden on the Government,

and Defendant is entitled to — and requests — an evidentiary hearing at which the affiant's basis may be tested. A $1.655 billion restitution cannot be fixed by adopting, on the papers and without a hearing, the untested affidavit of an officer of the very entity the Special Master/Receiver owns and controls.

## III. The Government's own account confirms, rather than refutes, the Special Master/Receiver's control of the disposition.

The Government argues that Mr. Lindberg "had already lost control" of NHC and the Specified Affiliated Companies through the 2019 MOU and the Wake County litigation, so the Special Master/Receiver "only took control over whatever remaining interest, if any," Mr. Lindberg had. Doc. 308 at 14. The premise is contradicted by the Government's own affidavit. The 2019 MOU did not itself move the Specified Affiliated Companies out of Mr. Lindberg's hands; the contribution of those companies to NHC — the step by which any transfer was to occur — "did not occur until October 2024." Ex. C ¶ 4. On the affiant's own account, the SACs had not been contributed to NHC as of the 2019 events the Government says stripped Mr. Lindberg of control, and the transfer awaited a later contribution transaction. The Government cannot date the loss of control to 2019 while its own witness dates the operative contribution to 2024. That argument defeats itself. If Mr. Lindberg had lost control to NHC, then control lay with NHC — and the Special Master/Receiver became the record owner of the NHC equity, holding all voting rights. Doc. 260 at 2. The Government cannot simultaneously say that control resided in NHC and that the officer who owns NHC controlled nothing. Its own affiant resolves the point: NHC "provided its consent to the transaction as the Manager of … Entrust Global." Ex. C

¶ 19. The Special Master/Receiver's own conduct refutes the "inherited nothing" premise. An officer who controlled nothing could not remove the company's directors — yet two weeks after taking the NHC equity, the Special Master/Receiver, signing "solely as Special Master," removed both AAI-appointed directors of NHC, Kathy Million and Lonna Carter, effective immediately. Million Decl. ¶¶ 25–26. Nor could an officer who controlled nothing have supplied the approvals the disposition required: the Beckett Trust could be terminated only with the Grantor's written approval, § 9.1(e), and a sale of substantially all Beckett assets required the Grantor's instruction, § 7.2(a)(vi) — and the Grantor, Entrust Global, acts through NHC, which the Special Master/Receiver owns. He thus held both the two AAI-director seats he cleared and the Grantor-side approval right over the trust's dissolution and the Beckett sale. That is decisive control over the very transaction — not the empty "remaining interest, if any" the Government describes.

The MOU, moreover, did not strip Mr. Lindberg — or the officer who succeeded to his company's rights — of control over any sale. Under Article II of the MOU, the AAI-appointed director held a veto over any sale of the assets or stock of NHC or any NHC subsidiary: "provided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director." Def. Ex. 1, Tab A ¶ 5 (Affidavit of Greg E. Lindberg) (quoting MOU Art. II, § 3.i). That veto could be defeated only by a default under the "Loans" as they were to be amended and restructured under Article III of the MOU — and Article III was never implemented. The Interim Loan

Amendment executed the same day waived "any and all claims for any Events of Default" predating it, Def. Ex. 1, Tab A ¶ 9; the Wake County court held Article III to be an unenforceable "agreement to agree," so "the default provisions that would trigger a loss of the … veto right were never implemented," Def. Ex. 1, Tab A ¶¶ 8, 14 (and Ex. B thereto); and no default under Article III has ever been asserted, Def. Ex. 1, Tab A ¶¶ 15–18. The veto therefore passed intact to the Special Master/Receiver when he acquired AAI's rights in NHC — and he exercised it: on Mr. Lindberg's account, no buyer would have closed the Beckett sale without the affirmative consent of the Special Master/Receiver's NHC-board designee, and the Special Master/Receiver furnished that consent, including by providing the buyer his letter of non-objection. Def. Ex. 1, Tab A ¶¶ 19–20. The approval the Government attempts to recast as Mr. Lindberg's lost 2019 control was, on this record, an affirmative act of the Special Master/Receiver.

The Government's contrary reading of the MOU (Doc. 308 at 15 n.11) fails on Mr. Lindberg's sworn account of that instrument. The Government invokes the proviso that, "[p]rovided there is no default under any Loan," the NHC Board may approve a sale without an AAI Director's consent, and argues that a loan default freed the board to act alone. Doc. 55-1 at 5. But the veto falls away only upon a default under the "Loans" as they were to be amended and restructured under Article III of the MOU — and, as Mr. Lindberg attests, no such default ever existed. The Interim Loan Amendment executed the same day as the MOU "waive[d] any and all claims for any Events of Default" predating it, wiping the slate clean of every pre-existing

default. Def. Ex. 1, Tab A ¶ 9. The Article III default terms that alone could give rise to a qualifying default were never implemented: the Wake County court held Article III an unenforceable "agreement to agree," and its order records that the plaintiffs "have not asserted a claim based on breach of Article III." Def. Ex. 1, Tab A ¶¶ 14, 16 (and Ex. B thereto). Nor has Mr. Dinius ever asserted any default under Article III. Def. Ex. 1, Tab A ¶ 17. NHC's attempt to invoke defaults under the superseded, pre-MOU loan covenants cannot supply what the MOU requires: as Mr. Lindberg attests, "the veto provision would be rendered meaningless" if the NCICs could "simply declare defaults under the old, pre-MOU loan agreements in order to deprive [him] of [his] bargained-for veto right." Def. Ex. 1, Tab A ¶ 11. The Government thus has not shown a declared, operative Event of Default "under any Loan" as the governing documents define one; a civil finding that interest was underpaid is not, without more, such a default, and the point cannot be resolved against Defendant without the evidentiary hearing he has requested. And even if this Court, reviewing the question de novo, were to reinterpret the Loan and Article III of the MOU differently than the Wake County court did — treating what that court held to be an unenforceable "agreement to agree" as though it created an operative default — that reinterpretation could operate only after the fact. It would be ex post facto as to every res already sold, supplying retroactively an authority that did not exist when the assets were liquidated; and it still could not furnish a default basis under Article III of the MOU that existed at the time of the Beckett sale. The authority to consent to, and to effect, that sale had to exist when the sale occurred; it cannot be conjured

afterward by re-reading the Loan, and no such reinterpretation can retroactively validate a disposition made without it. Because no qualifying default ever stripped the AAI veto, the Special Master/Receiver's affirmative consent remained necessary to the Beckett sale — and, as shown above, he supplied it.

The disposition was, moreover, unauthorized on the face of the appointing order. The Order permitted liquidation of a Primary Restitution Asset only on the express condition that the Special Master/Receiver "seek Court approval to liquidate" and "oversee and help accomplish the liquidation with Court approval." Doc. 56 at 6–7. The Special Master/Receiver never sought that approval: the Beckett sale closed with no motion, no notice, and no order of this Court, and he disclosed the completed transaction only after the fact. His position that "no approval was required" is therefore not a defense of the disposition but a concession that it exceeded the authority the Court conferred. Neither the sequence nor the form of his participation rescues it. That the Special Master/Receiver dissolved the Beckett Trust first, to clear the path for the sale, does not change the analysis: dissolving the asset's holding structure in order to enable its sale is itself an act facilitating the disposition, taken — like the sale it enabled — without ever seeking this Court's approval. And writing the letter of non-opposition on which the NHC board relied was not abstention from the sale; it was an act that helped accomplish it. The sale required the affirmative consent of an AAI Director; his designee supplied that consent, and his letter cleared it. Furnishing the approval a sale requires is participating in the sale, not standing apart from it. A letter of non-opposition, without which the board would not have

approved, is not a non-action — it is the action that accomplished the sale. Whether the dissolution preceded the sale or was a term of it, and whether his hand appears as a vote or a letter, the Special Master/Receiver acted on the estate to accomplish the disposition — without the Court approval the Order required. A restitution order built upon an unauthorized disposition of the estate cannot stand. *United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006); *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995).

That the Government defends the Beckett disposition with an affidavit from the Special Master/Receiver's own controlled entity confirms, rather than answers, the constitutional problem. The affidavit is sworn by the acting CEO of NHC — the entity the Special Master/Receiver owns and controls — and it admits that the transaction was approved through the vote of the Special Master/Receiver's own board appointee and cleared by the Special Master/Receiver's letter of non-objection. Ex. C ¶¶ 20–21. The officer appointed to preserve the estate and neutrally quantify the loss now has the entity he controls — NHC — supplying sworn testimony to the prosecution to defend his conduct and sustain the loss figure. The Special Master/Receiver has thereby become a witness in these proceedings as well: his own conduct — what he did and did not do in dissolving the trust and clearing the Beckett sale — is now the very fact in dispute, and the evidence offered to resolve it comes from him and the entity he controls. That is the Special Master/Receiver operating as a second prosecutor, funded by and now speaking through the very res he administers, and as a witness in his own cause. See Doc. 269 ¶¶ 12–14. The NHC

affidavit does not dispel the conflict; it reiterates it in writing — accuser, adjudicator, seller, and now witness, concentrated in a single office. The Constitution has never permitted that concentration. *In re Murchison*, 349 U.S. 133 (1955).

**IV. Consent and waiver cannot cure the structural Article III and due-process defects.**

The Government's recurring theme — that Mr. Lindberg agreed to the reference, proposed an initial draft, and did not object to the fee petitions — is a non-answer as a matter of law. It is also false on the facts. The change that transformed a neutral special master into a receiver was not Mr. Lindberg's doing; it was added by Assistant United States Attorney Daniel Ryan and imposed as the Government's insistence over the defense's objection — as the attached e-mails and redlines show, Def. Ex. 2, Tab E — and it was extracted under threat that Mr. Lindberg would forfeit the benefit of his plea and that the Government would file competing briefs. The record is developed below; it suffices here that the very feature the Government recasts as the product of the defendant's "agreement" was the Government's own. Article III's structural component and a § 455(b) financial-interest disqualification are not waivable. "To the extent that this structural principle is implicated … the parties cannot by consent cure the constitutional difficulty," *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986); accord *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). That principle applies with full force to the due-process guarantee of a neutral adjudicator, which safeguards the integrity of the tribunal and public confidence in it, not merely the interests of the parties; a proceeding before a financially interested decisionmaker is structural error, *Williams*

*v. Pennsylvania*, 579 U.S. 1, 14 (2016); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927), and courts "do not presume acquiescence in the loss of fundamental rights," *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "A fair trial in a fair tribunal is a basic requirement of due process," and "no man can be a judge in his own case." *In re Murchison*, 349 U.S. 133, 136 (1955). Consent to a neutral master is not consent to a conflicted one. Section 455(e) forbids acceptance of "a waiver of any ground for disqualification enumerated in subsection (b)," and § 455(b)(4) reaches a "financial interest" held "as a fiduciary." Fed. R. Civ. P. 53(a)(2) permits consent only "with the court's approval" and only after disclosure — neither of which occurred. Because MVRA restitution is now criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), the right to have that punishment fixed by a neutral Article III court is a criminal defendant's right that cannot be traded away to install a fee-interested, non-Article III officer as the effective sentencer. Nor does the plea reach the illegal-sentence defect: "a defendant's consent cannot … authorize a restitution order not authorized by the statutory source." *United States v. Broughton-Jones*, 71 F.3d 1143, 1147–49 (4th Cir. 1995).

Even if consent could cure a structural defect — and it cannot — no valid consent exists here, for three independent reasons. First, any agreement to the reference was not the free, knowing, and voluntary waiver the law demands. It was a term embedded in a negotiated plea, and acquiescence extracted as a condition of a plea is not the intentional relinquishment of a known right required to give up the right to a neutral sentencing tribunal. *See Johnson v. Zerbst*, 304 U.S. 458, 464

(1938). And because the reference was a term of the Government's plea bargain, any ambiguity about what the defendant agreed to is construed against the Government, which bears the greater responsibility for the terms of a plea agreement — not converted into the defendant's consent to an unauthorized process. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986); *United States v. Jordan*, 509 F.3d 191, 200 (4th Cir. 2007). Second, whatever the Government characterizes as Mr. Lindberg's agreement reached, at most, a special master under 18 U.S.C. § 3664(d)(6) — an officer limited to proposed findings of fact and recommendations subject to the Court's de novo determination — not an officer's taking exclusive possession of the estate, his undisclosed disposition of one of its largest assets, or his subsequent adjudication of the very loss that disposition produced. The version of the appointment the defense proposed — which the Government itself attaches — framed the role as that of "an independent, third-party neutral in accordance with 18 U.S.C. § 3664(d)(6)," acting "solely in [his] capacity as Special Master." Doc. 308-1 ¶¶ 1, 11 (draft). That draft conferred none of the custody, liquidation, or title-clearing powers the entered order later added, and it nowhere designated the Special Master/Receiver a receiver. Even arguendo if there was, consent to that neutral special master was not consent to an officer who would take exclusive possession of the estate, liquidate it, and dispose of one of its largest assets. The Special Master/Receiver's undisclosed approval and disposition of Beckett exceeded the scope of, and vitiated, any consent: a party who agrees to a neutral does not thereby agree to an interested actor, and consent to a fiduciary does not survive the fiduciary's undisclosed adverse conduct. The defendant

could not have consented to a conflict that had not yet occurred and was not disclosed when it did. Third, the process the Government now recasts as consensual was, in the end, unilateral. The Government — through Assistant United States Attorney Daniel Ryan — took control of the draft restitution order, rejected nearly all of the changes proposed on the defendant's behalf (including his request that the order impose a fiduciary duty to all stakeholders), and caused the final order to be filed with or without the defendant's participation. See Decl. of Greg E. Lindberg (Plea & Appointment) (Def. Ex. 1, Tab B) ¶¶ 8–10. The Government's reliance on the defendant's having "proposed an initial draft" cannot be squared with that fact: the prosecution took control of the draft and produced the operative order itself, so the final order is the Government's work product, not an artifact of the defendant's assent. An order the prosecution drafted and filed is not a product of the defendant's consent; it is the opposite. That the Government both shaped the Special Master/Receiver's work and then assumed control of the drafting and filing of the order underscores, rather than answers, the structural objection.

The contemporaneous record of the appointment negotiations — the parties' own e-mails, filed herewith as Def. Ex. 2, Tabs D and E — confirms what the "consent" theory omits. What Mr. Lindberg agreed to was a special master under 18 U.S.C. § 3664(d)(6): under the plea agreement, he consented "to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution." Plea Agreement ¶ 9 (Def. Ex. 2, Tab B). He did not agree to a receiver. Yet the reference that emerged was the Government's design, pressed over the defense's objection.

Before any motion was filed, the Government itself recruited the officer, asking the defense to "consider this Charlotte-based firm for the role as special master." Def. Ex. 2, Tab D. That firm is Grier Wright Martinez PA, which the Government's joint motion recommended as Special Master; the same motion recommended Scott Avila of Paladin Management as the Special Master's financial advisor — not as the Special Master. Doc. 54 ¶ 8. Paladin Management is the Special Master's financial advisor; it is not the Special Master, and any suggestion to the contrary is mistaken. When the defense proposed order language that would have preserved a measure of control for Mr. Lindberg or cabined the officer's authority, Assistant United States Attorney Daniel Ryan refused, insisting that Mr. Lindberg was "supposed to be giving up 'exclusive possession and control' of these assets to the government's satisfaction in order to get the benefit of the plea agreement," and that the Government "will not agree to any such efforts," and that "[t]he Special Master does not owe a duty to Mr. Lindberg or to the assets, but rather to the Court and to victims." Def. Ex. 2, Tab E. The Government rejected nearly all of the changes proposed on Mr. Lindberg's behalf — including his request that the order impose a fiduciary duty to all stakeholders — took control of the draft, and produced the operative order itself. Def. Ex. 2, Tab E. And it made clear that it would file its memorandum and proposed order by the end of the week, with "competing memos and proposed orders" if the defense did not agree — that is, with or without Mr. Lindberg's participation. Def. Ex. 2, Tab E. The order the Court entered vested precisely what the Government demanded: the estate in the "exclusive possession and control" of the Special Master/Receiver, Doc. 56 ¶ 9, with

authority to liquidate the Primary Restitution Assets, *id.* at 6–7. Those are the powers of a receiver, and the Government sought them deliberately. A structure the Government recruited, drafted, and imposed over the defendant's express request that he retain control — and threatened to file without him — is not a consensual reference. It is the Government's installation of a receiver in all but name; it cannot supply the "consent" the Government now invokes or cure the Article III and due-process defects, and it confirms that the transfer of control the Government attributes to Mr. Lindberg was the Government's doing, not his. Coercion is not consent: a reference the Government designed and imposed under threat of proceeding without the defendant — while he remained bound by a plea whose benefit the Government held over him and was itself prepared to disregard — cannot be recast as his agreement. The Government made the Special Master a receiver, and it owns the constitutional crisis that choice created; it cannot attribute that crisis to Mr. Lindberg, nor cure it by invoking a "consent" it coerced. Nor did the defense ever treat the resulting restitution determination as settled or agreed. At the sentencing hearing, when the preliminary order of restitution was entered, counsel placed the defense's objection on the record, stating that the order was "obviously subject to the objections of numerous parties and further hearings with the Court." Sentencing Tr. 66:18–22 (May 26, 2026). A determination that the defense expressly reserved on the record — as subject to the objections of numerous parties and to further hearings — is not one to which Mr. Lindberg consented. The same demand also inverted the sequence the Mandatory Victims Restitution Act prescribes. The statute directs the

court to determine each victim's loss and enter a restitution order, 18 U.S.C. § 3664; it nowhere authorizes the Government to take exclusive possession of — and to begin liquidating — the defendant's property before the amount of any loss has been determined. Yet that is precisely what the Government did: it demanded surrender of "exclusive possession and control" and installed an officer armed to liquidate the estate before the § 3664(e) determination the statute requires had ever been made. Putting seizure and sale before adjudication is not how the MVRA works, and the Government's disregard of that sequence — taking control of the property before the numbers were determined — is one more reason its "consent" theory cannot bear the weight it places on it. These acts — recruiting the officer, drafting the receiver powers, adding the authority to appoint the trusts' trustees and the companies' directors, and imposing the whole structure under threat of proceeding without the defendant — are the Government's own, and they are impossible for it to disclaim. The constitutional crisis they created is the Government's own. And it is a crisis no procedure can launder: a structural defect of this kind is not cured by the Court's review, for "even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 618 (1993) (citing *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972)). The Government cannot install a receiver as the officer who adjudicates the loss, over the defendant's objection, and then invoke § 3664(d)(6) de novo review to

sanitize the result; as set out below, the defect is structural and cannot be cured even by de novo review.[1]

The Government's narrower waiver theory fails on its own premise. The Government contends that the defendant forfeited any non-constitutional objection "other than those specifically reserved in the [Preliminary Restitution] Order." Doc. 308 at 2 n.2. But the defendant preserved these very issues by raising them in his Response to the Special Master/Receiver's Report and in his Consolidated Objections to the Preliminary Order of Restitution (Doc. 190). The credits, offsets, causation, and valuation questions the Government now labels waived were presented there — indeed, the Government's own chart takes its issue numbers directly from the defendant's response. Doc. 308 at 2 n.3 (citing Doc. 132-3). Objections are preserved by making them, and the defendant made them. This is, moreover, a deferred, non-final determination under 18 U.S.C. § 3664(d)(5), (d)(6), in which those preserved issues are to be resolved now. In any event, the mandatory credits and offsets — the value of returned property credited as of the date returned, § 3663A(b)(1)(B)(ii); the

[1] The December 18, 2024 e-mail also sets out the Government's assertions concerning Mr. Lindberg's conduct at that time; those assertions are addressed and refuted in the accompanying Declaration of Greg E. Lindberg in Response to the December 18, 2024 Allegations (Def. Ex. 1, Tab B). For example, the Government asserted that Mr. Lindberg was "actively trying to reach deals regarding the sale of AAPC" and to "dissipate assets," and invoked those assertions to justify placing the estate in the officer's exclusive control. The record is to the contrary. The proposal to approach Blackstone about an AAPC transaction came from AAPC's own Chairman, not from Mr. Lindberg; and Mr. Lindberg's letters to the AAPC board urged that any such sale be structured as a stock transaction precisely to preserve value — to avoid a tax of $750 million or more that an asset sale would have imposed and that would have come directly out of the funds available for restitution — while he separately objected, in writing, to a proposed HPS credit-facility amendment he believed would force an unfavorable, value-destroying sale. Def. Ex. 1, Tab B ¶¶ 117, 119 & Attachment 2 thereto. Recasting the defendant's efforts to protect an asset's value — against a sale others were independently contemplating, and against a structure that would strip $750 million from the restitution fund — as an attempt to "sell" or "dissipate" that asset, and then invoking that mischaracterization to justify a receivership, is prosecutorial overreach, not a ground for seizing the estate.

full amount of each victim's losses, § 3664(f)(1)(A); and reduction for amounts recovered, § 3664(j)(2) — are statutory commands the Court must apply; they are not "objections" a defendant forfeits by failing to reserve them line-by-line. And Defendant did not stay silent: he pressed these credits, offsets, and causation issues expressly, and repeatedly, at every stage of this proceeding. He raised them before sentencing, in his Response and Objection to the Special Master/Receiver's Report — the submission from which the Government's own chart takes its issue numbers (Doc. 132 & Ex. 2). He renewed them immediately after the judgment, in the two emergency motions to stay he filed within fourteen days of it: his Motion to Stay Asset Sales and Enforcement of the Preliminary Order of Restitution (Doc. 172), and his Emergency Motion to Stay All Asset Sales and Consolidated Objections to the Preliminary Order of Restitution (Doc. 190). He pressed them again in his Preliminary Response and Objection to the Special Master/Receiver's Second Supplement to Report and Recommendations (Doc. 281), and in his Motion for a Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction (Doc. 234). And he moved to protect these very offsets and credits from irreversible loss by seeking a complete accounting and a stay of all asset sales until the offsets and that Motion are adjudicated. The issues the Government now brands forfeited were thus reserved, and re-reserved, on the record at every juncture the statute and this Court's schedule allowed. Silence on interim fee petitions is not consent to a conflicted adjudicator or to an unlawful sentence, and the full extent of the Beckett breach — that the Special

Master/Receiver alone could and did approve the sale — became apparent only when counsel obtained the trust and assignment instruments. Docs. 269, 292.

## V. The Government's authorities do not reach the constitutional question, which *O'Connor* and *Tumey* answer.

None of the Government's authorities addresses the constitutional question presented here — whether an officer who is paid from, and who liquidates, the estate may also adjudicate the loss. They are appointment orders in which no party raised, and no court decided, that question. That the same question was not raised in those cases does not mean the defect did not exist. An unraised question is not a resolved one, and an order of appointment that no court subjected to Article III or due-process scrutiny is not a holding that the combination it created is constitutional. The controlling principle is the one *O'Connor* and *Tumey* state, and *O'Connor* states it as a holding, not dictum. Confronting the very arrangement at issue here — a receiver appointed also to serve as special master — the Second Circuit held: "Although in theory the receiver may have no interest in whether any claims are established, in fact he certainly does; such an interest, as well as his duties to the claimants and the taxpayer, disqualify him from performing the judicial duties" of a special master. *United States v. O'Connor*, 291 F.2d 520 (2d Cir. 1961) (Friendly, J.). And the court did not merely say so; it acted on it, vacating the reference: "Order affirmed insofar as it appoints a receiver, vacated insofar as it appoints a special master." *Id.* The Government's characterization of that holding as dictum is wrong: a court does not vacate an appointment on the strength of a dictum. That is precisely this case. Whatever his title, the Special Master/Receiver was clothed by the appointing order

with the defining powers of a receiver — exclusive possession and control of the estate, Doc. 56 ¶ 9; the authority to liquidate the Primary Restitution Assets, *id.* at 6–7; and record ownership of the entities, holding "all associated economic, legal, voting, and" other rights, Doc. 260 at 2. A court-appointed officer who takes custody of the res, holds its title, and liquidates it is a receiver in function, whatever the caption of the order calls him — and the entered order gave the Special Master/Receiver each of those powers even as the defense's proposed draft had designated him none of them and nowhere named him a receiver. Doc. 308-1 ¶¶ 1, 11. The reference itself was the Government's drafting. The special-master provision of the plea agreement — paragraph 9, by which "[t]he defendant agrees to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court" — was inserted into the plea by the Government's own prosecutor; the plea's tracked changes attribute that insertion to Assistant United States Attorney Daniel Ryan. See Def. Ex. 2, Tab B, ¶ 9. Nor did the Government merely draft the clause; it proposed and recruited the special master. In the weeks before the plea, the Government asked defense counsel to "consider this Charlotte-based firm for the role as special master," and the firm it named corresponded directly with the Government about "this potential assignment" before the Government forwarded the firm's materials to defense counsel. Def. Ex. 2, Tab D (Special Master email correspondence, Nov. 25, 2024). The defense, for its part, could not meaningfully shape the terms: its "ability to get [the Government] a revised draft of the Motion and Order" was "severely

hampered by [its] inability to effectively or reliably communicate with [its] client," who obtained regular communication access only in early December 2024. *Id.* That clause conveyed a restitution-distribution role — it says nothing of exclusive possession and control, of liquidation, or of the appointment of directors — and only when it is read together with Mr. Ryan's December 18, 2024 email and his redline of the proposed appointment order does it become clear who converted that limited role into a receivership. That the officer emerged as a receiver was the Government's deliberate design, and the record shows the change was made by the Government's own hand: transmitting the Government's redline of the proposed order, Mr. Ryan struck the defense's provisions that would have preserved a measure of control for Mr. Lindberg, on the stated ground that Mr. Lindberg was "supposed to be giving up 'exclusive possession and control' of these assets" and that the Government "will not agree to any such efforts, and … will not give Mr. Lindberg credit for doing anything less than giving up 'exclusive possession and control.'" Dec. 18, 2024 e-mail of AUSA Daniel Ryan (Def. Ex. 2, Tab E). The tracked-changes record confirms the point on the face of the documents, and it does so through the Government's own red edits alone. In the supporting memorandum's redline, the edit that converted the office into a receivership — shown in red and thus attributable to Mr. Ryan, not to the defense — directed that the officer "assume Defendant's and/or Global Growth's authority whether held directly or indirectly, if any, to: (1) appoint trustees for all trusts related to the Primary Restitution Assets; and (2) appoint directors to all boards of directors of all companies related to the Primary Restitution Assets; and"

— arrogating to the officer the defendant's own governance powers. Def. Ex. 2, Tab C. That single insertion is what transformed a special master who would merely "identify, receive, apportion, and distribute funds for restitution" into a receiver vested with the defendant's own control of the estate. And the order the Court ultimately entered embodies that design: it secures the Primary Restitution Assets in the officer's control and empowers him to determine their value, to liquidate them, to clear title for transfer to buyers, and to coordinate with other receivers. Doc. 56. Possession and control, liquidation, clearing title, and coordination with "other receivers" are the powers of a receiver, and the Government's own grouping of the Special Master/Receiver with "any other receivers" names him as one. Taking custody and exclusive control of the estate is the office of a receiver; the Government wrote that office into the order and rejected every term that would have made the officer anything less. The Special Master/Receiver is thus both the receiver who possesses and liquidates the estate and the officer who quantifies the loss and recommends the award against it, and *O'Connor* holds that the same person cannot lawfully be both. The rule *O'Connor* applied is *Tumey*'s: a decisionmaker with "a direct, personal, substantial pecuniary interest" in the outcome is constitutionally disqualified. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). That interest is not incidental here; it scales with the estate. The Special Master/Receiver is paid from the very assets he administers and liquidates, so the larger the estate he sells, the greater his compensation — the temptation runs the wrong way, and it runs harder the more he sells. The Government's own authority confirms the point by contrast. In *Konrad*, the master

had no conflict for one reason only: she "was paid the standard hourly rate, and not a percentage of the sum she calculated." *United States v. Konrad*, 730 F.3d 343, 353 n.12 (3d Cir. 2013).[2] Here the opposite is true — the Special Master/Receiver is paid out of the very fund whose value he sets and whose assets he sells, so his interest rises with the size of the disposition. That is the precise structural interest *O'Connor* and *Tumey* forbid, and no appointment order the Government cites has ever sanctioned it.

**VI. The compensation structure is a disqualifying interest under the objective test.**

The Government says the Special Master/Receiver's fees are hourly rather than contingent and that he received nothing from the Beckett sale. Doc. 308 at 18. Neither point dispels the interest. Due process forbids entrusting a party's property to a decisionmaker with "a direct, personal, substantial pecuniary interest," and the test is objective and requires no proof of actual bias. *Tumey*, 273 U.S. at 523; *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). The Special Master/Receiver is paid from "the assets administered by the Special Master," Doc. 56 ¶ 14 — the very res whose value he quantifies and whose liquidation he directs — and he supplies both the loss figure the Government adopts and the proposed order that fixes it. That an

[2] In *Konrad*, a criminal defendant found able to pay for his own counsel challenged, as a conflict of interest, the appointment of a master to fix the cost of the private defense counsel he was ordered to reimburse under the Criminal Justice Act. The master surveyed prevailing hourly rates, took the lowest ($400 per hour), and set the reimbursable cost of the defense at $6,000. The Third Circuit rejected the conflict claim for a single reason: the master "was paid the standard hourly rate, and not a percentage of the sum she calculated," so her fee neither rose nor fell with the figure she produced. 730 F.3d at 353 & n.12. The arrangement here is the opposite: the Special Master/Receiver's compensation is drawn from the very estate whose value he fixes and whose assets he liquidates, so the more of the estate he administers and sells, the greater his fee — the interest *Konrad* found absent is the interest present here.

hourly fee is drawn from the estate does not make the interest less "direct" or "substantial"; it makes the officer's solvency depend on the estate he administers and adjudicates. The Constitution does not permit the same person to serve as accuser and adjudicator. *In re Murchison*, 349 U.S. 133, 136–37 (1955). And a disqualifying interest is structural error that neither de novo review nor a later order can cure, *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016); *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 618 (1993).

Nor can the promise of de novo review rescue the reference. The Government's answer to the conflict is that the Special Master/Receiver only proposes findings while the Court decides de novo, § 3664(d)(6); indeed it asks this Court to "conduct a de novo review" and then adopt his numbers. Doc. 308 at 1. But de novo review does not cure a structurally disqualified adjudicator; it presupposes a neutral one. "Even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 618 (1993) (citing *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972)). Concrete Pipe proves the point by contrast: the trustees there survived challenge only because they acted "in an enforcement capacity," with a neutral adjudicator standing between them and the decision to "conduct a de novo review of all factual and legal issues." *Id.* at 618–19. Here the opposite is true. The Special Master/Receiver is not an enforcer whose work a neutral officer reviews; he is himself the adjudicator — he takes custody of the estate, values it, liquidates it, and quantifies the very loss he asks the Court to adopt — and no neutral officer stands between him and this Court. A court reviewing

his Report sees only what the conflicted officer chose to place in it, so de novo review of a record curated by the disqualified officer is not the independent determination § 3664(e) requires. Nor is the defect academic: because the Special Master/Receiver sold the Primary Restitution Assets before any determination — Beckett among them, at roughly thirteen cents on the dollar — no later de novo review can recover the value his conduct destroyed or unwind the dispositions to third parties. The advisory label describes what a special master ordinarily does; it does not describe what this officer has already done, and it cannot save a reference in which execution has preceded adjudication. Defendant has developed this conflict, and the principle that de novo review cannot cure it, fully in his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master/Receiver, and to Set Aside the Restitution Orders (Doc. 269) — to which the Special Master/Receiver has already responded — and in his Second Motion to Set Aside the Special Master/Receiver's Report and the Restitution Orders (Doc. 278), which likewise establishes that the Report "is not cured by a later de novo determination under 18 U.S.C. § 3664(d)(6)," and Defendant incorporates and preserves that showing here. The Special Master/Receiver's own positions, moreover, cannot be reconciled. To defend against disqualification he casts himself as a mere advisor whose proposed findings are subject to the Court's de novo review; yet to act upon the estate he has assumed and exercised the possessory and liquidating powers of a receiver — taking custody of the assets, holding their title, and selling them, Beckett among them at roughly thirteen cents on the dollar, before any determination was made. He cannot

be an advisor for purposes of the conflict and a receiver for purposes of the estate. His own valuation carries the same double posture: he disclaims it as a "current guess on the value of the Primary Restitution Assets," Doc. 245 at 37, and a "desktop exercise" that does "not constitute formal valuations or fairness opinions," *id.* at 36 n.31, even as the Government asks the Court to adopt that very figure as the loss. These positions are irreconcilable, and the inconsistency is itself telling: an officer who were truly the neutral advisor he claims to be would have had no occasion to seize and liquidate the estate before the Court determined what, if anything, is owed.

## VII. The Government has not proven causation, and the plea's "indirect harm" language does not convert intervening losses into restitution.

### A. An admission of "hardship" is not proof of the amount of each victim's loss caused by the offense.

The Government first says Mr. Lindberg admitted causing "substantial financial hardship," so causation is established. Doc. 308 at 19–20. But an admission that the offense caused hardship is not proof of the amount of each victim's loss caused by the offense, which the Government must still establish by a preponderance. § 3664(e); *Hughey v. United States*, 495 U.S. 411 (1990). Causation and foreseeability are, moreover, legal determinations for the Court, not facts the Special Master/Receiver may find; and a restitution order may not grant a victim a windfall. *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017). The burden of proving that causal loss is the Government's, and it does not shift until the Government carries it: the defendant's burden to dispute an amount arises only "once the Government has satisfied its burden," *United States v. Stone*, 866 F.3d 219, 227 (4th Cir. 2017), and

where the Government "fail[s] to meet its initial burden," the burden "never shift[s]" and the resulting order must be vacated, *United States v. Steele*, 897 F.3d 606, 614 (4th Cir. 2018). An order that fixes restitution without that proximate-cause determination does not merely fail for want of proof — it exceeds the statutory maximum. Restitution ordered "for losses not proximately caused by the defendant" is "a sentence expressly foreclosed by statute," *United States v. Leal*, 933 F.3d 426, 431 (5th Cir. 2019), so that "if a court orders a defendant to pay restitution . . . without determining that the defendant's conduct proximately caused the victim's claimed losses, the amount of restitution necessarily exceeds the statutory maximum," *United States v. Winchel*, 896 F.3d 387, 389 (5th Cir. 2018); see *United States v. Kim*, 988 F.3d 803, 810–811 (5th Cir. 2021) (reaffirming both principles and vacating a restitution order the Government had failed to tie to proximately caused loss). The Fourth Circuit's rule is the same: a restitution order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Broughton-Jones*, 71 F.3d 1143, 1147 (4th Cir. 1995); accord *United States v. Davis*, 714 F.3d 809 (4th Cir. 2013). And because that limit is statutory, no agreement can lift it: "even when a defendant, prosecutor, and court agree on a sentence, the court cannot give the sentence effect if it is not authorized by law," *Leal*, 933 F.3d at 430–31, and "a defendant's consent to a particular restitution order cannot, without more, authorize a restitution order not authorized by the statutory source," *Broughton-Jones*, 71 F.3d at 1149. That burden reaches causation, not merely arithmetic: restitution attaches only to loss "directly and

proximately caused by [the defendant's] offense conduct," *United States v. Wilkinson*, 590 F.3d 259, 268 (4th Cir. 2010); *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009), and a mere connection between an injury and the crime does not suffice — the connection must be direct and proximate. *See Paroline v. United States*, 572 U.S. 434, 445–46 (2014). The Fourth Circuit's own disposition in this case fixes the standard: direct harm requires the harm to be "closely related to the conduct inherent to the offense, rather than merely tangentially linked," and the court applied it to reject a nine-figure claim, holding the claimant had "fail[ed] to sufficiently connect the harm suffered … with Lindberg's criminal conduct." *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026) (per curiam) (quoted at Doc. 308 at 8). If an adjudicated, nine-figure loss was too tangentially connected to support restitution, a gross-balance figure that ties no particular loss to any particular act of conviction cannot support an award many times larger.

On the record it filed, the Government has neither proven nor even engaged the elements causation requires. It has not established: (1) proximate cause — that any victim's loss is "closely related to the conduct inherent to the offense, rather than merely tangentially linked," *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026), rather than a loss that merely occurred somewhere within the companies; (2) foreseeability — that each victim's loss was a reasonably foreseeable result of the specific offense, the record containing only the Special Master/Receiver's assertion that "an inability to pay is always reasonably foreseeable," Doc. 245 at 30, which is foreseeability in the air; (3) the absence of a superseding cause — that the intervening

decisions of the Rehabilitator and the Special Master/Receiver (the refusal of face-value offers, the coerced hold, the premature sale of the zero-coupon protection bonds, and the below-value sale of Beckett) did not break the causal chain; (4) actual, net loss and a complete accounting — that a loss remained after the collateral, the roughly $1 billion first-loss capital, the principal-protection bonds, and the recoveries, § 3664(f)(1)(A); and (5) claimant-by-claimant, dollar-by-dollar attribution — which act of conviction proximately caused which un-recovered loss to which named victim. Section 3664(e) places each of these on the Government, and it has engaged none of them, resting instead on the plea's "indirect harm" language and its adoption of the Special Master/Receiver's conclusions. Issues the Government has not addressed stand unopposed. LCrR 47.1(d)(3).

**B. The losses were driven by intervening, post-indictment decisions — as the Government's own chart concedes.**

The Government's chart proves the causation problem it seeks to avoid. It disallows credit for the diminution in the North Carolina Insurance Companies' 2018 value (Issue 11, $454,000,000), the Eye Care Lenders loss (Issue 13, $22,288,826), the UKAT refinance failure (Issue 14, $39,000,000), the Clanwilliam sale loss (Issue 16, $474,000,000), and the losses from selling the zero-coupon bonds before maturity (Issue 17, $611,600,000) — each on the express ground that the loss resulted from a decision made by the rehabilitators or the Special Master/Receiver "after LINDBERG defrauded them." Doc. 308 at 5–6.[3] That is a concession that these later decisions —

[3] Defendant objects to the Government's repeated characterization that Mr. Lindberg "defrauded" the rehabilitators and the Special Master/Receiver. See, e.g., Doc. 308 at 5–6. No evidence has been produced by the Government to support that statement. The word is a conclusion, not proof: the

made after control of the companies had passed to the rehabilitators — produced those losses. The Government cannot treat those later decisions as irrelevant when they would reduce the defendant's exposure and decisive when they increase it. The same intervening decisions — premature and forced sales, the refusal to refinance, the liquidation of long-dated instruments, and the Special Master/Receiver's own fire-sale of Beckett — are superseding causes that break the causal chain, *Robers v. United States*, 572 U.S. 639, 646 (2014); *United States v. Speakman*, 594 F.3d 1165, 1172–74 (10th Cir. 2010), and the resulting losses cannot be laid at the defendant's door. The Government concedes the same for whole categories of claimants: it declines to seek restitution for Conservatrix and for Vista/Cell 1.16 precisely because it "does not have sufficient evidence" to connect their losses to Mr. Lindberg's criminal conduct. Doc. 308 at 7–8. That confirms the causal connection *In re Zetteler* requires must be proven claimant-by-claimant and dollar-by-dollar — and has not been. The Government's premise that the "swap" of assets itself fixed the loss also fails on the record: Mr. Lindberg added roughly $1 billion of his own capital to the businesses as a net, first-loss cushion that would be exhausted before any protected policyholder or creditor bore a dollar, and when control passed the affiliated loans were independently valued and found well secured. Docs. 234, 235, 278. Defendant's full causation, offset, and accounting showing — issue by issue — is set out in his Reply

---

Government has offered no record evidence that any fraud proximately caused the particular losses its own chart attributes to the post-indictment decisions of those third parties. Section 3664(e) places on the Government the burden of proving, by a preponderance, that the offense proximately caused each victim's loss, and a pejorative label cannot substitute for that proof. Deploying "defrauded" as a rhetorical bridge—to sweep losses caused by later, third-party decisions into the restitution figure without proving causation as to any of them—is prosecutorial overreach, not evidence. Defendant objects to the use of that characterization for any purpose in fixing restitution or forfeiture.

regarding restitution (Doc. 300) and the motions and objections incorporated there (Docs. 132, 234, 280), which he incorporates by reference.

The Government's issue-specific grounds for two of the charged losses fail on the same principle. As to Agera (Issue 12, $129,398,324), that Mr. Lindberg "agreed to include these loans in the IALA," Doc. 308 at 7, fixes their place on a schedule; it does not prove that the offense of conviction proximately caused the loss, which arose from later market and management developments, and the controlling-stake and timing assertions the Government adds are disputed. And as to the Eli Global insurance-holding-company debt (Issue 15, $14,897,805), the Government's submission that "given Defendant's admitted fraudulent conspiracy, the losses are properly included," mistakes attribution for causation: relevant conduct is not a substitute for the proximate-cause determination 18 U.S.C. § 3663A(a)(2) requires, and the Government must still prove that these specific loans were proximately caused by the offense of conviction. The record is to the contrary: the approximately $14.84 million in losses tied to the Insurance HoldCo Debt resulted from decisions made by the GBIG management team, not by Mr. Lindberg. That team selected the acquisitions, negotiated them, and structured the purchases of the companies; and the associated transactions were ordinary-course steps taken to allocate capital promptly across the different international jurisdictions in which GBIG operated — capital invested through a holding-company loan into the various international holding companies, with a promissory note issued back to the HoldCo that made the investment, the usual structuring of a multinational insurance enterprise. In

substance the transaction is double-ledger account-keeping between international subsidiaries, not a loss at all. A loss produced by the management team's ordinary-course capital allocation is not a loss the offense of conviction proximately caused. *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009); *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026). On causation the burden is the Government's, § 3664(e), and it is not carried by a generic label: that a transaction can be swept under an "admitted fraudulent conspiracy" does not prove that the offense proximately caused this particular loss, where the transaction reflects standard industry practice or was required by an insurance regulator in a changing regulatory environment — a generality that fits ordinary-course conduct equally well proves nothing about causation. Nor may the Government carry the day with mere attorney argument. It opposed — though it had no standing to do so — the Rule 17(c) subpoenas that would have produced the very company records documenting the management team's decisions, and those subpoenas were denied; a party has no standing to oppose subpoenas directed to third-party custodians in which it claims no privilege or proprietary interest, *In re Grand Jury Subpoena John Doe*, 584 F.3d 175, 184 n.14 (4th Cir. 2009), and having blocked production of the records, the Government cannot fault the defendant for proving the point by proffer rather than by the documents it kept from him. Neither item can be resolved against Mr. Lindberg without the § 3664(e) hearing he has requested.

On the largest charged loss, the intervening cause is established directly, on personal knowledge, by Mr. Lindberg's sworn affidavit. Def. Ex. 1, Tab A (Affidavit of

Greg E. Lindberg). The affidavit establishes that the consent right over any sale of NHC's assets or stock — the AAI Director's veto under Article II, Section 3.i of the June 27, 2019 Memorandum of Understanding — passed to the Special Master/Receiver and never lapsed: the only defaults that could extinguish it were those to be agreed and implemented under Article III of the MOU, and the Wake County court held Article III an unenforceable "agreement to agree" that was therefore never implemented, while every pre-MOU default was waived on the day the MOU was signed. *Id.* ¶¶ 5–18 & Exs. A–B. The consequence for causation is decisive. The Beckett sale did not simply befall Mr. Lindberg; it was affirmatively approved by the Special Master/Receiver, through his own NHC board designee. Aware of the veto right, the buyer required the affirmative vote of the Special Master/Receiver's designee and was furnished the Special Master/Receiver's letter of non-objection; and in Mr. Lindberg's sworn assessment, drawn from decades of mergers-and-acquisitions experience, no buyer would have closed the Beckett purchase without the Special Master/Receiver's affirmative signature — a signature the Special Master/Receiver gave knowing he could not lawfully approve the sale without this Court's approval. *Id.* ¶¶ 19–20. The approximately $866 million Beckett loss is thus the product of the Special Master/Receiver's own affirmative act, taken through the governance rights he holds over the estate, not of Mr. Lindberg's offense of conviction — the paradigm of a superseding cause that breaks the causal chain. *Robers v. United States*, 572 U.S. 639, 646 (2014).

**C. The Fourth Circuit has construed this same "directly or indirectly harmed" plea language and held it does not dispense with causation — the plea fixes no amount and waives no causal predicate.**

The Government also argues that Mr. Lindberg agreed in his plea to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct," Doc. 40 ¶ 10(a), and that § 3663A(a)(3) permits agreed restitution. Two features of that language are dispositive. First, read in its entirety, the promise runs to persons "directly or indirectly harmed by the defendant's criminal conduct," and its controlling words are the closing ones — *"by the defendant's criminal conduct"* (emphasis added). The modifier "directly or indirectly" does not delete the requirement, stated in the same breath, that the harm be one caused by the defendant's criminal conduct. Read in total, Paragraph 10(a) fixes a causation floor — it reaches harm caused by the offense conduct, and nothing less — and cannot be inverted into a promise to pay for harm the defendant's conduct did not cause without reading the words "by the defendant's criminal conduct" out of the very sentence the Government quotes. The obligation thus reaches only persons "harmed by the defendant's criminal conduct" — an express causal predicate. Second, the phrase "regardless of the resulting loss amount" speaks to quantum alone, confirming only that the figure is not tied to the Guidelines loss calculation. An agreement to pay "full restitution" fixes the amount a defendant will owe without discharging the Government from proving causation. A plea may waive the quantum of loss; it does not, through general language, erase the statutory predicate that the loss be one the offense directly and proximately caused. Any waiver of that threshold

causal requirement must be express, and none appears here: "regardless of the resulting loss amount" addresses how much, not whether Mr. Lindberg's conduct caused it. The plea confirms the distinction — the Guidelines "loss" figure "may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Doc. 40 ¶ 8(a). The Fourth Circuit's rule is directly on point: "[u]nless a plea agreement provides otherwise," an MVRA restitution order "is to be based upon the loss directly and proximately caused by the defendant's offense conduct." *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009). Nothing in Paragraph 10(a) provides otherwise as to causation — it speaks to the loss amount, not to the causal predicate. *Squirrel* is not merely the source of that rule; it is a holding on this very language. The defendants there agreed in their pleas to pay "full restitution, regardless of the resulting loss amount," to "all victims directly or indirectly harmed by the defendant's 'relevant conduct' … regardless of whether such conduct constitutes an 'offense' under 18 U.S.C. § 3663 or 3663A." *Id.* at 216 — the same "directly or indirectly harmed" formulation the Government invokes here, and broader still. The Fourth Circuit held that that language did not supply a valid basis for restitution absent proximate cause. Applying the causation analysis regardless, it held "the distinction is without a difference, because … the conduct of *Squirrel* and Slee did not directly and proximately cause any financial loss," and it vacated the award. *Id.* at 218. And because the power to order restitution is statutory in origin, the plea cannot supply what the statute withholds: "a defendant's consent to a particular restitution order cannot, without more, authorize a restitution order not authorized by the statutory

source," and the only avenue to vary the statutory limits is a specific agreement formally embodied in the plea agreement, not a general reference to "indirect" harm. *United States v. Broughton-Jones*, 71 F.3d 1143, 1148–49 (4th Cir. 1995). The Fourth Circuit has applied that principle to the MVRA: where a restitution order "is not based on [the defendant's] plea agreement or his criminal conduct, it exceeds the statutory maximum under the MVRA," because even a defendant who agrees to pay a sum certain "did not agree … to relieve the government of its burden of proving that [his] restitution obligation included only those losses caused by [his] criminal conduct." *United States v. Zakrzewski*, 462 F. App'x 421, 426 (4th Cir. 2012) (unpublished); accord *United States v. Patty*, 992 F.2d 1045, 1051 (10th Cir. 1993). "Indirectly harmed" does not remove the causal chain to the defendant's criminal conduct; it does not sever that chain. That is the uniform rule: an agreement to expand restitution beyond proximately caused loss must be express and will not be implied from general language, *United States v. Randle*, 324 F.3d 550 (7th Cir. 2003); even an express § 3663(a)(3) plea agreement does not authorize restitution absent some causal connection between the defendant's conduct and the victim's loss, *United States v. Woods*, 689 F. Supp. 2d 1102 (N.D. Iowa 2010); and "directly and proximately" requires both but-for and proximate causation, *United States v. Goodrich*, 12 F.4th 219 (2d Cir. 2021). "Indirect" does not waive causation, and it does not elevate restitution into liability in the air. *Cf. Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 341 (1928) (Cardozo, Ch. J.) ("Proof of negligence in the air, so to speak, will not do"). Paragraph 10(a) thus fixes no amount and does not abandon the

requirement — central to the MVRA and to *Hughey* — that the loss be caused by the conduct of conviction. *Hughey v. United States*, 495 U.S. 411, 413 (1990). An agreement to pay restitution for indirect harm is not an agreement that every diminution in the estate is the defendant's to bear regardless of what caused it — least of all losses attributable not to his offense but to intervening, post-indictment decisions and to value that a court-appointed officer himself extinguished. Because the plea neither sets a figure nor supplies causation, the Government must still prove, and the Court must still determine, that each dollar of claimed loss was harm caused by the criminal conduct. Nor can a plea term supply the constitutional authority the reference lacks or waive the structural defect. Defendant expressly reserves the de novo determination of causation, offsets, and credits, and reserves and preserves the Sixth Amendment challenge to fact-finding by a preponderance following *Ellingburg*. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Southern Union Co. v. United States*, 567 U.S. 343 (2012).

**D. The "circular" character of the disaffiliation transfers reflects regulator-mandated restructuring, not additional offense-caused loss.**

The Government's reliance on the plea's reference to "circular, non-economic transactions among … entities using insurance company funds," Doc. 308 (quoting Doc. 42 ¶ 5), cannot be stretched to recast the disaffiliation transfers as a separate, loss-causing wrong. The Special Master/Receiver isolates the affiliated-investment transactions — the insurer's rated debt investment into each vehicle, and the vehicle's loan to an affiliate — and treats those transactions as the conduct that caused the loss, measuring restitution by their outstanding balances. Doc. 106, at 19.

But those transactions were not free-standing acts of Mr. Lindberg's choosing; they were the required mechanics of the four disaffiliation structures the North Carolina Department of Insurance reviewed — the two-class special-purpose vehicles, the irrevocable trust, the finance companies, and the principal-protection notes. Each structure operated, by design, only through the very transaction the Special Master/Receiver now isolates: the insurer could not implement the reviewed structure without making the rated debt investment, and the vehicle could not function without the corresponding affiliate loan. In a real sense, the transactions were the structures. The Department negotiated and confirmed that framework — setting the approximately forty-percent ceiling on affiliated investments in its April 11, 2016 review letter, receiving the eleven disclaimers of affiliation filed under N.C. Gen. Stat. § 58-19-25(j), and reviewing the successor finance-company and principal-protection-note structures before they were used. Doc. 234, at 6; Doc. 300, at 29–31. The apparent circularity is the signature of that mandated sequence, not evidence that value left the estate: the transfers were successive restructurings of the same assets, as the group phased out the original special-purpose-vehicle exposure and migrated those holdings into the finance-company and, ultimately, the principal-protection-note structures. Creating the principal-protection notes required unwinding the earlier special-purpose vehicles and finance companies and placing the same underlying affiliated credits into the note structure — now backed by added third-party bond collateral. Moving the same assets into a successively better-collateralized, regulator-reviewed structure increased credit quality and added

collateral; it did not create a new loss. The outstanding balances the Special Master/Receiver counts therefore reflect the same underlying assets carried in a more protected form, not incremental harm proximately caused by Mr. Lindberg. § 3664(e); *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026). The full account, with the supporting regulatory record, is set out in Defendant's Statement of Facts Regarding the Disaffiliation Structure and the accompanying Disaffiliation Exhibits (DS-1 through DS-21). Doc. 300.

**E. Independently, the restructuring the Government now charges as loss arose only because of the Government's own interference — a superseding cause.**

Even if the disaffiliation transfers could be recast as loss-causing conduct, the sequence the Special Master/Receiver isolates would never have arisen but for the Government's own interference. The original disaffiliation plan required no sale of any operating company: the affiliated credits were to be contributed to a securitization and financed, retiring the affiliated loans on the insurers' balance sheets in full — a structure the group's principal lender was prepared to underwrite and that an independent third party proposed on the same terms, neither of which contemplated selling any operating company. It was only after the Government intervened — its communications causing the lender to refuse to do business with Mr. Lindberg and to refuse to hold the affiliated assets in the securitization — that the plan was forced to pivot to demanding "clean" insurance companies, and it was that Government-forced pivot that first required the asset sales and transfers the Special Master/Receiver now recasts as Mr. Lindberg's loss-causing conduct. See

Sealed Addendum (Department of Justice interview memoranda). The losses the Government charges to Mr. Lindberg are thus the product of the Government's own conduct: but for the Government's interference, the affiliated loans would have been retired through the original vehicle — with no sale, no forced disposition, and no loss. A loss the Government itself set in motion cannot be the loss "directly and proximately caused by [Mr. Lindberg's] offense conduct," *United States v. Wilkinson*, 590 F.3d 259, 268 (4th Cir. 2010); it is the paradigm of a superseding cause. *Robers v. United States*, 572 U.S. 639, 646 (2014); *United States v. Speakman*, 594 F.3d 1165, 1172–74 (10th Cir. 2010). That interference, moreover, rested on a false premise: the Government treated the affiliated transactions as illicit and directed the lender to treat them the same way, foreclosing the diligence that would have confirmed — from the same regulator-reviewed record set out above and in Defendant's Reply — that the transactions were mandated by the statutory disaffiliation framework rather than evidence of wrongdoing. Doc. 300, at 29–31 & Exs. DS-1 through DS-21; see Sealed Addendum.

The Government's refusal to answer issue by issue is nowhere more consequential than here, because an issue-by-issue response would have had to confront the Government's own intervening acts. Defendant's evidence includes the contemporaneous e-mail of the companies' Chief Financial Officer, Christa Miller, memorializing that when Ares — then in exclusivity to purchase the U.S. insurance companies and willing to retain the affiliated loans through a proposed SPV — reversed course, Ares "said that they had been told by a third party constituent that

they should avoid any ongoing connection to Eli Global after the close," having earlier "been advised to not have any ongoing ties." Christa Miller e-mail (Jan. 6, 2019) (Sealed Addendum). The e-mail's express words are "a third party constituent"; Defendant contends, and is prepared to establish, that the third party was the Government. The Government has never engaged that evidence or accounted for its own role, and the Ares records from the period surrounding that e-mail remain unavailable to the defense — the materials the Government did produce are attached to the sealed affidavit accompanying this Response. Because the Government will not answer, Defendant is compelled to place these matters on the record himself, without the Prosecution ever having met the burden of proof § 3664(e) assigns it. That the defendant must prove the Government's own intervening conduct while the Government declines even to respond is, in itself, an extraordinary posture for a proceeding in which the burden is the Government's alone.

For the same reasons, Defendant's Motion for a Determination That No Restitution Is Owed (Doc. 234) cannot be turned aside on this record. It rests on new and controlling authority — *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026), the Fourth Circuit's own disposition in this case — which fixes the governing proximate-cause standard and applies directly here. This Court cannot reject Doc. 234 consistent with that authority; and because the Government has not responded to it on the merits, the motion should be granted. LCrR 47.1(d)(3). The Government has not answered any of the causation issues raised in Defendant's Motion for a Determination That No Restitution Is Owed and its accompanying Statement of

Facts (Docs. 234, 235) — the specific, evidence-backed showings that the losses the Special Master/Receiver charges were produced by intervening, post-indictment decisions of third parties and not proximately caused by the offense of conviction. Those causation issues, and the facts and evidence supporting each, are expressly reserved and are incorporated in this Response as if reproduced in full; they stand unopposed, LCrR 47.1(d)(3), and are not waived.

**VIII. The mandatory credits and offsets cannot be "disallowed" on the Government's "unless and until monetized" theory.**

The Government's chart disallows nearly every credit on the theory that the defendant should be credited only "if and when" an asset is monetized and only in "the actual dollar amount of value once realized." Doc. 308 at 3. That inverts the statute. For a property offense the measure is the value on the date of loss or of sentencing, less the value of any part returned "as of the date … returned," § 3663A(b)(1)(B) — a present determination, not a future contingency — and the Court must order restitution in "the full amount of each victim's losses," crediting amounts recovered so that no order overstates the loss, § 3664(f)(1)(A), (j)(2). The AAPC preferred equity given to ULICO (Issue 3, $352,906,240) illustrates the error: the record establishes that ULICO holds AAPC preferred equity with a par value matching the obligation, and the credit is fixed as of transfer, not deferred until ULICO chooses to monetize. Doc. 278 ¶ 6. Because that equity was transferred in partial satisfaction of a civil judgment, the credit is presently due: "[a]ny amount the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution

amount to prevent double recovery." *United States v. Malone*, 747 F.3d 481, 485 (7th Cir. 2014). A restitution order that fails to offset the loss by the value of property the defendant returned is error requiring vacatur. *United States v. Arrington*, 97 F.4th 593 (8th Cir. 2024) (vacating restitution for failure to reduce it by the value of returned shares). And returned property is credited at the value it had when returned — not at a future liquidation the victim may never pursue. *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring) (a victim who "chooses to hold collateral rather than to reduce it to cash within a reasonable time … must bear the risk of any subsequent decline").

For the reasons developed in Argument VII.B, the Government's disallowance of the largest disputed items — the Clanwilliam sale loss (Issue 16, $474,000,000), the early zero-coupon-bond sales (Issue 17, $611,600,000), and the diminution in the North Carolina Insurance Companies' value (Issue 11, $454,000,000) — on the express ground that they resulted from decisions made "after LINDBERG defrauded them," Doc. 308 at 5–6,[4] proves the defense's causation point: these are losses of later, intervening decisions, and the value those same decisions destroyed cannot be disregarded while the losses themselves are charged to Mr. Lindberg. That the North Carolina insurance companies were worth what the schedule reflects is not Mr. Lindberg's say-so; it is established by the Government's own evidence, for the lender

[4] Defendant renews his objection, stated above, to the Government's characterization that Mr. Lindberg "defrauded" the rehabilitators. Doc. 308 at 5–6. No evidence has been produced by the Government to support that statement, and the label cannot substitute for the proximate-cause proof 18 U.S.C. § 3664(e) requires; its use to charge Mr. Lindberg with losses produced by later, intervening third-party decisions is prosecutorial overreach, not evidence.

the Government dealt with agreed in its letter of intent to acquire those companies for approximately $450 million — an arm's-length price the Government cannot disclaim, and one that corroborates the value charged as lost. The $450 million is thus not a separate credit but independent proof of the very value the Government's interference destroyed. The remaining issue-specific objections are set out in Defendant's prior filings (Docs. 132, 234, 235, and Defendant's response to Doc. 275) and are not waived.

The reductions the Special Master/Receiver disallowed or omitted are set out, item by item, in the revised schedule of offsets, credits, and reductions in Defendant's Preliminary Response and Objection to the Special Master/Receiver's Second Supplement to Report and Recommendations (Doc. 281, at 30), reproduced below. They fall into three groups: improper additions to the affiliate-investment balances; mandatory credits and offsets for value the insurers received or recovered, § 3664(j)(2); § 3663A(b)(1)(B); and losses that the intervening decisions of third parties produced and that the offense did not proximately cause, § 3664(e) — including the roughly $866 million destroyed when the Special Master/Receiver sold Beckett — a company valued of record at approximately $1 billion, see Argument IX — for approximately $134 million, some thirteen cents on the dollar. Applied against the Special Master/Receiver's $1,625,000,000 figure, these reductions total $3,765,418,383 and yield net restitution of zero — and that is before the roughly $1 billion of Mr. Lindberg's own first-loss capital that stands ahead of any protected party's loss:

| Description | Amount |
|---|---|
| Special Master/Receiver's Proposed Restitution Figure | $1,625,000,000 |
| I. Improper Additions to the Affiliate-Investment Balances | |
| Prejudgment Interest | ($263,000,000) |
| Corrected Starting Balance of Affiliate Investments | ($141,000,000) |
| II. Additional Credits and Offsets | |
| AAPC Preferred Equity Par Value (as of May 26, 2026) | ($352,906,240) |
| SNIC Payments | ($27,823,425) |
| Cash Payments to Pre-Designated Restitution Parties Not Captured by the Special Master/Receiver | ($79,655,289) |
| CBL Subordination Fee (Beckett refinancing) | ($3,000,000) |
| Additional Clanwilliam Sale Proceeds | ($20,000,000) |
| ULICO Sale of Contributed Real Estate | ($13,596,013) |
| Sale Proceeds of Zero-Coupon Bonds in PPNs | ($243,452,385) |
| Value of the NCICs as of October 2018 | ($454,000,000) |
| Bermuda ICs' Proceeds from Sales of Affiliated Assets | ($9,800,076) |
| III. Losses Not Proximately Caused by Mr. Lindberg | |
| Loss on Agera | ($129,398,324) |
| ECL Losses | ($22,288,826) |
| Loss on UKAT | ($39,000,000) |
| Insurance-Holdco Debt Portion | ($14,897,805) |
| Loss on Clanwilliam Below-Market Sale | ($474,000,000) |
| Loss on Early Zero-Coupon Bond Sales | ($611,600,000) |
| Loss on Beckett Sale | ($866,000,000) |
| TOTAL MINIMUM OFFSETS AND REDUCTIONS | ($3,765,418,383) |
| NET RESTITUTION OWED | $0 |

To the extent the Government suggests that Mr. Lindberg did not prove these offsets, the records that would document them passed to third parties when Mr. Lindberg surrendered the companies — they are held by NHC Holdings, LLC, the North Carolina Insurance Companies and their Special Deputy Rehabilitator, the Bermuda insurers, and the Special Master/Receiver and his advisor — and any uncertainty from the withholding of those records must be read against the party that withheld them, not against Mr. Lindberg. The items are exemplary, not exhaustive; the records that would establish each are the subject of Defendant's Rule 17(c) subpoena motion (Doc. 248). Mr. Lindberg has, moreover, shown through valuation the factual basis for the value of everything he held until control of the companies

passed from him: those values rest on independent, professional valuations — KPMG's and Houlihan Lokey's — and, for offsets arising from events after control passed, on the Rehabilitator Mr. Dinius's own valuation of the same assets, so that each offset is supported, depending on the offset at issue, by a valuation that must be read in Mr. Lindberg's favor. Because the Government bears the burden of a complete accounting, § 3664(a), (e), and it and the Special Master/Receiver have simultaneously withheld and opposed production of the very records that would establish these offsets and disprove these charged losses, the amounts cannot be resolved against Mr. Lindberg — at a minimum, the value those records would establish may not be charged to him. And the Government, which had no standing to oppose the subpoenas directed to those third-party custodians yet stepped in to defeat them, cannot now be heard to claim that Mr. Lindberg failed to prove these offsets. *In re Grand Jury Subpoena John Doe*, 584 F.3d 175, 184 n.14 (4th Cir. 2009).

The factual bases for each of these reductions are established in Defendant's statements of facts already before the Court, which Defendant incorporates here as if fully set forth herein: his Statement of Facts in support of his Response and Objection to the Special Master/Receiver's Report and Recommendations (Doc. 132, Ex. 1); the Statements of Facts filed with his post-judgment Motion to Stay Asset Sales and Enforcement of the Preliminary Restitution Order (Doc. 172) and his Emergency Motion to Stay All Asset Sales and Consolidated Objections to the Preliminary Order of Restitution (Doc. 190), both filed within fourteen days of the May 29, 2026 judgment; his Consolidated Statement of Facts (Doc. 235); and his

Statement of Facts Regarding the Disaffiliation Structure and the accompanying Disaffiliation Exhibits (Doc. 300). The facts, evidence, and arguments set out in those statements of fact are incorporated in this Response as though reproduced in full.

The two improper additions at the head of the schedule require separate mention, because the Government defends the larger one affirmatively. The $263,000,000 the Special Master/Receiver added as prejudgment or "time value" interest has no basis in the MVRA. Restitution under the Act compensates a victim's actual loss caused by the offense, *Hughey v. United States*, 495 U.S. 411 (1990), and may neither exceed that loss nor grant a windfall, *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017). The Court must order "the full amount of each victim's losses" as § 3663A(b) defines it, and for an offense against property that amount is the value of the property lost, less the value of any part returned, § 3663A(b)(1)(B) — a measure that contains no interest component. The Government's own policy confirms as much: the Department of Justice's published guidance on the restitution process expressly excludes interest, recognizing that interest is a financial loss that is "not eligible for restitution." The Restitution Process (Fraud and/or Financial Crimes), U.S. Dep't of Justice, Criminal Division, https://www.justice.gov/criminal/criminal-vns/restitution-process (last updated Oct. 10, 2023). Where, as here, the property lost was cash the defendant can return, the measure is the amount taken under § 3663A(b)(1)(A), which includes no interest; and the pre-MVRA decision the Special Master/Receiver invokes, United States v. *Hoyle*, 33 F.3d 415 (4th Cir. 1994), predates the Act and does not authorize interest under

it. Adding $263 million of interest charges the defendant a sum the victims did not lose to the offense; and an amount not authorized by the statutory source is not a lawful term of a restitution order. *United States v. Broughton-Jones*, 71 F.3d 1143, 1147–49 (4th Cir. 1995). The out-of-circuit decision the Government invokes cannot bind this Court or enlarge the measure of loss that § 3664 and the Fourth Circuit prescribe.

The Government's disallowance of four further credits on a "new consideration" theory fails on the statute. It declines to credit the SNIC payments (Issue 4, $27,823,425), the CBL subordination fee ($3,000,000), the ULICO real-estate transfer ($13,596,013), and the Bermuda insurers' asset-sale proceeds ($9,800,076) on the ground that the payments were "made for new consideration" and were "not related to affiliate loan balances." Doc. 308 at 4–5. Neither rationale defeats a credit the MVRA makes mandatory. The statute reduces restitution by the value of property returned, § 3663A(b)(1)(B), and by amounts the victims recover, § 3664(j)(2), without regard to the payer's motive or whether a given payment matched a particular schedule line; what governs is that the payment in fact reduced the victim's net loss, which is all the statute measures. *Ritchie*, 858 F.3d at 216. And to the extent the Special Master/Receiver has already credited a portion of the cash payments not captured in his figures (line item, $79,655,289), that portion is not claimed twice: the credit sought is the net amount his accounting still omits. The Special Master/Receiver's contrary "criteria" — disallowing payments he deems "made for [Mr. Lindberg's] own strategic, business, or self-preservation purposes or for other

independent consideration" — has no basis in the statute and no supporting authority. What the MVRA measures is whether the victim was in fact repaid, not the defendant's motive; once the defendant shows a payment that reduced the victim's loss, the offset is mandatory, and the defendant bears only the burden of showing it. *United States v. Karam*, 201 F.3d 320 (4th Cir. 2000); § 3664(j)(2). Two further recoveries generated no credit at all and must also reduce the figure. Of the Clanwilliam proceeds, the Special Master/Receiver withheld a $14,112,426 administrative reserve, and $23,520,710 was paid to Vista — an entity the Special Master/Receiver "is unsure" is even due restitution — yet neither amount was credited to Mr. Lindberg. Doc. 66 ¶¶ 20(d), 26 n.8; Doc. 190. Every amount the victims received, and every amount diverted from the estate, must be brought to account before any net loss can be fixed, and these too reduce it. § 3664(f)(1)(A), (j)(2).

Nor does the Government's footnote defending restitution paid "directly to failed insurance companies," Doc. 308 at 8 n.8, answer § 3664(j). To the extent the guaranty associations have paid policyholder claims, the amounts the victims have already recovered must reduce the restitution figure so that no victim recovers twice and no order overstates the loss. § 3664(j)(1)–(2); *Ritchie*, 858 F.3d at 216. The allocation and "provider of compensation" questions the Government raises under § 3664(j)(1) are addressed in Defendant's response to Doc. 275, which he incorporates by reference.

The zero-coupon principal-protected notes illustrate the same error and independently subtract from the loss; the record supporting the credit is set out in

full in Defendant's Supplemental Response Regarding the Zero-Coupon Principal-Protected Bonds and the accompanying Declaration of Greg E. Lindberg. Doc. 295 (and Exs. A–N thereto). Beginning in 2018, with the express permission of the North Carolina Department of Insurance, the North Carolina insurance companies acquired a portfolio of principal-protected notes issued through nationally recognized banks — including Barclays, RBC, UBS, and Natixis — contractually scheduled to repay approximately $1,006,239,867 at maturity. Doc. 295 ¶ 1 & Exs. A–F. Each note paired a zero-coupon bond that guaranteed repayment of principal if the note was held to maturity with an affiliate-loan component; because the issuers were major, highly rated banks and the principal was guaranteed at maturity, the notes were designed and expected to be held to maturity, at which point they would return the full guaranteed principal, while sold early they returned only a fraction — the equivalent of surrendering a life-insurance policy for a fraction of its face value. *Id.* ¶ 2. The companies' own contemporaneous books confirm that the zero-coupon bonds existed solely to fund and protect the affiliate investments, dollar-for-dollar, and served no independent investment purpose. *Id.* ¶¶ 3–4 & Exs. H–J.

When the notes were unwound, the zero-coupon components performed exactly as designed: every one was sold for par or higher, and the proceeds paid down the principal owed to the insurers — albeit at a loss of approximately $611 million to their full payoff, the result of an early sale that was never contemplated by any party and that was unnecessary given cash reserves sufficient to pay any obligations. Doc. 295 ¶¶ 5–7 & Ex. G. The insurers' own investment professional confirmed the

outcome contemporaneously — although the worst-positioned notes had been projected to lose $50 to $60 million, they were in fact disposed of at a net gain, the disposition summary recording a total realized gain of $6,036,766.05 across the portfolio. Doc. 295 ¶¶ 6–7 & Ex. G; see Doc. 234-38 (Oct. 28, 2019 email). The same records fix the cash actually recovered company by company: $329,169,087.55 for Colorado Bankers Life, $21,842,490.43 for Bankers Life Insurance Company, and $43,567,328.50 for Southland National Insurance Corporation — $394,578,906.48 in all. Doc. 295 ¶ 7 & Ex. G. These are recorded, dollar-for-dollar proceeds, not projections or "illustrative" figures, and the Special Master/Receiver's Report neither reflects them nor reconciles against them. *Id.* ¶¶ 7, 10.

Issue 17 (approximately $611.66 million) is not a loss chargeable to Mr. Lindberg but a credit the Government refuses to give: it is the value that same early sale destroyed, not any value Mr. Lindberg took. Mr. Lindberg surrendered control of the companies and their records in October 2018; the decision to sell the notes before maturity — for approximately $394,578,906.48, less than forty cents on the roughly $1.006 billion guaranteed at maturity — was made in 2019 by the court-supervised Rehabilitator, Mr. Dinius, after control had passed to him. Doc. 295 ¶¶ 8–9. Nor was the sale compelled by any liquidity need: the companies held more than $1 billion in cash and marketable securities for years after the 2019 sale, so the early liquidation was a discretionary choice by the fiduciaries then in control, not a necessity. *Id.* ¶ 9. It is therefore an intervening, superseding cause of whatever loss the sale produced,

attributable to the Rehabilitator and not to Mr. Lindberg. *Robers v. United States*, 572 U.S. 639, 646 (2014).

Two credits follow, and the MVRA requires both. First, the approximately $394,578,906.48 in cash the sales generated returned the protected principal to the victims and must reduce the restitution figure as the value of property "returned." 18 U.S.C. § 3663A(b)(1)(B); see *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017) (restitution may not require a defendant to "pay back more money than he stole"); Doc. 295 ¶¶ 10–11 & Exs. G, K. Second, the approximately $611,660,961 in value the premature sale destroyed must be excluded because it was caused by the intervening, discretionary act of a court-supervised third party, not by Mr. Lindberg. Doc. 295 ¶ 11. Taken together, the two credits account for the full $1,006,239,867 of principal protection the notes were designed to deliver: the portion recovered in cash must be credited because the statute requires it, and the portion destroyed must be excluded because Mr. Lindberg did not cause it. And because the Special Master/Receiver's figures nowhere account for these cash paydowns, they cannot satisfy the complete accounting the MVRA requires before restitution is fixed. § 3664(f)(1)(A). On either footing, the zero-coupon bonds cannot add a dollar to restitution against Mr. Lindberg — they subtract from it.

## IX. The valuation objections are not merely "informational," and the accounting is a statutory predicate to any final order.

The Government urges that the Court need not resolve Defendant's objections to the Special Master/Receiver's asset valuations because they were "provided for informational purposes." Doc. 308 at 21 n.15. But the Court cannot determine "the

full amount of each victim's losses," § 3664(f)(1)(A), or resolve the disputed credits, without knowing what the Special Master/Receiver sold, for how much, and where the proceeds went. The Beckett disposition — the sale of Beckett Collectibles, a business independently valued at approximately $1 billion by the Cabrillo Advisors appraisal and by Blackstone's own arm's-length acquisition proposal, for approximately $134 million, with the price withheld as "confidential" — evaded every statutory checkpoint. The Government's suggestion that Beckett was "a small portion" of the Collectivus Group (Ex. C ¶ 13), and that the "Surviving Collectivus Group … remains a valuable restitution asset" (*id.* ¶ 22), confirms nothing. Enterprise value is not revenue share, and the independent appraisal already in this record values each company separately. The Cabrillo Advisors appraisal fixed Beckett Collectibles, LLC — the business actually sold — at $1,003,924,000, corroborated by Blackstone's $1.05 billion enterprise-value indication of interest, while placing the other portfolio companies on their own lines (Arcane Tinmen ApS, $107,749,000; CBCS Operations, LLC, $14,125,000; Southern Hobby Distribution, LLC, $538,010,000). Doc. 256-1 at 3; Doc. 256-2. The roughly $1 billion figure is thus Beckett standing alone — an apples-to-apples measure of the business sold for approximately $134 million — not, as the Government implies, a number swollen by other entities. That a larger group retained value says nothing about whether the roughly $1 billion Beckett business was sold for a fraction of its worth, and the survival of other assets does not offset the loss of the one disposed of. If anything, that Collectivus remains valuable confirms that the estate held ample value to

protect and that the disposition was not compelled by any shortfall. A full and verified accounting is the necessary predicate to the Court's § 3664 determination, not an optional add-on, and the Special Master/Receiver cannot offer an affidavit about the Beckett documents while withholding the documents themselves. Compounding the problem, the Special Master/Receiver has refused to place his valuation methodology on the record at all — the basis on which he derived the $1.655 billion figure, wrote down or valued the estate's assets, and accounted for the Beckett proceeds. A de novo determination under § 3664(e) cannot be made on a computation the Court cannot see, the Government cannot expose to scrutiny, and the defendant cannot rebut. A loss figure whose derivation is kept off the record is not proof of loss but an unsupported assertion; and a party cannot withhold the books, records, and valuations that would establish loss — while resisting the very subpoenas that would produce them — and simultaneously demand adoption of a report built without them. § 3664(a), (f)(1)(A).

The Government's suggestion that Mr. Lindberg's valuations are themselves suspect because "artificially inflating the financial condition of companies was a central part of [his] scheme," Doc. 308 at 6 n.5, does not reach the valuations on which this Response relies. Those figures are not Mr. Lindberg's own representations; they are independent, third-party determinations — the Cabrillo Advisors appraisal and Blackstone's own arm's-length indication of interest addressed in Argument IX — together with the arm's-length offers sophisticated buyers actually made. The valuations of the other assets are likewise the work of independent, nationally

recognized firms, and none of them is in dispute: KPMG prepared a valuation of the Eli Global insurance entities, and Houlihan Lokey prepared an independent portfolio valuation of the same assets, both filed with Defendant's Motion for Determination That No Restitution Is Owed (Doc. 234) as Exhibits E and HL. A premise about the defendant's historical representations says nothing about the reliability of an independent appraiser's valuation or a third party's binding offer. And the independence of the KPMG and Houlihan Lokey valuations is established by Mr. Lindberg's sworn testimony: he never communicated with KPMG or Houlihan Lokey, did not know who staffed their engagement teams, and supplied none of their inputs — the bank-account records and financial statements for the underlying operating companies were furnished by those companies' management, not by him — and his only role was to approve the more than $1.8 million in fees for their work. Def. Ex. 1, Tab A ¶ 22. Those valuations were therefore neither Mr. Lindberg's representations nor influenced by him, and the Government's "artificially inflating" premise, Doc. 308 at 6 n.5, does not reach them. Nor does attorney argument change the facts these independent valuations establish: the Government's counsel may characterize the defendant's past representations however it wishes, but the characterizations of counsel are not evidence and do not alter what KPMG, Houlihan Lokey, Cabrillo Advisors, and the buyers' own offers actually found. Indeed, the Rehabilitator's own valuation of these same assets — the valuation Mr. Dinius prepared after he took control of the companies, filed as Exhibit J to Defendant's Statement of Facts, Doc. 132, Ex. 1 — confirms rather than contradicts the values on which this Response

relies, and squarely rebuts the Special Master/Receiver's debt-based numbers. The Government's attorney argument therefore cannot discredit the record evidence that the estate held far more value than the Special Master/Receiver's debt-based figures reflect.

The accounting the Government would skip is a predicate not only to entering a restitution order but to enforcing one, and the MVRA's enforcement scheme confirms why the Special Master/Receiver's ongoing sales are unauthorized. The statute does not empower a court-appointed officer to liquidate the estate to satisfy restitution; it vests enforcement in the United States, and only after a final order fixes the amount. A restitution order is enforced "by the United States in the manner provided for" in the fine-collection subchapters "or by all other available and reasonable means," 18 U.S.C. § 3664(m)(1)(A), through the civil-judgment machinery of § 3613 — under which restitution becomes "a lien in favor of the United States on all property and rights to property" that "arises on the entry of judgment," § 3613(c), and which incorporates the Federal Debt Collection Procedures Act and its writs of execution, 28 U.S.C. §§ 3001 et seq.; *id.* § 3203. See United States v. *Abdelhadi*, 327 F. Supp. 2d 587, 590 (E.D. Va. 2004) (the United States may pursue "any civil remedies available under the [MVRA] … such as a lien attached to defendant's property," and "any civil enforcement methods available under the [FDCPA], such as a writ of garnishment or execution on defendant's property"); *United States v. Scarboro*, 352 F. Supp. 2d 714, 716 (E.D. Va. 2005). That machinery presupposes an existing, valid order: the enforcement authority flows from the restitution order, not

the other way around. And the order it enforces must fix "the full amount of each victim's losses," § 3664(f)(1)(A), determined by the Court de novo, § 3664(d)(6), by a preponderance, § 3664(e), on the complete accounting § 3664(a) requires — none of which can be accomplished on the data the Special Master/Receiver has withheld. That accounting reaches both sides of the ledger: it must fix not only each victim's loss but the value of the very property being liquidated to satisfy it. For an offense against property, restitution is measured by the value of the property less the value of any part returned, § 3663A(b)(1)(B), and the enforcement lien attaches to "all property and rights to property of the person," § 3613(c) — a worth the Court must establish before that property is sold, not after. Here it never was: the Special Master/Receiver disposed of the Primary Restitution Assets without ever fixing, on the record, what they were worth, so the accounting reaches neither the victims' losses nor the value of the property applied against them. What is happening here inverts that scheme. There is no final order of restitution, no complete accounting, and no judicial lien or writ; yet the Primary Restitution Assets are being disposed of one after another without any order of this Court: Beckett was sold for a fraction of its appraised value, cleared by the Special Master/Receiver's own NHC-board designee and without the Court approval his appointing order required, Doc. 56 at 6–7; and the Damovo Group — a going concern independently worth between $400 million and $500 million — is now the subject of a pending state-court motion to approve its sale for no more than the debt against it. That disposition is one no order of this Court has authorized, and NHC's consent to it cannot lawfully be given without

this Court's approval. Selling a several-hundred-million-dollar enterprise for its debt, without the approval of this Court and before any loss has been determined, does not shrink the estate on paper alone; it destroys hundreds of millions of dollars of real value and manufactures, in a single transaction, one of the largest losses the Government would then charge to Mr. Lindberg — the same below-value, no-approval pattern already seen in the Beckett sale. Liquidating the res to satisfy a restitution obligation that has never been lawfully fixed, outside the only enforcement mechanism the MVRA authorizes and before the judgment that alone could trigger it, is not enforcement of a restitution order; it is a disposition the statute does not permit. As shown above, a restitution order built upon such unauthorized dispositions of the estate cannot stand. *United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006); *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995).

The methodology defect is systemic, not confined to Beckett. In the Report and across the successive dispositions, the Special Master/Receiver has repeatedly valued and sold the companies at little more than their debt — the measure appropriate to the bankruptcy liquidation of an insolvent estate, not to the sale of a going concern. The order appointing him charged him with that very task: it directed the Special Master/Receiver to "identify all assets available for liquidation … and to the extent those assets are not readily convertible to cash, determine a reasonable estimated value for those assets." Doc. 56 at 6. A reasonable estimated value of a revenue-producing enterprise is its enterprise value, not the debt carried against it. But these are not balance-sheet shells; they are operating businesses generating hundreds of

millions of dollars in annual revenue, whose enterprise value is a function of that revenue and cash flow, not merely the debt carried against them. Valuing a revenue-producing company at its debt systematically understates what the business is worth, understates the credits and offsets the defendant is owed, and inflates the net loss charged to him. The Court cannot determine "the full amount of each victim's losses," § 3664(f)(1)(A), or the value of any property returned, § 3663A(b)(1)(B), without the companies' financial reports, board reports, revenue and cash-flow data, and the offers and letters of intent they received — the very materials that establish enterprise value and that the Special Master/Receiver has declined to place on the record. That data is not a formality; it is the difference between a debt-based liquidation number and the true value of the businesses, and it is required to determine the exact value of the companies on which the restitution figure, and the forfeiture keyed to it, depend. For a property offense, § 3663A(b)(1)(B) fixes restitution as the value of the property lost, less the value of any part of that property returned — and each figure must be established on the record. The victim's loss is the Government's to prove by a preponderance, § 3664(e); where it fails to put record proof of that loss before the Court, the order cannot stand. The Fourth Circuit vacated a property-loss restitution order on exactly that ground, holding that "the record contains no proof of the victim's actual loss" and that, because "the Government failed to meet its initial burden of demonstrating the amount of loss, the burden of proof never shifted" to the defendant. *United States v. Steele*, 897 F.3d 606, 613–15 (4th Cir. 2018). The other half of the same statutory measure — the value of the property

returned, § 3663A(b)(1)(B)(ii) — is the credit the defendant is owed, and it too must be established on the record before any net loss can be fixed. That is where the Special Master/Receiver's debt-based figures fail: valuing the returned operating companies at little more than their debt understates the offset the statute commands and inflates the net loss charged to Mr. Lindberg. A valuation the Special Master/Receiver keeps off the record — whether of the victim's loss or of the property applied against it — cannot satisfy the statute, and a restitution order resting on it cannot survive review. And the defect is not confined to the offset side of the ledger. Even as to the loss itself, the Court cannot order restitution on a figure whose derivation it is not permitted to see. The full methodology underlying the Special Master/Receiver's $1.655 billion figure — the basis on which he valued each asset, applied or disallowed each offset, and accounted for the proceeds of the assets he sold — has never been placed before this Court, nor shared with the defendant, despite the defendant's repeated requests that it be produced or simply placed on the docket under the protective order already in place. The defendant has pressed for that methodology and data at every turn, including in his Motion for Reconsideration of the Order Denying His Rule 17(c) Subpoenas (Doc. 309), which asks the Court either to issue narrowed subpoenas or to order the Special Master/Receiver to place his valuation methodology and supporting data on the record under the existing protective order — the very material the Special Master/Receiver himself once offered to provide the Court under seal or in camera, Doc. 106 at 29, and has since refused to produce. A loss figure the Court cannot examine, the defendant cannot test, and the Government

has never proved is not a lawful basis for restitution; § 3664(e) requires a de novo determination on a methodology in the record, not deference to an undisclosed computation.

The AAPC valuation presents this defect in its starkest form. Because the Special Master/Receiver's write-down of AAPC rests on, and can be answered only by reference to, material he filed under seal — Appendix 1 to the Second Supplement, Doc. 245 — Defendant does not restate that material in this public Response. He addresses the AAPC valuation in full, and demonstrates that the reduced valuation cannot be reconciled with the independent professional valuations already of record, in the sealed addendum submitted with this Response — Part Two of Defendant's Sealed Addendum, which addresses the AAPC valuation and requests the unsealing of Appendix 1 to the Special Master's Second Supplement (Doc. 245) — which he incorporates here by reference. The AAPC write-down is a sentencing- and forfeiture-determinative input that has never been proved on the record, and it cannot support the restitution figure or the forfeiture keyed to it.

Once again, Defendant objects that he is forced to prove, and to place on the record, his position on the AAPC valuation before the Government has met its burden of proving that value at all. The burden under § 3664(e) is the Government's; yet the defendant is made to litigate a sentence- and forfeiture-determinative valuation the Government will not defend, on a sealed record he cannot fully answer and the Court cannot independently verify. That inversion is one more constitutional irregularity in a process already beset with them — a fee-interested officer who both liquidates and

values the estate, a forfeiture keyed to a contested and unproven valuation, and a valuation kept from scrutiny under seal — and, as shown throughout, these are structural defects that no de novo review can cure. *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 618 (1993).

**X. The § 3664(d)(5) deadline is directory, not jurisdictional, and cannot be used to force an inaccurate award.**

The Government has invoked the ninety-day deadline of 18 U.S.C. § 3664(d)(5) as a reason to fix restitution now. The deadline does not bear that weight. It is directory, not jurisdictional: a sentencing court that passes it retains authority to order restitution, because the provision exists to protect victims from delay, not to compel a deadline-driven result. *Dolan v. United States*, 560 U.S. 605 (2010). The deadline therefore cannot be wielded as a sword to force a rushed, inaccurate award. Where a victim's losses are not ascertainable by the date set, the statute's own remedies are to set or extend the determination date and develop the record, § 3664(d)(5), or — where determining causation or the amount of loss would unduly complicate or prolong the sentencing process — to decline restitution, § 3663A(c)(3)(B); see *United States v. Reifler*, 446 F.3d 65, 135–36 (2d Cir. 2006) (Congress "plainly intended that sentencing courts not become embroiled in intricate issues of proof" and made mandatory restitution "inapplicable" where the complex factual issues of cause or amount "would unduly burden the sentencing process"). What the statute nowhere authorizes is the adoption of an admitted estimate to beat a date. The lawful path is a complete accounting and a determination on the merits, not a number entered under deadline pressure.

## XI. The Government bargained for a process to develop the restitution record and cannot now truncate it.

The bifurcated procedure the Government invokes to accelerate a final order is one the Government itself bargained for: the plea contemplated the development of the restitution record through the Special Master/Receiver before any final determination. Having secured that bargain, the Government cannot now compress the very process it obtained in order to fix a $1.655 billion figure before the accounting is complete and the defendant has been heard. A defendant is entitled to the benefit of the process for which the Government bargained, and the Government is held to the promises that induced the plea. *Santobello v. New York*, 404 U.S. 257 (1971). The defendant preserves this objection, which remains pending, including before the Fourth Circuit.

The Government notes only that the Circuit denied Defendant's petitions for a stay and for an expedited writ of mandamus. Doc. 308 at 9 n.9. To the extent that bare notation is offered to suggest that the appellate disposition supports entering a final order now, it does not. A denial of a stay and of the extraordinary writ of mandamus is a discretionary denial of interlocutory and extraordinary relief; it resolves nothing on the merits, and the Fourth Circuit did not pass on any of the issues preserved here. *See Will v. United States*, 389 U.S. 90 (1967); *In re United States*, 333 F.3d 509 (4th Cir. 2003) (mandamus is a drastic and extraordinary remedy reserved for exceptional circumstances). Two circumstances confirm as much. First, the Government itself urged the Fourth Circuit that the petitions were premature and that the restitution record should be developed in this Court before

any appellate review — a position irreconcilable with its present demand to fix a $1.655 billion figure before that record and the § 3664(a) accounting are complete. Second, the timing and form of the Circuit's disposition confirm that it expressed no view on the merits, and the Government's flat description of both petitions as "denied" overstates what occurred. The petition for mandamus — which sought to compel this Court to act — was denied only after this Court set the August 10, 2026 hearing on the restitution issues, not before: once this Court took the matter up by setting it for hearing, the Circuit declined to exercise its extraordinary jurisdiction. The requested stay, in turn, was never ruled on at all on the merits: the stay was sought on the premise that this Court had not acted, and once this Court set and held the August 10, 2026 hearing on the motions for stay pending with this Court, that premise no longer existed — so the stay was left, without comment, as an interim posture rather than decided. The Circuit thus passed on nothing — a disposition reflecting deference to the ongoing proceedings in this Court, not any assessment of the merits. Because the stay was left unresolved rather than decided, it remains open for decision: this Court has not ruled on it, and the Government has not addressed it.

Defendant reasserts that application for a stay, which this Court must still decide, and the ruling on it will provide the basis for a further appeal, including an application for a stay pending appeal to the Fourth Circuit. The Government cannot recast the Circuit's disposition as an appellate ruling in its favor; and having resisted appellate review on the ground that the process in this Court should run its course, it cannot now truncate that same process. The contradiction is concrete: having told

the Fourth Circuit that the restitution record should be developed in this Court, the Government has refused to participate in developing it — it declined to respond to Defendant's dispositive motions and, even now, has not answered many of them. A party cannot represent to the court of appeals that the process below should run its course and then refuse to engage that process when this Court affords it the opportunity. The appeal of the judgment and preliminary restitution order itself remains pending.

## XII. The Court's restitution determination may not be delegated to, or governed by, the state rehabilitation court's civil findings.

Section 3664(e) commits the causation-and-amount determination to this Court, on the Government's preponderance proof; the district court is the trier of fact, *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009), and it may not delegate the determination of the restitution amount to another decisionmaker, *United States v. Dawkins*, 202 F.3d 711 (4th Cir. 2000); *United States v. Blake*, 81 F.3d 498 (4th Cir. 1996); *United States v. Stuver*, 845 F.2d 73 (4th Cir. 1988). Deferring to another tribunal's findings is a form of that forbidden delegation, and it is independently barred because § 3664(d)(6) makes a special master's proposed findings "subject to a de novo determination of the issue by the court." The Special Master/Receiver's Report nonetheless resolves several disputed issues — the Clanwilliam sale among them — by deferring to the civil findings of the Wake County Superior Court that supervised the insurers' rehabilitation. Doc. 245 at 22–23. Those findings cannot bear that weight. They are not final (they are on appeal); they are civil findings, made under civil procedures for a different purpose — whether a sale served the

policyholders' best interests — and never adjudicated whether the offense proximately caused any particular loss, or in what amount; and issue preclusion does not apply, because "the difference in the burden of proof in criminal and civil cases precludes application of the doctrine of collateral estoppel." *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 235 (1972); see *Standefer v. United States*, 447 U.S. 10 (1980). A finding made under a civil best-interests standard cannot satisfy the Government's burden in this criminal proceeding. Because restitution is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), the facts that fix it must be found here, under the standard the criminal law requires — not borrowed from a civil record resolving a different question. The state-court record may be weighed as evidence; it may not be treated as controlling.

**XIII. The Government's use of the undisclosed $1.6 billion loss figure to enhance the sentence, while disclaiming that figure as "separate" from restitution, is prosecutorial misconduct preserved for the sentencing appeal.**

The Government cannot have the loss figure both ways. When the plea was being negotiated, footnote 3 of the draft plea agreement — dated the same day — addressed whether Mr. Lindberg's Sentencing Guidelines "loss amount" would be reduced by payments he made after indictment. The Government refused. In a December 18, 2024 e-mail responding to that footnote, the prosecutor wrote that "'loss amount' is a USSG issue, not a restitution issue," and that the Government would "not . . . agree . . . that his USSG 'loss amount' should be reduced by payments he makes post indictment," adding that "nothing in 18 USC 3664(j)(2) suggests otherwise." Def. Ex. 2, Tab E (Dec. 18, 2024 e-mail of AUSA Daniel Ryan). The

Government thus drew a sharp line: the Guidelines loss that drives the sentence is a USSG matter, separate from restitution, and it would not be reduced by a dollar of post-indictment payments.

Having fixed the loss that way, the Government used it to drive the sentence upward. It urged, and obtained, an offense-level enhancement built on a loss of approximately $1.6 billion — even though many of the amounts making up that figure were not losses proximately caused by Mr. Lindberg's offense, but the product of the intervening, post-indictment decisions of third parties detailed throughout this Response. A loss the Government would not reduce by any post-indictment payment, and that swept in amounts the offense did not cause, became the engine of the sentence.

And now the Government presses that same figure as the final restitution number. The $1.655 billion it asks this Court to enter is the sentencing loss repackaged — the same inaccurate analysis, untied to causation, now advanced as a restitution award and untethered from reality. The Government cannot in one breath insist that post-indictment payments will not reduce the Guidelines "loss amount" that drove the sentence, and in the next deploy that same unreduced, causation-untethered figure to demand a boxcar restitution award and the forfeiture keyed to it.

The infirmity is compounded because the methodology behind that $1.6 billion figure has never been disclosed to the defense. The Government enhanced Defendant's sentence on a loss calculation whose derivation — how the figure was

built, what was counted, and what offsets were ignored — it has withheld, and it now asks this Court to enter restitution and forfeiture on the same undisclosed computation. A defendant cannot test, and a court cannot review de novo under § 3664(e), a loss figure whose basis is kept off the record; the enhancement and the restitution demand rest on the identical unexamined number.

That the Government's use of this figure crosses from advocacy into misconduct is confirmed by evidence that has surfaced only now. In its Consolidated Position the Government represents that the reference to a Special Master, and the Special Master's conversion into a receiver with control of the estate, originated with Mr. Lindberg — that he "agreed to the reference." The contemporaneous record refutes that representation: as the attached exhibits show, the Special Master provision and the receiver conversion were authored and insisted upon by the Government's own counsel — including the December 18, 2018 e-mail and redlines in which the Government's attorney added the very language assuming Defendant's and Global Growth's authority to appoint trustees and directors — under threat of a plea violation and competing briefs, not at Mr. Lindberg's instance. See Def. Ex. 1, Tabs C–D. That the Government would attribute its own structural demand to the defendant, on a record that shows the opposite, reflects the same pattern as its use of an undisclosed loss figure it disclaims when convenient. This evidence has come to light only now and will be used in Defendant's appeal of the sentence.

The prosecutor "may strike hard blows," but "is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). Advancing a $1.6 billion loss

to enhance a sentence while disclaiming that same figure to defeat restitution offsets, on a methodology withheld from the defense, and attributing to the defendant a structural demand the Government itself authored, are foul blows, not hard ones. Defendant preserved this issue as prosecutorial misconduct within fourteen days of the May 29, 2026 judgment, in his post-judgment stay motions (Docs. 172, 190), and again in his Motion to Enforce the Plea Agreement and for Conflict-Free Government Counsel (Docs. 201/202). He does not waive it, and he expressly preserves it for review in the Fourth Circuit, including in his appeal of the sentence.

Finally, Defendant incorporates by reference and preserves all of his pending motions, objections, and arguments, including his Objections to the Special Master/Receiver's Report and the Restitution Orders (Doc. 280), his Reply in support of his restitution motions (Doc. 300), his Motion to Strike the Government's Omnibus Response (Doc. 290), and his Response to the Government's prior Omnibus Response. Defendant is compelled to preserve his issues in this manner because the Government has once again responded not issue by issue but with a single omnibus submission — the very non-responsiveness Defendant moved to strike. That the Government cannot meet the issues one at a time reflects the root of the problem: it has no facts to offer, having assembled its restitution demand without the examination of the facts that 18 U.S.C. § 3664(e) requires it to prove, and it now asks the Court to adopt a figure it declines to establish. The Government's position is non-responsive. Despite the multiple opportunities it has been afforded to answer, Defendant's request for a writ of mandamus, and Defendant's explicit request at the August 10, 2026 hearing that

the Court require the Government to respond to each pending motion issue by issue, neither the Government nor the Special Master/Receiver has answered Defendant's arguments on the merits, issue by issue. To the extent the Government and the Special Master/Receiver have not responded to any of Defendant's motions or arguments, those arguments stand unopposed, LCrR 47.1(d)(3), and Defendant does not waive any of them. The Government's silence is not a neutral litigation choice; the issues it has left unanswered — including the live and continuing disposition of the Damovo Group, a Primary Restitution Asset now the subject of a pending state-court sale, which the Government has chosen to ignore, treating engagement as counterproductive rather than addressing it — stand unopposed and will be read against the Government on review. Defendant expressly preserves every such argument for review, and each is and shall remain available to him on appeal to the United States Court of Appeals for the Fourth Circuit as if fully placed on the record.

Beyond its statutory consequences, the Government's practice of picking and choosing which issues to answer is, in and of itself, a violation of Defendant's constitutional rights. Due process entitles a defendant facing a criminal sanction — here, a $1.655 billion restitution and the forfeiture keyed to it — to notice and a meaningful opportunity to be heard on each disputed issue, and to hold the Government to its burden of proof; a prosecutor who selects which of the defendant's dispositive challenges to engage, and leaves the rest unanswered across multiple dispositive motions, denies that opportunity and shifts onto the defendant a burden the Constitution and § 3664(e) place on the Government. That denial is aggravated

by the Government's inconsistent representations across courts. Having urged the Court of Appeals that appellate intervention was premature because the restitution record should be developed in the district court, the Government here refuses to develop or defend that record issue by issue. And the Court of Appeals' denial of the defendant's stay and mandamus petitions, Doc. 308 at 9 n.9, was a discretionary refusal of extraordinary, interlocutory relief that resolved nothing on the merits; it cannot be treated as an appellate ruling against the defendant on any issue preserved here. A prosecutor cannot urge one court that its case should be proved below and then decline to prove it, issue by issue, when this Court affords the opportunity; Defendant submits that this inconsistency, in a matter carrying a $1.655 billion sanction, cannot be the foundation of a final restitution order.

Defendant further, and specifically, does not waive his responses to the Government's and the Special Master/Receiver's positions on his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master/Receiver (Doc. 269), or his request for conflict-free counsel, and he preserves those issues for appeal — including his showing that the policyholder statements offered against him were stale, presented as though recent. Nor does Defendant waive his responses to any other motion the Government has not answered. And because the Court took up these matters at the August 10, 2026 hearing, Defendant states that, upon receipt of the transcript, he will file a notice of objections and corrections to that hearing; he has not waived, and does not waive, any right with respect to anything that transpired during it.

Finally, and for the reasons developed throughout, the Government's Consolidated Position (Doc. 308) should be stricken as non-responsive. At the August 10, 2026 hearing, Defendant asked specifically that the Government be required to answer his pending motions and the disputed restitution issues one at a time, issue by issue and on the merits. It has not done so. Doc. 308 instead recasts the Special Master/Receiver's conclusions, appends a new affidavit from the entity the Special Master/Receiver owns and controls, and declines to engage — issue by issue — the defendant's specific, evidence-backed showings on causation, offsets, credits, and valuation. A single omnibus brief that does not join those issues does not carry the Government's burden under § 3664(e) and does not supply the record the Court needs for a de novo determination. Consistent with the grounds set out in Defendant's Motion to Strike the Government's Omnibus Response (Doc. 290), the Court should strike Doc. 308 as non-responsive and, if the Government intends to seek any restitution, require it to respond to each motion and each disputed issue separately and on the evidence, as Defendant requested and as § 3664(e) requires.

## CONCLUSION

The Court should decline to adopt the Special Master/Receiver's Report; set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order (Doc. 245-1); order the Special Master/Receiver to produce a full and verified accounting, including the Beckett purchase agreement, board consents, closing statement, sale price, and the referenced J.P. Morgan fairness opinion; and make the § 3664(e) loss and causation determination itself, on the

Government's own proof and after an evidentiary hearing, with a right of reply for Defendant. The Court should further stay the pending state-court sale of the Damovo Group — a Primary Restitution Asset now the subject of a pending state-court motion to approve its sale for no more than the debt against it — and enjoin any further disposition of the Primary Restitution Assets, until it has made the § 3664 determination; no such sale has been authorized by any order of this Court, and allowing the estate to be liquidated piecemeal, below value and before any loss is determined, would inflict exactly the irreparable, unrecoverable harm the Beckett disposition already caused. Where the loss cannot be determined accurately or the issues are too complex, the Court's course is to decline restitution, not to enter an inaccurate award. 18 U.S.C. § 3663A(c)(3)(B).

Dated: August 18, 2026.

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
*Admitted pro hac vice*

*Counsel for Greg E. Lindberg*

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 18, 2026.

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

Greg E. Lindberg v. AAPC Holdings, LLC and American Academy Holdings, LLC
Case No. 2:26-cv-__________

# EXHIBIT J

Motions to Compel Production of Ex Parte Communications and Restitution Data,
Docs. 331, 332, with Doc. 331-2 (Aug. 31, 2026)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S MOTION TO COMPEL THE GOVERNMENT TO PRODUCE THE DATA UNDERLYING THE RESTITUTION FIGURE IT ADOPTED AND ITS EX PARTE COMMUNICATIONS WITH THE SPECIAL MASTER, AND TO SET ASIDE THE SPECIAL MASTER'S REPORT AND FINAL SUPPLEMENT**

Defendant Greg E. Lindberg respectfully moves the Court, under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664, including § 3664(d)(6), the Court's inherent supervisory authority over its own appointee, *Brady v. Maryland* and its progeny, and the Due Process Clause, for an order (1) compelling the Government to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories of data, spreadsheets, methodology, valuations, and communications set out in Part VII below—including the underlying spreadsheets and the methodology by which the loss and valuation figures were built, and all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and

proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) directing that those communications be logged and preserved immediately; and (3) setting aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding to which the Defendant had no access. In support, Defendant states as follows, and relies on the Affidavit of Greg E. Lindberg and Exhibit A (the meet-and-confer correspondence of August 15–29, 2026, including the Government's and the Special Master's responses), filed herewith.

Counsel for the Defendant file this Motion in discharge of their professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues for review by the United States Court of Appeals for the Fourth Circuit. The Government and the Special Master have taken the position of running out the clock—pressing toward a final order of restitution and forfeiture under the deadline of 18 U.S.C. § 3664(d)(5) while producing none of the data, valuations, methodology, loss values, or ex parte communications on which the figures rest. A defendant cannot be made to contest, or to appeal, a multibillion-dollar restitution and forfeiture, and a custodial sentence already imposed, on a record he has never been permitted to see. Counsel therefore raise and preserve, now and expressly, the ex parte, due process, Brady and Giglio, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) challenges, together with the failure-of-proof and gross-loss challenges, so that none is waived, and so that the Fourth Circuit will have a complete

record of the defense's demands and the refusals that met them. Counsel would be remiss in their duty to the Defendant were they to allow a final order to enter on this record without raising and preserving these issues.

## I. The Government adopted each and every position of the Special Master, made his figures its own, and—as the prosecutor bearing the burden of proof—must produce the data that supports them.

The Government did not merely receive the Special Master's work; it adopted it wholesale and made it the basis of the punishment it seeks. In its Omnibus Response, the Government asks the Court to "adopt the reasoning and recommendations set forth in the Special Master's" Final Report and to enter a final order of restitution "similar to that proposed by the Special Master." Doc. 279. In its Consolidated Position, the Government states that it "concurs with the arguments and conclusions contained in the Special Master's filings" and asks the Court to enter a restitution order "substantially similar to that proposed by the Special Master." Doc. 308. The Government has embraced each and every one of the Special Master's positions—the loss build, the valuations, and the disallowed offsets and credits—as its own. Having done so, the Government owns those figures, and with them the obligation to produce and support the data beneath them.

Even in the proceeding before the Special Master, the Government remained the prosecutor. A special master under 18 U.S.C. § 3664(d)(6) is an adjunct who makes proposed findings and recommendations, subject to the Court's de novo determination; he does not carry the Government's burden, and his involvement did not relieve the Government of the prosecutor's obligations. The burden of proving

each victim's loss by a preponderance is, and throughout has been, the Government's, 18 U.S.C. § 3664(e); so is the duty to render "a complete accounting of the losses to each victim," id. § 3664(a); and so are the prosecutor's disclosure duties under Brady and Giglio. A prosecutor's interest "is not that it shall win a case, but that justice shall be done"; he "may strike hard blows," but "is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). The Government could not shed its burden, or its disclosure obligations, by routing the development of the loss and valuation figures through the Special Master; those obligations followed it into that forum and bind it now. Having adopted the figures the master produced, the Government must produce and support the data on which they rest, or those figures fail for want of proof.

The restitution the Government seeks, and the forfeiture measured against the Special Master's "Mid" estimate, rest entirely on the Special Master's loss and valuation figures, which the Government adopted as its own and placed before the Court—at sentencing, where the approximately $1.655 billion loss drove the guideline enhancement and the twelve-year term, and again as the basis for restitution. The Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e); a proponent that adopts a third party's figure must be able to produce the basis for it. *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). On August 26, 2026 the defense served a written, itemized demand for the data. The Government first said the Defendant

already had it in former counsel's files; former counsel and current counsel each searched and found none of it. Confronted with the itemized list, the Government reserved its position and directed the defense to file this motion, see Ex. A (Ryan email, Aug. 17, 2026), while the Special Master offered to produce only "documents in [his] possession," and then only under a confidentiality agreement and protective order, or a court order compelling production, id. (Martinez email, Aug. 17, 2026). Pressed for the data, the Government disclaimed possession of the underlying numbers, its correspondence reflecting that many of the requested items were exchanged ex parte and so did not come to the Government. Id. The result is dispositive: the data is in no one's hands within this proceeding—the Defendant does not have it; the Court has only figures filed under seal with no underlying data; and the Government has disclaimed possession of it. The Special Master and the custodians subject to his authority are the sole remaining source.

Nor was any of this waived by the passage of time. Current counsel first learned of the ex parte character of this proceeding only within the past several days—on or about August 27, 2026—and learned it as a direct result of the Government's own emails. When the Government represented that the data had all been provided to former counsel, current counsel investigated that representation; asking former counsel and searching the files revealed both that the data had never been produced and the extent of the ex parte communications to the Special Master—from M3, the North Carolina insurance companies, NHC Holdings, LLC, Michael Dinius, Wes Camden, and Williams Mullen, among others—on which the loss and

valuation figures were built. The Government's representation, offered to deflect the demand, is what exposed the unconstitutional, one-sided character of the proceeding to current counsel. A challenge raised within days of learning the facts that give rise to it is timely and is preserved.

The Defendant has been diligent. From the moment the Special Master was appointed, the defense sought the underlying loss and valuation data, and it renewed those requests, in writing, again and again for eighteen months; each was deferred, conditioned, or refused. The full sequence is set out in the Affidavit of Greg E. Lindberg ¶ 5, and includes: requests beginning at the Special Master's appointment on January 23, 2025 (Doc. 56); requests for the M3 "desktop" valuations in the spring of 2025; a June 16–17, 2025 request for the North Carolina insurance companies' loan data, which the Special Master agreed on June 17 to share and never did; the defense's own analysis supplied on July 29–30, 2025 while it received nothing in return; written requests on the Clanwilliam valuation and offsets on August 13, 2025; the September 16, 2025 Restitution Calculation letter to the Special Master and the Financial Advisor; further written requests on causation and offsets on November 22–23, 2025; formal written information requests in December 2025, deferred by the Special Master on December 18, 2025; the March and April 2026 reports' offer only to show conclusions under seal or in camera, without the data (Doc. 106 at 29); the July 2026 filing of low, middle, and high figures under seal with no underlying data; and the August 15–17, 2026 written demand that the data be placed on the record, met by the Special Master's willingness to produce only "under a confidentiality

agreement," the Government's "reserving [its] position," and the Special Master's one-word "No." The defense then served a written, itemized demand on August 26, 2026, and renewed it on August 28–29, 2026. See Ex. A. This is not a defendant who slept on his rights; it is a defendant who asked, in writing, at every stage of the proceeding and was refused at every stage. Any suggestion that these materials are "available by other means," or that the Defendant failed to pursue them, is refuted by this record; the fault for their absence lies with those who withheld them, and any uncertainty must be resolved against the party that withheld the records, not against the Defendant. 18 U.S.C. § 3664(a), (e).

The Government's two answers do not defeat this motion; they confirm it. To the extent the Government contends that producing the underlying data is not its burden, the burden of producing the data follows the burden of proving the loss. The Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e), and the statute requires a complete accounting, id. § 3664(a); a proponent that adopts a third party's figure as its own—as the Government adopted the Special Master's loss and valuation figures, at sentencing and again for restitution—must be able to produce and support the basis for it. *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). The Government cannot keep the figure while disclaiming the data beneath it. If it will not or cannot produce the foundation for the loss it asks the Court to impose, the figure fails for want of proof, and the remedy is that no restitution or forfeiture may

be entered upon it—not that the Defendant must accept, as a criminal punishment, a number whose basis its proponent refuses to supply.

To the extent the Government contends that, because many of the requested items were exchanged ex parte, it does not possess them, that is not a defense; it is an admission, and it cuts against the Government twice over. It concedes that the loss and valuation figures were developed through ex parte channels from which the Defendant was excluded—the precise defect addressed in Parts II and III below. And it confirms that the data underlying the figure is in no party's hands within this proceeding: the Defendant does not have it, the Court has only figures filed under seal, and the Government has disclaimed possession of the data, its correspondence reflecting that many of the items were exchanged ex parte and did not come to it. A proponent that cannot produce the foundation for the loss it adopted cannot carry its burden to prove it; and a loss figure whose foundation neither party to the appointing order possesses cannot support restitution or forfeiture. The order, moreover, required the Special Master to "regularly update the Parties throughout the diligence and/or sales process," Order ¶ 5, and to advise the Defendant, through counsel, in writing, id. ¶ 8. The Defendant, a Party, was entitled to be kept informed and was not; and to the extent the Government does not possess the data underlying the figure, that data was developed and exchanged wholly outside the order's structure for keeping the Parties informed—a further reason it cannot support punishment. Because the Special Master (and his advisors), and the custodians subject to his authority, are the only remaining source, the Court should compel production from

them under 18 U.S.C. § 3664 and the Court's supervisory authority over its own appointee; and because the figure was built ex parte, on data the parties never saw, the report and its Final Supplement must be set aside.

## II. The proceeding operated as an ex parte forum to which the Defendant had no access; the order authorized no ex parte contact; and nothing conveyed ex parte was ever "before" the Special Master.

The figures were not developed in an adversarial process open to the Defendant. The Special Master (and his advisors) received and exchanged communications, ex parte, with the Government and with any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—the interested persons who hold, generated, or supplied the assets, the valuations, and the data. The Defendant was not a party to those communications, was not copied on them, and has not seen them. The order appointing the Special Master has only two parties—the United States and Greg E. Lindberg—and it authorized no ex parte communication at all: it requires the Special Master to "regularly update the Parties throughout the diligence," Order ¶ 5, and to advise the Defendant "through Defendant's counsel," in writing, id. ¶ 8, with matters "heard upon notice and hearing," id. ¶ 15. Cf. Fed. R. Civ. P. 53(b)(2)(B) (the civil analogue requires the appointing order to state the circumstances, if any, in which a master may communicate ex parte with a party; here the order states none). Rule 53 does not itself govern this criminal proceeding; the authority for the reference is the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the limits on the Special Master's conduct are fixed by the appointing

order and by due process. The interested custodians are not parties and had no license to feed the Court's neutral off the record. On information and belief, at least some of them—including Mr. Dinius, NHC, and the North Carolina insurance companies—told the Government that if it wanted certain information it should obtain an order from the Court. The proper course was therefore an application to the Court, on notice and hearing—the mechanism paragraph 15 supplies—not ex parte data-gathering that excluded the Defendant. The reduction of AAPC, a Primary Restitution Asset, to near zero is precisely what paragraph 15 governs, yet it was accomplished with no motion, notice, or hearing, on data the Defendant never saw.

It follows that whatever was conveyed to the Special Master ex parte was never, in any cognizable sense, "before" him. A submission is "before the Special Master" only when two conditions are satisfied: first, it was disclosed to the proceeding—placed on the record, together with the underlying data supporting it, so that the Defendant, through counsel, could examine, test, and contest it; and second, it was then adopted by the Special Master on that record. Anything short of that—information passed to the Special Master, to his financial advisor, or to the Government outside that process, without the underlying data, and without disclosure to the Defendant—never entered the proceeding at all. It cannot support a finding, and any value drawn from it was adopted as a final number, not established on a record the Defendant could meet. The loss and valuation figures that drive the restitution and the forfeiture were fixed in precisely that way: taken as final numbers from ex parte sources, without the data beneath them ever being disclosed to the

Defendant or made part of the record on which he could be heard. For that independent reason, those figures were never properly before the Special Master, cannot be treated as though they were, and cannot stand unless and until the underlying data and communications are produced, placed on the Court's record, and—only then—adopted through a process in which the Defendant can participate.

These distinctions define the relief. The Government is a party, and any ex parte communication between the prosecuting authority and the adjudicating neutral is itself impermissible in a criminal proceeding; the vice is the communication itself, not merely its subject. For that reason the Defendant seeks all ex parte communications between the Government and the Special Master (and his advisors), without limitation as to subject—their existence and content are a constitutional question the Court and the Defendant are entitled to see in full. As to the interested third parties, who are not parties to the order, the Defendant limits his request to their communications with the Special Master (and his advisors) concerning the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

**III. In a criminal proceeding no ex parte communication with the adjudicating neutral is permissible; the defect is incurable, and the report must be set aside.**

A neutral that decides on ex parte submissions is not a neutral. Due process guarantees the Defendant notice and a meaningful opportunity to be heard before a neutral decisionmaker, and forbids the resolution of adjudicative facts on communications one party cannot see, test, or rebut. *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980); *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996); *cf. In re Kensington Int'l Ltd.*, 368 F.3d 289 (3d Cir. 2004); *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) (de novo review of a master's findings does not cure impermissible ex parte adjudicative contacts). Even where Federal Rule of Civil Procedure 53 permits a master to communicate ex parte when the appointing order so provides, that civil allowance has no application here: this is a criminal case, the order authorized no such contact, restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), and the same figures drove the § 2B1.1 enhancement and the sentence. Belated production cannot cure the defect: the ex parte communications—many of them oral and occurring outside the weekly calls the defense attended—cannot be perfectly retraced, and what passed between the Special Master and the Government and the custodians "leave[s] no trace in the record" and is "now unknowable," *Edgar*, 93 F.3d 256. Because many of the participants refused to recognize the authority of the Special Master, the restitution flows in one direction only, without accountability to the Defendant for how or why he is charged these values; the entire process is infected

with ex parte data that cannot be separated from it. Production is therefore necessary but not sufficient; the report and its Final Supplement, being the product of that process, cannot be adopted, relied upon, or placed on the record, and must be set aside.

The Government's proposed course underscores the defect rather than curing it. Pressed to produce the data, the Government directs the Defendant to obtain it through the very officer to whom the loss and valuation questions were referred under 18 U.S.C. § 3664(d)(6)—a magistrate judge or special master—before whom the figures were placed and who made his recommendation upon them. That instruction is circular and constitutionally untenable. The data was placed before that officer ex parte; it has not been produced to the Defendant except on conditions the Special Master would set or a court order he demands; and the Defendant has never had access to the very materials the officer used to reach the figures the Court adopted. A criminal defendant cannot be sentenced, cannot be ordered to pay restitution, and cannot be made to forfeit property on the strength of evidence that only the decisionmaker saw and that the defendant was never permitted to examine, test, or rebut. The approximately $1.655 billion loss figure drove the § 2B1.1 enhancement and the twelve-year sentence already imposed, and it drives the restitution and forfeiture now sought—yet it rests on data the Defendant has never seen. That is not a curable discovery dispute; it is punishment imposed on a record from which the Defendant was excluded, in violation of due process, and it renders the resulting sentence, and any restitution and forfeiture built on the same figures,

constitutionally infirm. The de novo determination the statute requires, id. § 3664(d)(6), is itself impossible on a record whose foundation is withheld from the party who must contest it and from the Court that must review it.

## IV. It makes no difference whether the Special Master is treated as a neutral or as an arm of the prosecution.

It does not matter which characterization the Government embraces. If the Special Master is an adjudicative neutral whose findings the Court is asked to adopt, his ex parte contacts and off-the-record development of the loss and valuation facts are impermissible and require that his report be set aside. If instead the Government contends that the Special Master functioned in a prosecutorial or plaintiff-like capacity—recovering for the victims and building the loss figure—then his figures and the data behind them are the Government's own; the prosecutor's Brady and Giglio disclosure duties attach directly and fully, *Kyles v. Whitley*, 514 U.S. 419 (1995); and the ex parte communications are the prosecution developing, in secret and outside the Defendant's presence, the very facts that fix a criminal punishment. Either characterization is fatal to using the report as the basis for restitution or forfeiture, and the Defendant need not win the neutrality question to prevail.

## V. The ex parte communications are Brady and Giglio material the Defendant is entitled to receive.

Independent of the structural defect, the ex parte communications are favorable, material evidence the Government must disclose. *Brady v. Maryland*, 373 U.S. 83, 87 (1963), reaches evidence "material either to guilt or to punishment" and applies at sentencing, *Cone v. Bell*, 556 U.S. 449 (2009); restitution is punishment,

*Ellingburg*. The communications are exculpatory as to the amount of loss—the offsets, credits, and true values—and impeaching, *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Bagley*, 473 U.S. 667 (1985), of figures the officer who produced them calls a "best guess" and "inherently unreliable"; and the duty reaches favorable evidence known to those acting on the Government's behalf, *Kyles*, 514 U.S. 419. Because restitution is criminal punishment, the disclosure duty extends to this proceeding; and even if the Court does not formally extend Brady to restitution, the same materials must be disclosed as a matter of due process—the Defendant's right to see and to rebut the evidence used to punish him. The Defendant has demanded these communications repeatedly and in writing, on August 28 and 29, 2026, and they have not been produced. *See* Ex. A; Affidavit of Greg E. Lindberg.

## VI. The manner of the liquidations was hidden, and the new report's lower values cannot be tested without the originals.

The M3 "desktop" valuations valued all of the Primary Restitution Assets and the Specified Affiliated Companies and were used to fix the value of the assets available for restitution; yet the nature, manner, terms, and proceeds of the liquidations—Beckett, sold for approximately $134 million against an approximately $1 billion appraisal; Clanwilliam; and the zero-coupon notes sold before maturity—were never disclosed to the Defendant, who could not contest how the dispositions were carried out, was not informed when the companies were being sold, and had no opportunity to test their value independently before sale. That is not the manner of disposition the MVRA prescribes: the Act vests enforcement in the United States, and only after a final order fixes the amount, through the civil-judgment machinery of 18

U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to liquidate the estate ex parte, before any final order, and to withhold the valuations and terms. The point is sharpened by the Special Master's further report, which now claims the companies are worth less than his earlier valuations reflected. Without the original valuations and the underlying data, there is no way to assess why—whether the decline is attributable to the offense or to the Special Master's own post-transfer management and below-value dispositions, an intervening cause the Government must disprove under 18 U.S.C. § 3664(e). The original valuations and every revaluation are therefore essential to any determination. The Special Master's report does not address the facts of this intervening cause at all; it charges the post-transfer decline to the Defendant without accounting for the losses caused by the intervening actors—Michael Dinius, the Rehabilitator, and the third-party custodians, including the Special Master/Receiver himself. It is the Government's burden to introduce facts showing why that intervening cause does not reduce or eliminate the Defendant's liability, 18 U.S.C. § 3664(e), and the United States Court of Appeals for the Fourth Circuit cannot make that determination on a record that does not include the losses those intervening actors caused. The Government, having adopted the figures, must introduce those facts or the figures fail for want of proof; the data must therefore be produced and placed on the record now.

The ex parte liquidations also worked an unconstitutional taking. Before any final order of restitution fixed what, if anything, the Defendant owes, the Special Master—an officer appointed at the Government's instance—took the Defendant's

property into his exclusive control and liquidated it, in ex parte dealings the Defendant could neither see nor contest, and disposed of it below value, selling Beckett for approximately $134 million against an approximately $1 billion appraisal. The MVRA authorizes enforcement against a defendant's property only after a final order fixes the amount, and then only by the United States through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to seize and sell the estate ex parte, before any final order, on values the Defendant never saw. A pre-order, ex parte liquidation of the Defendant's property—without notice, without hearing, and without the process the appointing order itself required—is a taking of property without due process of law and without just compensation, in violation of the Fifth Amendment; and forfeiture and restitution reach only property properly subject to them, *Honeycutt v. United States*, 581 U.S. 443 (2017). Had the Defendant retained control, any disposition would have been at fair market value; the ex parte, below-value dispositions are the injury the Takings and Due Process Clauses forbid. Defendant expressly raises and preserves this challenge.

## VII. The forty-seven categories of data underlying the figures the Government adopted, which it must produce or support.

The materials necessary to test the figures, and the ex parte communications that produced them, are the following forty-seven categories. Each is necessary to test the loss and valuation figures, to establish an offset, credit, or intervening cause, or consists of the ex parte communications themselves; the Affidavit of Greg E. Lindberg (Exhibits 1 and 2 thereto), incorporated herein, shows where each category rests

within the restitution figure and why it matters. This list seeks only materials within the possession, custody, or control of the Government, the Special Master and his advisors, or the third-party custodians; it does not seek, and this Motion does not concern, any of the Defendant's own materials, which in any event are not the Government's or the Special Master's to withhold.

A. Company valuations.

1. The M3 "desktop" low/middle/high valuations of the Specified Affiliated Companies and AAPC, 2025, and every draft, with any M3 recommendation on disclosure.
2. All data, inputs, assumptions, models, workpapers, and methodology underlying the M3 valuations, with M3's transmittal correspondence.
3. Every valuation and revaluation of the companies from January 2025 to the present, and the reason for each change, including the reduction of AAPC.
4. The low/middle/high figures filed under seal in July 2026, and all data behind them.
5. The March 2026 data the Special Master offered under seal, and all documents he intends to rely on for valuations.
6. The basis for reducing AAPC to near zero, and how that reduction triggers the forfeiture money judgment.
7. All communications with M3 (or any other valuation professional) concerning the valuations.

B. The loss build.

8. The complete data, spreadsheets, workpapers, and methodology underlying the approximately $1.655 billion figure.
9. The Paladin/Mr. Dinius spreadsheets reflecting the starting loan balances.
10. The repayment data and loan-balance base data used as the starting point.
11. All LoanIQ screenshots, exports, and outputs.
12. The affiliated-loan base data for each insurer (NC and Bermuda) as of (a) October 18, 2018, (b) the MOU date, and (c) the Bermuda transfer to the JPLs.
13. The ILA/MOU reconciliations, including the ECL debt and the April 2022 AAPC refinance.
14. The ULICO reconciliation.
15. The iteration history of the loss memoranda (approximately $2.9 billion to approximately $1.6 billion).

C. Offsets and credits.

16. The method of calculation for every offset and credit applied or disallowed, with the repayment data behind each disputed offset.
17. The NCIC-investment offset the Government conceded—on-record confirmation and the data and methodology applying it.
18. The terms of the agreed Clanwilliam offset and the valuation data applying it.
19. The source and itemization of the additional approximately $100 million in offsets and additions from Mr. Dinius.
20. Data for the disallowed offsets (the SNIC payments; the CBL subordination fee; the ULICO real-estate transfer; the Bermuda asset-sale proceeds; the zero-

coupon note proceeds; the preferred-equity payments; the Finanzen sale; the CBL redemption fee).

21. Mr. Dinius's own approximately $641 million November 2018 valuation of the North Carolina insurers, and all communications concerning that valuation and its exclusion.

22. Intervening-cause data—what happened to each company after transfer (Issues 11–17).

D. Board and financial records (last four years).

23. All AAPC board books and packs.

24. All NHC board books.

25. All board minutes, financial reports, and financial presentations for the companies.

26. All letters of intent received.

27. All offers to purchase received.

E. Sale and marketing process.

28. All documents and communications on the marketing and sale of Becket, Clanwilliam, Damovo, and the SACs, including bids, offers, and valuations generated.

29. The terms, proceeds, and closing documents of every completed sale (Becket; Clanwilliam and the Triton escrow; and others).

30. For any sale or offer that did not close, all documents explaining why.

31. All Damovo figures and terms.

F. Communications.

32. All communications between the Special Master or Paladin and New Holding Company concerning valuation or the restitution figure.

33. All communications between the Special Master or Paladin and AAPC or its board concerning valuation or the restitution figure.

34. All communications between the Special Master or Paladin and the bankers concerning valuation, marketing, or sale.

35. All communications between the Special Master or Paladin and North Carolina counsel, Wes Camden, and Williams Mullen concerning valuation or the restitution figure.

36. All communications between the Special Master or Paladin and NHC concerning valuation or the restitution figure.

37. All communications between the Special Master or Paladin and the Bermuda joint provisional liquidators concerning valuation or the restitution figure.

38. All communications of Joseph Grier and Michael Martinez with any party concerning the restitution figure or the valuations.

39. All communications instructing or reflecting that information be withheld from the Defendant (e.g., "do not tell Greg Lindberg").

G. The Government's adoption trail.

40. All ex parte communications between the Government and the Special Master and his advisors, without limitation as to subject; and all communications between the Government or the Special Master and M3 or the custodians

concerning the valuation or any revaluation of the assets; the marketing, sale, or other disposition of the assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in value; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

41. All data and methodology in the Government's possession supporting the figure and the low/middle/high valuations.

42. All materials the Government relied upon at sentencing to support the loss figure.

H. Identified files (produce in native format).

43. All M3 desktop valuation files.

44. The Special Master's Appendix 1 to the Final Supplement (July 2026) and all data underlying it.

I. Additional items.

45. The Wes Camden letters to the Special Master disputing his authority, and any similar authority-dispute letters from the NCICs, NHC, or other custodians.

46. The Special Master's AAPC-waiver requests and all communications concerning those waivers.

47. All communications with the trustee of the trusts (Steve Wilson) concerning the trusts, their assets, and any disposition or valuation of those assets.

## VIII. A continued hearing cannot cure the defect where the data does not exist for anyone.

The Court should not enter restitution or forfeiture on the present record. A continued hearing under 18 U.S.C. § 3664(d)(5) cannot cure the defect, because the data required for any de novo determination or review does not exist for the Defendant, the Court, or the Government; until it is produced, no such determination can be made, and production is therefore the necessary predicate to any hearing. To the extent the cause and amount cannot be determined because that data is unavailable, the Court may decline restitution under 18 U.S.C. § 3663A(c)(3)(B).

## IX. Relief.

Immediate logging and preservation are essential and independently warranted. The ex parte communications are the only record of how the figures were built; they sit in the hands of interested custodians and of an officer whose own conduct they concern, and they will be dissipated if they are not preserved now. Preservation also guards against a graver injury. The Defendant is exposed to multiple punishments for the same conduct—restitution of approximately $1.655 billion, a forfeiture measured against the same unverified ex parte valuations, and pre-judgment "time value" interest layered on top—each derived from figures no party can produce and none of which the Defendant has been permitted to test. The Double Jeopardy Clause forbids multiple punishments for the same offense, and the Excessive Fines Clause forbids monetary sanctions grossly disproportional to the offense. U.S. Const. amends. V, VIII; *Timbs v. Indiana*, 586 U.S. 146 (2019); *United States v. Bajakajian*, 524 U.S. 321 (1998). The Court cannot gauge either danger, and

the Defendant cannot guard against successive and duplicative punishment, without the underlying data and the ex parte record—which must be preserved before it is lost.

Defendant requests that the Court order the Government (1) to produce to the Defendant, and to support with the underlying data, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories set out in Part VII, including all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) to log and preserve those communications immediately, to prevent their dissipation and to forestall the imposition of multiple punishments; (3) set aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding, and decline to adopt, rely upon, or place them on the record; (4) treat nothing conveyed to the Special Master ex parte as having been "before" him, and give it no weight, unless it was disclosed to the proceeding with its underlying data and adopted by the Special Master on the

record in a process in which the Defendant could participate; and (5) not enter restitution or forfeiture on the present record. Neither the Government nor the Special Master has a privilege or proprietary interest in the third-party custodians' records, and a generalized interest in the outcome does not confer standing to resist their production. *In re Grand Jury Subpoena John Doe*, 584 F.3d 175, 184 n.14 (4th Cir. 2009); *United States v. Beckford*, 964 F. Supp. 1010, 1023 (E.D. Va. 1997). Defendant expressly raises and preserves the ex parte, due process, Brady, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) issues, and the gross-loss issue, for review by the United States Court of Appeals for the Fourth Circuit. Counsel for Defendant have a professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues, and expressly do so here so that none is waived.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant this Motion, compel production of the forty-seven categories and the ex parte communications, and set aside the Special Master's report and Final Supplement before any final order of restitution and forfeiture is entered.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*

Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603

919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 31, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S MOTION TO COMPEL THE SPECIAL MASTER TO PRODUCE THE DATA UNDERLYING THE RESTITUTION FIGURE AND HIS EX PARTECOMMUNICATIONS, AND TO SET ASIDE HIS REPORT AND FINAL SUPPLEMENT**

Defendant Greg E. Lindberg respectfully moves the Court, under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664, including § 3664(d)(6), the Court's inherent supervisory authority over its own appointee, *Brady v. Maryland* and its progeny, and the Due Process Clause, for an order (1) compelling the Special Master to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories of data, spreadsheets, methodology, valuations, and communications set out in Part VII below—including the underlying spreadsheets and the methodology by which the loss and valuation figures were built, and all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those

assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) directing that those communications be logged and preserved immediately; and (3) setting aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding to which the Defendant had no access. In support, Defendant states as follows, and relies on the Affidavit of Greg E. Lindberg and Exhibit A (the meet-and-confer correspondence of August 15–29, 2026, including the Government's and the Special Master's responses), filed herewith.

Counsel for the Defendant file this Motion in discharge of their professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues for review by the United States Court of Appeals for the Fourth Circuit. The Government and the Special Master have taken the position of running out the clock—pressing toward a final order of restitution and forfeiture under the deadline of 18 U.S.C. § 3664(d)(5) while producing none of the data, valuations, methodology, loss values, or ex parte communications on which the figures rest. A defendant cannot be made to contest, or to appeal, a multibillion-dollar restitution and forfeiture, and a custodial sentence already imposed, on a record he has never been permitted to see. Counsel therefore raise and preserve, now and expressly, the ex parte, due process, Brady and Giglio, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) challenges, together with the failure-of-proof and gross-loss challenges, so that none is waived, and so that the Fourth Circuit will have a complete record of the defense's demands and the refusals that met them. Counsel would be

remiss in their duty to the Defendant were they to allow a final order to enter on this record without raising and preserving these issues.

At the outset, the Defendant recognizes that a motion to compel a special master to disclose the information before him is unusual—because, in the ordinary course, it should never be necessary. When data is placed before a master, it is shared with the parties: the Government and the Defendant alike. The master's record is the parties' record; that is a basic incident of the reference authorized by the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and of due process, and it is why a party rarely has to move to compel the very officer deciding its case to reveal what he relied upon. In this proceeding, that never happened. The data underlying the loss and valuation figures was placed before the Special Master ex parte and was never shared with the Defendant—not at the time, and not since.

The Government sought to obscure this by trading on a change in defense counsel. When the Defendant's current counsel demanded the data, the Government represented that it had all been provided to the Defendant's former counsel, Katten Muchin Rosenman. Current counsel then did exactly what that representation invited: they asked former counsel. Former counsel searched and—far from confirming the Government's account—helped current counsel identify, item by item, the materials that had never been turned over to the Defendant at all. The Government's premise thus collapsed: the records confirm that the data current counsel seeks was never produced to former counsel either. Confronted with that, the Government did not produce the data. It shifted ground, asserting instead that it had

met its discovery obligations—an assertion it advanced knowing that its effort to blame former counsel had backfired, and that former counsel had helped current counsel pinpoint the very data the Special Master and the Government never produced.

The timing confirms that nothing has been waived. Current counsel first learned of the ex parte character of this proceeding only within the past several days—on or about August 27, 2026. It was the Government's own emails, representing that the data had all been provided to former counsel, that prompted current counsel to run the point to ground; and it was that inquiry—asking former counsel and searching the files—that revealed both that the data had never been produced and the extent of the ex parte communications to the Special Master: from M3, the North Carolina insurance companies, NHC Holdings, LLC, Michael Dinius, Wes Camden, and Williams Mullen, among others, on which the loss and valuation figures were built. The unconstitutional, one-sided character of the proceeding thus became known to current counsel only days ago, as a direct consequence of the Government's own representation. A challenge asserted within days of learning the facts that give rise to it is timely; the ex parte and due process issues are preserved, not forfeited.

## I. The Special Master and the custodians subject to his authority hold the data; as the Court's own appointee he must produce it, and the Court has full supervisory authority to compel him.

The loss and valuation figures rest on data the Special Master and his financial advisor, Paladin Management Group, developed and hold, together with the

interested custodians subject to his authority—NHC Holdings, LLC, the North Carolina insurance companies, M3, and Michael Dinius. The Defendant does not have that data; the Court has only figures filed under seal, with no underlying data; and the Government has disclaimed possession of it. The Special Master and those custodians are the sole remaining source. The Special Master is the Court's own appointee under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the Court retains inherent supervisory authority over its own officer to direct him to produce the data, methodology, valuations, offsets, credits, and communications underlying the figures he recommended, and to place them on the Court's record. He has stated that he would produce "documents in [his] possession" only "under a confidentiality agreement," or upon "a court order compelling" production. Ex. A (Martinez email, Aug. 17, 2026). The Court should now enter that order.

The restitution the Government seeks, and the forfeiture measured against the Special Master's "Mid" estimate, rest entirely on the Special Master's loss and valuation figures, which the Government adopted as its own and placed before the Court—at sentencing, where the approximately $1.655 billion loss drove the guideline enhancement and the twelve-year term, and again as the basis for restitution. The Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e); a proponent that adopts a third party's figure must be able to produce the basis for it. *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). On August 26, 2026 the defense served

a written, itemized demand for the data. The Government first said the Defendant already had it in former counsel's files; former counsel and current counsel each searched and found none of it. Confronted with the itemized list, the Government reserved its position and directed the defense to file this motion, see Ex. A (Ryan email, Aug. 17, 2026), while the Special Master offered to produce only "documents in [his] possession," and then only under a confidentiality agreement and protective order, or a court order compelling production, id. (Martinez email, Aug. 17, 2026). Pressed for the data, the Government disclaimed possession of the underlying numbers, its correspondence reflecting that many of the requested items were exchanged ex parte and so did not come to the Government. Id. The result is dispositive: the data is in no one's hands within this proceeding—the Defendant does not have it; the Court has only figures filed under seal with no underlying data; and the Government has disclaimed possession of it. The Special Master and the custodians subject to his authority are the sole remaining source.

The Defendant has been diligent. From the moment the Special Master was appointed, the defense sought the underlying loss and valuation data, and it renewed those requests, in writing, again and again for eighteen months; each was deferred, conditioned, or refused. The full sequence is set out in the Affidavit of Greg E. Lindberg ¶ 5, and includes: requests beginning at the Special Master's appointment on January 23, 2025 (Doc. 56); requests for the M3 "desktop" valuations in the spring of 2025; a June 16–17, 2025 request for the North Carolina insurance companies' loan data, which the Special Master agreed on June 17 to share and never did; the

defense's own analysis supplied on July 29–30, 2025 while it received nothing in return; written requests on the Clanwilliam valuation and offsets on August 13, 2025; the September 16, 2025 Restitution Calculation letter to the Special Master and the Financial Advisor; further written requests on causation and offsets on November 22–23, 2025; formal written information requests in December 2025, deferred by the Special Master on December 18, 2025; the March and April 2026 reports' offer only to show conclusions under seal or in camera, without the data (Doc. 106 at 29); the July 2026 filing of low, middle, and high figures under seal with no underlying data; and the August 15–17, 2026 written demand that the data be placed on the record, met by the Special Master's willingness to produce only "under a confidentiality agreement," the Government's "reserving [its] position," and the Special Master's one-word "No." The defense then served a written, itemized demand on August 26, 2026, and renewed it on August 28–29, 2026. See Ex. A. This is not a defendant who slept on his rights; it is a defendant who asked, in writing, at every stage of the proceeding and was refused at every stage. Any suggestion that these materials are "available by other means," or that the Defendant failed to pursue them, is refuted by this record; the fault for their absence lies with those who withheld them, and any uncertainty must be resolved against the party that withheld the records, not against the Defendant. 18 U.S.C. § 3664(a), (e).

The Government's two answers do not defeat this motion; they confirm it. To the extent the Government contends that producing the underlying data is not its burden, the burden of producing the data follows the burden of proving the loss. The

Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e), and the statute requires a complete accounting, id. § 3664(a); a proponent that adopts a third party's figure as its own—as the Government adopted the Special Master's loss and valuation figures, at sentencing and again for restitution—must be able to produce and support the basis for it. *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). The Government cannot keep the figure while disclaiming the data beneath it. If it will not or cannot produce the foundation for the loss it asks the Court to impose, the figure fails for want of proof, and the remedy is that no restitution or forfeiture may be entered upon it—not that the Defendant must accept, as a criminal punishment, a number whose basis its proponent refuses to supply.

To the extent the Government contends that, because many of the requested items were exchanged ex parte, it does not possess them, that is not a defense; it is an admission, and it cuts against the Government twice over. It concedes that the loss and valuation figures were developed through ex parte channels from which the Defendant was excluded—the precise defect addressed in Parts II and III below. And it confirms that the data underlying the figure is in no party's hands within this proceeding: the Defendant does not have it, the Court has only figures filed under seal, and the Government has disclaimed possession of the data, its correspondence reflecting that many of the items were exchanged ex parte and did not come to it. A proponent that cannot produce the foundation for the loss it adopted cannot carry its

burden to prove it; and a loss figure whose foundation neither party to the appointing order possesses cannot support restitution or forfeiture. The order, moreover, required the Special Master to "regularly update the Parties throughout the diligence and/or sales process," Order ¶ 5, and to advise the Defendant, through counsel, in writing, id. ¶ 8. The Defendant, a Party, was entitled to be kept informed and was not; and to the extent the Government does not possess the data underlying the figure, that data was developed and exchanged wholly outside the order's structure for keeping the Parties informed—a further reason it cannot support punishment. Because the Special Master (and his advisors), and the custodians subject to his authority, are the only remaining source, the Court should compel production from them under 18 U.S.C. § 3664 and the Court's supervisory authority over its own appointee; and because the figure was built ex parte, on data the parties never saw, the report and its Final Supplement must be set aside.

## II. The proceeding operated as an ex parte forum to which the Defendant had no access; the order authorized no ex parte contact; and nothing conveyed ex parte was ever "before" the Special Master.

The figures were not developed in an adversarial process open to the Defendant. The Special Master (and his advisors) received and exchanged communications, ex parte, with the Government and with any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—the interested persons who hold, generated, or supplied the assets, the valuations, and the data. The Defendant was not a party to those communications, was not copied on them, and has

not seen them. The order appointing the Special Master has only two parties—the United States and Greg E. Lindberg—and it authorized no ex parte communication at all: it requires the Special Master to "regularly update the Parties throughout the diligence," Order ¶ 5, and to advise the Defendant "through Defendant's counsel," in writing, id. ¶ 8, with matters "heard upon notice and hearing," id. ¶ 15. Cf. Fed. R. Civ. P. 53(b)(2)(B) (the civil analogue requires the appointing order to state the circumstances, if any, in which a master may communicate ex parte with a party; here the order states none). Rule 53 does not itself govern this criminal proceeding; the authority for the reference is the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the limits on the Special Master's conduct are fixed by the appointing order and by due process. The interested custodians are not parties and had no license to feed the Court's neutral off the record. On information and belief, at least some of them—including Mr. Dinius, NHC, and the North Carolina insurance companies—told the Government that if it wanted certain information it should obtain an order from the Court. The proper course was therefore an application to the Court, on notice and hearing—the mechanism paragraph 15 supplies—not ex parte data-gathering that excluded the Defendant. The reduction of AAPC, a Primary Restitution Asset, to near zero is precisely what paragraph 15 governs, yet it was accomplished with no motion, notice, or hearing, on data the Defendant never saw.

It follows that whatever was conveyed to the Special Master ex parte was never, in any cognizable sense, "before" him. A submission is "before the Special Master" only when two conditions are satisfied: first, it was disclosed to the

proceeding—placed on the record, together with the underlying data supporting it, so that the Defendant, through counsel, could examine, test, and contest it; and second, it was then adopted by the Special Master on that record. Anything short of that—information passed to the Special Master, to his financial advisor, or to the Government outside that process, without the underlying data, and without disclosure to the Defendant—never entered the proceeding at all. It cannot support a finding, and any value drawn from it was adopted as a final number, not established on a record the Defendant could meet. The loss and valuation figures that drive the restitution and the forfeiture were fixed in precisely that way: taken as final numbers from ex parte sources, without the data beneath them ever being disclosed to the Defendant or made part of the record on which he could be heard. For that independent reason, those figures were never properly before the Special Master, cannot be treated as though they were, and cannot stand unless and until the underlying data and communications are produced, placed on the Court's record, and—only then—adopted through a process in which the Defendant can participate.

These distinctions define the relief. The Government is a party, and any ex parte communication between the prosecuting authority and the adjudicating neutral is itself impermissible in a criminal proceeding; the vice is the communication itself, not merely its subject. For that reason the Defendant seeks all ex parte communications between the Government and the Special Master (and his advisors), without limitation as to subject—their existence and content are a constitutional question the Court and the Defendant are entitled to see in full. As to the interested

third parties, who are not parties to the order, the Defendant limits his request to their communications with the Special Master (and his advisors) concerning the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

### III. In a criminal proceeding no ex parte communication with the adjudicating neutral is permissible; the defect is incurable, and the report must be set aside.

A neutral that decides on ex parte submissions is not a neutral. Due process guarantees the Defendant notice and a meaningful opportunity to be heard before a neutral decisionmaker, and forbids the resolution of adjudicative facts on communications one party cannot see, test, or rebut. *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980); *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996); *cf. In re Kensington Int'l Ltd.*, 368 F.3d 289 (3d Cir. 2004); *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) (de novo review of a master's findings does not cure impermissible ex parte adjudicative contacts). Even where Federal Rule of Civil Procedure 53 permits a master to communicate ex parte when the appointing order so provides, that civil allowance has no application here: this is a criminal case, the order authorized no such contact, restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), and the same figures drove the § 2B1.1 enhancement and the sentence. Belated production

cannot cure the defect: the ex parte communications—many of them oral and occurring outside the weekly calls the defense attended—cannot be perfectly retraced, and what passed between the Special Master and the Government and the custodians "leave[s] no trace in the record" and is "now unknowable," *Edgar*, 93 F.3d 256. Because many of the participants refused to recognize the authority of the Special Master, the restitution flows in one direction only, without accountability to the Defendant for how or why he is charged these values; the entire process is infected with ex parte data that cannot be separated from it. Production is therefore necessary but not sufficient; the report and its Final Supplement, being the product of that process, cannot be adopted, relied upon, or placed on the record, and must be set aside.

The Government's proposed course underscores the defect rather than curing it. Pressed to produce the data, the Government directs the Defendant to obtain it through the very officer to whom the loss and valuation questions were referred under 18 U.S.C. § 3664(d)(6)—a magistrate judge or special master—before whom the figures were placed and who made his recommendation upon them. That instruction is circular and constitutionally untenable. The data was placed before that officer ex parte; it has not been produced to the Defendant except on conditions the Special Master would set or a court order he demands; and the Defendant has never had access to the very materials the officer used to reach the figures the Court adopted. A criminal defendant cannot be sentenced, cannot be ordered to pay restitution, and cannot be made to forfeit property on the strength of evidence that only the

decisionmaker saw and that the defendant was never permitted to examine, test, or rebut. The approximately $1.655 billion loss figure drove the § 2B1.1 enhancement and the twelve-year sentence already imposed, and it drives the restitution and forfeiture now sought—yet it rests on data the Defendant has never seen. That is not a curable discovery dispute; it is punishment imposed on a record from which the Defendant was excluded, in violation of due process, and it renders the resulting sentence, and any restitution and forfeiture built on the same figures, constitutionally infirm. The de novo determination the statute requires, id. § 3664(d)(6), is itself impossible on a record whose foundation is withheld from the party who must contest it and from the Court that must review it.

## IV. It makes no difference whether the Special Master is treated as a neutral or as an arm of the prosecution.

It does not matter which characterization the Government embraces. If the Special Master is an adjudicative neutral whose findings the Court is asked to adopt, his ex parte contacts and off-the-record development of the loss and valuation facts are impermissible and require that his report be set aside. If instead the Government contends that the Special Master functioned in a prosecutorial or plaintiff-like capacity—recovering for the victims and building the loss figure—then his figures and the data behind them are the Government's own; the prosecutor's Brady and Giglio disclosure duties attach directly and fully, *Kyles v. Whitley*, 514 U.S. 419 (1995); and the ex parte communications are the prosecution developing, in secret and outside the Defendant's presence, the very facts that fix a criminal punishment.

Either characterization is fatal to using the report as the basis for restitution or forfeiture, and the Defendant need not win the neutrality question to prevail.

## V. The ex parte communications are Brady and Giglio material the Defendant is entitled to receive.

Independent of the structural defect, the ex parte communications are favorable, material evidence the Government must disclose. *Brady v. Maryland*, 373 U.S. 83, 87 (1963), reaches evidence "material either to guilt or to punishment" and applies at sentencing, *Cone v. Bell*, 556 U.S. 449 (2009); restitution is punishment, *Ellingburg*. The communications are exculpatory as to the amount of loss—the offsets, credits, and true values—and impeaching, *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Bagley*, 473 U.S. 667 (1985), of figures the officer who produced them calls a "best guess" and "inherently unreliable"; and the duty reaches favorable evidence known to those acting on the Government's behalf, *Kyles*, 514 U.S. 419. Because restitution is criminal punishment, the disclosure duty extends to this proceeding; and even if the Court does not formally extend Brady to restitution, the same materials must be disclosed as a matter of due process—the Defendant's right to see and to rebut the evidence used to punish him. The Defendant has demanded these communications repeatedly and in writing, on August 28 and 29, 2026, and they have not been produced. *See* Ex. A; Affidavit of Greg E. Lindberg.

## VI. The manner of the liquidations was hidden, and the new report's lower values cannot be tested without the originals.

The M3 "desktop" valuations valued all of the Primary Restitution Assets and the Specified Affiliated Companies and were used to fix the value of the assets

available for restitution; yet the nature, manner, terms, and proceeds of the liquidations—Beckett, sold for approximately $134 million against an approximately $1 billion appraisal; Clanwilliam; and the zero-coupon notes sold before maturity—were never disclosed to the Defendant, who could not contest how the dispositions were carried out, was not informed when the companies were being sold, and had no opportunity to test their value independently before sale. That is not the manner of disposition the MVRA prescribes: the Act vests enforcement in the United States, and only after a final order fixes the amount, through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to liquidate the estate ex parte, before any final order, and to withhold the valuations and terms. The point is sharpened by the Special Master's further report, which now claims the companies are worth less than his earlier valuations reflected. Without the original valuations and the underlying data, there is no way to assess why—whether the decline is attributable to the offense or to the Special Master's own post-transfer management and below-value dispositions, an intervening cause the Government must disprove under 18 U.S.C. § 3664(e). The original valuations and every revaluation are therefore essential to any determination. The Special Master's report does not address the facts of this intervening cause at all; it charges the post-transfer decline to the Defendant without accounting for the losses caused by the intervening actors—Michael Dinius, the Rehabilitator, and the third-party custodians, including the Special Master/Receiver himself. It is the Government's burden to introduce facts showing why that intervening cause does not reduce or

eliminate the Defendant's liability, 18 U.S.C. § 3664(e), and the United States Court of Appeals for the Fourth Circuit cannot make that determination on a record that does not include the losses those intervening actors caused. The data must therefore be produced and placed on the record now.

The ex parte liquidations also worked an unconstitutional taking. Before any final order of restitution fixed what, if anything, the Defendant owes, the Special Master—an officer appointed at the Government's instance—took the Defendant's property into his exclusive control and liquidated it, in ex parte dealings the Defendant could neither see nor contest, and disposed of it below value, selling Beckett for approximately $134 million against an approximately $1 billion appraisal. The MVRA authorizes enforcement against a defendant's property only after a final order fixes the amount, and then only by the United States through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to seize and sell the estate ex parte, before any final order, on values the Defendant never saw. A pre-order, ex parte liquidation of the Defendant's property—without notice, without hearing, and without the process the appointing order itself required—is a taking of property without due process of law and without just compensation, in violation of the Fifth Amendment; and forfeiture and restitution reach only property properly subject to them, *Honeycutt v. United States*, 581 U.S. 443 (2017). Had the Defendant retained control, any disposition would have been at fair market value; the ex parte, below-value

dispositions are the injury the Takings and Due Process Clauses forbid. Defendant expressly raises and preserves this challenge.

## VII. The forty-seven categories of data the Special Master must produce.

The materials necessary to test the figures, and the ex parte communications that produced them, are the following forty-seven categories. Each is necessary to test the loss and valuation figures, to establish an offset, credit, or intervening cause, or consists of the ex parte communications themselves; the Affidavit of Greg E. Lindberg (Exhibits 1 and 2 thereto), incorporated herein, shows where each category rests within the restitution figure and why it matters. This list seeks only materials within the possession, custody, or control of the Government, the Special Master and his advisors, or the third-party custodians; it does not seek, and this Motion does not concern, any of the Defendant's own materials, which in any event are not the Government's or the Special Master's to withhold.

A. Company valuations.

1. The M3 "desktop" low/middle/high valuations of the Specified Affiliated Companies and AAPC, 2025, and every draft, with any M3 recommendation on disclosure.
2. All data, inputs, assumptions, models, workpapers, and methodology underlying the M3 valuations, with M3's transmittal correspondence.
3. Every valuation and revaluation of the companies from January 2025 to the present, and the reason for each change, including the reduction of AAPC.

4. The low/middle/high figures filed under seal in July 2026, and all data behind them.
5. The March 2026 data the Special Master offered under seal, and all documents he intends to rely on for valuations.
6. The basis for reducing AAPC to near zero, and how that reduction triggers the forfeiture money judgment.
7. All communications with M3 (or any other valuation professional) concerning the valuations.

B. The loss build.

8. The complete data, spreadsheets, workpapers, and methodology underlying the approximately $1.655 billion figure.
9. The Paladin/Mr. Dinius spreadsheets reflecting the starting loan balances.
10. The repayment data and loan-balance base data used as the starting point.
11. All LoanIQ screenshots, exports, and outputs.
12. The affiliated-loan base data for each insurer (NC and Bermuda) as of (a) October 18, 2018, (b) the MOU date, and (c) the Bermuda transfer to the JPLs.
13. The ILA/MOU reconciliations, including the ECL debt and the April 2022 AAPC refinance.
14. The ULICO reconciliation.
15. The iteration history of the loss memoranda (approximately $2.9 billion to approximately $1.6 billion).

C. Offsets and credits.

16. The method of calculation for every offset and credit applied or disallowed, with the repayment data behind each disputed offset.

17. The NCIC-investment offset the Government conceded—on-record confirmation and the data and methodology applying it.

18. The terms of the agreed Clanwilliam offset and the valuation data applying it.

19. The source and itemization of the additional approximately $100 million in offsets and additions from Mr. Dinius.

20. Data for the disallowed offsets (the SNIC payments; the CBL subordination fee; the ULICO real-estate transfer; the Bermuda asset-sale proceeds; the zero-coupon note proceeds; the preferred-equity payments; the Finanzen sale; the CBL redemption fee).

21. Mr. Dinius's own approximately $641 million November 2018 valuation of the North Carolina insurers, and all communications concerning that valuation and its exclusion.

22. Intervening-cause data—what happened to each company after transfer (Issues 11–17).

D. Board and financial records (last four years).

23. All AAPC board books and packs.

24. All NHC board books.

25. All board minutes, financial reports, and financial presentations for the companies.

26. All letters of intent received.

27. All offers to purchase received.

E. Sale and marketing process.

28. All documents and communications on the marketing and sale of Becket, Clanwilliam, Damovo, and the SACs, including bids, offers, and valuations generated.

29. The terms, proceeds, and closing documents of every completed sale (Becket; Clanwilliam and the Triton escrow; and others).

30. For any sale or offer that did not close, all documents explaining why.

31. All Damovo figures and terms.

F. Communications.

32. All communications between the Special Master or Paladin and New Holding Company concerning valuation or the restitution figure.

33. All communications between the Special Master or Paladin and AAPC or its board concerning valuation or the restitution figure.

34. All communications between the Special Master or Paladin and the bankers concerning valuation, marketing, or sale.

35. All communications between the Special Master or Paladin and North Carolina counsel, Wes Camden, and Williams Mullen concerning valuation or the restitution figure.

36. All communications between the Special Master or Paladin and NHC concerning valuation or the restitution figure.

37. All communications between the Special Master or Paladin and the Bermuda joint provisional liquidators concerning valuation or the restitution figure.

38. All communications of Joseph Grier and Michael Martinez with any party concerning the restitution figure or the valuations.

39. All communications instructing or reflecting that information be withheld from the Defendant (e.g., "do not tell Greg Lindberg").

G. The Government's adoption trail.

40. All ex parte communications between the Government and the Special Master and his advisors, without limitation as to subject; and all communications between the Government or the Special Master and M3 or the custodians concerning the valuation or any revaluation of the assets; the marketing, sale, or other disposition of the assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in value; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

41. All data and methodology in the Government's possession supporting the figure and the low/middle/high valuations.

42. All materials the Government relied upon at sentencing to support the loss figure.

H. Identified files (produce in native format).

43. All M3 desktop valuation files.

44. The Special Master's Appendix 1 to the Final Supplement (July 2026) and all data underlying it.

I. Additional items.

45. The Wes Camden letters to the Special Master disputing his authority, and any similar authority-dispute letters from the NCICs, NHC, or other custodians.

46. The Special Master's AAPC-waiver requests and all communications concerning those waivers.

47. All communications with the trustee of the trusts (Steve Wilson) concerning the trusts, their assets, and any disposition or valuation of those assets.

## VIII. A continued hearing cannot cure the defect where the data does not exist for anyone.

The Court should not enter restitution or forfeiture on the present record. A continued hearing under 18 U.S.C. § 3664(d)(5) cannot cure the defect, because the data required for any de novo determination or review does not exist for the Defendant, the Court, or the Government; until it is produced, no such determination can be made, and production is therefore the necessary predicate to any hearing. To the extent the cause and amount cannot be determined because that data is unavailable, the Court may decline restitution under 18 U.S.C. § 3663A(c)(3)(B).

## IX. Relief.

Immediate logging and preservation are essential and independently warranted. The ex parte communications are the only record of how the figures were built; they sit in the hands of interested custodians and of an officer whose own

conduct they concern, and they will be dissipated if they are not preserved now. Preservation also guards against a graver injury. The Defendant is exposed to multiple punishments for the same conduct—restitution of approximately $1.655 billion, a forfeiture measured against the same unverified ex parte valuations, and pre-judgment "time value" interest layered on top—each derived from figures no party can produce and none of which the Defendant has been permitted to test. The Double Jeopardy Clause forbids multiple punishments for the same offense, and the Excessive Fines Clause forbids monetary sanctions grossly disproportional to the offense. U.S. Const. amends. V, VIII; *Timbs v. Indiana*, 586 U.S. 146 (2019); *United States v. Bajakajian*, 524 U.S. 321 (1998). The Court cannot gauge either danger, and the Defendant cannot guard against successive and duplicative punishment, without the underlying data and the ex parte record—which must be preserved before it is lost.

Defendant requests that the Court order the Special Master (1) to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories set out in Part VII, including all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those

assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) to log and preserve those communications immediately, to prevent their dissipation and to forestall the imposition of multiple punishments; (3) set aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding, and decline to adopt, rely upon, or place them on the record; (4) treat nothing conveyed to the Special Master ex parte as having been "before" him, and give it no weight, unless it was disclosed to the proceeding with its underlying data and adopted by the Special Master on the record in a process in which the Defendant could participate; and (5) not enter restitution or forfeiture on the present record. Neither the Government nor the Special Master has a privilege or proprietary interest in the third-party custodians' records, and a generalized interest in the outcome does not confer standing to resist their production. *In re Grand Jury Subpoena John Doe*, 584 F.3d 175, 184 n.14 (4th Cir. 2009); *United States v. Beckford*, 964 F. Supp. 1010, 1023 (E.D. Va. 1997). Defendant expressly raises and preserves the ex parte, due process, Brady, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) issues, and the gross-loss issue, for review by the United States Court of Appeals for the Fourth Circuit. Counsel for Defendant have a professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues, and expressly do so here so that none is waived.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant this Motion, compel production of the forty-seven categories and the ex parte communications, and set aside the Special Master's report and Final Supplement before any final order of restitution and forfeiture is entered.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 31, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*

# EXHIBIT A

Email Correspondence — "Draft Final Supplement to Restitution Report" Thread
(the complete chain, August 2026)

United States v. Lindberg, No. 3:23-CR-48-MOC (W.D.N.C.)

**Contents (top-level emails; each carries the full quoted chain beneath it)**


1. Aug 17, 2026 04:57 PM — Michael Martinez
2. Aug 28, 2026 03:30 PM — vramachandran@dhammalaw.com
3. Aug 29, 2026 07:50 AM — Vramachandran
4. Aug 29, 2026 03:48 PM — vramachandran@dhammalaw.com
5. Aug 30, 2026 04:55 PM — vramachandran@dhammalaw.com

**Date:** Mon, 17 Aug 2026 16:57:24 +0000

**From:** Michael Martinez <mmartinez@grierlaw.com>

**To:** "vramachandran@dhammalaw.com" <vramachandran@dhammalaw.com>, "Ryan, Daniel (USANCW)" <Daniel.Ryan@usdoj.gov>

**Cc:** "barnesatty@aol.com" <barnesatty@aol.com>, "Freeman, Lyndie (CRM)" <Lyndie.Freeman@usdoj.gov>, "Bain-Creed, Benjamin (USANCW)" <Benjamin.Bain-Creed@usdoj.gov>, Joe Grier <jgrier@grierlaw.com>, "Sanders, Jeremy (CRM)" <Jeremy.Sanders@usdoj.gov>, "Washington, Dana (USANCW)" <Dana.Washington@usdoj.gov>

**Subject:** RE: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

---

No.

Michael L. Martinez

Grier Wright Martinez PA

521 E. Morehead St., Ste. 440, Charlotte, NC 28202

(704) 332-0209 (direct dial)

www.grierlaw.com

mmartinez@grierlaw.com

-----Original Message-----

From: vramachandran@dhammalaw.com <vramachandran@dhammalaw.com>

Sent: Monday, August 17, 2026 12:28 PM

To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>; Michael Martinez <mmartinez@grierlaw.com>

Cc: barnesatty@aol.com; Freeman, Lyndie (CRM) <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin (USANCW) <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier <jgrier@grierlaw.com>; Sanders, Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>; Washington, Dana (USANCW) <Dana.Washington@usdoj.gov>

Subject: Re: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

Caution: This message is from an external sender.

Martinez,

Are you going to place the requested data under seal on the court records to avoid the motion? We would rather fight on the designation than delay proceedings. Thank you.

In any case, in March 2026 you offered to place it on the record under seal. I am not sure why you cannot do the same now. None of this requires a confidentiality agreement.

Sincerely,

Vivek

On 2026-08-17 11:49, vramachandran@dhammalaw.com wrote:

> Dan,

>

> We need the data. We are asking for the data to avoid the motion.

>

> Sincerely,

> Vivek

>

> On 2026-08-17 11:48, Ryan, Daniel (USANCW) wrote:

>> Vivek,

>>

>> We appreciate your advocacy for your client, but we do not litigate

>> via email. If you file a motion with the court with your requested

>> relief, we will respond accordingly. To the extent we understand your

>> emails, we object to your conclusions, accusations, and requested

>> relief. That said, with respect to your requests for valuation
>> information, you can represent to the Court that we are reserving our
>> position until we see your motion.
>>
>> Regards,
>>
>> Dan
>>
>> From: vramachandran@dhammalaw.com <vramachandran@dhammalaw.com>
>> Sent: Monday, August 17, 2026 11:37 AM
>> To: Michael Martinez <mmartinez@grierlaw.com>
>> Cc: barnesatty@aol.com; Ryan, Daniel (USANCW)
>> <Daniel.Ryan@usdoj.gov>; Freeman, Lyndie (CRM)
>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin
>> (USANCW) <Benjamin.Bain-Creed@usdoj.gov>; Meyer, Ryan J.
>> <ryan.meyer@katten.com>; Joe Grier <jgrier@grierlaw.com>; Sanders,
>> Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>
>> Subject: [EXTERNAL] Re: Draft Final Supplement to Restitution Report
>>
>> Dan and Michael,
>>
>> (1) Do you have the financial reports data we asked for below? Did
>> you use it in your report?
>>
>> We are looking for all financial reports and all board reports for
>> all primary restitution assets, specified affiliated companies for

>> the last four years and all letter of intents and offers to purchase
>> received. It is going to take us a month to analyze all this data.
>>
>> (2) Specifically the mid low high you filed with the court in July
>> 2026 is going to trigger a forfeiture worth millions of dollars. So
>> you need to let the defendant see this data on the court docket and
>> this needs to be on the docket so that this can be appealed.
>>
>> (3) Do you have the data you used to arrive at the valuation of all
>> assets you quoted in the sealed report in July 2026?
>>
>> (4) Do you have the data you said you will share with the court under
>> seal on March 2026?
>>
>> (5) Where is the updated data from March 2026 for the same where you
>> said that because AAPC is now valued less it needs to be downgraded?
>>
>> You are going to place all of the above on the record today under
>> seal.
>>
>> Without this the sentencing is going to be based on a blackbox and
>> attorney arguments.
>>
>> Dan, the government may not stand silent in all this. This is a
>> criminal proceeding where you sent someone to prison for 12 years
>> based on data he cannot see and will not be allowed to see? And

>> restitution worth billions of dollars based on data he cannot see and
>> you will not place on the record under seal?
>>
>> Sorry, I am having trouble with scruples. I am flummoxed that anyone
>> thinks this is ok in a criminal proceeding and if we ask for it as a
>> criminal defendant we are delaying the proceedings.
>>
>> Thank you.
>>
>> Sincerely,
>> Vivek
>>
>> On 2026-08-17 11:08, vramachandran@dhammalaw.com wrote:
>>
>>> Michael,
>>>
>>> Let me get this straight you are evaluating the assets with a range
>>> that you put on the record to trigger forfeiture but will not share
>>> that information with the defendant?
>>>
>>> You are going to share the valuation you said you have on all the
>>> assets from March 26, 2026 report. Either that was a lie or you have
>>> that data. You are going to place this on the record today under
>>> seal which we will contest.
>>>
>>> Dan, you are going to sentence someone based on data he cannot even

>>> see. You need to get this on the docket today please. And this is
>>> not for lack of asking as was represented to the court. You
>>> represented to the court when you had questionable authority to
>>> prevent product as the government and you want a sentence on an
>>> incomplete record. You need to explain this to the court.
>>>
>>> We want this on the record today under seal. You forced the deadline
>>> you need to give us the data now on the court records under seal if
>>> it needs to be.
>>>
>>> Sincerely,
>>> Vivek
>>>
>>> On 2026-08-17 10:35, vramachandran@dhammalaw.com wrote:
>>>
>>> Michael,
>>>
>>> Let me get this straight you are evaluating the assets with a range
>>> that you put on the record to forfiture but will not share that
>>> information with the defendant?
>>>
>>> You are going to share the valuation you said you have on all the
>>> assets from March 26, 2026 report. Either that was a lie or you have
>>> that data. You are going to place this on the record today under
>>> seal which we will contest.
>>>

>>> Dan, you are going to sentence someone based on data he cannot even
>>> see. You need to get this on the docket today please. And this is
>>> not for lack of asking as was represented to the court. You
>>> represented to the court when you had questionable authority to
>>> prevent product as the government and you want a sentence on an
>>> incomplete record. You need to explain this to the court.
>>>
>>> We want this on the record today under seal. You forced the deadline
>>> you need to give us the data now on the court records under seal if
>>> it needs to be.
>>>
>>> Sincerely,
>>> Vivek
>>>
>>> On 2026-08-17 10:24, vramachandran@dhammalaw.com wrote:
>>>
>>> Dan,
>>>
>>> Also as suggested, we have raised concerns about the relevance to
>>> some of this data to an independent criminal investigation.
>>> The government needs to act and get this data on file. Thank you.
>>>
>>> Sincerely,
>>> Vivek
>>>
>>> On 2026-08-17 10:19, vramachandran@dhammalaw.com wrote:

\>>>

\>>> Dan,

\>>>

\>>> As a prosecutor you should be aware that this is not just about Greg
\>>> Lindberg. This data belongs to the victims and should be known to
\>>> the general public. Sentencing without disclosing all of this
\>>> information on the record is illegal. Unconstitutional. You need to
\>>> let the Special Master know that he needs to file everything under
\>>> seal if he so wants to.

\>>>

\>>> This is a criminal proceeding. You have a duty to place this
\>>> information on the docket. This is exceptional. You delay the
\>>> proceedings and then blame it on the defendant. Then seek a
\>>> confidentiality agreement. You have the burden of proof. Are you
\>>> going to meet it or not?

\>>>

\>>> I would like an answer by 12.00 P.M.

\>>>

\>>> Sincerely,
\>>> Vivek

\>>>

\>>> Michael,

\>>>

\>>> This is a criminal case. Whatever you want to produce you need to
\>>> produce now. I need to get this to my client so that we can defend
\>>> on August 24th which you are forcing on the defendant.

>>>
>>> The data is subject to the court's sealing procedures. You are not
>>> going to condition this data on anything other than the court's own
>>> processes.
>>>
>>> Any failure to produce the data means you are unwilling to establish
>>> these on the record as required under the MVRA. That is a failure to
>>> prosecute by the government.
>>>
>>> Please file on the record the methodology and the data we requested
>>> underseal by August 17, 2026 noon. We will contest the sealing with
>>> the court if necessary.
>>>
>>> This is not a civil proceeding.
>>>
>>> Sincerely,
>>> viek
>>>
>>> On 2026-08-17 10:13, Michael Martinez wrote:
>>>
>>> Vivek:
>>>
>>> The Special Master disagrees with your legal analyses and
>>> conclusions below.
>>>
>>> That said, the Special Master would not be opposed in concept to

>>> producing (on a reasonable timeline) documents in our possession
>>> under a confidentiality agreement and protective order limiting the
>>> public disclosure of proprietary information. If your client is
>>> amenable to preserving the confidentiality of sensitive proprietary
>>> information, then I can draft a confidentiality agreement and
>>> protective order for your review and edit. If your client is not
>>> amenable to preserving the confidentiality of sensitive proprietary
>>> information, then a court order compelling us to produce these
>>> materials with no restrictions on subsequent disclosure will be
>>> required.
>>>
>>> Without limiting the foregoing, our proposed methodology for
>>> unrealized offsets/credits is that your client will receive a credit
>>> against his restitution obligation as the assets are monetized
>>> rather than him receiving a credit now based on our estimation of
>>> what the Primary Restitution Assets might fetch for victims. The
>>> purpose of the estimation was to satisfy the mandate in the special
>>> master order that the special master identify assets "and to the
>>> extent those assets are not readily convertible to cash, determine a
>>> reasonable estimated value for those assets." In other words,
>>> evaluating our estimation of what the Primary Restitution Assets
>>> might generate for victims in the future is not an integral
>>> component of the Court's restitution determination, and those
>>> estimated figures do not appear anywhere in the proposed restitution
>>> order.
>>>

>>> Michael L. Martinez

>>> Grier Wright Martinez PA

>>> 521 E. Morehead St., Ste. 440, Charlotte, NC 28202

>>> (704) 332-0209 (direct dial)

>>> www.grierlaw.com [1] [1 [2]]

>>> mmartinez@grierlaw.com

>>>

>>> -----Original Message-----

>>> From: vramachandran@dhammalaw.com <vramachandran@dhammalaw.com>

>>> Sent: Monday, August 17, 2026 6:03 AM

>>> To: Michael Martinez <mmartinez@grierlaw.com>

>>> Cc: barnesatty@aol.com; Daniel Ryan (Daniel.Ryan@usdoj.gov)

>>> <daniel.ryan@usdoj.gov>; Freeman, Lyndie (CRM)

>>> <lyndie.freeman@usdoj.gov>; Bain-Creed, Benjamin (USANCW)

>>> <benjamin.bain-creed@usdoj.gov>; Meyer, Ryan J.

>>> <ryan.meyer@katten.com>; Joe Grier <jgrier@grierlaw.com>; Jeremy

>>> Sanders <jeremy.sanders@usdoj.gov>

>>> Subject: Re: Draft Final Supplement to Restitution Report

>>>

>>> Caution: This message is from an external sender.

>>>

>>> Michael and Dan,

>>>

>>> I do want to remind you that unlike a bankruptcy proceeding, these

>>> companies are not just worth debt. They have revenues in the

>>> millions, so your methodology of evaluation has to be disclosed to

>>> the defendant on the record.

>>>

>>> We are looking for all financial reports and all board reports for

>>> all primary restitution assets, specified affiliated companies for

>>> the last four years and all letter of intents and offers to purchase

>>> received. It is going to take us a month to analyze all this data.

>>> Without this the sentencing is going to be based on a blackbox and

>>> attorney arguments.

>>> This does not meet the MVRA accounting requirement. Please get us

>>> this information by noon August 17, 2026.

>>>

>>> A fiduciary duty applies to the Special Master/Receiver.

>>>

>>> If you cannot establish your burden of proof, the government has a

>>> duty to let the court know that you cannot do it. Failure to do that

>>> to win is striking a foul blow.

>>>

>>> Katten has asked for this in the past. We do not have this

>>> information.

>>>

>>> Thank you.

>>>

>>> Sincerely,

>>> Vivek

>>>

>>> On 2026-08-15 14:59, vramachandran@dhammalaw.com wrote:

>>>
>>> Michael and Dan,
>>>
>>> (I) In your March 2026 report, you stated that publicly disclosing
>>> too much detail regarding the Primary Restitution Assets and the
>>> Special Master's value determinations concerning the same would
>>> negatively impact liquidation efforts and could, in itself,
>>
>> decrease
>>
>>>> the value of the Primary Restitution Assets, and that the Special
>>>> Master therefore erred on the side of caution by including in the
>>>> report a single range encompassing all Primary Restitution Assets
>>
>> lumped together.
>>
>>>> Please provide all of the data you stated you would provide to the
>>>> Court in that March 2026 report, together with any other documents
>>>> the Special Master intends to rely on for the valuations in this
>>>> proceeding. Please do so by noon on August 17, 2026. To the extent
>>>> you have any additional information these have to be established on
>>
>>>> the record under § 3664(f)(1)(A) by placing them on the record.
>>>>
>>>> Under the MVRA that material belongs with the defendant: the burden
>>

>>>> of demonstrating the amount of loss is on the Government, 18 U.S.C.

>>

>> §

>>

>>>> 3664(e); the statute requires "a complete accounting of the losses

>>

>> to

>>

>>>> each victim," id. § 3664(a); and restitution must be set "in the

>>

>> full

>>

>>>> amount of each victim's losses as determined by the court," id. §

>>>> 3664(f)(1)(A). A single lumped range, with its particulars

>>

>> withheld,

>>

>>>> cannot satisfy those provisions or permit the de novo

>>>> determination

>>

>>>> the Court is required to make. Id. § 3664(d)(6).

>>>>

>>>> (II) We will also file a motion on to unseal the Appendix to the

>>>> final report. Other than attorney argument, there is nothing in

>>

>> that

>>
>>>> Appendix, and we will file our own argument saying so -- both to
>>>> highlight this issue and to preserve the record for the Fourth
>>>> Circuit. Neither the defendant's right to contest the loss amount
>>
>> nor
>>
>>>> the Court's de novo review under § 3664(d)(6) can be exercised
>>>> against a figure whose basis is kept under seal. See § 3664(e).
>>>>
>>>> (III) We are going to file a motion for reconsideration of the
>>
>> denial
>>
>>>> of the subpoenas -- not because we expect the Court to change its
>>>> mind, but to make sure the record is clear on three points. First,
>>>> under the MVRA the burden of proof lies with the Government, not
>>
>> the
>>
>>>> defendant. § 3664(e). Second, to the extent the valuations of the
>>>> companies rest with the Special Master, they must be provided to
>>
>> the
>>
>>>> defendant under the accounting provisions of the MVRA. §§

>>

>> 3664(a),

>>

>>>> (f)(1)(A). Third, restitution under the MVRA must be accurate; if

>>

>> it

>>

>>>> cannot be made accurate, or if the issues are too complex, the

>>>> Court's option is to decline restitution rather than order an

>>>> inaccurate amount. § 3663A(c)(3)(B). To the extent you again

>>>> press

>>

>>>> the August 24 deadline, we preserve this issue for the Fourth

>>>> Circuit: the deferred determination is expressly contemplated by

>>>> §

>>

>>>> 3664(d)(5), and that ninety-day date is directory, not a license

>>

>> for an inaccurate award.

>>

>>>> See Dolan v. United States, 560 U.S. 605 (2010) (a court that

>>

>> misses

>>

>>>> the § 3664(d)(5) deadline retains authority to order restitution,

>>>> because the deadline is meant to protect victims, not to create a

>>>> windfall for defendants). Where loss is not yet ascertainable, the
>>>> MVRA's remedy is to develop the record -- or to decline
>>>> restitution
>>
>>>> under § 3663A(c)(3)(B) -- not to adopt a guess.
>>>>
>>>> (IV) We will additionally file a motion on the AAPC valuation and
>>
>> on
>>
>>>> Ares causation, tied to the subpoena request, to highlight the
>>>> live
>>
>>>> issues that remain pending and that the Government and the Special
>>>> Master are resisting. Causation and amount are the Government's to
>>>> prove by a preponderance of the evidence, § 3664(e), and the
>>>> value
>>
>> of
>>
>>>> the property must be established on the record under §
>>
>> 3664(f)(1)(A).
>>
>>> Attorney arguments about AI and AAPC do not establish value of the
>>> property on the record.

>>>

>>> We are happy to state that you are opposed to these motions.

>>>

>>> Sincerely,

>>> Vivek

>>>

>>> On 2026-07-22 16:48, Michael Martinez wrote:

>>>

>>> Please find attached our current draft of a final supplement to

>>

>> the

>>

>>> restitution report in the 3:23-CR-48 case. Also attached is a

>>> proposed final order of restitution and appendix to the supplement

>>

>>> discussing the primary restitution assets.

>>>

>>> Here is what we said about the other parties positions on this

>>> supplement: "The Special Master has conferred with both the

>>> government and the Defendant's counsel in relation to this

>>> Supplement.

>>> Although the government does not oppose the positions articulated

>>

>> by

>>

>>> the Special Master through this Supplement, the Defendant opposes

>>> the majority of the Special Master's recommendations appearing in

>>> this Supplement." If I have not accurately stated your client's

>>> position on our supplement, please let me know by the end of the

>>

>> day

>>

>>> tomorrow.

>>> We have to file this by Friday.

>>>

>>> Thank you.

>>>

>>> Michael L. Martinez

>>>

>>> Grier Wright Martinez, PA

>>>

>>> 521 E. Morehead St., Ste. 440

>>>

>>> Charlotte, NC 28202

>>>

>>> 704/332.0209 (direct)

>>>

>>> 704/332.0215 (fax)

>>>

>>> mmartinez@grierlaw.com

>>>

>>> Disclaimer

>>>

>>> This e-mail may contain confidential and attorney-client

>>

>> privileged

>>

>>> material for the sole use of the intended recipient. Do not accept

>>

>>> wiring instructions from us by email. If you are not the

>>

>> recipient,

>>

>>> you are hereby notified that any disclosure, copying, distribution

>>

>>> or taking action in relation of the contents of this information

>>

>> is

>>

>>> strictly prohibited and may be unlawful, please contact the sender

>>

>>> and delete this e-mail.

>>>

>>> This email has been scanned for viruses and malware, and may have

>>> been automatically archived by Mimecast Ltd, an innovator in

>>> Software as a Service (SaaS) for business. Providing a safer and

>>> more useful place for your human generated data. Specializing in;

>>> Security, archiving and compliance. To find out more Click Here [1

>>

>>> [1 [3]]].

>>>

>>> Links:

>>> ------

>>> [1] http://www.mimecast.com/products/ [4]

>>>

>>> Links:

>>> ------

>>> [1] http://www.mimecast.com/products/ [5]

>>

>> Disclaimer

>>

>> This e-mail may contain confidential and attorney-client privileged
>> material for the sole use of the intended recipient. Do not accept
>> wiring instructions from us by email. If you are not the recipient,
>> you are hereby notified that any disclosure, copying, distribution or
>> taking action in relation of the contents of this information is
>> strictly prohibited and may be unlawful, please contact the sender and
>> delete this e-mail.

>>

>> This email has been scanned for viruses and malware, and may have been
>> automatically archived by Mimecast Ltd, an innovator in Software as a
>> Service (SaaS) for business. Providing a safer and more useful place
>> for your human generated data. Specializing in; Security, archiving
>> and compliance. To find out more Click Here [2 [6]].

>>

>> Links:

>> ------

>> [1] http://www.grierlaw.com [7]

>> [2] http://www.mimecast.com/products/ [8]

>>

>> Links:

>> ------

>> [1]

>> https://protect2.fireeye.com/v1/url?k=b3214c9a-d5e409a4-b326687f-c400add0b6f2-b0f035d2a11fd9ff&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F

>> [2]

>> https://protect2.fireeye.com/v1/url?k=e9f097bc-8f35d282-e9f7b359-c400add0b6f2-c4743b7b59bdd01d&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

>> [3]

>> https://protect2.fireeye.com/v1/url?k=12a32567-74666059-12a40182-c400add0b6f2-ae54406c5cb0daf0&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

>> [4]

>> https://protect2.fireeye.com/v1/url?k=36fafe39-503fbb07-36fddadc-c400add0b6f2-6fafbb72a6d03376&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

>> [5]

>> https://protect2.fireeye.com/v1/url?k=f61eaf3f-90dbea01-f6198bda-c400add0b6f2-af89ff6354a1d166&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

>> [6]

>> https://protect2.fireeye.com/v1/url?k=620d41e3-04c804dd-620a6506-c400add0b6f2-aa491b58f642012f&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

>> [7]

>> https://protect2.fireeye.com/v1/url?k=42df8291-241ac7af-42d8a674-c400add0b6f2-79b98e28ef7d1681&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F

>> [8]

>> https://protect2.fireeye.com/v1/url?k=2fe87868-492d3d56-2fef5c8d-c400add0b6f2-cbb29ed8819504b6&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F

Disclaimer

This e-mail may contain confidential and attorney-client privileged material for the sole use of the intended recipient. Do not accept wiring instructions from us by email. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful, please contact the sender and delete this e-mail.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast Ltd, an innovator in Software as a Service (SaaS) for business. Providing a safer and more useful place for your human generated data. Specializing in; Security, archiving and compliance. To find out more visit the Mimecast website.

**Date:** Fri, 28 Aug 2026 15:30:24 -0400

**From:** vramachandran@dhammalaw.com

**To:** "Daniel (USANCW) Ryan" <daniel.ryan@usdoj.gov>

**Cc:** Barnesatty <barnesatty@aol.com>, "Lyndie (FRD) Freeman" <lyndie.freeman@usdoj.gov>, "Benjamin (USANCW) Bain-Creed" <benjamin.bain-creed@usdoj.gov>, Joe Grier <jgrier@grierlaw.com>, "Jeremy (FRD) Sanders" <jeremy.sanders@usdoj.gov>, "Dana (USANCW) Washington" <dana.washington@usdoj.gov>, Michael Martinez <mmartinez@grierlaw.com>, "Ryan J. Meyer" <ryan.meyer@katten.com>, "Brandon N. McCarthy" <brandon.mccarthy@katten.com>

**Subject:** Re: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

---

Dan,

Once again following up on the ex parte communications. We need an answer. I also sent you the categories we want via a separate email.

Silence is not an option. We have done everything we can to get you specificity.

Sincerely,
Vivek

On 2026-08-28 13:29, vramachandran@dhammalaw.com wrote:
> Dan,
>
> Following up once again on ex parte communications with the special
> master and his representatives (including but not limited to Paladin.)
> The government should let us know when we can see this Brady/Gigilo
> material. We need a response because the judgement may issue anytime
> and we don't want to go an file a motion to reconsider. Want to get
> this resolved through emails instead of another motion. We need to
> prepare for a 4th circuit appeal and cannot be blocked at every turn on
> everything from the government.
>
> As I understand the entire NHC communications were ex parte to the
> special master and Defendant has not had any access to that information
> and emails. All of these goto the $1.6 Billion base itself. Please
> provide this material to the Defendant. Since you adopted all of these
> wholesale you must have the underlying data.
>
> Similarly, the entire communication from Mike Dinius was ex parte to
> the special master. Defendant has not had any access to any of that
> information and emails. All of these goto the $1.6 Billion base itself.
> Please provide this material to the Defendant. Since you adopted all of
> these wholesale you must have the underlying data.
>

> Thank you.
>
> Sincerely,
> Vivek
>
>
> On 2026-08-28 11:35, vramachandran@dhammalaw.com wrote:
>> Dan,
>>
>> Your silence over the past three days on this ex parte issue is
>> disconcerting. How extensive was your ex parte contact with the
>> special master and his representatives (including paladin)? What was
>> discussed? Defense needs to know and have this Brady/Gigilo material.
>>
>> You had a trial two days ago. We can understand that. It's now 11.30
>> and we wanted a response by 9.30 A.M. today. Thank you.
>>
>>
>> Sincerely,
>> Vivek
>>
>>
>>
>> On 2026-08-28 10:01, vramachandran@dhammalaw.com wrote:
>>> Dan,
>>>
>>> We asked about ex parte communications two or three days ago. You
>>> have not responded yet. Please do so now.
>>>
>>> Thank you.
>>>
>>> Sincerely,
>>> Vivek
>>>
>>> On 2026-08-28 08:17, vramachandran@dhammalaw.com wrote:
>>>> Dan,
>>>>
>>>> For clarity, ex-parte communications are targeted for Brady/Gigilo
>>>> material targets everything that was send or received by the
>>>> government from/to the special master, his counsel or his
>>>> representatives (including but not limited to Paladin.) Any
>>>> communications between the government and any officers of the
>>>> entities (Preliminary Restitution Assets and Specified Affiliated
>>>> Companies) including but not limited to CEOs and trustees of the
>>>> organizations. For example, your communication with NHC officer
>>>> Meiji(?) to produce the affidavit you did in one of the only
>>>> responses to our motions you filed with the court.
>>>>
>>>> We are also trying to preserve evidence in what is a scrambled egg
>>>> with a special master/receiver. This applies not just to Greg
>>>> Lindberg. It applies to the victims as well. You have a
>>>> constitutional duty to get this done right.

>>>>
>>>> Please respond by 9.30 A.M. so that we know you are going to meet
>>>> your constitutional obligations.
>>>>
>>>> Sincerely,
>>>> Vivek
>>>>
>>>> On 2026-08-28 07:39, vramachandran@dhammalaw.com wrote:
>>>>> Dan,
>>>>>
>>>>> We want all ex parte communication between the government and the
>>>>> special master or his counsel. Let's start there. As you know
>>>>> communicating with a judge ex parte is not constitutional. It's a
>>>>> due process issue. It's Brady/Gigilo material which defense is
>>>>> entitled to have. All of it. Please respond by 9.30 AM so that we
>>>>> know that you are working on this production.
>>>>>
>>>>> We will send a discrete list of other items we want from the
>>>>> government as well. We will place all of these on the record in a
>>>>> motion to compel just as a protective measure. We will of course
>>>>> remove this from the docket if you provide us the information. We
>>>>> have no choice but to do this.
>>>>>
>>>>> I have had an extensive look at the contemporaneous record and the
>>>>> government in many instances made promises it never kept. For
>>>>> example, it agreed with Greg Lindberg that ClanWilliams should have
>>>>> a value of $800 million and Greg could argue for the $400 in
>>>>> credits. The government during a call suggested the same NCICS
>>>>> offset would be favorably treated and Greg would get the offsets.
>>>>>
>>>>> Let me just say, I had issues with my scruples again.
>>>>>
>>>>> Sincerely,
>>>>> Vivek
>>>>>
>>>>> On 2026-08-27 10:03, Vramachandran wrote:
>>>>>> Dan,
>>>>>>
>>>>>> Added you to the one place where the special master reached out to
>>>>>> us.
>>>>>> We have now regularized the one ex parte communication initiated
>>>>>> by
>>>>>> the master.
>>>>>>
>>>>>> Thank you.
>>>>>>
>>>>>> Sincerely,
>>>>>> Vivek
>>>>>>
>>>>>>> On Aug 26, 2026 at 12:39 PM, <Vramachandran> wrote:
>>>>>>>
>>>>>>> Brandon,

>>>>>>>
>>>>>>> Per my understanding the special master never gave us any
>>>>>>> information on
>>>>>>> the data and the spreadsheets behind the 1.6 Billion in
>>>>>>> restitution.
>>>>>>> Nor
>>>>>>> the methodology behind that value. Greg does not have them and
>>>>>>> would
>>>>>>>
>>>>>>> have had them if you had access to them.
>>>>>>>
>>>>>>> Additionally, none of the calculations, methodology spreadsheets
>>>>>>> and
>>>>>>>
>>>>>>> data behind the offsets and credits are disclosed.
>>>>>>>
>>>>>>> The valuations of the primary restitution assets and specified
>>>>>>> affiliated companies and assets and the methodology was ever
>>>>>>> disclosed.
>>>>>>> One was made in March 2026 and filed with the court in April
>>>>>>> 2026.
>>>>>>>
>>>>>>> This valuation of assets was updated and not disclosed to the
>>>>>>> defendant
>>>>>>> in the second supplement. None of which has ever been produced
>>>>>>> with
>>>>>>> the
>>>>>>> defendant. Only a range was disclosed in the second supplement.
>>>>>>>
>>>>>>> None of this is available with the defendant. We just asked the
>>>>>>> government to provide this information. We have already formally
>>>>>>> requested the government with a list and expect the government to
>>>>>>> step
>>>>>>> in provide all the results. This is an independent request to the
>>>>>>> government and they should provide it.
>>>>>>>
>>>>>>> Sincerely,
>>>>>>> Vivek
>>>>>>>
>>>>>>> On 2026-08-26 12:27, McCarthy, Brandon N. wrote:
>>>>>>>> Just seeing this back and forth. I am not sure what specific
>>>>>>>> items
>>>>>>> are
>>>>>>>> needed. We are happy to run another search for anything. Just
>>>>>>>> let
>>>>>>> us
>>>>>>>> know the specific items to look for.
>>>>>>>> Thanks
>>>>>>>>
>>>>>>>> Brandon N. McCarthy
>>>>>>>> Partner
>>>>>>>> Katten

>>>>>>>> Katten Muchin Rosenman LLP
>>>>>>>> 2121 North Pearl Street, Suite 1100 | Dallas, TX 75201-2591
>>>>>>>> direct +1.214.765.3680
>>>>>>>> brandon.mccarthy@katten.com | katten.com
>>>>>>>> Bio | vCard
>>>>>>>>
>>>>>>>> -----Original Message-----
>>>>>>>> From: vramachandran@dhammalaw.com <vramachandran@dhammalaw.com>
>>>>>>>> Sent: Wednesday, August 26, 2026 9:37 AM
>>>>>>>> To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
>>>>>>>> Cc: Barnesatty <barnesatty@aol.com>; Freeman, Lyndie (FRD)
>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin (USANCW)
>>>>>>>> <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier
>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>> Sanders, Jeremy (FRD) <Jeremy.Sanders@usdoj.gov>; Washington,
>>>>>>>> Dana
>>>>>>>> (USANCW) <Dana.Washington@usdoj.gov>; Michael Martinez
>>>>>>>> <mmartinez@grierlaw.com>; Meyer, Ryan J.
>>>>>>>> <ryan.meyer@katten.com>;
>>>>>>>> McCarthy, Brandon N. <brandon.mccarthy@katten.com>
>>>>>>>> Subject: Re: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>>> Restitution
>>>>>>>> Report
>>>>>>>>
>>>>>>>> EXTERNAL EMAIL \u2013 EXERCISE CAUTION
>>>>>>>>
>>>>>>>> Dan,
>>>>>>>>
>>>>>>>> And yes, I spoke to Greg Lindberg a few minutes ago. He has
>>>>>>>> never
>>>>>>>> received any of this information from the special master or
>>>>>>>> anyone
>>>>>>>> else.
>>>>>>>> Prior counsel also have not had any success getting this
>>>>>>> information
>>>>>>>> from the special master. They are copied here.
>>>>>>>>
>>>>>>>> You (the government) have the burden of proof. Also all of this
>>>>>>>> is
>>>>>>>> Brady/Giglio information.
>>>>>>>>
>>>>>>>> We don't have it and have not had it. We want this information.
>>>>>>>>
>>>>>>>> Sincerely,
>>>>>>>> Vivek
>>>>>>>>
>>>>>>>> On 2026-08-26 09:33, vramachandran@dhammalaw.com wrote:
>>>>>>>>> I have not had any ex parte communication with the special
>>>>>>>>> master
>>>>>>>> other
>>>>>>>>> than an AAPC tax return.
>>>>>>>>> I would like to know what communication the government had.

>>>>>>>>> And your data request is to you the government. Do not bring in
>>>>>>> the
>>>>>>>>> Special Master or anyone else into this.
>>>>>>>>> Either you have it or you don't have it. State plainly whether
>>>>>>> you
>>>>>>>> have
>>>>>>>>> the data or not in the other email.
>>>>>>>>>
>>>>>>>>> Sincerely,
>>>>>>>>> vivek
>>>>>>>>>
>>>>>>>>> On 2026-08-26 09:29, vramachandran@dhammalaw.com wrote:
>>>>>>>>>> Dan,
>>>>>>>>>>
>>>>>>>>>> The government was asked via a separate email for the data to
>>>>>>>>>> be
>>>>>>>>>> produced.
>>>>>>>>>> You can respond there. We asked the government to produce what
>>>>>>> it
>>>>>>>> has
>>>>>>>>>> in that email thread.
>>>>>>>>>> It is directed to the government. I am not playing ask the
>>>>>>> special
>>>>>>>>>> master again.
>>>>>>>>>> We want the basis for your adoption of the report wholesale
>>>>>>>>>> and
>>>>>>>> using
>>>>>>>>>> that during sentencing.
>>>>>>>>>> Your response to the government's request should be on that
>>>>>>> thread.
>>>>>>>>>>
>>>>>>>>>> Sincerely,
>>>>>>>>>> Vivek
>>>>>>>>>>
>>>>>>>>>> On 2026-08-26 09:27, Ryan, Daniel (USANCW) wrote:
>>>>>>>>>>> Vivek,
>>>>>>>>>>>
>>>>>>>>>>> We once again disagree with your claims about the facts and
>>>>>>>>>>> the
>>>>>>>> law.
>>>>>>>>>>> Moreover, you did not answer my question. What materials
>>>>>>> regarding
>>>>>>>>>>> restitution did Mr. Lindberg's prior counsel not receive from
>>>>>>> the
>>>>>>>>>>> Government, the Special Master, Paladin, or any other source?
>>>>>>> The
>>>>>>>>>>> government does not have any obligation to reproduce
>>>>>>>>>>> materials
>>>>>>>>>>> already in Defendant's possession. Is it your position that
>>>>>>>>>>> Mr.
>>>>>>>>>>> Lindberg's counsel did not receive any information or
>>>>>>>>>>> materials

>>>>>>>> from
>>>>>>>>>>> the Special Master and/or Paladin during its ex parte
>>>>>>>> communications
>>>>>>>>>>> with them or the government in discovery relating to
>>>>>>> restitution?
>>>>>>>> If
>>>>>>>>>>> so, please provide support for that claim.
>>>>>>>>>>>
>>>>>>>>>>> We are happy to provide Mr. Lindberg with any materials he is
>>>>>>>>>>> entitled to, but we do not agree with your suggestion that he
>>>>>>> has
>>>>>>>> not
>>>>>>>>>>> already received materials underpinning the restitution
>>>>>>>>>>> amount.
>>>>>>>>>>>
>>>>>>>>>>> Also, I will be at a trial that starts this morning, so I
>>>>>>>>>>> will
>>>>>>> not
>>>>>>>> be
>>>>>>>>>>> able to respond to any further emails today.
>>>>>>>>>>>
>>>>>>>>>>> Dan
>>>>>>>>>>>
>>>>>>>>>>>
>>>>>>>>>>> -----Original Message-----
>>>>>>>>>>> From: vramachandran@dhammalaw.com
>>>>>>>>>>> <vramachandran@dhammalaw.com>
>>>>>>>>>>> Sent: Wednesday, August 26, 2026 7:43 AM
>>>>>>>>>>> To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
>>>>>>>>>>> Cc: Barnesatty <barnesatty@aol.com>; Freeman, Lyndie (FRD)
>>>>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin (USANCW)
>>>>>>>>>>> <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier
>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>> Sanders, Jeremy (FRD) <Jeremy.Sanders@usdoj.gov>; Washington,
>>>>>>> Dana
>>>>>>>>>>> (USANCW) <Dana.Washington@usdoj.gov>; Michael Martinez
>>>>>>>>>>> <mmartinez@grierlaw.com>
>>>>>>>>>>> Subject: Re: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>> Restitution
>>>>>>>>>>> Report
>>>>>>>>>>>
>>>>>>>>>>> Dan,
>>>>>>>>>>>
>>>>>>>>>>> We will be placing objections on file today. We will also
>>>>>>>>>>> place
>>>>>>> a
>>>>>>>>>>> motion
>>>>>>>>>>> to compel against the government and special master if I
>>>>>>>>>>> don't
>>>>>>>> hear
>>>>>>>>>>> back
>>>>>>>>>>> from the government on the documents we asked for.

>>>>>>>>>>>
>>>>>>>>>>> Clearly, the government knows how to share the information it
>>>>>>> has.
>>>>>>>>>>> And
>>>>>>>>>>> it should to avoid troubling the court.
>>>>>>>>>>>
>>>>>>>>>>> Sincerely,
>>>>>>>>>>> Vivek
>>>>>>>>>>>
>>>>>>>>>>> On 2026-08-25 14:38, vramachandran@dhammalaw.com wrote:
>>>>>>>>>>>> Please respond before 3.30 P.M. We will be seeking active
>>>>>>>>>>>> intervention
>>>>>>>>>>>> from both the 4th circuit and the district court on the
>>>>>>>> government's
>>>>>>>>>>>> obligation to share data it has.
>>>>>>>>>>>>
>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>> Vivek
>>>>>>>>>>>>
>>>>>>>>>>>> On 2026-08-25 14:28, vramachandran@dhammalaw.com wrote:
>>>>>>>>>>>>> Dan and Jeremy,
>>>>>>>>>>>>>
>>>>>>>>>>>>> We once again request the government to give the data that
>>>>>>>>>>>>> underlies
>>>>>>>>>>>>> the restitution and sentencing. Restitution is part and
>>>>>>> parcel
>>>>>>>> of
>>>>>>>>>>>>> the
>>>>>>>>>>>>> criminal sentence. It's a Brady/Giglio violation to deny
>>>>>>> access
>>>>>>>> to
>>>>>>>>>>>>> the
>>>>>>>>>>>>> data and the methodology on which sentencing is based.
>>>>>>>>>>>>>
>>>>>>>>>>>>> Additionally, your second omnibus position is against DOJ
>>>>>>> policy
>>>>>>>> on
>>>>>>>>>>>>> interest rate.
>>>>>>>>>>>>>
>>>>>>>>>>>>> The prosecution has the duty to provide the data we
>>>>>>>>>>>>> requested
>>>>>>>> from
>>>>>>>>>>>>> the
>>>>>>>>>>>>> special master.
>>>>>>>>>>>>>
>>>>>>>>>>>>> There is an appeal filed to preserve Greg Lindberg's rights
>>>>>>>> after
>>>>>>>>>>>>> sentencing and after preliminary order on restitution. That
>>>>>>> does
>>>>>>>>>>>>> not
>>>>>>>>>>>>> excuse non-production of the data. Dan it's the
>>>>>>>>>>>>> government's

>>>>>>>>>>>>> responsibility to get the data and share the data similar
>>>>>>>>>>>>> to
>>>>>>> how
>>>>>>>>>>>>> the
>>>>>>>>>>>>> Ares 302's were shared.
>>>>>>>>>>>>>
>>>>>>>>>>>>> At the end of the day, it's the United States Vs. Greg
>>>>>>> Lindberg.
>>>>>>>>>>>>> It's
>>>>>>>>>>>>> your burden of proof irrespective of your position on what
>>>>>>> the
>>>>>>>> data
>>>>>>>>>>>>> relates to. It's the underlying data on restitution and the
>>>>>>> data
>>>>>>>>>>>>> that
>>>>>>>>>>>>> you used for sentencing and preliminary restitution and an
>>>>>>> order
>>>>>>>> on
>>>>>>>>>>>>> restitution the government wants and a forfeitutre the
>>>>>>>> government
>>>>>>>>>>>>> will
>>>>>>>>>>>>> seek to enforce.
>>>>>>>>>>>>> And sentencing is as yet incomplete and we are asking for
>>>>>>>>>>>>> the
>>>>>>>> data.
>>>>>>>>>>>>>
>>>>>>>>>>>>> It's the prosecution to obtain the data.
>>>>>>>>>>>>>
>>>>>>>>>>>>> On our part, even when we don't agree with a designation,
>>>>>>>>>>>>> we
>>>>>>>> have
>>>>>>>>>>>>> gone
>>>>>>>>>>>>> the extra mile to file everything under seal pending
>>>>>>>> determination
>>>>>>>>>>>>> by
>>>>>>>>>>>>> the court. Not getting us the data under these
>>>>>>>>>>>>> circumstances
>>>>>>>> does
>>>>>>>>>>>>> not
>>>>>>>>>>>>> comport with your obligations.
>>>>>>>>>>>>>
>>>>>>>>>>>>> You have the ability to share the data with the defendant
>>>>>>>>>>>>> and
>>>>>>>> have
>>>>>>>>>>>>> done so on victims statements which are far more sensitive
>>>>>>> than
>>>>>>>> the
>>>>>>>>>>>>> statements of companies Greg Lindberg turned over to you.
>>>>>>>>>>>>>
>>>>>>>>>>>>> Thank you.
>>>>>>>>>>>>>
>>>>>>>>>>>>> Sincerely,

>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>
>>>>>>>>>>>>> On 2026-08-23 21:11, vramachandran@dhammalaw.com wrote:
>>>>>>>>>>>>>> Jermey,
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> We may file this with the 4th again as an interim stay.
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> Dan and Martinez,
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> Given that the court has not been informed of a sale on
>>>>>>>>>>>>>> the
>>>>>>>> Damovo
>>>>>>>>>>>>>> sale and both of you have not responded to the motion
>>>>>>> relating
>>>>>>>> to
>>>>>>>>>>>>>> Damovo which is now being sold for debt with an offer for
>>>>>>> the
>>>>>>>> $400
>>>>>>>>>>>>>> million to 450 million. We are filing a motion for stay.
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>
>>>>>>>>>>>>>> On 2026-08-18 11:07, vramachandran@dhammalaw.com wrote:
>>>>>>>>>>>>>>> Thank you, Dan. We will file a motion to reconsider
>>>>>>> shortly.
>>>>>>>> We
>>>>>>>>>>>>>>> need
>>>>>>>>>>>>>>> to preserve our objections at this point.
>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>> Sent with Spark [18]
>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>> On Aug 18, 2026 at 11:03\u202fAM -0400, Ryan, Daniel
(USANCW)
>>>>>>>>>>>>>>> <Daniel.Ryan@usdoj.gov>, wrote:
>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Vivek,
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> I disagree with your recitation of the facts and law,
>>>>>>>>>>>>>>>> but,
>>>>>>> as
>>>>>>>> I
>>>>>>>>>>>>>>>> indicated yesterday, the Government has no objection to
>>>>>>> you
>>>>>>>>>>>>>>>> getting

>>>>>>>>>>>>>>>> access to the type of information you are requesting
>>>>>>>>>>>>>>>> from
>>>>>>> the
>>>>>>>>>>>>>>>> Special Master subject to his ability to provide it to
>>>>>>> you.
>>>>>>>> The
>>>>>>>>>>>>>>>> Government believes that the information you are seeking
>>>>>>>> would,
>>>>>>>>>>>>>>>> at
>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>> minimum, qualify as \u201csensitive materials\u201d under
the
>>>>>>>> Court\u2019s
>>>>>>>>>>>>>>>> Standard Criminal Discovery Order that the Defendant may
>>>>>>> not
>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>> copies of, and they may rise to the level of
>>>>>>> \u201cattorney\u2019s
>>>>>>>> eyes
>>>>>>>>>>>>>>>> only.\u201d I would encourage you to work with the
Special
>>>>>>>> Master to
>>>>>>>>>>>>>>>> see if you can agree to a mechanism for you to obtain
>>>>>>> access
>>>>>>>> to
>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>> materials you seek.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Dan
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> From: Vramachandran <vramachandran@dhammalaw.com>
>>>>>>>>>>>>>>>> Sent: Monday, August 17, 2026 5:55 PM
>>>>>>>>>>>>>>>> To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
>>>>>>>>>>>>>>>> Cc: Barnesatty <barnesatty@aol.com>; Freeman, Lyndie
>>>>>>>>>>>>>>>> (CRM)
>>>>>>>>>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin
>>>>>>>>>>>>>>>> (USANCW)
>>>>>>>>>>>>>>>> <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier
>>>>>>>>>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>>>>>>> Sanders, Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>;
>>>>>>> Washington,
>>>>>>>>>>>>>>>> Dana
>>>>>>>>>>>>>>>> (USANCW) <Dana.Washington@usdoj.gov>; Michael Martinez
>>>>>>>>>>>>>>>> <mmartinez@grierlaw.com>
>>>>>>>>>>>>>>>> Subject: Re: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>>>>>>>>>>> Restitution
>>>>>>>>>>>>>>>> Report
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Corrected. Sent was hit before the draft was complete.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>> Defense wants a complete record for the appeal. The
>>>>>>>>>>>>>>>> basis
>>>>>>> for
>>>>>>>>>>>>>>>> both
>>>>>>>>>>>>>>>> the sentence term and the restitution number is based on
>>>>>>> the
>>>>>>>>>>>>>>>> methodology of calculating the value of the restitution
>>>>>>>> assets
>>>>>>>>>>>>>>>> i.e.
>>>>>>>>>>>>>>>> companies.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Similar to when law enforcement uses a sting ray device
>>>>>>> they
>>>>>>>>>>>>>>>> need
>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>> disclose the specification of the stingray device and
>>>>>>>>>>>>>>>> how
>>>>>>> the
>>>>>>>>>>>>>>>> data
>>>>>>>>>>>>>>>> on a particular suspect was collected.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Similarly over here when you allege that multiple
>>>>>>> restitution
>>>>>>>>>>>>>>>> assets
>>>>>>>>>>>>>>>> are worth a lump sum value you need to disclose what
>>>>>>>>>>>>>>>> each
>>>>>>>>>>>>>>>> company
>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>> worth and how that valuation was arrived at. Finally you
>>>>>>> need
>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>> show how each credit and offset is calculated and the
>>>>>>>> detailed
>>>>>>>>>>>>>>>> method. All of these under MVRA are the government
>>>>>>>>>>>>>>>> burden
>>>>>>> to
>>>>>>>>>>>>>>>> establish. Without this there cannot be a final
>>>>>>> restitution
>>>>>>>>>>>>>>>> order.
>>>>>>>>>>>>>>>> Here the restitution order triggers a forfeiture if the
>>>>>>> value
>>>>>>>> of
>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>> companies is less than the restitution ordered. So the
>>>>>>> harm
>>>>>>>> is
>>>>>>>>>>>>>>>> immediate to Greg Lindberg. In addition whatever
>>>>>>> methodology
>>>>>>>>>>>>>>>> including numbers from the insurance companies and
>>>>>>>>>>>>>>>> losses
>>>>>>>> that
>>>>>>>>>>>>>>>> went

>>>>>>>>>>>>>>>> into the calculations should also be on the record.
>>>>>>>>>>>>>>>> Again
>>>>>>> the
>>>>>>>>>>>>>>>> governments proof on the record.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Once again defendants interest over here is to
>>>>>>>>>>>>>>>> adversarily
>>>>>>>> test
>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>> information for which defendant has to see this
>>>>>>> information
>>>>>>>> and
>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>> time with this information.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> On multiple instances Katten has tried to obtain this
>>>>>>>>>>>>>>>> information
>>>>>>>>>>>>>>>> unsuccessfully. If we need to go to the 4 th circuit and
>>>>>>> come
>>>>>>>>>>>>>>>> back
>>>>>>>>>>>>>>>> on remand to get this information in two years we will.
>>>>>>>>>>>>>>>> We
>>>>>>>> will
>>>>>>>>>>>>>>>> seek
>>>>>>>>>>>>>>>> a bond from the 4th because government failed in
>>>>>>>>>>>>>>>> providing
>>>>>>>> the
>>>>>>>>>>>>>>>> factual basis for the numbers.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> It will be easier for all parties including Greg
>>>>>>>>>>>>>>>> Lindberg
>>>>>>> and
>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>> victims, if this information is placed on the record
>>>>>>>>>>>>>>>> right
>>>>>>>> now.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Given that we are willing to use the governments
>>>>>>> protective
>>>>>>>>>>>>>>>> order
>>>>>>>>>>>>>>>> there is no basis to deny access to the information we
>>>>>>>>>>>>>>>> requested.
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> On Aug 17, 2026 at 1:38 PM, <Vramachandran> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> There is already a standing protective order in place
>>>>>>>>>>>>>>>>> in
>>>>>>> the

```
>>>>>>>>>>>>>>>>> criminal
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> case that governs all of the government's discovery in
>>>>>>> this
>>>>>>>>>>>>>>>>> case,
>>>>>>>>>>>>>>>>> so I'm
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> now sure where there needs to be a new protective order
>>>>>>> for
>>>>>>>>>>>>>>>>> this.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> Please use that order.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>> On 2026-08-17 13:20, Vramachandran wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Martinez,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Please provide the information we asked for and what\
u2019s
>>>>>>> in
>>>>>>>> your
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> subpoena. Just blocking access with a no is just an
>>>>>>> illegal
>>>>>>>>>>>>>>>>> sentence.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> This is not a civil proceeding. Delaying access is
>>>>>>>> prejudicial
>>>>>>>>>>>>>>>>> to Greg
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Lindberg.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> On Aug 17, 2026 at 1:11 PM, <Vramachandran> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
```

>>>>>>>>>>>>>>>>>>> Of course if there is business confidential
>>>>>>>>>>>>>>>>>>> information
>>>>>>> we
>>>>>>>>>>>>>>>>> won\u2019t
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> contest it. It\u2019s Greg Lindberg\u2019s companies.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> The AAPC report is mere attorney arguments without
>>>>>>>>>>>>>>>>>>> any
>>>>>>>> data.
>>>>>>>>>>>>>>>>> That
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> kind of a report being sealed serves no one.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> On Aug 17, 2026 at 1:06 PM, <Vramachandran> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> The court can order a protective order and the
>>>>>>>>>>>>>>>>>>> Special
>>>>>>>> Master
>>>>>>>>>>>>>>>>> can
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> request one after filing it under seal. We will
>>>>>>>>>>>>>>>>>>> contest
>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> protective order request.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sent with Spark [1]

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> On Aug 17, 2026 at 1:04\u202fPM -0400, Ryan, Daniel
>>>>>>>> (USANCW)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <Daniel.Ryan@usdoj.gov>, wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Vivek,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> While we do not believe the requested information is
>>>>>>>> relevant
>>>>>>>>>>>>>>>>> to the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Court's determination of a final restitution order,
>>>>>>>>>>>>>>>>>>> we
>>>>>>>> have
>>>>>>>>>>>>>>>>>>> no
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> objection to you getting relevant data from the
>>>>>>>>>>>>>>>>>>> Special
>>>>>>>>>>>>>>>>>>> Master.
>>>>>>>>>>>>>>>>> That
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> said, we agree a protective order, not just filing it
>>>>>>>> under
>>>>>>>>>>>>>>>>> seal, is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> appropriate here at least with respect to the most
>>>>>>>> sensitive
>>>>>>>>>>>>>>>>> types
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> of business data.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Dan
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> From: Vramachandran <vramachandran@dhammalaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sent: Monday, August 17, 2026 1:01 PM
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Cc: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>;
>>>>>>>> Barnesatty
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <barnesatty@aol.com>; Freeman, Lyndie (CRM)

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin
>>>>>>> (USANCW)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier
>>>>>>>>>>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sanders, Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>;
>>>>>>>> Washington,
>>>>>>>>>>>>>>>>> Dana
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> (USANCW) <Dana.Washington@usdoj.gov>; Michael
>>>>>>>>>>>>>>>>>>> Martinez
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <mmartinez@grierlaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Subject: Re: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>>>>>>>>>>>> Restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Report
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Are you opposed to an expedited motion being placed
>>>>>>>>>>>>>>>>>>> on
>>>>>>> the
>>>>>>>>>>>>>>>>> record?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> We have no interest in delaying proceedings and want
>>>>>>> this
>>>>>>>>>>>>>>>>>>> data
>>>>>>>>>>>>>>>>> on
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the record now.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> On Aug 17, 2026 at 12:57 PM, <Michael Martinez>

>>>>>>>>>>>>>>>>>>> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> No.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Michael L. Martinez
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Grier Wright Martinez PA
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> 521 E. Morehead St., Ste. 440, Charlotte, NC 28202
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> (704) 332-0209 (direct dial)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=27d1ab0d-429dc25f-27d68fe8-74fe4867716e-08c48172a4f75ca0&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [1]
>>>>>>>>>>>>>>>>>>> [1] [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> mmartinez@grierlaw.com
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> -----Original Message-----
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> From: vramachandran@dhammalaw.com
>>>>>>>>>>>>>>>>>>> <vramachandran@dhammalaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sent: Monday, August 17, 2026 12:28 PM
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> To: Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>;
>>>>>>> Michael
>>>>>>>>>>>>>>>>> Martinez
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <mmartinez@grierlaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Cc: barnesatty@aol.com; Freeman, Lyndie (CRM)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin
>>>>>>> (USANCW)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> <Benjamin.Bain-Creed@usdoj.gov>; Joe Grier
>>>>>>>>>>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sanders, Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>;
>>>>>>>> Washington,

>>>>>>>>>>>>>>>>> Dana
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> (USANCW) <Dana.Washington@usdoj.gov>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Subject: Re: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>>>>>>>>>>>> Restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Report
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Caution: This message is from an external sender.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Martinez,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Are you going to place the requested data under seal
>>>>>>>>>>>>>>>>>>> on
>>>>>>>> the
>>>>>>>>>>>>>>>>> court
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> records to avoid the motion? We would rather fight on
>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> designation than delay proceedings. Thank you.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> In any case, in March 2026 you offered to place it on
>>>>>>> the
>>>>>>>>>>>>>>>>> record
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> under seal. I am not sure why you cannot do the same
>>>>>>> now.
>>>>>>>>>>>>>>>>>>> None
>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> this requires a confidentiality agreement.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> On 2026-08-17 11:49, vramachandran@dhammalaw.com
>>>>>>>>>>>>>>>>>>> wrote:

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>> We need the data. We are asking for the data to
>>>>>>>>>>>>>>>>>>>> avoid
>>>>>>> the
>>>>>>>>>>>>>>>>> motion.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>> On 2026-08-17 11:48, Ryan, Daniel (USANCW) wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Vivek,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> We appreciate your advocacy for your client, but we
>>>>>>> do
>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> litigate
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> via email. If you file a motion with the court with
>>>>>>> your
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> requested
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> relief, we will respond accordingly. To the extent
>>>>>>>>>>>>>>>>>>>>> we
>>>>>>>>>>>>>>>>> understand
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> your
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> emails, we object to your conclusions, accusations,
>>>>>>> and
>>>>>>>>>>>>>>>>> requested
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> relief. That said, with respect to your requests
>>>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>> valuation
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> information, you can represent to the Court that we
>>>>>>> are
>>>>>>>>>>>>>>>>> reserving

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> our
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> position until we see your motion.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Regards,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Dan
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> From: vramachandran@dhammalaw.com
>>>>>>>>>>>>>>>>> <vramachandran@dhammalaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Sent: Monday, August 17, 2026 11:37 AM
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> To: Michael Martinez <mmartinez@grierlaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Cc: barnesatty@aol.com; Ryan, Daniel (USANCW)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> <Daniel.Ryan@usdoj.gov>; Freeman, Lyndie (CRM)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> <Lyndie.Freeman@usdoj.gov>; Bain-Creed, Benjamin
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (USANCW) <Benjamin.Bain-Creed@usdoj.gov>; Meyer,
>>>>>>>>>>>>>>>>>>>>> Ryan
>>>>>>> J.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> <ryan.meyer@katten.com>; Joe Grier
>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Sanders,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Jeremy (CRM) <Jeremy.Sanders@usdoj.gov>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Subject: [EXTERNAL] Re: Draft Final Supplement to
>>>>>>>>>>>>>>>>>>>>> Restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Report
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Dan and Michael,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (1) Do you have the financial reports data we asked
>>>>>>> for

>>>>>>>>>>>>>>>>> below?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Did
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> you use it in your report?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> We are looking for all financial reports and all
>>>>>>> board
>>>>>>>>>>>>>>>>> reports
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> all primary restitution assets, specified
>>>>>>>>>>>>>>>>>>>>> affiliated
>>>>>>>>>>>>>>>>> companies
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> the last four years and all letter of intents and
>>>>>>> offers
>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> purchase
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> received. It is going to take us a month to analyze
>>>>>>> all
>>>>>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> data.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (2) Specifically the mid low high you filed with
>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>> court
>>>>>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> July
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> 2026 is going to trigger a forfeiture worth
>>>>>>>>>>>>>>>>>>>>> millions
>>>>>>> of
>>>>>>>>>>>>>>>>> dollars.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> So
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> you need to let the defendant see this data on the
>>>>>>> court
>>>>>>>>>>>>>>>>> docket
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> this needs to be on the docket so that this can be
>>>>>>>>>>>>>>>>>>>>> appealed.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (3) Do you have the data you used to arrive at the
>>>>>>>>>>>>>>>>>>>>> valuation
>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> all
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> assets you quoted in the sealed report in July
>>>>>>>>>>>>>>>>>>>>> 2026?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (4) Do you have the data you said you will share
>>>>>>>>>>>>>>>>>>>>> with
>>>>>>>> the
>>>>>>>>>>>>>>>>> court
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> seal on March 2026?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> (5) Where is the updated data from March 2026 for
>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>> same
>>>>>>>>>>>>>>>>> where
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> you
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> said that because AAPC is now valued less it needs
>>>>>>>>>>>>>>>>>>>>> to
>>>>>>> be
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> downgraded?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> You are going to place all of the above on the
>>>>>>>>>>>>>>>>>>>>> record
>>>>>>>> today
>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> seal.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Without this the sentencing is going to be based on
>>>>>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>> blackbox
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> attorney arguments.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Dan, the government may not stand silent in all
>>>>>>>>>>>>>>>>>>>>> this.
>>>>>>>> This
>>>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>> a [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> criminal proceeding where you sent someone to
>>>>>>>>>>>>>>>>>>>>> prison
>>>>>>> for
>>>>>>>> 12
>>>>>>>>>>>>>>>>> years [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> based on data he cannot see and will not be allowed
>>>>>>> to
>>>>>>>> see?
>>>>>>>>>>>>>>>>> And [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [2]>>> restitution worth billions of dollars based on
>>>>>>> data
>>>>>>>> he
>>>>>>>>>>>>>>>>> cannot see
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> you will not place on the record under seal?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Sorry, I am having trouble with scruples. I am
>>>>>>> flummoxed
>>>>>>>>>>>>>>>>>>>>> that
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> anyone
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> thinks this is ok in a criminal proceeding and if
>>>>>>>>>>>>>>>>>>>>> we
>>>>>>> ask
>>>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>> it
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> as a

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> criminal defendant we are delaying the proceedings.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Thank you.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> On 2026-08-17 11:08, vramachandran@dhammalaw.com
>>>>>>> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Let me get this straight you are evaluating the
>>>>>>> assets
>>>>>>>>>>>>>>>>>>>>>> with
>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> range
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> that you put on the record to trigger forfeiture
>>>>>>>>>>>>>>>>>>>>>> but
>>>>>>>> will
>>>>>>>>>>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> share
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> that information with the defendant?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> You are going to share the valuation you said you
>>>>>>> have
>>>>>>>> on
>>>>>>>>>>>>>>>>> all
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> assets from March 26, 2026 report. Either that was
>>>>>>>>>>>>>>>>>>>>>> a
>>>>>>>> lie

>>>>>>>>>>>>>>>>>>>>>> or
>>>>>>>>>>>>>>>>> you
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> that data. You are going to place this on the
>>>>>>>>>>>>>>>>>>>>>> record
>>>>>>>> today
>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> seal which we will contest.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Dan, you are going to sentence someone based on
>>>>>>>>>>>>>>>>>>>>>> data
>>>>>>> he
>>>>>>>>>>>>>>>>> cannot
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> even
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> see. You need to get this on the docket today
>>>>>>> please.
>>>>>>>> And
>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> not for lack of asking as was represented to the
>>>>>>> court.
>>>>>>>>>>>>>>>>>>>>>> You
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> represented to the court when you had questionable
>>>>>>>>>>>>>>>>>>>>>> authority
>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> prevent product as the government and you want a
>>>>>>>> sentence
>>>>>>>>>>>>>>>>>>>>>> on
>>>>>>>>>>>>>>>>> an
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> incomplete record. You need to explain this to the
>>>>>>>> court.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> We want this on the record today under seal. You
>>>>>>> forced
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> deadline
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> you need to give us the data now on the court
>>>>>>> records
>>>>>>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>> seal
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> if
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> it needs to be.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-08-17 10:35, vramachandran@dhammalaw.com
>>>>>>> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Let me get this straight you are evaluating the
>>>>>>> assets
>>>>>>>>>>>>>>>>>>>>>> with
>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> range
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> that you put on the record to forfiture but will
>>>>>>>>>>>>>>>>>>>>>> not
>>>>>>>> share
>>>>>>>>>>>>>>>>> that
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information with the defendant?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> You are going to share the valuation you said you
>>>>>>> have
>>>>>>>> on
>>>>>>>>>>>>>>>>> all
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> assets from March 26, 2026 report. Either that was
>>>>>>>>>>>>>>>>>>>>>> a
>>>>>>>> lie

>>>>>>>>>>>>>>>>>>>>>> or
>>>>>>>>>>>>>>>>> you
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> that data. You are going to place this on the
>>>>>>>>>>>>>>>>>>>>>> record
>>>>>>>> today
>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> seal which we will contest.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Dan, you are going to sentence someone based on
>>>>>>>>>>>>>>>>>>>>>> data
>>>>>>> he
>>>>>>>>>>>>>>>>> cannot
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> even
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> see. You need to get this on the docket today
>>>>>>> please.
>>>>>>>> And
>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> not for lack of asking as was represented to the
>>>>>>> court.
>>>>>>>>>>>>>>>>>>>>>> You
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> represented to the court when you had questionable
>>>>>>>>>>>>>>>>>>>>>> authority
>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> prevent product as the government and you want a
>>>>>>>> sentence
>>>>>>>>>>>>>>>>>>>>>> on
>>>>>>>>>>>>>>>>> an
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> incomplete record. You need to explain this to the
>>>>>>>> court.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> We want this on the record today under seal. You
>>>>>>> forced
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> deadline
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> you need to give us the data now on the court
>>>>>>> records
>>>>>>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>> seal
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> if
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> it needs to be.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-08-17 10:24, vramachandran@dhammalaw.com
>>>>>>> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Also as suggested, we have raised concerns about
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>> relevance
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> some of this data to an independent criminal
>>>>>>>>>>>>>>>>>>>>>> investigation.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> The government needs to act and get this data on
>>>>>>> file.
>>>>>>>>>>>>>>>>>>>>>> Thank
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> you.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-08-17 10:19, vramachandran@dhammalaw.com
>>>>>>> wrote:
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> As a prosecutor you should be aware that this is
>>>>>>>>>>>>>>>>>>>>>> not
>>>>>>>> just
>>>>>>>>>>>>>>>>> about
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Greg
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Lindberg. This data belongs to the victims and
>>>>>>> should
>>>>>>>> be
>>>>>>>>>>>>>>>>> known
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the general public. Sentencing without disclosing
>>>>>>> all
>>>>>>>> of
>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information on the record is illegal.
>>>>>>> Unconstitutional.
>>>>>>>>>>>>>>>>>>>>>> You
>>>>>>>>>>>>>>>>> need
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> let the Special Master know that he needs to file
>>>>>>>>>>>>>>>>>>>>>> everything
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> under
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> seal if he so wants to.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This is a criminal proceeding. You have a duty to
>>>>>>> place
>>>>>>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information on the docket. This is exceptional.
>>>>>>>>>>>>>>>>>>>>>> You
>>>>>>>> delay
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> proceedings and then blame it on the defendant.
>>>>>>>>>>>>>>>>>>>>>> Then

>>>>>>>> seek
>>>>>>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> confidentiality agreement. You have the burden of
>>>>>>>> proof.
>>>>>>>>>>>>>>>>>>>>>> Are
>>>>>>>>>>>>>>>>> you
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> going to meet it or not?
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> I would like an answer by 12.00 P.M.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This is a criminal case. Whatever you want to
>>>>>>> produce
>>>>>>>> you
>>>>>>>>>>>>>>>>> need
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> produce now. I need to get this to my client so
>>>>>>>>>>>>>>>>>>>>>> that
>>>>>>> we
>>>>>>>>>>>>>>>>>>>>>> can
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> defend
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> on August 24th which you are forcing on the
>>>>>>> defendant.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> The data is subject to the court's sealing
>>>>>>> procedures.
>>>>>>>> You
>>>>>>>>>>>>>>>>> are
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> not
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> going to condition this data on anything other
>>>>>>>>>>>>>>>>>>>>>> than
>>>>>>> the
>>>>>>>>>>>>>>>>> court's
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> own
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> processes.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Any failure to produce the data means you are
>>>>>>> unwilling
>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> establish
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> these on the record as required under the MVRA.
>>>>>>>>>>>>>>>>>>>>>> That
>>>>>>> is
>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> failure to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> prosecute by the government.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Please file on the record the methodology and the
>>>>>>> data
>>>>>>>> we
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> requested
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> underseal by August 17, 2026 noon. We will contest
>>>>>>> the
>>>>>>>>>>>>>>>>> sealing
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> with
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the court if necessary.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This is not a civil proceeding.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> viek
>>>>>>>>>>>>>>>>>

```
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-08-17 10:13, Michael Martinez wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> The Special Master disagrees with your legal
>>>>>>> analyses
>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> conclusions below.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> That said, the Special Master would not be opposed
>>>>>>> in
>>>>>>>>>>>>>>>>> concept to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> producing (on a reasonable timeline) documents in
>>>>>>> our
>>>>>>>>>>>>>>>>> possession
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> under a confidentiality agreement and protective
>>>>>>> order
>>>>>>>>>>>>>>>>> limiting
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> public disclosure of proprietary information. If
>>>>>>> your
>>>>>>>>>>>>>>>>>>>>>> client
>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> amenable to preserving the confidentiality of
>>>>>>> sensitive
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> proprietary
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information, then I can draft a confidentiality
>>>>>>>> agreement
>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> protective order for your review and edit. If your
>>>>>>>> client
>>>>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> amenable to preserving the confidentiality of
```

```
>>>>>>> sensitive
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> proprietary
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information, then a court order compelling us to
>>>>>>>> produce
>>>>>>>>>>>>>>>>> these
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> materials with no restrictions on subsequent
>>>>>>> disclosure
>>>>>>>>>>>>>>>>>>>>>> will
>>>>>>>>>>>>>>>>> be
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> required.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Without limiting the foregoing, our proposed
>>>>>>>> methodology
>>>>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> unrealized offsets/credits is that your client
>>>>>>>>>>>>>>>>>>>>>> will
>>>>>>>>>>>>>>>>>>>>>> receive
>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> credit
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> against his restitution obligation as the assets
>>>>>>>>>>>>>>>>>>>>>> are
>>>>>>>>>>>>>>>>> monetized
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> rather than him receiving a credit now based on
>>>>>>>>>>>>>>>>>>>>>> our
>>>>>>>>>>>>>>>>> estimation
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> what the Primary Restitution Assets might fetch
>>>>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>>>>>> victims.
>>>>>>>>>>>>>>>>> The
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> purpose of the estimation was to satisfy the
>>>>>>>>>>>>>>>>>>>>>> mandate
>>>>>>> in
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> special
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> master order that the special master identify
>>>>>>>>>>>>>>>>>>>>>> assets
```

>>>>>>>> \u201cand
>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> extent those assets are not readily convertible to
>>>>>>>> cash,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> determine a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> reasonable estimated value for those assets.\u201d
In
>>>>>>>> other
>>>>>>>>>>>>>>>>> words,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> evaluating our estimation of what the Primary
>>>>>>>> Restitution
>>>>>>>>>>>>>>>>> Assets
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> might generate for victims in the future is not an
>>>>>>>>>>>>>>>>>>>>>> integral
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> component of the Court\u2019s restitution
>>>>>>> determination,
>>>>>>>> and
>>>>>>>>>>>>>>>>> those
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> estimated figures do not appear anywhere in the
>>>>>>>> proposed
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> order.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael L. Martinez
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Grier Wright Martinez PA
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> 521 E. Morehead St., Ste. 440, Charlotte, NC 28202
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> (704) 332-0209 (direct dial)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=d7e8bd0a-b2a4d458-d7ef99ef-74fe4867716e-429552d0fc93fb87&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [2]
>>>>>>>>>>>>>>>>>>>>>> [1] [3] [1] [1 [2]]

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> mmartinez@grierlaw.com
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> -----Original Message-----
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> From: vramachandran@dhammalaw.com
>>>>>>>>>>>>>>>>> <vramachandran@dhammalaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sent: Monday, August 17, 2026 6:03 AM
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> To: Michael Martinez <mmartinez@grierlaw.com>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Cc: barnesatty@aol.com; Daniel Ryan
>>>>>>>>>>>>>>>>>>>>>> (Daniel.Ryan@usdoj.gov)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> <daniel.ryan@usdoj.gov>; Freeman, Lyndie (CRM)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> <lyndie.freeman@usdoj.gov>; Bain-Creed, Benjamin
>>>>>>>> (USANCW)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> <benjamin.bain-creed@usdoj.gov>; Meyer, Ryan J.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> <ryan.meyer@katten.com>; Joe Grier
>>>>>>>> <jgrier@grierlaw.com>;
>>>>>>>>>>>>>>>>> Jeremy
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sanders <jeremy.sanders@usdoj.gov>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Subject: Re: Draft Final Supplement to Restitution
>>>>>>>> Report
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Caution: This message is from an external sender.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael and Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> I do want to remind you that unlike a bankruptcy
>>>>>>>>>>>>>>>>>>>>>> proceeding,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> these
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> companies are not just worth debt. They have
>>>>>>> revenues
>>>>>>>> in
>>>>>>>>>>>>>>>>>>>>>> the

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> millions, so your methodology of evaluation has to
>>>>>>> be
>>>>>>>>>>>>>>>>> disclosed
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the defendant on the record.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> We are looking for all financial reports and all
>>>>>>> board
>>>>>>>>>>>>>>>>> reports
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> all primary restitution assets, specified
>>>>>>>>>>>>>>>>>>>>>> affiliated
>>>>>>>>>>>>>>>>> companies
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> for
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the last four years and all letter of intents and
>>>>>>>> offers
>>>>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> purchase
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> received. It is going to take us a month to
>>>>>>>>>>>>>>>>>>>>>> analyze
>>>>>>> all
>>>>>>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> data.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Without this the sentencing is going to be based
>>>>>>>>>>>>>>>>>>>>>> on
>>>>>>> a
>>>>>>>>>>>>>>>>> blackbox
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> attorney arguments.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This does not meet the MVRA accounting
>>>>>>>>>>>>>>>>>>>>>> requirement.
>>>>>>>> Please
>>>>>>>>>>>>>>>>> get
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> us
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> this information by noon August 17, 2026.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> A fiduciary duty applies to the Special
>>>>>>>> Master/Receiver.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> If you cannot establish your burden of proof, the
>>>>>>>>>>>>>>>>>>>>>> government
>>>>>>>>>>>>>>>>> has
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> duty to let the court know that you cannot do it.
>>>>>>>> Failure
>>>>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>> do
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> that
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> to win is striking a foul blow.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Katten has asked for this in the past. We do not
>>>>>>> have
>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> information.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Thank you.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-08-15 14:59, vramachandran@dhammalaw.com
>>>>>>> wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael and Dan,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> (I) In your March 2026 report, you stated that
>>>>>>> publicly
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> disclosing
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> too much detail regarding the Primary Restitution
>>>>>>>> Assets
>>>>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Special Master's value determinations concerning
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>> same
>>>>>>>>>>>>>>>>> would
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> negatively impact liquidation efforts and could,
>>>>>>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>>>>>> itself,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> decrease
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the value of the Primary Restitution Assets, and
>>>>>>> that
>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Special
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Master therefore erred on the side of caution by
>>>>>>>>>>>>>>>>>>>>>>> including
>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> report a single range encompassing all Primary
>>>>>>>>>>>>>>>>>>>>>>> Restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Assets
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> lumped together.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Please provide all of the data you stated you
>>>>>>>>>>>>>>>>>>>>>>> would
>>>>>>>>>>>>>>>>>>>>>>> provide

>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Court in that March 2026 report, together with
>>>>>>>>>>>>>>>>>>>>>>> any
>>>>>>>> other
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> documents
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the Special Master intends to rely on for the
>>>>>>>> valuations
>>>>>>>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> proceeding. Please do so by noon on August 17,
>>>>>>> 2026.
>>>>>>>> To
>>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> extent
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> you have any additional information these have to
>>>>>>> be
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> established on
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the record under � 3664(f)(1)(A) by placing them
>>>>>>> on
>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> record.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Under the MVRA that material belongs with the
>>>>>>>> defendant:
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> burden
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> of demonstrating the amount of loss is on the
>>>>>>>> Government,
>>>>>>>>>>>>>>>>> 18
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> U.S.C.
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> �
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> 3664(e); the statute requires "a complete
>>>>>>> accounting
>>>>>>>> of
>>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> losses
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> each victim," id. � 3664(a); and restitution must
>>>>>>> be
>>>>>>>> set
>>>>>>>>>>>>>>>>> "in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> full
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> amount of each victim's losses as determined by
>>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>>>>>>> court,"
>>>>>>>>>>>>>>>>> id.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> �
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> 3664(f)(1)(A). A single lumped range, with its
>>>>>>>>>>>>>>>>>>>>>>> particulars
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> withheld,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> cannot satisfy those provisions or permit the de
>>>>>>> novo
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> determination

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the Court is required to make. Id. � 3664(d)(6).
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> (II) We will also file a motion on to unseal the
>>>>>>>> Appendix
>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> final report. Other than attorney argument, there
>>>>>>> is
>>>>>>>>>>>>>>>>> nothing in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> that
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Appendix, and we will file our own argument
>>>>>>>>>>>>>>>>>>>>>>> saying
>>>>>>> so
>>>>>>>> --
>>>>>>>>>>>>>>>>> both
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> highlight this issue and to preserve the record
>>>>>>>>>>>>>>>>>>>>>>> for
>>>>>>>> the
>>>>>>>>>>>>>>>>> Fourth
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Circuit. Neither the defendant's right to contest
>>>>>>> the
>>>>>>>>>>>>>>>>>>>>>>> loss
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> amount
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> nor
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the Court's de novo review under � 3664(d)(6) can
>>>>>>> be
>>>>>>>>>>>>>>>>> exercised
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>>> against a figure whose basis is kept under seal.
>>>>>>> See
>>>>>>>> �
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> 3664(e).
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> (III) We are going to file a motion for
>>>>>>>> reconsideration
>>>>>>>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> denial
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> of the subpoenas -- not because we expect the
>>>>>>>>>>>>>>>>>>>>>>> Court
>>>>>>> to
>>>>>>>>>>>>>>>>> change
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> its
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> mind, but to make sure the record is clear on
>>>>>>>>>>>>>>>>>>>>>>> three
>>>>>>>>>>>>>>>>>>>>>>> points.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> First,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> under the MVRA the burden of proof lies with the
>>>>>>>>>>>>>>>>> Government,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> defendant. � 3664(e). Second, to the extent the
>>>>>>>>>>>>>>>>>>>>>>> valuations
>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> companies rest with the Special Master, they must
>>>>>>> be
>>>>>>>>>>>>>>>>> provided

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> defendant under the accounting provisions of the
>>>>>>> MVRA.
>>>>>>>> ��
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> 3664(a),
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> (f)(1)(A). Third, restitution under the MVRA must
>>>>>>> be
>>>>>>>>>>>>>>>>> accurate;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> if
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> it
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> cannot be made accurate, or if the issues are too
>>>>>>>>>>>>>>>>>>>>>>> complex,
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Court's option is to decline restitution rather
>>>>>>> than
>>>>>>>>>>>>>>>>>>>>>>> order
>>>>>>>>>>>>>>>>> an
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> inaccurate amount. � 3663A(c)(3)(B). To the
>>>>>>>>>>>>>>>>>>>>>>> extent
>>>>>>>> you
>>>>>>>>>>>>>>>>> again
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> press
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the August 24 deadline, we preserve this issue
>>>>>>>>>>>>>>>>>>>>>>> for
>>>>>>> the

>>>>>>>>>>>>>>>>> Fourth
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Circuit: the deferred determination is expressly
>>>>>>>>>>>>>>>>> contemplated
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> by
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> �
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> 3664(d)(5), and that ninety-day date is
>>>>>>>>>>>>>>>>>>>>>>> directory,
>>>>>>> not
>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> license
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> for an inaccurate award.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> See Dolan v. United States, 560 U.S. 605 (2010)
>>>>>>>>>>>>>>>>>>>>>>> (a
>>>>>>>> court
>>>>>>>>>>>>>>>>> that
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> misses
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the � 3664(d)(5) deadline retains authority to
>>>>>>> order
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> restitution,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> because the deadline is meant to protect victims,
>>>>>>> not
>>>>>>>> to
>>>>>>>>>>>>>>>>> create
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> windfall for defendants). Where loss is not yet
>>>>>>>>>>>>>>>>> ascertainable,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>>> MVRA's remedy is to develop the record -- or to
>>>>>>>> decline
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> restitution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> under � 3663A(c)(3)(B) -- not to adopt a guess.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> (IV) We will additionally file a motion on the
>>>>>>>>>>>>>>>>>>>>>>> AAPC
>>>>>>>>>>>>>>>>> valuation
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> on
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Ares causation, tied to the subpoena request, to
>>>>>>>>>>>>>>>>>>>>>>> highlight
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> live
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> issues that remain pending and that the
>>>>>>>>>>>>>>>>>>>>>>> Government
>>>>>>> and
>>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Special
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> Master are resisting. Causation and amount are
>>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>> Government's
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> prove by a preponderance of the evidence, �
>>>>>>> 3664(e),
>>>>>>>> and
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> value
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>> the property must be established on the record
>>>>>>> under
>>>>>>>> �
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> 3664(f)(1)(A).
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Attorney arguments about AI and AAPC do not
>>>>>>> establish
>>>>>>>>>>>>>>>>>>>>>> value
>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> property on the record.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> We are happy to state that you are opposed to
>>>>>>>>>>>>>>>>>>>>>> these
>>>>>>>>>>>>>>>>>>>>>> motions.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Sincerely,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Vivek
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> On 2026-07-22 16:48, Michael Martinez wrote:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Please find attached our current draft of a final
>>>>>>>>>>>>>>>>>>>>>> supplement
>>>>>>>>>>>>>>>>> to
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> restitution report in the 3:23-CR-48 case. Also
>>>>>>>> attached
>>>>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>> a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> proposed final order of restitution and appendix
>>>>>>>>>>>>>>>>>>>>>> to
>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> supplement
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> discussing the primary restitution assets.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Here is what we said about the other parties
>>>>>>> positions
>>>>>>>> on
>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> supplement: "The Special Master has conferred with
>>>>>>> both
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> government and the Defendant's counsel in relation
>>>>>>> to
>>>>>>>> this
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Supplement.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Although the government does not oppose the
>>>>>>> positions
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> articulated
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> by
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the Special Master through this Supplement, the
>>>>>>>> Defendant
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> opposes
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> the majority of the Special Master's
>>>>>>>>>>>>>>>>>>>>>> recommendations
>>>>>>>>>>>>>>>>> appearing
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> this Supplement." If I have not accurately stated
>>>>>>> your
>>>>>>>>>>>>>>>>> client's
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> position on our supplement, please let me know by
>>>>>>> the
>>>>>>>> end
>>>>>>>>>>>>>>>>>>>>>> of
>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> day
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> tomorrow.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> We have to file this by Friday.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Thank you.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Michael L. Martinez
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Grier Wright Martinez, PA
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> 521 E. Morehead St., Ste. 440
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Charlotte, NC 28202
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> 704/332.0209 (direct)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> 704/332.0215 (fax)
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>>> mmartinez@grierlaw.com
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Disclaimer
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This e-mail may contain confidential and
>>>>>>>> attorney-client
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> privileged
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> material for the sole use of the intended
>>>>>>>>>>>>>>>>>>>>>> recipient.
>>>>>>> Do
>>>>>>>>>>>>>>>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> accept
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> wiring instructions from us by email. If you are
>>>>>>>>>>>>>>>>>>>>>> not
>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> recipient,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> you are hereby notified that any disclosure,
>>>>>>> copying,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> distribution
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> or taking action in relation of the contents of
>>>>>>>>>>>>>>>>>>>>>> this
>>>>>>>>>>>>>>>>> information
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> strictly prohibited and may be unlawful, please
>>>>>>> contact
>>>>>>>>>>>>>>>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> sender
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> and delete this e-mail.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> This email has been scanned for viruses and
>>>>>>>>>>>>>>>>>>>>>> malware,
>>>>>>>> and
>>>>>>>>>>>>>>>>>>>>>> may
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> been automatically archived by Mimecast Ltd, an
>>>>>>>> innovator
>>>>>>>>>>>>>>>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Software as a Service (SaaS) for business.
>>>>>>>>>>>>>>>>>>>>>> Providing
>>>>>>> a
>>>>>>>>>>>>>>>>>>>>>> safer
>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> more useful place for your human generated data.
>>>>>>>>>>>>>>>>> Specializing
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> in;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Security, archiving and compliance. To find out
>>>>>>>>>>>>>>>>>>>>>> more
>>>>>>>> Click
>>>>>>>>>>>>>>>>> Here
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [1
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> [1 [3]]].
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>>>>

```
>>>>>>>>>>>>>>>>>>>>>> [1]
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b4a86c6f-d1e4053d-b4af488a-
74fe4867716e-51e0532dcd107cc3&q=1&e=390e473a-8f5f-4c98-a129-
17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [3]
>>>>>>>>>>>>>>>>>>>>>> [4] [4]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>> [1]
>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=686a9d19-0d26f44b-686db9fc-
74fe4867716e-a368940ed31d1681&q=1&e=390e473a-8f5f-4c98-a129-
17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [4]
>>>>>>>>>>>>>>>>>>>>>> [5] [5]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Disclaimer
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> This e-mail may contain confidential and
>>>>>>> attorney-client
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> privileged
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> material for the sole use of the intended
>>>>>>>>>>>>>>>>>>>>> recipient.
>>>>>>> Do
>>>>>>>> not
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> accept
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> wiring instructions from us by email. If you are
>>>>>>>>>>>>>>>>>>>>> not
>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> recipient,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> you are hereby notified that any disclosure,
>>>>>>>>>>>>>>>>>>>>> copying,
```

>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> distribution or
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> taking action in relation of the contents of this
>>>>>>>>>>>>>>>>>>>>> information
>>>>>>>>>>>>>>>>> is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> strictly prohibited and may be unlawful, please
>>>>>>> contact
>>>>>>>> the
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> sender and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> delete this e-mail.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> This email has been scanned for viruses and
>>>>>>>>>>>>>>>>>>>>> malware,
>>>>>>> and
>>>>>>>>>>>>>>>>>>>>> may
>>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> been
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> automatically archived by Mimecast Ltd, an
>>>>>>>>>>>>>>>>>>>>> innovator
>>>>>>> in
>>>>>>>>>>>>>>>>> Software
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> as a
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Service (SaaS) for business. Providing a safer and
>>>>>>> more
>>>>>>>>>>>>>>>>> useful
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> place
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> for your human generated data. Specializing in;
>>>>>>>> Security,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> archiving
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> and compliance. To find out more Click Here [2
>>>>>>>>>>>>>>>>>>>>> [6]].
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>>>> [1]
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=1256fbba-771a92e8-1251df5f-74fe4867716e-5a41341f986a8499&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [5]
>>>>>>>>>>>>>>>>>>>>> [6] [7]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [2]
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b875bf00-dd39d652-b8729be5-74fe4867716e-a15d6b5aa53271f9&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [6]
>>>>>>>>>>>>>>>>>>>>> [7] [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [1]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b3214c9a-d5e409a4-b326687f-c400add0b6f2-b0f035d2a11fd9ff&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [7]
>>>>>>>>>>>>>>>>> [3]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=e9f097bc-8f35d282-e9f7b359-c400add0b6f2-c4743b7b59bdd01d&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [8]
>>>>>>>>>>>>>>>>> [4]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [9]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [3]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=12a32567-74666059-12a40182-c400add0b6f2-ae54406c5cb0daf0&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [9]
>>>>>>>>>>>>>>>>> [5]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [10]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [4]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=36fafe39-503fbb07-36fddadc-c400add0b6f2-6fafbb72a6d03376&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [10]
>>>>>>>>>>>>>>>>> [6]
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>> [11]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [5]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=f61eaf3f-90dbea01-f6198bda-c400add0b6f2-af89ff6354a1d166&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [11]
>>>>>>>>>>>>>>>>> [7]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [12]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [6]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=620d41e3-04c804dd-620a6506-c400add0b6f2-aa491b58f642012f&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [12]
>>>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [13]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [7]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>

>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=42df8291-241ac7af-42d8a674-c400add0b6f2-79b98e28ef7d1681&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [13]
>>>>>>>>>>>>>>>>> [9]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [14]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2fe87868-492d3d56-2fef5c8d-c400add0b6f2-cbb29ed8819504b6&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [14]
>>>>>>>>>>>>>>>>> [10]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [15]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Disclaimer
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> This e-mail may contain confidential and
>>>>>>> attorney-client
>>>>>>>>>>>>>>>>> privileged
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> material for the sole use of the intended recipient.
>>>>>>>>>>>>>>>>>>> Do
>>>>>>>> not
>>>>>>>>>>>>>>>>> accept
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> wiring instructions from us by email. If you are not
>>>>>>> the
>>>>>>>>>>>>>>>>> recipient,
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> you are hereby notified that any disclosure, copying,
>>>>>>>>>>>>>>>>> distribution
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>>> or taking action in relation of the contents of this
>>>>>>>>>>>>>>>>> information is
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> strictly prohibited and may be unlawful, please
>>>>>>>>>>>>>>>>>>> contact
>>>>>>>> the
>>>>>>>>>>>>>>>>> sender
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> and delete this e-mail.
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> This email has been scanned for viruses and malware,
>>>>>>> and
>>>>>>>> may
>>>>>>>>>>>>>>>>> have
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> been automatically archived by Mimecast Ltd, an
>>>>>>> innovator
>>>>>>>> in
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Software as a Service (SaaS) for business. Providing
>>>>>>>>>>>>>>>>>>> a
>>>>>>>> safer
>>>>>>>>>>>>>>>>> and
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> more useful place for your human generated data.
>>>>>>>> Specializing
>>>>>>>>>>>>>>>>> in;
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> Security, archiving and compliance. To find out more
>>>>>>> Click
>>>>>>>>>>>>>>>>>>> Here
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>> [16].
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [1] https://sparkmailapp.com/source?from=signature
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [2]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=255d2cc9-439869f7-255a082c-c400add0b6f2-ef3d6ebaede0607b&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [15]
>>>>>>>>>>>>>>>>> [11]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [3]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=58de74e3-3e1b31dd-58d95006-c400add0b6f2-c480a08ec262503a&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [16]
>>>>>>>>>>>>>>>>> [12]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [4]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b21c0063-d4d9455d-b21b2486-c400add0b6f2-a89226c8521b3cfb&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [17]
>>>>>>>>>>>>>>>>> [13]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [5]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=cc6968bb-aaac2d85-cc6e4c5e-c400add0b6f2-2e8d6cc528df355f&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [18]
>>>>>>>>>>>>>>>>> [14]
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>>> [6]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=a22959de-c4ec1ce0-a22e7d3b-c400add0b6f2-90df1e1e64bd4ff1&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [19]
>>>>>>>>>>>>>>>>> [15]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [7]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=9f3909c3-f9fc4cfd-9f3e2d26-c400add0b6f2-50b7993eed216485&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [20]
>>>>>>>>>>>>>>>>> [16]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b3214c9a-d5e409a4-b326687f-c400add0b6f2-b0f035d2a11fd9ff&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [7]
>>>>>>>>>>>>>>>>> [3]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [9]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>

>>>>>> https://protect2.fireeye.com/v1/url?k=e9f097bc-8f35d282-e9f7b359-c400add0b6f2-c4743b7b59bdd01d&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [8]
>>>>>>>>>>>>>>>>> [4]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [10]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=12a32567-74666059-12a40182-c400add0b6f2-ae54406c5cb0daf0&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [9]
>>>>>>>>>>>>>>>>> [5]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [11]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=36fafe39-503fbb07-36fddadc-c400add0b6f2-6fafbb72a6d03376&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [10]
>>>>>>>>>>>>>>>>> [6]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [12]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=f61eaf3f-90dbea01-f6198bda-c400add0b6f2-af89ff6354a1d166&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [11]
>>>>>>>>>>>>>>>>> [7]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [13]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=620d41e3-04c804dd-620a6506-c400add0b6f2-aa491b58f642012f&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [12]
>>>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [14]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=42df8291-241ac7af-42d8a674-c400add0b6f2-79b98e28ef7d1681&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [13]
>>>>>>>>>>>>>>>>> [9]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [15]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2fe87868-492d3d56-2fef5c8d-c400add0b6f2-cbb29ed8819504b6&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [14]
>>>>>>>>>>>>>>>>> [10]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>> [16]
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=1c82a97f-7a47ec41-1c858d9a-c400add0b6f2-92ca2cca7ec81edf&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [21]
>>>>>>>>>>>>>>>>> [17]
>>>>>>>>>>>>>>>

>>>>>>>>>>>>>>>
>>>>>>>>>>>>>>> Links:
>>>>>>>>>>>>>>> ------
>>>>>>>>>>>>>>> [1]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=5698ca81-33d4a3d3-569fee64-74fe4867716e-28d93030ca2e1c11&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [22]
>>>>>>>>>>>>>>> [2]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2137e668-447b8f27-2130c28d-74fe4868cd43-1f354b13c23ee39e&q=1&e=acab17db-132a-430a-a710-caa9d1ae50c8&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [23]
>>>>>>>>>>>>>>> [3]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b3214c9a-d5e409a4-b326687f-c400add0b6f2-b0f035d2a11fd9ff&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [7]
>>>>>>>>>>>>>>> [4]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=e9f097bc-8f35d282-e9f7b359-c400add0b6f2-c4743b7b59bdd01d&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [8]
>>>>>>>>>>>>>>> [5]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=12a32567-74666059-12a40182-c400add0b6f2-ae54406c5cb0daf0&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [9]
>>>>>>>>>>>>>>> [6]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=36fafe39-503fbb07-36fddadc-c400add0b6f2-6fafbb72a6d03376&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [10]
>>>>>>>>>>>>>>> [7]

>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=f61eaf3f-90dbea01-f6198bda-c400add0b6f2-af89ff6354a1d166&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [11]
>>>>>>>>>>>>>>> [8]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=620d41e3-04c804dd-620a6506-c400add0b6f2-aa491b58f642012f&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [12]
>>>>>>>>>>>>>>> [9]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=42df8291-241ac7af-42d8a674-c400add0b6f2-79b98e28ef7d1681&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [13]
>>>>>>>>>>>>>>> [10]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2fe87868-492d3d56-2fef5c8d-c400add0b6f2-cbb29ed8819504b6&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [14]
>>>>>>>>>>>>>>> [11]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=255d2cc9-439869f7-255a082c-c400add0b6f2-ef3d6ebaede0607b&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [15]
>>>>>>>>>>>>>>> [12]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=58de74e3-3e1b31dd-58d95006-c400add0b6f2-c480a08ec262503a&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [16]
>>>>>>>>>>>>>>> [13]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>

```
>>>>>> https://protect2.fireeye.com/v1/url?k=b21c0063-d4d9455d-b21b2486-c400add0b6f2-a89226c8521b3cfb&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [17]
>>>>>>>>>>>>>>> [14]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=cc6968bb-aaac2d85-cc6e4c5e-c400add0b6f2-2e8d6cc528df355f&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [18]
>>>>>>>>>>>>>>> [15]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=a22959de-c4ec1ce0-a22e7d3b-c400add0b6f2-90df1e1e64bd4ff1&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [19]
>>>>>>>>>>>>>>> [16]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=9f3909c3-f9fc4cfd-9f3e2d26-c400add0b6f2-50b7993eed216485&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [20]
>>>>>>>>>>>>>>> [17]
>>>>>>>>>>>>>>>
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=1c82a97f-7a47ec41-1c858d9a-c400add0b6f2-92ca2cca7ec81edf&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [21]
>>>>>>>>>>>>>>> [18] https://sparkmailapp.com/source?from=signature
>>>>>>>>
>>>>>>>> ============================================================
>>>>>>>> CONFIDENTIALITY NOTICE:
>>>>>>>> This electronic mail message and any attached files contain
>>>>>>>> information intended for the exclusive
>>>>>>>> use of the individual or entity to whom it is addressed and may
>>>>>>>> contain information that is
>>>>>>>> proprietary, privileged, confidential and/or exempt from
>>>>>>> disclosure
>>>>>>>> under applicable law. If you
>>>>>>>> are not the intended recipient, you are hereby notified that any
>>>>>>>> viewing, copying, disclosure or
>>>>>>>> distribution of this information may be subject to legal
>>>>>>> restriction
>>>>>>>> or sanction. Please notify
```

>>>>>>>> the sender, by electronic mail or telephone, of any unintended
>>>>>>>> recipients and delete the original
>>>>>>>> message without making any copies.
>>>>>>>> ============================================================
>>>>>>>> NOTIFICATION: Katten Muchin Rosenman LLP is an Illinois limited
>>>>>>>> liability partnership that has
>>>>>>>> elected to be governed by the Illinois Uniform Partnership Act
>>>>>>> (1997).
>>>>>>>>
>>>>>>>> ============================================================
>>>>>>>>
>>>>>>>>
>>>>>>>> Links:
>>>>>>>> ------
>>>>>>>> [1]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=27d1ab0d-429dc25f-27d68fe8-74fe4867716e-08c48172a4f75ca0&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [2]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=d7e8bd0a-b2a4d458-d7ef99ef-74fe4867716e-429552d0fc93fb87&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [3]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b4a86c6f-d1e4053d-b4af488a-74fe4867716e-51e0532dcd107cc3&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [4]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=686a9d19-0d26f44b-686db9fc-74fe4867716e-a368940ed31d1681&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [5]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=1256fbba-771a92e8-1251df5f-74fe4867716e-5a41341f986a8499&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [6]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b875bf00-dd39d652-b8729be5-74fe4867716e-a15d6b5aa53271f9&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [7]
>>>>>>>>

>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b3214c9a-d5e409a4-b326687f-c400add0b6f2-b0f035d2a11fd9ff&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [8]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=e9f097bc-8f35d282-e9f7b359-c400add0b6f2-c4743b7b59bdd01d&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [9]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=12a32567-74666059-12a40182-c400add0b6f2-ae54406c5cb0daf0&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [10]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=36fafe39-503fbb07-36fddadc-c400add0b6f2-6fafbb72a6d03376&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [11]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=f61eaf3f-90dbea01-f6198bda-c400add0b6f2-af89ff6354a1d166&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [12]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=620d41e3-04c804dd-620a6506-c400add0b6f2-aa491b58f642012f&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [13]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=42df8291-241ac7af-42d8a674-c400add0b6f2-79b98e28ef7d1681&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [14]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2fe87868-492d3d56-2fef5c8d-c400add0b6f2-cbb29ed8819504b6&q=1&e=08ea5c6d-8163-4e16-89b9-8f97a2c47e86&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [15]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=255d2cc9-439869f7-255a082c-c400add0b6f2-ef3d6ebaede0607b&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F

>>>>>>>> [16]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=58de74e3-3e1b31dd-58d95006-c400add0b6f2-c480a08ec262503a&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [17]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=b21c0063-d4d9455d-b21b2486-c400add0b6f2-a89226c8521b3cfb&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [18]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=cc6968bb-aaac2d85-cc6e4c5e-c400add0b6f2-2e8d6cc528df355f&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [19]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=a22959de-c4ec1ce0-a22e7d3b-c400add0b6f2-90df1e1e64bd4ff1&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [20]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=9f3909c3-f9fc4cfd-9f3e2d26-c400add0b6f2-50b7993eed216485&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [21]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=1c82a97f-7a47ec41-1c858d9a-c400add0b6f2-92ca2cca7ec81edf&q=1&e=a6705d1f-d38d-426b-88ff-6538cfab6e48&u=http%3A%2F%2Fwww.mimecast.com%2Fproducts%2F
>>>>>>>> [22]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=5698ca81-33d4a3d3-569fee64-74fe4867716e-28d93030ca2e1c11&q=1&e=390e473a-8f5f-4c98-a129-17549e1ff525&u=http%3A%2F%2Fwww.grierlaw.com%2F
>>>>>>>> [23]
>>>>>>>>
>>>>>>>
>>>>>> https://protect2.fireeye.com/v1/url?k=2137e668-447b8f27-2130c28d-74fe4868cd43-1f354b13c23ee39e&q=1&e=acab17db-132a-430a-a710-caa9d1ae50c8&u=http%3A%2F%2Fwww.grierlaw.com%2F

**Date:** Sat, 29 Aug 2026 07:50:50 -0400

**From:** Vramachandran <vramachandran@dhammalaw.com>

**To:** "Daniel (USANCW) Ryan" <daniel.ryan@usdoj.gov>

**Cc:** Barnesatty <barnesatty@aol.com>, "Lyndie (FRD) Freeman" <lyndie.freeman@usdoj.gov>, "Benjamin (USANCW) Bain-Creed" <benjamin.bain-creed@usdoj.gov>, Joe Grier <jgrier@grierlaw.com>, "Jeremy (FRD) Sanders" <jeremy.sanders@usdoj.gov>, "Dana (USANCW) Washington" <dana.washington@usdoj.gov>, Michael Martinez <mmartinez@grierlaw.com>, "Ryan J. Meyer" <ryan.meyer@katten.com>, "Brandon N. McCarthy" <brandon.mccarthy@katten.com>

**Subject:** Re: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

---

Dan and Jermey,

The government ( believe Dan Ryan) chose the special master. The government (Dan Ryan via edits) made him a receiver ( illegally and unconstitutionally with no basis in MVRA and the constitution)over the objections of the defendant with threats of filing with or without Lindberg.

Then tried to claim in a filing that Greg Lindberg wanted a receiver/special master. He did not. The government made the special master a part of the plea agreement. Then the government made the special master a receiver using characterizations in your email that had no basis in facts. Greg Lindberg wanted to retain control so that any dissipation was at fair market value. Then the government in a filing claimed Greg Lindberg wanted the special master as a receiver at the district court just two weeks ago. To claim consent that never existed to an illegal taking under the constitution and illegal appointment. With that filing the government breached the provisions of Hunter and other cases once again. I can’t recall how many other times this has happened.The government can hit hard but cannot play foul.

The government needs to give us all the ex parte communication. This filing from two weeks ago is an independent reason why we need that information.

You own the constitutional crisis. The defense is trying to document things so that the defendant Greg Lindberg does not end up with multiple punishments in the form of restitution again and again stemming from the mistakes of the government.

And part of that includes all ex parte communication to the special master and the other named entities in the list from the government being logged right now before it is dissipated.

On multiple punishments. Already Beckett plus Damovo is 1.5 Billion in losses.

Government taking a position that is contrary to DOJ policy in pre-restitution order interest is another few million dollars. In all that's one punishment even assuming the faulty figures which have never been verified because Defendant does not have the numbers. The email from Dan disclaims having the numbers yesterday in some part.

The second punishment was ClanWilliams was sold and the government (Dan Ryan) orally with Katten copied on this email on a weekly call/ phone call claimed it would allow Greg Lindbeg to argue for offsets at a price of $800 million. Similar promises by government (Dan Ryan) made on a phone call with Katten that NCICs loans would be offsets.

For all of the reasons above Defendant should have access to all ex parte communications the government had with the special master, Paladin, M3, NCICs, Mike Dinius, Wes Camden and the Mullin law firm. To preserve evidence that will be dissipated. Preservation so multiple criminal punishments can stop.

When this issue goes to the 4th circuit or the district court.

Jermey,

I have advised you multiple times about conflict. Here is a live example.

The government has been told via you that there are severe issues that cannot be ignored needing an internal government ethics review. The government just does not care to self-correct.

Defendant and his counsel have tried multiple times to bring awareness to this issue without success and need to get this on the record. After repeated failure.

Sincerely,

Vivek

>
> On Aug 29, 2026 at 3:31 AM, <Vramachandran (mailto:vramachandran@dhammalaw.com)> wrote:
>
>
>
>
>
> Dan,
>
>
>
> I will follow up every day until I get this from the government. Please give us all of the government's ex parte communications with the special master, Wes Camden, Williams Mullin, playing, NHC, NCICs and M3.
>
>
>
> Greg Lindberg has nothing to hide. We are happy to provide all data we shared with the special master. We did indeed share information. We never got back anything from any other party.
>
>

>
> Prosecutor all Brady/Gigilo info should be shared.
>
>
>
> Once again we don’t live in the USSR. We don’t have secret courts. We don’t send people to prison using confidential data that defense cannot get under the discovery order.
>
>
>
> Please follow MVRA and the constitution.
>
>
>
> Sincerely,
>
> Vivek
>
>
>
>
>
>
>
>
>
>
> >
> > On Aug 28, 2026 at 4:40 PM, <Vramachandran (mailto:vramachandran@dhammalaw.com)> wrote:
> >
> >
> >
> >
> > Dan
> >
> > Let me know when you are going to produce all the ex parte communications?
> >
> > You responded to the other email so let me know when you will product the ex parte emails?
> >
> > Sincerely,
> > Vivek
> >
> > Sent with Spark (https://sparkmailapp.com/source?from=signature)
> > On Aug 28, 2026 at 4:40 PM -0400, vramachandran@dhammalaw.com, wrote:
> >
> > >
> > >
> > > Dan

> > >
> > > Let me know when you are going to produce all the ex parte communications?
> > >
> > > You responded to the other email so let me know when you will product the ex parte emails?
> > >
> > > Sincerely,
> > > Vivek

**Date:** Sat, 29 Aug 2026 15:48:41 -0400

**From:** vramachandran@dhammalaw.com

**To:** "Daniel (USANCW) Ryan" <daniel.ryan@usdoj.gov>

**Cc:** Barnesatty <barnesatty@aol.com>, "Lyndie (FRD) Freeman" <lyndie.freeman@usdoj.gov>, "Benjamin (USANCW) Bain-Creed" <benjamin.bain-creed@usdoj.gov>, Joe Grier <jgrier@grierlaw.com>, "Jeremy (FRD) Sanders" <jeremy.sanders@usdoj.gov>, "Dana (USANCW) Washington" <dana.washington@usdoj.gov>, Michael Martinez <mmartinez@grierlaw.com>, "Ryan J. Meyer" <ryan.meyer@katten.com>, "Brandon N. McCarthy" <brandon.mccarthy@katten.com>

**Subject:** Re: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

---

Dan and Jermey,

I will talk to Greg Lindberg tomorrow. We will go through our messages and produce everything that was ever sent to the Special Master and Paladin. We do NOT have anything to hide. We will have our paralegal go through the messages and create a production set.

We expect the government to give us all of the message you ever send ex parte. In any case, we will file a motion to compel forthwith. It's not appropriate for a tribunal to be making decisions based on ex parte submissions. And in the case of the government in a criminal proceeding, that is fatal.

Thank you.

Sincerely,
Vivek

On 2026-08-29 07:50, Vramachandran wrote:
> Dan and Jermey,
>
> The government ( believe Dan Ryan) chose the special master. The
> government (Dan Ryan via edits) made him a receiver ( illegally and
> unconstitutionally with no basis in MVRA and the constitution)over the
> objections of the defendant with threats of filing with or without
> Lindberg.
>
> Then tried to claim in a filing that Greg Lindberg wanted a
> receiver/special master. He did not. The government made the special
> master a part of the plea agreement. Then the government made the
> special master a receiver using characterizations in your email that
> had no basis in facts. Greg Lindberg wanted to retain control so that
> any dissipation was at fair market value. Then the government in a
> filing claimed Greg Lindberg wanted the special master as a receiver
> at the district court just two weeks ago. To claim consent that never
> existed to an illegal taking under the constitution and illegal

> appointment. With that filing the government breached the provisions
> of Hunter and other cases once again. I can\u2019t recall how many other
> times this has happened.The government can hit hard but cannot play
> foul.
>
> The government needs to give us all the ex parte communication. This
> filing from two weeks ago is an independent reason why we need that
> information.
>
> You own the constitutional crisis. The defense is trying to document
> things so that the defendant Greg Lindberg does not end up with
> multiple punishments in the form of restitution again and again
> stemming from the mistakes of the government.
>
> And part of that includes all ex parte communication to the special
> master and the other named entities in the list from the government
> being logged right now before it is dissipated.
>
> On multiple punishments. Already Beckett plus Damovo is 1.5 Billion in
> losses.
>
> Government taking a position that is contrary to DOJ policy in
> pre-restitution order interest is another few million dollars. In all
> that\u2019s one punishment even assuming the faulty figures which have
> never been verified because Defendant does not have the numbers. The
> email from Dan disclaims having the numbers yesterday in some part.
>
> The second punishment was ClanWilliams was sold and the government
> (Dan Ryan) orally with Katten copied on this email on a weekly call/
> phone call claimed it would allow Greg Lindbeg to argue for offsets at
> a price of $800 million. Similar promises by government (Dan Ryan)
> made on a phone call with Katten that NCICs loans would be offsets.
>
> For all of the reasons above Defendant should have access to all ex
> parte communications the government had with the special master,
> Paladin, M3, NCICs, Mike Dinius, Wes Camden and the Mullin law firm.
> To preserve evidence that will be dissipated. Preservation so multiple
> criminal punishments can stop.
>
> When this issue goes to the 4th circuit or the district court.
>
> Jermey,
>
> I have advised you multiple times about conflict. Here is a live
> example.
>
> The government has been told via you that there are severe issues that
> cannot be ignored needing an internal government ethics review. The
> government just does not care to self-correct.
>
> Defendant and his counsel have tried multiple times to bring awareness
> to this issue without success and need to get this on the record.

> After repeated failure.
>
> Sincerely,
> Vivek
>
>> On Aug 29, 2026 at 3:31 AM, <Vramachandran> wrote:
>>
>> Dan,
>>
>> I will follow up every day until I get this from the government.
>> Please give us all of the government\u2019s ex parte communications
>> with the special master, Wes Camden, Williams Mullin, playing, NHC,
>> NCICs and M3.
>>
>> Greg Lindberg has nothing to hide. We are happy to provide all data
>> we shared with the special master. We did indeed share information.
>> We never got back anything from any other party.
>>
>> Prosecutor all Brady/Gigilo info should be shared.
>>
>> Once again we don\u2019t live in the USSR. We don\u2019t have secret
>> courts. We don\u2019t send people to prison using confidential data
>> that defense cannot get under the discovery order.
>>
>> Please follow MVRA and the constitution.
>>
>> Sincerely,
>> Vivek
>>
>> On Aug 28, 2026 at 4:40 PM, <Vramachandran> wrote:
>>
>> Dan
>>
>> Let me know when you are going to produce all the ex parte
>> communications?
>>
>> You responded to the other email so let me know when you will
>> product the ex parte emails?
>>
>> Sincerely,
>> Vivek
>>
>> Sent with Spark [1]
>> On Aug 28, 2026 at 4:40\u202fPM -0400, vramachandran@dhammalaw.com,
>> wrote:
>>
>> Dan
>>
>> Let me know when you are going to produce all the ex parte
>> communications?
>>
>> You responded to the other email so let me know when you will

```
>> product the ex parte emails?
>>
>> Sincerely,
>> Vivek
>
>
> Links:
> ------
> [1] https://sparkmailapp.com/source?from=signature
```

**Date:** Sun, 30 Aug 2026 16:55:47 -0400

**From:** vramachandran@dhammalaw.com

**To:** "Daniel (USANCW) Ryan" <daniel.ryan@usdoj.gov>

**Cc:** Barnesatty <barnesatty@aol.com>, "Lyndie (FRD) Freeman" <lyndie.freeman@usdoj.gov>, "Benjamin (USANCW) Bain-Creed" <benjamin.bain-creed@usdoj.gov>, Joe Grier <jgrier@grierlaw.com>, "Jeremy (FRD) Sanders" <jeremy.sanders@usdoj.gov>, "Dana (USANCW) Washington" <dana.washington@usdoj.gov>, Michael Martinez <mmartinez@grierlaw.com>, "Ryan J. Meyer" <ryan.meyer@katten.com>, "Brandon N. McCarthy" <brandon.mccarthy@katten.com>

**Subject:** Re: [EXTERNAL] Re: Draft Final Supplement to Restitution Report

---

Jermey,

The reason it should goto up the chain in the DOJ. What was the government representative at the distirct court an in front of the tribunal doing in light of extensive ex-parte communications from M3, NHC, NCICs, Wes Camden, Willams Mullen law firm, Mike Dinius which directly affect the $1.6 Billion restitution?

Why did the government not goto the Judge and let the Judge know about the ex parte communication that was the norm here from everyone. I am still flummoxed having realized the entire proceeding was fundamentally flawed at such a basic level in a criminal proceeding? I was here looking at the constitution and everything else. Judge Rader chief judge of the Federal Circuit had to resign after just one ex-parte contact for something innocuous. Here the contact seems to be so extensive, with no access to any of that data available to the Defendant that I don't know what to make of this.

Why did the government think it was ok to engage in it's own ex parte communications for months on end with a tribunal in a criminal proceedings?

You need to get someone else to look into this so that the government can at least do the right thing moving forward.

Sincerely,
Vivek

On 2026-08-30 16:39, vramachandran@dhammalaw.com wrote:
> Jermey,
>
> This should goto ODAG.
>
> Sincerely,
> Vivek
>

> Dan and Jermey,
>
> Additionally, counsel is unsure what the position of the government
> is:
>
> There are numerous submissions that were entirely ex parte from M3,
> NHC, NCICs, Wes Camden, Willams Mullen law firm, Mike Dinius which
> directly affect the $1.6 Billion restitution or forfiture that were
> never provided to Defendant. Moreover, since these were provided to
> the forum ex parte.
>
> It's like the government which is the party with the burden of proof
> is asking us to ask a tribunal for information that it used to arrive
> at a decision. Since the submissions themselves were ex parte, none of
> this was ever properly before the tribunal. Finally, even if it was
> before a the tribunal, Defendant has never had the ability to test the
> data because it was never shared with the defendant. As already
> provided former counsel and current counsel have looked for all the
> requests and shown when each request was made.
>
> To the extent, government is adopting the results of this ex parte
> data from M3, NHC, NCICs, Wes Camden, Willams Mullen law firm, Mike
> Dinius which directly affect the $1.6 Billion restitution or
> forfeiture, it's the government's burden to give us this information.
> Asking us to go ask a tribunal is a weird position under the law for
> the government in an MVRA dispute. Unless you claim the special master
> is a paid prosecutor.
>
> The government has to disclose all ex parte communication with the
> special master M3, NHC, NCICs, Wes Camden, Willams Mullen law firm
> and/or Mike Dinius. It's independently fatal.
>
> Finally, the Defendant is in a position where it has to petition the
> Judge Cogburn here to give us information from someone in the shoes of
> Magistrate Keesler, because the submissions were made ex parte to
> Magistrate Keesler. This is just not constitutional in a criminal
> proceeding. I don't see how the government gets around ex parte data
> from M3, NHC, NCICs, Wes Camden, Willams Mullen law firm, Mike Dinius
> which directly affect the $1.6 Billion restitution or forfeiture, it's
> the government's burden. For example, NCICs numbers on losses drove
> the restitution 1.6 billion. Similarly, Mike Dinius's numbers drove
> the 1.6 Billion restitution calculations themselves. Each of the 54
> identified categories is related to 1.6 Billion in restitution itself
> or the forfiture.
>
> On the straw man argument the government (Dan Ryan) threw up to
> mislead the court and the 4th circuit:
>
> I spoke to Greg Lindberg today:
>   (i) Greg Lindberg has made a handful of submissions to the financial
> advisor to the special master (all of the memos had a cc to the
> special master from his email. All were addressed to the tribunal

> (e.g., with a cc to the special master) and all of which are for
> release to everyone and to the general public. He did not mark Dan
> Ryan or any other government attorney because he was represented by
> counsel and was not sure he could copy the government attorney on
> these submissions.
> (ii) Greg Lindberg has no issues with submissions to the tribunal
> (special master and his advisors) being given to the government and it
> was always his intention that all of these be available publicly and
> to the government.
> (iii) Current counsel will forward every email that was sent to the
> tribunal (special master or his advisor) from Greg Lindberg's email to
> the government because none of these were submitted in secret and were
> for wider distribution. There are a handful. All of these were on
> information and belief of Greg Lindberg made available to the
> government at the time through the tribunal and have since been used
> by the government and tribunal in their analysis. In some instances,
> Dan Ryan remarked that Greg Lindberg has given more data than the
> NCICs have while claiming to be a victim.
> (iv) Everything else referenced in the chronology, were based on
> weekly calls and follow ups for data from those weekly calls that is
> still the government's responsibility to produce. None of these are ex
> parte.
> (v) Other than these here is no non-privileged emails that Greg
> Lindberg has of any ex parte submissions.
> (vi) To the extent government claims something else is ex parte,
> current counsel are happy to go look at them but our research over the
> last two days did not turn up anything that Greg Lindberg has other
> than the handful of emails.
>
> Sincerely,
> Vivek
>
> On 2026-08-29 15:48, vramachandran@dhammalaw.com wrote:
>
>> Dan and Jermey,
>>
>> I will talk to Greg Lindberg tomorrow. We will go through our
>> messages and produce everything that was ever sent to the Special
>> Master and Paladin. We do NOT have anything to hide. We will have
>> our paralegal go through the messages and create a production set.
>>
>> We expect the government to give us all of the message you ever send
>> ex parte. In any case, we will file a motion to compel forthwith.
>> It's not appropriate for a tribunal to be making decisions based on
>> ex parte submissions. And in the case of the government in a
>> criminal proceeding, that is fatal.
>>
>> Thank you.
>>
>> Sincerely,
>> Vivek
>>

```
>> On 2026-08-29 07:50, Vramachandran wrote: Dan and Jermey,
>>
>> The government ( believe Dan Ryan) chose the special master. The
>> government (Dan Ryan via edits) made him a receiver ( illegally and
>> unconstitutionally with no basis in MVRA and the constitution)over
>> the
>> objections of the defendant with threats of filing with or without
>> Lindberg.
>>
>> Then tried to claim in a filing that Greg Lindberg wanted a
>> receiver/special master. He did not. The government made the special
>> master a part of the plea agreement. Then the government made the
>> special master a receiver using characterizations in your email that
>> had no basis in facts. Greg Lindberg wanted to retain control so
>> that
>> any dissipation was at fair market value. Then the government in a
>> filing claimed Greg Lindberg wanted the special master as a receiver
>> at the district court just two weeks ago. To claim consent that
>> never
>> existed to an illegal taking under the constitution and illegal
>> appointment. With that filing the government breached the provisions
>> of Hunter and other cases once again. I can't recall how many other
>> times this has happened.The government can hit hard but cannot play
>> foul.
>>
>> The government needs to give us all the ex parte communication. This
>> filing from two weeks ago is an independent reason why we need that
>> information.
>>
>> You own the constitutional crisis. The defense is trying to document
>> things so that the defendant Greg Lindberg does not end up with
>> multiple punishments in the form of restitution again and again
>> stemming from the mistakes of the government.
>>
>> And part of that includes all ex parte communication to the special
>> master and the other named entities in the list from the government
>> being logged right now before it is dissipated.
>>
>> On multiple punishments. Already Beckett plus Damovo is 1.5 Billion
>> in
>> losses.
>>
>> Government taking a position that is contrary to DOJ policy in
>> pre-restitution order interest is another few million dollars. In
>> all
>> that's one punishment even assuming the faulty figures which have
>> never been verified because Defendant does not have the numbers. The
>> email from Dan disclaims having the numbers yesterday in some part.
>>
>> The second punishment was ClanWilliams was sold and the government
>> (Dan Ryan) orally with Katten copied on this email on a weekly call/
>> phone call claimed it would allow Greg Lindbeg to argue for offsets
```

>> at
>> a price of $800 million. Similar promises by government (Dan Ryan)
>> made on a phone call with Katten that NCICs loans would be offsets.
>>
>> For all of the reasons above Defendant should have access to all ex
>> parte communications the government had with the special master,
>> Paladin, M3, NCICs, Mike Dinius, Wes Camden and the Mullin law firm.
>> To preserve evidence that will be dissipated. Preservation so
>> multiple
>> criminal punishments can stop.
>>
>> When this issue goes to the 4th circuit or the district court.
>>
>> Jermey,
>>
>> I have advised you multiple times about conflict. Here is a live
>> example.
>>
>> The government has been told via you that there are severe issues
>> that
>> cannot be ignored needing an internal government ethics review. The
>> government just does not care to self-correct.
>>
>> Defendant and his counsel have tried multiple times to bring
>> awareness
>> to this issue without success and need to get this on the record.
>> After repeated failure.
>>
>> Sincerely,
>> Vivek
>>
>> On Aug 29, 2026 at 3:31 AM, <Vramachandran> wrote:
>>
>> Dan,
>>
>> I will follow up every day until I get this from the government.
>> Please give us all of the government's ex parte communications
>> with the special master, Wes Camden, Williams Mullin, playing, NHC,
>> NCICs and M3.
>>
>> Greg Lindberg has nothing to hide. We are happy to provide all data
>> we shared with the special master. We did indeed share information.
>> We never got back anything from any other party.
>>
>> Prosecutor all Brady/Gigilo info should be shared.
>>
>> Once again we don't live in the USSR. We don't have secret
>> courts. We don't send people to prison using confidential data
>> that defense cannot get under the discovery order.
>>
>> Please follow MVRA and the constitution.
>>

>> Sincerely,
>> Vivek
>>
>> On Aug 28, 2026 at 4:40 PM, <Vramachandran> wrote:
>>
>> Dan
>>
>> Let me know when you are going to produce all the ex parte
>> communications?
>>
>> You responded to the other email so let me know when you will
>> product the ex parte emails?
>>
>> Sincerely,
>> Vivek
>>
>> Sent with Spark [1 [1]]
>> On Aug 28, 2026 at 4:40\u202fPM -0400, vramachandran@dhammalaw.com,
>> wrote:
>>
>> Dan
>>
>> Let me know when you are going to produce all the ex parte
>> communications?
>>
>> You responded to the other email so let me know when you will
>> product the ex parte emails?
>>
>> Sincerely,
>> Vivek
>>
>> Links:
>> ------
>> [1] https://sparkmailapp.com/source?from=signature
>
>
> Links:
> ------
> [1] https://sparkmailapp.com/source?from=signature